UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SUSAN LEVY,

               Plaintiff,

              -against-

BASF METALS LIMITED, BASF CORPORATION,
GOLDMAN SACHS INTERNATIONAL,
GOLDMAN SACHS GROUP, INC. GOLDMAN
SACHS & CO., GOLDMAN SACHS EXECUTION
& CLEARING, LP  HSBC BANK USA, NA, ICBC
STANDARD BANK PLC, UBS AG, UBS
SECURITIES LLC,  LONDON PLATINUM AND
PALLADIUM FIXING COMPANY LTD.; John Does
#1-20.

              Defendants.
-----------------------------------------------------------------x

**AMENDED
VERIFIED COMPLAINT**

JURY TRIAL DEMANDED

15-cv-7317 (GHW)

Related to

15-CV-9319 (GHW)

# TABLE OF CONTENTS

**Page**

EXHIBIT LIST.................................................................................................................v

SUMMARY OF ALLEGATIONS.....................................................................................1

PARTIES........................................................................................................................14

Plaintiff..........................................................................................................................14

Defendants......................................................................................................................14

JURISDICTION AND VENUE.......................................................................................21

FACTUAL ALLEGATIONS............................................................................................22

The Platinum and Palladium Physical and Futures Market.............................................22

NYMEX Platinum and Palladium-Based Financial Products...........................................23

The Relevant Market For NYMEX Palladium Futures Contracts....................................26

Physical Platinum and Palladium Markets......................................................................28

Interrelationship between the Spot and Futures Markets For Platinum and Palladium.............29

The NYMEX restricts the Number of Contracts a Market Participant Can Own......................30

THE PLATINUM AND PALLADIUM FIXING PROCESS/
THE PLATINUM AND PALLADIUM AUCTION PROCESS.................................................31

All Defendants Had the Ability to Fix the Prices of NYMEX Platinum and
Move The Market For NYMEX Platinum in the Direction each Defendant Desired................38

The Auctioneer defendants, UBS AG and the FCM defendants were Horizontal
Competitors for Spot and NYMEX Platinum and Palladium And Together
Had the Ability to Combine and Conspire to Set Prices During the Relevant
Time Period.....................................................................................................................42

Defendants' Conduct was Intentional..............................................................................43

DEFENDANTS' PRICE FIXING CONDUCT IN THE PHYSICAL MARKET

IN LONDON CAUSED PRICE ARTIFICIALITY IN THE 2008 NYMEX FUTURES
CONTRACT AND IN OTHER NYMEX CONTRACTS THROUGHOUT THE
RELEVANT TIME PERIOD........................................................................................................47

Because the rise in demand for Platinum was due to defendants' and other
financial institutions making large investments in these metals just to move the
market and for no commercial uses, and the actual use of Platinum did not
increase enough to justify the large price increases during the relevant time frame, an
inference of causation of artificiality can be drawn based on the large increases in
historical prices...........................................................................................................................50

Because Experts have identified Aberrant Price Movements in Platinum Prices
Between 2008 and 2014 at the time of the Fixes where prices spiked around the Fixes,
and such movements cannot be explained by the legitimate forces of supply and demand, an
inference of causation of artificial prices is established.................................................................53

A.      Sample Price Charts from Specific Days Demonstrate Anomalous
        Activity Around And During the Platinum and Palladium Fixings...................................60

B.      Because Experts have identified Aberrant Price Movements in
        Platinum Prices Between 2008 and 2014 that cannot be explained by
        the legitimate forces of supply and demand, an inference of causation of
        Artificial Prices Is Established.........................................................................................68

C.      Analyses of Palladium Prices around the Platinum and Palladium
        Fixings Also Reveal Similar Anomalous Movements........................................................78

Plaintiff was Injured and Caused to Sustain Actual Losses as Well As Lost
Profits as a direct result of her ownership of NYMEX Platinum Futures Contracts
during the relevant time period...................................................................................................81

FRAUDULENT CONCEALMENT...............................................................................................83

CAUSES OF ACTION..................................................................................................................85
        COUNT I

        MARKET MANIPULATION IN VIOLATION OF THE COMMODITIES
        EXCHANGE ACT 7 U.S.C. § 1 Et. Seq., 17 C.F.R. § 339(d) ...............................................85

        COUNT II

        DEFENDANTS MADE FALSE, MISLEADING OR KNOWINGLY
        INACCURATE FALSE AND/OR MISLEADING REPORTS CON-
        CERNING THE PRICES OF 2008 NYMEX Platinum IN VIOLATION

OF SECTION CEA §6© OF THE ACT, 7 U.S.C.§9(1)(a),(2)(B), and
7 U.S.C.§6b(a)(2)(B) and 7 U.S.C.§6(c)(2)(B)(Against all defendants)...............................86

COUNT III

VIOLATION OF THE ANTI-FRAUD PROVISIONS OF THE CEA
7 U.S.C. §6, ET. SEQ. VIOLATIONS OF 7 U.S.C.§6(b)(2)(a)-Cheating.........................87

COUNT IV

VICARIOUS LIABILITY....................................................................................................88

COUNT V

VIOLATIONS OF THE ANTITRUST LAWS, 15 U.S.C.§1,§2 AS WELL
AS N.Y. GENERAL BUSINESS LAW §340, Et. Seq. (THE DONNELLY
ACT) (Against All Defendants).........................................................................................89

COUNT VI

VIOLATIONS OF THE RACKETEERING INFLUENCED AND CORRUPT
ORGANIZATION ACT, 18 U.S.C.§§ 1961 ET. SEQ. AND 18 U.S.C. §§ 1962
(a)(b)©...............................................................................................................................96

COUNT VII

AIDING AND ABETTING-THE FEDERAL LAW CLAIMS 7 U.S.C.
§25(a) and 13(c)(a)..........................................................................................................106

COUNT VIII

FRAUDULENT CONCEALMENT and EQUITABLE TOLLING..............................107

COUNT IX

UNJUST ENRICHMENT...................................................................................................108

COUNT X
INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (Against
All Defendants)...............................................................................................................110

COUNT XI

PUNITIVE DAMAGES.....................................................................................................111

JURY DEMAND...........................................................................................................................112

DAMAGES AND OTHER RELIEF.............................................................................................112

## EXHIBIT LIST

Bank Platinum and Palladium Futures Positions...........................................................Exhibit 1

Historical Prices of Spot Platinum from 1969 to 2014..................................................Exhibit 2

Article dated June 26, 2014 relating to Settlement in the
Forex Antitrust Litigation for $234.5 Million Dollars...................................................Exhibit 3

FINRA Press Release Relating to Goldman Sachs Execution
& Clearing, L.P. for $ 1.8 Million Dollars Dated July 27, 2015...................................Exhibit 4

Platinum Supply and Demand Charts from 2004-2013....................................................Exhibit 5

NYMEX Platinum Contracts Expiring in 2008
including open interests in Electronic and Pit trading.......................................................Exhibit 6

Chart Demonstrating Platinum and Palladium as
Sister Metals moving in Tandem in the Spot and Future Markets....................................Exhibit 7

FINRA Press Release relating to a $22 Million Dollar
Fine for Goldman Sachs & Co.'s failure to supervise its
Traders who shared Confidential Information in Trading Huddles...................................Exhibit 8

Financial Times Press Release Showing that
Spoofing (in an unrelated case) is Felonious Conduct worthy of
an U.S. Indictment, even if the conduct was committed in England..................................Exhibit 9

News Articles from 2008 demonstrating that Platinum Futures were
supposed to go to $2500 per ounce by year end 2008 based on
Fundamental Analysis.....................................................................................................Exhibit 10

Dispersion of Anomalies Before the Fixing Calls and
After the Fixing Calls During the Relevant Time Period............................................... Exhibit 11

Platinum Futures Prices on November 5, 2009 and
Relative Fluctuations of Platinum Futures
Prices and Indices on November 5, 2009........................................................................Exhibit 12

Normalized Platinum Futures Price and Rolling Forecast Errors, 10/07-09/14...............Exhibit 13

NYMEX Futures Trading Volume Jan 2007 through November 2014.............................Exhibit 14

Summary of Evidence Indicating Collusive Manipulation
of Platinum and Palladium Prices Around the AM and PM Fixings................................ Exhibit 15

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SUSAN LEVY,

                   Plaintiff,

            -against-

BASF METALS LIMITED, BASF CORPORATION,
GOLDMAN SACHS INTERNATIONAL,
GOLDMAN SACHS GROUP, INC. GOLDMAN
SACHS & CO., GOLDMAN SACHS EXECUTION
& CLEARING, LP  HSBC BANK USA, NA, ICBC
STANDARD BANK PLC, UBS AG, UBS
SECURITIES LLC,  LONDON PLATINUM AND
PALLADIUM FIXING COMPANY LTD.; John Does
#1-20.

                Defendants.
-------------------------------------------------------------x

**AMENDED**
**VERIFIED COMPLAINT**

JURY TRIAL DEMANDED

15-cv-7317 (GHW)

Related to

15-CV-9319 (GHW)

      Plaintiff, Susan Levy,     proceeding pro se complains upon knowledge with

respect to allegations regarding herself and her losses in the NYMEX Platinum market and upon

information and belief as to all other allegations and parties as follows:

## SUMMARY OF ALLEGATIONS

**Manipulation, Price Fixing and Racketeering Scheme ("The Scheme") to Artificially inflate and/or deflate the price  NYMEX Platinum Futures Contracts from at least January, 2008 through December, 2014. ("The Relevant Time Period")**

1. Between at least January, 2008 and December, 2014, ("The Relevant Time Period"

herein after) defendants on behalf of themselves and their principals conspired to and did engage

in a Scheme to manipulate and thereby fix the prices the NYMEX Platinum Futures contract

("NYMEX Platinum" hereinafter) during the relevant time period.

2. Defendants accomplished their Scheme by means of a variety of acts and practices that

were intended to and did manipulate the settlement prices and closing prices of the NYMEX

Platinum Futures contracts for the 2008 contracts expiring in January 2008, April, 2008, July

2008, and October, 2008. (NYMEX Platinum), and other contracts through 2014.

3. This Scheme consisted of several different types of manipulative conduct which alone

or in combination were intended to and did cause the prices of NYMEX Platinum to become

artificial and out-of-line with the normal market prices dictated by the fundamentals of supply

and demand during the relevant time period. *See Summary of Maniuplative conduct* annexed

hereto as Exhibit 15.

4. As a result, this Scheme caused uneconomic factors to artificially inflate and/or

deflate the prices of NYMEX Platinum in violation of *inter alia* Sections 6©, 6(d) and 9(a)(2) of

te Commodity Exchange Act ("the Act".) 7 U.S.C. §§ 9, 15, 13(b) an d 13(a)(2) (1994), as

amended by the Commodity Futures Modernization Act of 2000 as well as Sections 1 and 2 of

the Sherman Act, 15 U.S.C.§§ 1, 2, and Sections 1961 snf 1962 of RICO Act 18 U.S.C.§§ 1961

Et. Seq., as well as Pendant State Law Claims.

5. All defendants, their co-conspirators and aiders and abettors acted with intent,

knowledge, bad faith and/or constructive bad faith based on extreme arbitrariness.

Defendants Scheme had consisted of two parts:

A. **Manipulative Step One**: Artificially fix the prices of Physical (Spot)

-2-

Platinum and Palladium in London, England during a contrived and false auction

process which necessarily also artificially fixed prices of Platinum on the

NYMEX futures Exchange and then,

**B. Manipulative Step Two**: Take positions on the NYMEX Exchange in

Platinum and Palladium contracts that would be profitable knowing where prices

were moving, since defendants artificially set the prices themselves.

6. Both Manipulative Steps One and Two were accomplished by continuously

conspiring with co-defendants and other market participants John Does # 1-20 who are presently

unknown to Plaintiff, but well-known to defendants, to determine where the prices were going

and how they would be set to ensure profitability for themselves and their co-conspirators.

7. This manipulative Scheme was also accomplished by a variety of illegal

conduct including *inter alia:* (1) slamming the fix and banging the fix transactions which are per

se manipulative; (2) disclosure of non-public information among defendants who were in fact

horizontal competitors constituting collusion, (2) front running orders, (3) painting the screen

(spoofing), and (4) wash sales.

8. As a result of this Scheme defendants did not have to bear any of the risk of

investing in the NYMEX Platinum Market, since they knowingly set the prices and knew where

the prices would be headed.

9. Also as a result of this manipulative scheme there was no more competitive

market in NYMEX Platinum and Palladium during the relevant time frame. The entire market

became a farse during the relevant time frame and the legitimate forces of supply and demand

were reduced to a nullity and overwhelmed by market manipulation allowing defendants to take

-3-

positions to their advantage, since they set the prices themselves and knowing where the prices were headed on a twice daily basis as a result of the LPPFC/LPPM's fixing process.[1]

10. The activity in Manipulative Step one required collusion between and among the defendants and/or other market participant-co-conspirators in violation of the Sherman Act Section 1 as well.

11. For example, the large market participants in the Physical Market in London, England had to come together to decide who would buy in the cash market and who would sell. The Fixing Chair would allocate on a pro rata basis up to 4000 troy ounces of Physical Platinum (an enormous amount) among defendants and other co-conspirators to effectively set the prices at the levels pre-determined and desired by the fixing defendants.

12. This step of pro rating amounts of physical platinum to be purchased and sold up to 4000 troy ounces between defendants and other co-conspirators without any fundamental reason linked to supply and demand and notwithstanding that such defendants and co-conspirators and had no interest or need for buying or selling platinum, raises a presumption that the only reason for these forced sales by the fixing defendants were to move the market in the desired direction of the manipulators and constitutes manipulation per se.

13. These coordinated sales were necessary since the coordinated sales to each other was one important manipulative step used to move the NYMEX Platinum market. Once

---

[1] While this Platinum and Palladium Fixing is happening some of the same defendants are allegedly also rigging Libor, rigging Forex prices and allegedly moving aluminum around warehouses to also shift prices; *See In Re Foreign Exchange Benchmark Rates Antitrust Litiga* 1:13-cv-07789-LGS, Doc. #242;*Guarantee Bank and Trust Co. v. Credit Swiss Group, Ag, et.al.*, 1:13-cv00346-UA Doc. #1. It calls for immediate action by regulators and law enforcement, not by private litigants seeking compensation.

-4-

that decision was collusively made, the auction process would proceed and the bids would be called, and this farse would begin.

14. Because commodities trading as well as trading in the spot market is a zero-sum game, and for every market participant who profits another necessarily loses; a necessary step in this manipulative scheme was to voluntarily assume temporary losses in the physical market in London to then reap enormous profits in the NYMEX Market thus making up for temporary losses in the London Fix.

15. For example, to spread the responsibility, one of the co-conspirator defendants would have to sustain losses at the London Fixing Auction by selling off physical Platinum and/or Palladium in its inventory to push prices down, if that is the direction that the cartel wanted to move the price. Shortly thereafter, that same defendant would make back its temporary losses and reap enormous profits in addition by simply shorting Platinum NYMEX contracts in New York on the NYMEX exchange which necessarily fell in value after the London fixing auction which set the prices in these two inextricably linked markets.[2]

─────────────

[2] The instant scheme presented in sustaining initial losses in one related market to gain extraordinary profits in another closely related market presents a classic case of market manipulation, since as a necessary factor, both markets move in sync as in this case. See In re Amaranth Natural Gas Commodities Litigation, 587 F. Supp 2d 513, 524 (S.D.N.Y. 2008)(Plaintiffs established prima facie case for CEA market manipulation based on slamming the close of Natural Gas Contracts in the NYMEX market thus decreasing prices while simaltaneously profiting on a short position in swaps traded on the Intercontinental Exchange and elsewhere that was substantially larger than its long futures position on the NYMEX); see also, In Re Crude Oil Commodities Future Litigation, 913 F. Supp. 2d 41 (S.D.N.Y 2012)(Market Manipulation and Monopolization claims were proper where defendants allegedly purchased large quantities of NYMEX spread contracts to move the prices of NYMEX Oil Futures Contracts and by also buying a dominant position in the physical oil market, while also acquiring a substantial short position in March/April 2008 NYMEX WTI Calendar Spreads to gain extraordinary profits.")

Because these defendants had absolutely no fundamental economic reasons to

16. Because members of the investing public such as Ms. Levy were also investing in these markets based on their fundamental research linked to the legitimate forces of supply and demand, rather than defendants' Racketeering scheme, members of the investing public including Plaintiff, Ms. Levy, were caused to sustain heavy financial losses.

17. Most or all of the defendants, held themselves out as dealers in Platinum and Palladium, but were actually self-dealing. Defendants were predominatly financial services companies and themselves and their co-conspirators had no commercial interest or use for owning or buying such large quantities of physical platinum and palladium, other than to hoard it or dump it with an unlawful intent to move prices, the **only** reason for these "discretionary" buy and sell orders at the Fixing Auction by the market-making defendants was illegal which is to move the prices in the direction that defendants wanted these prices to move.

18. Even assuming arguendo that such outrageous conduct was technically legal in London, England, and there is no evidence that it was legal in Great Britain; the moment that one NYMEX Futures Contract moved in value due to the manipulated price movements in the Physical Platinum Markets in London, (which is inevitable since these two markets are inextricably linked in value) a violation of the laws of the United States occurred invoking the jurisdiction of the United States, since the NYMEX Contracts are traded in New York County.

19. Indeed, because defendants were only allowed to own up to 25 contracts in NYMEX Platinun and 25 contracts in NYMEX Palladium at one time, they also appear to have been in violation of position limits imposed by the NYMEX exchange during the relevant time

---

make these purchases and sales of commodities in both the physical and futures markets except to move prices in a desired direct, the conduct was held to be per se manipulative, as it appears to be in the case at bar as well.

-6-

period also showing rank manipulation. See Charts annexed hereto as Exhibit1.

20. Because selling pressure decreases prices and buying pressure increases prices, especially so in a market as illiquid as Platinum, the collusive decision as to who would purchase and sell Platinum and Palladium at the London Fixing Auctions had to be decided as part of this collusive Scheme.

21. In addition, because the fixing defendants had control of the tainted auction process, these defendants could also use legitimate market orders that were placed through them to move the markets intentionally as well by bunching these legitimate orders and placing them all at once at the time of the PM fix which effectively acted to slam the fix.

22. Slamming the Fix is per se manipulative and unlawful, because such conduct is done intentionally to move prices.

23. The findings of the Class Action Experts described in their Class Action Complaint which are fully incorporated by reference herein and made a part hereof clearly show anomolous movements of the prices of Platinum and Palladium during the Fixing windows that are out-of-line with normal statistical price movements and which had no logical explanation in the macroeconomic environment. According to these experts and others, up to 80% of the time, the prices of Platinum and Palladium fell in price during the fixing period and up to 30% of the time rose in value. However, absent any legitimate forces of supply and demand moving these prices, reflected in news reports, there was no reason for any price movement during the fixes, other than manipulation.

24. Such uncontroverted statistics clearly support a finding of price manipulation based on slamming the fix up to 80% of the time and banging the fix approximately 20 to 30 %

of the time. Such clear and uncontroverted dispersions from the norm show slamming of the fix and banging the fix transactions and therefore manipulative conduct per se.[3]

25. Because the Physical market in London is much smaller than the NYMEX market in New York where members of the investing public such as Ms. Levy had access to investments, the enormous profits were made by these defendants by trading over the N YMEX not in the London Spot Market, after manipulating the physical market in London.

26. Since 2011 the NYMEX market for Platinum was approximately 100 billion dollars per year during the relevant time frame; where as the Physical Market in London represented approximately 13 billion dollars per year of Platinum sales.

27. Thus, the conspirators knew that they would sustain monetary losses by having to sell Platinum to each other, for no economic reason other than to move prices, and their only hope of gaining large profits was by luring unwitting members of the investing public such as Ms. Levy and others into the market for NYMEX Platinum contracts.

28. Such market participants such as Ms. Levy were trying to save for retirement and relying on fundamental research to make sound investments in the NYMEX Platinum market which at the time was open to members of the investing public, unlike the auction process or Fixings in London which was part of the "old boys" network.

---

[3]Slamming the Fix is a new term just coined in this Complaint to describe this situation at hand and is extremely similar to Slamming the Close. Slamming the Close is a term of art used to describe a per se manipulative situation where actors have manipulated the price of a futures contract traded on the NYMEX by waiting until the close or the last few minutes of trading to place large sell orders on the NYMEX to artificially move prices in a downward direction. The Courts have well-recognized that by timing the market without any other legitimate reason other than to move prices is prima facie manipulative. See In Re Amaranth, 587 F. Supp. 2d 513 (S.D.N.Y. 2008.)

-8-

29. Knowing that commodities futures investing is a zero-sum game, and for every contract participant who gains profits, another necessarily loses; defendants knowingly conducted this Scheme whereby they could only profit by inflicting severe losses on the non-manipulators such as Ms. Levy and other who would be relying on fundamental analysis based on the legitimate forces of supply and demand to take positions in the NYMEX market.

30. Such trickery is unspeakable, since people such as Ms. Levy were losing their life savings at the hands of these manipulators.

31. Indeed, because defendants' unlawful and manipulative Scheme completely overwhelmed the fundamentals of supply and demand which is supposed to dictate market prices, not collusion and manipulation; Ms. Levy experienced a total collapse of her investments due to this manipulated market in the summer of 2008.

32. The total collapse of the NYMEX Platinum Market in the last two quarters of 2008 had nothing to do with the Financial Melt Down because Platinum futures like Gold was a safe haven for investors and under fundamental analysis Platinum should have been going up in value instead of plummeting as it were. Thus going into Q4- 2008. Gold was surging and so should too Platinum have been soaring. Instead, while gold prices were rising seismically in the heart of the economic meltdown, Platinum was tanking severely not rising.

33. Indeed, in 2008, Platinum prices dropped from an all time high of approximately $2100 per troy ounce in Q2 of 2008 to approximately $900 per troy ounce by year end 2008. See Platinum price charts annexed hereto as Exhibit 2.

34. Indeed, there were two major forces constituting manipulation in play during the relevant time frame.

-9-

A.  First, defendants were buying Platinum and Palladium that would be stored as inventory without any real commercial need or use for these acquisitions, other than to move prices These types of investments are inherently manipulative since the purchase or sale of these inventions will move the markets which are extremely illiquie and subject o manipulative conduct.

B.  Secondly, defendants and their co-conspirators could also spike in an uneconomic manner the prices of intraday Platinum and Palladium either up or down at their will by wsaiting until the fixing widow to coordinate the total market supply and demand on the day to their advantgae as wellas to the advantage of their preferred clients and to the detriment to the members of the investing public such as Ms. Levy who were relying on the integrity fo the market to place her orders over the NYMEX.

35.  Thus, defendants ignored the laws and Rules of the United States that proscribed such manipulative conduct, and their attempt to go to London, England to conduct htsi Scheme was in an effort to avoid scrutiny by Unite States regulators which they were able to achieve for a while.

36.  Like similar classic scheme to price fix, defendants took advantage of the obvious fact that the physical (spot or cash) markets in commodities greatly influence NYMEX future prices; and that the prices of both physical commodities and futures contracts move in sync; as well as the fact that all markets dealing with the same commodities are inextricably linked and just differ by the Contango.[4]

---

[4]  The Contango describes the difference in price between the physical commodity in the spot market versus the fustures market.  In the later, one must add to the price of the contract, the subsequent costs of storage, insurance and financing due to holding a commodity until the date of

37. Thus, as a result of defendants' opaque, collusive, and unlawful auction process, the extremely unlawful conduct in setting prices in the spot market in Platinum and Palladium caused price artificiality in the NYMEX Futures Market.

38. However, in addition to the underlying unlawful conduct of conspiring to set prices in the physical market, in phase two of the scheme, defendants, New York Clearing Firms were violating the NYMEX rules by executing trades in connection with the manipulative conduct taking place in London during the Fixes.

39. These co-conspirators engaged in a variety of violative conduct to take advantage of their superior information of knowing where prices were moving including but not limited to: (1) front running, (2) painting the screen (spoofing), (3) exchanging confidential customer orders with each other to determine depth of market knowledge, and wash sales.[5]

40. Front running is conduct whereby market participants take favorable positions ahead of the trades, by knowing that the prices are moving in a certain direction.

41. Thus, defendants' Fixing Auction appears to be a hoax and a cover up for theircollusive scheme.

42. In fact, the Auction process administered by the LPPFC and/or the LPPM appears to be entirely rigged for the following reasons.

---

expiry as required in any futures contract.

[5]Part of this manipulative conduct was also found to have occurred in *In re Forex, see In re Foreigh Exch. Benchmark Rates Antitrust Litig.* 1:13-cv-07789-LGS, Doc #42, 1/28/15 page 6 of 30, Doc. #242, Decision and order dated 01/28/2015. (Court found that FX traders engaged in manipulative condcut such as Front running, banging the close, and spoofing), just like the allegations in the case at bar herein.  Recent settlements with private litigants were in the amount of $234.5 million dollars. *See Exhibit 3.*

(A) First  the auctioneer defendants were also bidders in the auction, an obvious conflict of interest.  The four bidder defendants ("fixing defendants hereinafter") obviously favored their own interests in setting prices over the members of the pubic and other market participants by keeping the fixing process closed and confidential until the prices were set.

(B) Each of these four auctioneer-defendants, Goldman Sachs International, BASF METALS, HSBC USA NA and Standard bank could confer in secret and consult other market participants or their trade desks in New York before setting prices or even while prices were being set at their ultimate discretion; as opposed to having an open outcry auction with transparency so that all bidders know where the other market participants stood on prices to make it a competitive market.

(C) By failing during this time to utilize an electronic auction which would fairly and anonomously match  buyers and sellers of spot platinum and palladium who could simply enter their positions in a totally transparent fashion to quicky match bids and asks in a neutral and efficient manner to get the best execution rather than this auction process which arrogated all authority to the four fixing members who served as auctioneers and conspired to fix prices.

(D) Three out of the four fixing defendant auctioneers had  no reason to purchase physical metals and were not in the business of manufacturing, but merely facilitated their desire to manipulate the markets by exerting market power and buying and selling commodities to move prices, an illegitimate and

-12-

uneconomic reason to hoard Platinum and Palladium.

43. As such the Auction process was merely a ruse to make it look like defendants were engaging in a proper business, when in fact, they were collusively agreeing on how to price fix Platinum and Palladium on a twice daily basis using the phone wires or other means of communciations to make extraordinary profits on the NYMEX exchange in combination with their trade desks in New York.[6]

44 As a result, during the relevant time period, the prices of NYMEX Platinum became and continued to be artificial. The auctioneers and their co-conspirators used their economic might to buy and/or sell large quantifies of Platinum and Palladium without any commercial use for the metal rather only to inflate or deflate supply or demand to shift prices in the direction in which they collusively wanted to move the market to advantage their trading desks.

45. Each defendant had the ability to move the markets based on their sheer market power and each's ability to purchases large quantities of Platinum and Palladium in the Physical markets to move the prices. Such economic power was exercised to corner the markets in Platinum and Palladium and to put a squeeze on these markets as well thus constituting a monopoly in violation of Section 2 of the Sherman Act.

_____

[6] This entire manipulative scheme which is the subject of this Complaint is eerily similar to the other two awful schemes going on simaltaneously with this scheme by many of the same defendants including the Libor scandal and the Forex scandal. In the Forex scandal which is almost identical to this scandal, instead of using a contrived auction process to communicate and coordinate activities to set prices, the defendants used chat rooms instead. However, the result was the same in that horizontal competitors could share knowledge to artificially set prices to their advantage. *See In re Foreign Exchange Benchmark Rates Antitrust Litiga.*, 1:13-cv-00789, Doc. #242, 1/28/2015,

46. As such, the Platinum and Palladium Spot and Futures Market became artificial during the relevant time period to the benefit of defendants who reaped massive profits at the counterparties expense who sustained massive losses. *See also, In re Libor Financial Instruments Litigation,* 935 F. Supp. 2d 666 (S.D.N.Y. 2013.)

## PARTIES

### Plaintiff

47. Plaintiff **Susan Levy** is an individual residing in New York State.. During the Relevant Period, Ms. Levy purchased and sold NYMEX platinum futures contracts at artificial prices proximatelycaused by Defendants' unlawful manipulation as alleged herein. Ms. Levy was deprived of transacting in a lawful, non-manipulated, competitive market for Platinum Investments, including in the segment for platinum futures contracts, and otherwise suffered injury to her business or property as a direct and proximate result of Defendants' unlawful conduct.

48. During the relevant period, Plaintiff was a direct purchaser of Platinum NYMEX Futures Contracts. Her contracts were heavily influenced by the prices set at the London Fixings during the relevant time period. Therefore the settlement of her contracts and mark-to-market value of her NYMEX contracts were dictated in by the Platinum and Palladium Fixings occurring in London during the relevant time period. As a result of Defendants' manipulative and collusive conduct, Plaintiff was injured in her business or property.

### Defendants

-14-

**BASF Defendants**

49.    Defendant BASF Metals Limited ("**BASF Metals**"), a subsidiary of BASF SE, has its principal place of business in London, England. BASF also maintains precious metals trading operations in Iselin, New Jersey. BASF Metals was formerly known as Engelhard Metals Limited, when the latter was acquired by BASF SE in May 2006. After the acquisition, BASF Metals assumed Engelhard Metals Limited's role as a participating member in the London Fixing.

50.    BASF Metals conducts proprietary trading in the platinum and palladium markets. During the Relevant Period, BASF Metals entered directly into platinum and palladium spot, forward, option and platinum and palladium ETF share transactions with members of the investing public.

51.  BASF is also a major manufacturer of catalysts.

52.  Defendant BASF is also a market-making member of The London Platinum and Palladium Market (the "LPPM").

53 Defendant BASF is also a participating member of the London Platinum and Palladium Fixing Company, Ltd. ("LPPFC.").

54.  During the Relevant Period, BASF was a participating member in the London Fixing and was a market-making member of The London Platinum and Palladium Market ("LPPM").

55.  Defendant BASF was one of the four auctioneers who conducted the twice Daily Fixing Auctions during the relevant period.

56.    Defendant BASF CORPORATION ("BASF CORP." hereinafter) is headquartered in Iselin, New Jersey and is a Delaware-registered company.

-15-

57.     Defendant BASF CORP. is the parent company of BASF Precious Metals Services which is a member of the Chicago Mercantile Exchange, and is a founding member of the London Platinum and Palladium Market.

58.   BASF Corp. serves as an approved carrier, assayer, and refiner of Platinum and Palladium for the CME Group in the United States.  BASF Corp., also provides CME Group-approved Platinum and Palladium brands. This branded physical Platinum and Palladium is deliverable against NYMEX Platinum and Palladium futures contracts

59.   BASF Societas Europea ("BASF SE") is the largest chemical producer in the world. In 2006, BASF SE completed its acquisition of Englehard Corporation, which was one of the largest manufacturers of catalytic converters in the world.   Englehard Corporation (via a subsidiary) was a fixing member of the LPPFC up until 2006.  BASF SE is organized by divisions

**Goldman Sachs Defendants**

60. Defendant Goldman Sachs International ("GSI" hereinafter) is a financial services unlimited company incorporated under the Laws of Great Britain and is a subsidiary of The Goldman Sachs Group, Inc., with its principal place of business in London, England.

61.  GSI is a participating  member  in the L o n d o n  Platinum and Palladium Fixings ("LPPFC"), and a full member of the LPPM.

62.  GSI served as one of the four auctioneers who conducted the Platinum and Palladium Fixing Auctions twice daily during the Relevant Time Period.

63.   Defendant Goldman Sachs Group, Inc. ("GSG, Inc." hereinafter) is Delaware Corporation headquartered at 200 West Street, New York, New York 10282. GSG, Inc. is a bank

-16-

holding company and a financial holding company. It is the parent of the wholly owned subsidiary Goldman Sachs International. Inc.

64. GSI at all times hereinafter was acting as agent for its parent, GSG, Inc. during the relevant time period.

65. Goldman Sachs Execution & Clearing, L.P ("GSEC" hereinafter). was and is a Limited Partnership registered as a United States Futures Commission Merchant and Clearing House member of the New York Mercantile Exchange.

66. GSEC is registered to do business and conducts business in New York.

67. During the relevant time period, and for seven years GSEC violated rules requiring it to report certain trading activity in order to monitor market manipulation. Such failings resulted in a $1.8 nullion dollar fine by FINRA. See Exhibit 4, FINRA Release dated July 27, 2015.

68. GSEC on behalf of itself, GSG, Inc. GSI and clients initiated, held and closed-out trading positions as an agent and independently in Platinum and Palladium futures and or options contracts on behalf of GSG, Inc., GSI, and for itself, and firm clients during the relevant time period.

69. Goldman Sachs & Co. (GS & Co.) is a company conducting business in New York and is a wholly owned subsidiary of GSG, Inc.

70. GS & Co. is a registered Futures Commission Merchant and a Clearing House member of the New York Mercantile Exchange. (Collectively the Goldman Sachs defendants)

71. During the relevant time period, GS & Co. independently and as an agent for GSI and GSG, Inc. initiated and closed out positions in NYMEX Futures and/or Options Platinum and

-17-

Palladium contracts over the NYMEX Exchange on behalf of GSI, GSG, Inc. and its customers and/or for it own account

72. During the relevant time period, GS& Co. was fined $22 million dollars for failing to stop a practice among Goldman Sachs traders called "trading huddles" where traders came together to discuss and coordinate trading activity which is violative of many exchange rules, upon information and belief. See FINRA News Release, April 12, 2012, annexed hereto as Exhibit 8.

73. During the relevant period, GS&Co. independently and as an agent for GSI and GSG, Inc. initiated, held and closed out positions in NYMEX Futures and/or Options Platinum and Palladium contracts over the NYMEX Exchange on behalf of GSI, GSG, Inc., its customers and for its own account. (GSI, GSG, Inc., GSEC and GS & Co. are collectively referred to as the Goldman Sachs defendants.)

74. The Goldman Sachs defendants executed client trades in the physical platinum and palladium markets, on NYMEX, in platinum and palladium derivatives, and in shares of platinum and palladium ETFs. Goldman Sachs clients could make orders at the Fixing price. Goldman Sachs operates electronic platforms for trading platinum and palladium products. Goldman Sachs also conducted proprietary trading in the platinum and palladium markets during the Relevant period.

## HSBC Defendants

75. Defendant HSBC Bank USA, N.A. ("HSBC USA" hereinafter) is a subsidiary of HSBC Holdings Plc, which is a banking and financial services holding company. HSBC USA maintains its principal place of business in McLean, Virginia. HSBC USA also maintains a branch in London, England.

-18-

76. HSBC USA is a participating member in the Platinum and Palladium Fixings ("LPPFC)" and a full member of the LPPM.

77. Defendant HSBC USA was one of the four auctioneers running the twice daily Fixings on behalf of LMMP and/or LPPFC during the relevant time period.

**ICBC Standard Bank Defendants**

78. Defendant ICBC Standard Bank Plc ("Standard Bank" hereinafter), is a company incorporated under the Laws of Great Britain and is a subsidiary of Standard Bank Group Limited, a South African banking and financial services company. Standard Bank maintains its principal place of business in London, England. Standard Bank is a participating member in the Platinum and Palladium Fixings (LPPFC) and a full member of the LPPM. Standard Bank is also the current chair of the Platinum and Palladium Fixings.

79. Standard Bank and its parent Standard Bank Group Limited also maintain and conduct business out of an office at 520 Madison Avenue, 28th Floor, New York, New York 10022.

80. During the relevant time period, Standard Bank was one of the four auctioneers who conducted the Platinum and Palladium twice daily Fixing Auctions during the relevant time period.

**USB Defendants**

81. Defendant UBS AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland.

82. Defendants UBS AG maintains an office in New York City.

83. Defendant UBS Securities LLC, is a wholly owned subsidiary of UBS AG, and is a Delaware Limited Liability Company with its principal place of business in Stamford, Connecticut.

84. Defendant UBS Securities LLC is also a futures commission merchant registered with the CFTC and is a Clearing House Member oft eh NYMEX exchange.

85. As Such UBS Securties LLC was allowed to and did hold accounts for its principal UBS AG as well as other clients.

86. Defendant UBS AG and UBS Securities LLC hold themself out as leader

-19-

providing physical and derivative precious metal products to a broad range of customers around the globe. During the relevant time frame, UBS AG bought and sold Physical Platinum through the Fixing defendants at the London Auctions and fully participated in agreements to buy and sell Platinum and Palladium on a pro rata basis, even when they had no need to do so and no client orders to fill.

87. Defendant UBS AG on behalf of itself and its clients traded in NYMEX Platinum and Palladium during the relevant time period through its agent UBS Securities LLC, a clearing house firm at the NYMEX.

88. During the relevant time period, UBS AG was a market-making member of the LPPM .

### Defendant the London Platinum and Palladium Fixing Company Limited ("LPPFC") and the London Platinum and Palladium Market. ("LPPM")

89. Defendant London Platinum and Palladium Fixing Company Limited ("LPPFC" hereinafter) was and is a Limited Company organized under the Laws of Great Britain during the relevant time period.

90. The London Platinum and Palladium Fixing Company Ltd. ("LPPFC") is a U.K. company headquartered in London, England. During the Relevant Period, LPPFC administered and published the Platinum and Palladium Fixings.

91. On October 16, 2014, the LPPFC removed itself from its responsibilities of administering the Platinum and Palladium Fixings and appointed the LME as the new administrator of the supposedly revamped global price-setting process for platinum and palladium.

92. The London Platinum and Palladium Market ("LPPM' hereinafter) is a trade association and Limited Company organized under the Law of Great Britain during the relevant time period. The London Platinum and Palladium Market ("LPPM") was established in 1987. The LPPM acts as the coordinator for activities conducted on behalf of its members and other participants in the market for London Plaitnum and Palladium. The LPPM also sets standards for "London Good Deliver"- a set of rules prescribing the physical characteristics of platinum and palladium bars used in settlement in London Platinum and Palladium Market Transactions.

93. The LPPM is overseen by a Chariman and Management Committee, which are elected annually by LPPM members.

94. The LPPM currently has 12 market-making full members, 6 ordinary full members, 34 associated members, and 45 affiliate members..

95. LPPFCL does business under the name LPPM.

96. LPPFCL and LPPM are the same Limited Company and/or are alter egos.

97. LPPFCL and/or LPPM had various members who conducted business through LPPFCL and/or LPPM including but not limited to defendants herein as well as Barclays Bank PLC, Credit Suisse, Deutsch Bank AG, JP Morgan Chase Bank, The Bank of Nova Socitai, Scotia Mocatta, UBS AG.

98. During the relevant time period, defendants LPPFCL and/or LPPM conducted the Platinum and Palladium Fixings Auctions twice daily at 9:45 am and 2:00 p.m. London time.

99. Defendants John Does #1-20 were persons, not known by name to the Plaintiff, but did aid and abet the defendants in placing trades in Platinum and Palladium during the relevant time period.

## JURISDICTION AND VENUE

100. Platinum and palladium are "commodities" and are the "commodities underlying platinum and palladium futures and options contracts traded on NYMEX, as those terms are defined and used in the Commodity Exchange Act, 7 U.S.C. §§ 1a(9) & 25(a). respectively.

101. This Court has subject matter jurisdiction pursuant to Section 22 of the Commodities exchange Act, 7 U.S.C. §§ 25(a)(D), 25©, 28 U.S.C. § 1331 (b), © and §1337, 15 U.S.C. §§§ 15(a), 22 and 26, and pursuant to 18 U.S.C.§ 1964 in that this action arises under the laws of the United States, more particularly, the Commodities Exchange Act ("CEA"), 7 U.S.C.§ 1, Et. Seq., the Sherman Act, The Clayton Act 15 U.S.C.§ 1, Et. Seq. and the RICO Act 18 U.S.C.§ 1961, Et. Seq.

-21-

102. This Court may also exercise pendent jurisdiction over the common law claims and State law claims asserted by Plaintiff pursuant to this Court's supplemental jurisdiction pursuant to 28 U.S.C.§ 1367(a) and the Federal Rules of Civil Procedure, 18(a).

103. Some of these defendants  maintain offices and in the Southern District of New York, transacted and conducted business in the Southern District of New York, and the claims arose in the Southern District of New York where the NYMEX exchange is located and where all Platinum and Palladium Futures Contracts were traded in the United States.  A substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

104. Venue is also proper in this District pursuant to 15 U.S.C. § 15(a) &22and 28 U.S.C. §1391(b), (c) and (d), because during the Relevant Period, all Defendants transacted business or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

105. Venue is also proper in the Southern District of New York pursuant to Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, because defendants' unlawful acts manipulated the prices of platinum and palladium futures and/or option contracts traded on the NYMEX, a designated contract market located in New York.

## **FACTUAL ALLEGATIONS**

### **The Platinum and Palladium Physical and Futures Markets**

106. Platinum and Palladium are two metals described as Platinum Group Metals that are used and sold world wide both in a Spot or Cash (also referred to as the "Physical" market or in the NYMEX Futures Market. ("NYMEX Platinum" hereinafter)

107. In the United States, the Commodities Futures Markets including the NYMEX provide a market for the purchase and sale of Platinum and Palladium futures contracts ('NYMEX Platinum and NYMEX Palladium".

108. The pricing of both Cash Platinum and NYMEX Platinum are supposed to be based on the fundamentals of supply and demand, not collusive behavior to manipulate a commodity to ensure a price known to the manipulators. These fundamentals of supply and demand take into account the worldwide supply of a given commodity as well as the given demand. Such fundamental analysis is considered as the legitimate forces of supply and demand used to set prices. See Chart of Worldwide Platinum, Supply and Demand, annexed hereto as See Charts of Worldwide Platinum, Supply and Demand, annexed hereto as Exhibit 5.

109. A Commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity. See *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir 1980) (Friendly, J.) ("*Leist*") *aff'd, Merrill Lynch Fenner & Smith v. Curran*, 456 U.S. 353, 384-85 (1982). In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

**NYMEX Platinum- and Palladium-Based Financial Products**

110. Apart from physical platinum and palladium OTC transactions, some of the most heavily traded platinum- and palladium-based financial products are platinum and palladium futures.

111. The aggregate annual value of platinum futures has surpassed $100 billion each year since 2011.

112. Trades of platinum and palladium futures contracts have two sides. The "long" side represents the buyer of the contract who is obligated to pay for platinum

-23-

or palladium and take delivery. The "short" side represents the seller of the contract who is obligated to receive payment for the platinum or palladium and make delivery.

113. Futures contracts expire unlike other contracts. On the date of expiry, each market participant must perform under the terms of the futures contract.

114. If a market participant holds its position to the end of the settlement period for a platinum or palladium futures contract, the market participant is obligated to take delivery upon settlement date, and the futures contract for a particular month becomes a present contractual obligation for the purchase or sale of the platinum or palladium.

115. Long Platinum futures contracts require delivery of 50 troy ounces of good platinum *(i.e.,* platinum with a minimum of 99.95% purity), physically settled at a NYMEX-approved warehouse.

116. Trading is conducted for delivery during (1) the current calendar month; (2) the next two calendar months; and (3) each January, April, July, and October falling within a 12-month period beginning with the current calendar month.

117. Long Palladium contract holders must take delivery, and shorts must make delivery of 100 troy ounces by the date of delivery specified in the Futures Contract. The prices for the platinum or palladium that go to delivery are the "settlement prices" of the platinum and palladium

118. NYMEX futures contracts may be closed out prior to delivery by executing an offsetting transaction prior to the date of expiry of each contract.

119. The "bilateral" aspect of the futures contract is that there is a seller and buyer, Leist 638 F.2d at 322.

-24-

120. The sellers are one-half of the bilateral futures contract and one-half of the commodityfutures market. *Id.* They are referred to as "shorts." Id.

121. The buyers are the other one-half, and are referred to as "longs." *Id.*

122. One of the many differences between stock and commodity futures trading is that the commodity exchange (here, the NYMEX) publishes the amount of the open interest of "longs" and "shorts" at the end of each trading day. See Open Interests of NYMEX Platinum during the relevant time period annexed hereto as Exhibit 6 are the Open Interests in NYMEX Platinum for 2008.

123. Open interest is defined as the total number of futures contracts in a delivery month or market that has been entered into and not yet offset or cancelled. Each open transaction has a buyer (a long) and a seller (a short).

124. Buying pressure in a commodity futures contract and physical market will increase prices and selling pressure will decrease prices.

125. Because the prices of NYMEX futures contracts are publicly reported by the CME group, the increased or decreased prices resulting from buying pressure or selling pressure acts as a signal to the investing public to act accordingly.

126. Increased prices are often buy indicators and decreasing prices are often sell indicators.

127. Indeed, chartist create charts based on technical analysis of closing and settlement prices. Once points are plotted on a graph, the public reads these charts as indicating a buy or sell of the particular commodity and may enter or exit the market based on these charts.

128. A rising trend line due to falling prices is often a sell signal to members of the

-25-

public.

**The Relevant Market For NYMEX Palladium Futures Contracts**

129. Another futures contract created by the NYMEX who has been approved by the CFTC to create standardized contracts is the NYMEX Palladium futures contract. Palladium is a silver-white metallic element in the so-called Platinum group metals ("PGM").

130. The Prices of Plaitnum and Palladium both in the Physical and NYMEX markets move togeather and are in sync beause both Platinum Group Metals are interchangeable in the relevant market for Autocatyalysts. See Chart of Price Movements of Physical and NYMEX Platinum and Palladium annexed hereto as Exhibit 7.

131. During the relevant time period, Palladium futures contracts were transacted electronically on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms and also through open outcry on the floor market at the NYMEX in New York. Globex is an electronic trading platform owned by the NYMEX's parent company, the CME Group. Open outcry is a method of public auction for making bids and offers in the trading pits (on the floor) of futures exchanges.

132. The size of a NYMEX Palladium futures contract is 100 troy ounces.

133. NYMEX Palladium futures contracts call for settlement by physical delivery.

134. Palladium delivered under this contract must be a minimum of 99.95% pure.

135. During each calendar month (the "current calendar month"), the Exchange will make available for trading contracts that provide for delivery of Palladium in the following months: 1) the current calendar month; 2) the first calendar month following the current calendar month; 3) the second calendar month following the current calendar month; and 4) each March,

-26-

June, September and December during the period beginning with the first calendar month following the current calendar month through the 15th calendar month following the current calendar month.

136. Trading in Palladium futures contracts terminates on the third to last business day of the delivery month.

137. The settlement prices for both Platinum and Palladium futures contracts are calculated based on the volume-weighted average price of all transactions conducted both on the trading floor of the NYMEX and on Globex during the two-minute closing period.

138. Trading in NYMEX Palladium futures contracts is subject to the rules and regulations of the NYMEX, and prices are quoted per troy ounce. Typically—as was the case with Palladium futures during the Relevant Period—the prices for different expirations of futures contracts in the same commodity are chained together by arbitrage and so-called spread trading. Thus, if one contract increases significantly in price it will cause other contracts to also increase in price (though not always by the exact same amount). This was true of Palladium futures contract prices during the Relevant Time Period.

139. Regular trading hours for NYMEX Platinum and Palladium futures contracts are Monday – Friday 8:30 a.m. – 1:00 p.m. eastern time. The two minute closing period ends at 1:00 p.m. for Platinum and Palladium. During regular trading hours NYMEX futures Platinum and Palladium contracts trade on the trading floor as well as on the CME Globex and Clearport electronic trading platforms. The volume of trading was much larger in the electronic market than on the floor market. NYMEX Platinum and Palladium futures contracts also trade continuously from Sunday – Friday 6:00 p.m. – 5:15 p.m. eastern time on the CME's Globex and ClearPort electronic trading platforms.

-27-

140. The volumes of trading and liquidity of trading in the electronic trading platforms were much greater than the floor volume.

**Physical Platinum and Palladium Markets**

141. The spot platinum and palladium markets are Over-The-Counter markets. Major market participants in the platinum and palladium spot markets include members and affiliates of the LPPM, including the four participants in the Platinum and Palladium Fixings-Defendants Standard Bank, BASF, HSBC, GSI and UBS AG. These entities and others compete for customers in the physical platinum and palladium markets

142. There are other participants that enter the platinum and palladium markets from time to time, including platinum and palladium producers (such as miners and refiners), consumers (such as jewelers and industrials) and investors (such as pension funds, hedge funds, and individuals).

143. One major use for platinum and palladium is in the production of catalytic converters, which curb harmful emissions from automobiles. According to Johnson Matthey's *Platinum 2013 Interim Review,* both platinum and palladium are used heavily in catalytic equipment for automobiles.

144. As of 2013, gross demand for platinum was over eight million ounces. The *Platinum 2013 Interim Review* indicates that demand for platinum from these various sources between 2009 and 2013 rose from less than seven million ounces to more than eight million ounces in five years. See WorldWide Supply and Demand Charts annexed hereto as Exhibit 5.

145. The *Platinum 2013 Interim Review* also indicates that gross demand for palladium is similarly large at over 9.6 million ounces. for palladium.

-28-

146. Palladium is interchangeable with Platinum in the relevant market for autocatalyst and industrial segments

## Interrelationship between the Spot and Futures Markets for Platinum and Palladium

147. Platinum futures contracts prices represent what the market believes will be the spot prices of physical platinum on the delivery dates specified in the platinum futures contracts.

148. The following chart shows the strong correlation between the price of platinum futures contracts and physical (spot) platinum between during a portion of the relevant period.



149. The difference in prices of the Physical Commodity and the NymEX contract is

extremely small.   There i s 99.4% correlation between  the prices of NYMEX  platinum  futures contracts and the prices of physical platinum.

150. Thus, any movement in pri ce of the physical  platinum  should be tracked in the prices of NYMEX platinum futu res contracts, and vice versa.

151. There is a similar  correlation  that can  be observed  with  respect to the pricesof physical  palladium and palladium futures  contracts.

152. Thus, any movement in the price of physical palladium  is generally tracked i n price of palladium  futures.

### The NYMEX Restricts the Number of Cotnracts a Market Participant Can Own

153. To avoid Manipulation, the NYMEX imposes position limits on all purchaser s of NYMEX Platinum and Palladium Contracts whereby one entity including the principal and all subsidiaries may not own in aggregate at any one  more than 25 Platinum contracts and 25 Palladium. (50 contracts in total.)

154. This 25 position limit imposed on all Platinum or Palladium contracts is embodied in a NYMEX  rule based on a Congressional mandate as set forth in 7 U.S.C.§ 7(d)(5) to prevent  manipulation requiring a market participant to stop accumulating contracts once the amount of 25 contract-threshold has been reached so as to avoid an anti-competitive impact on the futures contract prices that resulted from  large purchases of over only 25 contracts per market participant.

155. This position limit of 25 contracts does not apply to hedgers but only to speculators.   A hedger is a person or entity who has an actual need for the commodity such as a autocatylist manufacturer; whereas a speculator or investor is one who has no actual use for the

-30-

commoditiy other than investment and thus is bound by the 25 position limit. Defendants herein the Goldman Sachs defendants, HSBC, Standard Bank ( other than BASF) were all speculators and had absolutely no commericial use for owning physical Platinum and Palladium.

156.  Because each NYMEX Contract represents 50 troy ounces of Platinum, the NYMEX regulators have in effected dermined that as little as 1250 physical ounces of Platinum (50 x 25) can move a market uneconomically.

157.  The NYMEX rules also impose position accountability requirements that require a large trader who holds more that 1500 Platinum and/or Palladium contracts to report their ownership interest so that the NYMEX can regulate the market and avoid market manipulation.

158.  Any market participant who has accumulated such a large position of 1500 Platinum or Palladium contracts has to immediately report such conduct to the NYMEX governors.

159.  Both position limits and position accountability rules are intended to control market manipulation whereby a large trade can move a market in an uneconomic fashion where large volumes are hoarded and then unloaded onto the market.

## THE PLATINUM FIXING PROCESS/ THE PLATINUM AND PALLADIUM AUCTION PROCESS

160.  The Platinum and Palladium Fixings are a relatively recent creation. The London Platinum Quotation, the predecessor to the Platinum and Palladium Fixings, was established in 1973, and was a twice-daily indication of the market price for spot platinum, reported by some of the principal companies dealing in this precious metal.

However, this was an informal trading system, and in 1987 it was formalized via the establishment of the LPPM. Two years later, the Platinum and Palladium Fixings were formally established for platinum and palladium.

161.   The Platinum and Palladium Fixings occur twice daily by teleconference: 9:45 a.m. GMT/4:45a.m. EST (the "morning Platinum and Palladium Fixing") and 2:00p.m. GMT/9:00a.m. EST (the "afternoon Platinum and Palladium Fixing"), the latter to accommodate the U.S. trading day. During each fixing call, the fixing members first set the price of platinum and then set the price of palladium. During the Class Period, the four participating members in the Platinum and Palladium Fixings were Defendants Standard Bank, BASF (obtaining its seat after its acquisition of Engel hard Metals Limited in May 2006), **GSI**, :md HSBC USA.

162.   During the relevant time period, the Pl atinum and Palladium Fixings were administered by the LP PM. Defenda nts are full members, along wit h Barclays Bank P LC, C red it Suisse, Deutsche Bank AG, Joh nson Matthey P LC, JPMorgan Chase Bank, Mitsui & Co. P recious Metals Inc. (London Branch), Stand ard C ha rtered Bank, The Bank of Nova Scotia,

163.   Fu ll membership," according to the LPPM, is "open to those companies in the U K en gaged in trading a nd dealing in platinum and palladi um and are recogni sed by the [LPPM] Management Committee as offering additional services in the UK to the market, including marrket-making, clearing services, refining or manufacturing."[3]

164.   In addition to full membership, there is "associate membership," in the LPPM which is open to companies in the UK currently engaged in trading and dealing in platinum a n d palladium and have an appropriate level of net assets and experience. Lastly, LPPM permits

certain companies to act as "affiliates," which are defined  as companies that failed to meet the normal requirements  of full or associate membership, but "are recognized by the LPPM as being involved  with or offering support to the global platinum  and palladium  markets.[4]

165.  The Platinum  and Palladium  Fixings involve the fixing members of the LPPM, BASF HSBC and GSI and STANDARD BANK who are all horizontal competitors and who compete for both physical Platinum and Palladium in the Spot Market as well as NYMEX contracts in Platinum and Palladium in the futures market to come together and agree with each other on a twice daily in the AM and PM fixing to determine the price of Physical Platinum and its sister metal Palladium.

166.  Based on the agreement among the fixing defendants, the price of Physical Platinum and Palladium cannot be fixed without the unanimous agreement of all four fixing defendants, BASF, HSBC, GSI and STANDARD BANK.

167.  The Fixing Defendants collect orders on a twice daily basis from their trade desks in New York and London as well as their clients and other market participants in deciding how to fix the price.

168.  During the fixing calls, these orders can be changed or rescinded.  The orders are made known to each participating fixing defendants who presumably are able to tally what the entire market for Platinum and Palladium will be on the day before a price is determined.

169.  However, the fixing defendants do not just match bids and asks to determine and equilibrium price.  Rather, they can march prices up or down at their total discretion and based on uneconomic factors outside the fundamentals of supply and demand.

170.  And the fixing defendants did engage in this uneconomic conduct to fix prices using artificial injections of supply and demand.

171.  The Fixing defendants also had the discretion to and did based on a concerted

-33-

agreement among themselves to buy and sell Physical Platinum and Palladium to each other in the London Physical Market to move the prices in an agreed direction.

172. Such sales and purchases among financial institutions had absolutely no economic value and were uneconomic and were engaged in just to tweak the prices to move in the direction that these defendants agreed it should move.

173. Legitimate market participants would also send their orders to Defendants which were \also placed and timed with an intent to manipulate by bunching these orders to move prices artificially.

174. Unlike in a competitive market not subject to Defendants' manipulative conduct, Defendants would instead consolidate their respective customer orders, as well as any proprietary orders from their own trading desks. The fixing process would then begin.

175. The price fixing process referred to as the auctions, were not real auctions since auctioneers were extremely conflicted and were also buyers and sellers of the very items being auctioned under their direction and control.

176. The auction process used was blatantly ridden with example of self-dealing as well as unilateral and arbitrary conduct by the fixing defendants to move prices as they pleased and outside the principals of supply and demand.

177. In addition, such fixing defendants and co-conspirator defendants UBS AG and others would agree to help move prices by volunteering and/or agreeing in restraint of trade to buy or sell Platinum or Palladium for their on inventories or out of their own

inventories when asked to do so to move prices to help establish a beneficial price.

178.  The Chair would announce a starting price (also known as the "Opening Price") for loco (s hort tor location) London or Zurich platinum or palladium. stated in U.S. dollars, which is usually at or near the current spot price. Each of the remaining three participating fixing members would eventually declare themselves as either a net buyer or a net seller, or as having no interest at the starting pnce.

179.  That the Chair could arbitrarily set a starting price or Opening prices ab initio shows price fixing because there was not necessarily any rational economic justification for the opening price other than the Chairs desire to fix prices to the advantage of himself and the other LPPM members to their advantage.

180.  If there was no b uyi n g and no selli ng interest at the starting price from any participating member, the Chair could arbitrarily announce the Opening Price as t he "fixed" price.   This conduct is another example of manipulation.

181.  If at the staring price there is only a selling or a b uy ing interest, the Chair wil l ask for figures and then may either:

a. Declare the price as "Fixed" if the quantity offered or sought is matched e x a c t l y  or is within 4,000 troy ounces; or

b. Move the Opening Price lower or higher until there is two-way interest-i. e., a match between a net b uyer and a net seller.

182.  If  the Chair must move the price to obtain  two-way  interest, t h e

-35-

increments in which Chair moves the price is determined by:

a. The prevailing bid/offer price in the platinum or palladium futures market as quoted on the CME adjusted to the physical London spot market using a prevailing Exchange for Physical *(i.e.,* an exchange of a position in the underlying physical instrument tor *a* corresponding futures position);

b. The prevailing bid/offer price on electronic trading plattorrns representing the spot market price; and

c. The level of buying and selling interests declared in the Fixing Call.

183. The Chair will choose the level of price increments as he/she considers necessary in order to match supply and demand.

184. The Chair's unilateral ability to change the prices was also arbitrary and uneconomic, and there was no legitimate reason for the Chair to set the prices where he/she did other than collusion with the other members to gain an trading advantage on the NYMEX exchange.

185. The fact that the chair could move prices of less than 4000 ounces of Platinum or apportion buy and sell orders among market participants clearly demonstrates that there were no more legitimate forces of supply and demand moving the market, but rather, the market was manipulated and totally or partially divorced from legitimate prices dictated by actual supply and demand.

186. At any time during the twic-daily fixing calls, participating member or their customers could increase or decrease an order, withdraw a previously declared buying or selling order, or place a new order. In the event of such an occurrence, a participating member could call a "flag" to suspend the fixing call so that it may recalculate its overall interest. When the flag was called, the Chair was not permitted to call the platinum or palladium prices "Fixed.

-36-

187.    When buy and sell orders are matched, the Chair will declare that the prices for platinum and palladium are fixed and state the time at which they have been fixed and the final price in U.S. dollars. Once the Fixing Prices for platinum and palladium have been declared by the Chair, buy and sell orders declared in relation to those Fixing Prices may not be altered or withdrawn by the firms participating in the Platinum and Palladium Fixings. The Chair will also provide the equivalent trading prices in pounds sterling and euros using the then-prevailing exchange rates published on Bloomberg or Reuters and read out these rates at the end of the call.

188.    The Chair would then match up the participating firms' orders and would specify the trades that must then be executed between the participating firms. The Chair will fill the largest seller's order first by matching that order with the largest buyer's order, with the participating firms' orders then being matched in descending order size.

189.    Where the Chair has been unable exactly to match supply and demand and has instead declared the price as fixed when the difference between quantities of platinum and palladium bid and offered was 4,000 troy ounces or less, the Chair will pro rate the difference between supply and demand between the participating firms

190.    Cash-settled, platinum- and palladium-based financial products, such as futures and options, are directly impacted by the physical prices assessed through the Platinum and Palladium Fixings.

191.    In an open and transparent system of price discovery for platinum and palladium, all market participants should have the opportunity to see in real-time bids and offers for platinum um and palladium to gauge their prices. However, the Platinum and Palladium Fixings controlled by the self-dealing, four large and heavily self-interested fixing defendants who participated in the platinum and palladium markets.

-37-

192. This self-imposed process gave Defendants the opportunity and motive to manipulate the Platinum and Palladium Fixings to their advantage, particularly with respective to their own holdings in both platinum and palladium and platinum- and palladium-based financial products, like futtures and options. Defendants took full advantage of this opportunity to the detriment of a truly competitive market.

## All Defendants Had the Ability to Fix the Prices of NYMEX Platinum And Move The Market For NYMEX Platinum in the Direction each defendant Desired

193. Defendants had the ability to price fix and/or monopolize the relevant markets for NYMEX and Spot Platinum and Palladium and did price fix and/or monopolize the relevant markets for NYMEX and Spot Platinum and Palladium and/or aided and abetted the NYMEX defendants

194. The NYMEX Palladium and Platinum markets, are relatively "illiquid," and are relatively "thin depth" markets. **See** Exhibit 6 showing volumes of trading. That is, both the amount of actual trading is low and the amount of potential trading is low in these markets than other NYMEX markets.

195. In fact, the enormous impact of buying large quantifies of Platinum and Palladium is evidenced by the fact that just making one large purchase or sale on a standardized exchange such as the NYMEX of 0.16 of the total amount of the subject item, may cause a permanent chance of 4.7 percent in the price of the item. *In Re Initial Public Offerings Sec. Litigation, 227 F.R.D.65, 113* (S.D.N.Y. 2004.)

196. In addition, a single large buy order can have a long term upward impact on prices. *E.g.* Robert E. Holthausen, Richard Leftwich and David Mayers, *The Effects of Large Block*

*Transactions on Security Prices: A Cross-Sectional Analysis*, 19 J. OF FIN. ECON. 237, 240 (1987) ("Block transactions have permanent price effects if trades convey information, even if there are sufficient close substitutes to produce perfectly elastic excess demand curves."); Myron Scholes, *The Market for Securities: Substitution Versus Price Pressure and the Effects of Information on Share Prices*, 2 J. OF BUSINESS 179, 193-94 (1972); Andrei Shleifer, *Do Demand Curves Slope Down?*, J. OF FINANCE 579, 580-582 (1986).

197. During the relevant time period; NYMEX Platinum and Palladium markets were extremely illiquid. For example, instead of having monthly expirations of NYMEX Platinum and Palladium contracts, Platinum and Palladium contracts occurred for delivery only 4 (not 12) times per year. Unlike Crude Oil, Gold or Corn, rather an investor had to worry about liquidity and usually only traded in the front month or soon thereafter; whereas with Crude Oil one could trade several years out into the future.

198. During the relevant time period, and relative to many other futures contracts,the NYMEX Platinum and Palladium futures contracts were extremely susceptible to a trade manipulation because of the illiquidity of these market.

199. Defendants were able to and did dominate and monopolize and/or price fix the NYMEX Platinum, Palladium and Spot Markets during the relevant time frame by a variety of methods calculated to exert market power over these markets and move the prices of NYMEX and spot Platinum and Palladium in the direction they desired to gain profits at the expense of the other members of the investing public who were bound to lose by the sudden gyrations in the market that were only known to defendants and intentionally caused by the defendants and their

-39-

co-conspirators and aiders and abettor by the other defendants including John Does #1-20 herein..

200. Defendants GSI, HSBC, Standard Bank and BASF, as the four auctioneers of the LPPFC Fixings Auctions, individually and/or in combination had the financial ability and power to dominate and monopolize and did dominate the Platinum and Palladium futures and spot markets during the relevant period.

201. Each Defendant including UBS AG held enormous positions in Physical Platinum and Palladium and held enough physical Platinum and or Palladium to move the prices of Platinum or Palladium based on the sheer volume of each defendants' holdings in either physical Platinum or Palladium or NYMEX futures contracts in Platinum and or Palladium.

202. In addition, the Fixing Defendants had the ability to move prices and exercise monopoly power over the prices of NYMEX Platinum and Palladium and Spot Platinum and Palladium due to their self-appointed ability to set prices during the fixing windows that occurred twice daily.

203. The Chair with the consent of the auctioneer defendants and other participating members of the LPPM and/or LPPFCL had the ability and did demand that participating members of the London Fixes such as UBS AG agree to purchase and/or sell up to 4000 troy ounces of Platinum and/or Palladium on a pro rata basis under certain circumstances apparently to affect the prices of Platinum and/or Palladium which constitutes unlawful price-fixing. This ability and conduct was more than enough to move markets for Platinum and Palladium uneconomically.

204. These auctioneer defendants and UBS AG were able to move the Platinum

-40-

and Palladium spot and future markets by purchasing and/or selling large quantities to actually move the prices to each defendants' desired price level.

205. Each of the defendants were multimillion and/or multibillion dollar organizations that could afford to make large purchases of Platinum and Palladium during the relevant time frame; and each defendant had sufficient assets to sustain a margin deficiency and avoid getting stopped out on a margin call.

206. For example, in 2012, Goldman Sachs Group, Inc. had reported income of over 7 Billion dollars in net profits at its disposal to use to purchases Platinum and Palladium and sustain positions that most people could not afford to sustain.

207. GSG, Inc. and the other defendants used these assets in part to exert monopoly power over the Platinum and Palladium markets by purchasing and/or selling large quantities of these metals to effect a squeeze and corner on these spot and future markets.

208. Each defendant also had enough financial assets to sustain margin calls of temporary losses that they incurred in furtherance of this Scheme to achieve monopoly power over thr Platinum and Palladium spot and NYMEX futures market.

209. The auctioneer defendants also had the ability to price fix by means of controlling the auction process during the relevant time period so as to determine market prices for spot platinum and palladium which then determined future NYMEX prices of Platinum and Palladium during the relevant time period.

210. Each of the auctioneer defendants by, among other acts, having the sole discretion to set the prices and in fact setting the prices during their twice daily auctions (also

-41-

referred to as the London fixes), then continued to move prices uneconomically by purchasing and selling physical Platinum and Palladium at these self-directed and "fixed" prices.

## The Auctioneer, UBS and the FCM defendants were Horizontal Competitors for Spot and NYMEX Platinum and Palladium And Together Had The Ablity to Combine and Conspire to Set Prices During the Relevant Time Period.

211. At base, the Platinum and Palladium Fixings are price-setting mechanisms among horizontal competitors in the platinum and palladium markets. Indeed, HSBC. Goldman Sachs, UBS and Standard Bank have large commodities desks in which they supposedly compete for customers in connection with their commodities trading services, including those tor precious metals like platinum and palladium.

212. In addition, each defendant has its own proprietary trading interests in platinum. palladium which it exercised in part through the FCM defendants' ability to trade on the NYMEX exchange.

213. Although the fact that the auctioneer defendants in combination with the FCM defendants are horizontal competitors, Defendants acted in an extremely collusive fashion through the guise of the London Auction. Each horizontal competitor collusively communicated with each other directly to establish "fixed" prices for platinum and palladium that are then used by all market participants in valuing their positions in both the platinum and palladium physical and derivatives markets.

214. Thus, the Platinum and Palladium Auction Process provided nothing more than a subterfuge for these defendants to collusively create illegitimate and non-competitive price moves while the rest of the market was relying on the legitimate forces of supply and demand to set prices.

215. Defendants, were able to and abuse the London Auction Process to their

advantage at the expense of a competitive market.

216. Defendants' exclusive control of the Platinum and Palladium Fixings gave them unparalleled power to manipulate the ultimate price of platinum, palladium, and platinum-and palladium-based financial products in the global platinum and palladium markets. Price manipulation was accomplished through their exceptional access to confidential information from other participants in the platinum and palladium markets, which allowed them the ability to use that information to manipulate platinum and palladium prices to their benefit and to the detrinted of Plaintiff Ms. Levy and the other members of the investing public.

## DEFENDANTS CONDUCT WAS INTENTIONAL

217. Defendants intentionally manipulated and fixed prices with respect to their Platinum and Palladium positions in the Spot and NYMEX Futures markets and their intentional conduct is clearly demonstrated by their disregard well-accepted norms as well as specific violations of the Commodities Exchange Act and NYMEX Rules by (1) discussing their trading strategies including confidential customer orders prior to the Fixing call in order to coordinate their strategies during the Platinum and Palladium Fixings, (2) By pre-arranging NYMEX futures prices by collusively fixing Physical Platinum prices during the London Fixes, and (3) by Engaging in unlawful Spoof Orders.

218. Defendants all had the opportunity and motive to manipulate these markets and price fix because each defendant owned investments for their own accounts in Platinum and Palladium Futures and in Physical Assets. Each defendant therefore had a motive to increase profits and certainly each defendant had an opportunity to do so since each was privy to information ahead of the fixings.

219. Each defendant also had the opportunity to profit based on this unlawful manipulation and price fixing, because each defendant knew based on the fixing calls where the price

-43-

of Platinum and Palladium was heading ahead of the market.

220.   During the relevant period the some or all of the FCM defendants were also conspiring and sharing confidential information as they formed trading huddles to exchange illegal information.

221.   Goldman Sachs & Co., and FCM defendant was fined $22 million dollars for engaging in these unlawful trading huddles during the relevant time period to intentionally exchange confidential information necessary to effectuate this Scheme. See FINRA News Release dated April 12, 2012 annexed hereto as Exhibit 8.

222.   Such trading huddles is per se intentional conduct to support a claim or Market Manipulation and Price Fixing in the relevant market.

223.   In addition, defendants intentionally or with extreme recklessness rising to the level of bad faith when they gave or received confidential customer orders which are supposed to be kept strictly confidential.[7]

224.   However, in order to manipulate the market, defendants discussed and evaluated confidential customer orders over the phone during the fixing calls among themselves and their trades desks.  Although this conduct may have appeared in London to be superficially valid as part of the "Auction" process, the moment that NYMEX futures were purchased based on these conversations where confidential information was knowingly exchanged, the laws of the United States were

---

[7] NYMEX Rule 532 requires that all customer orders be kept strictly confidential and states:

> "No person shall disclose another person's order to buy or sell except to a designated Exchange official or the CFTC and no person shall solicit or induce another person to disclose other information. An order for pit execution is not considered public until it has been bid or offered by open outcry. No person shall take action or direct another to take action based on non-public information, however acquired. The mere statement of opinions or indications of the price at which a market may open or resume trading does not constitute a violation of this rule.

-44-

egregiously and knowingly violated in the United States by United States companies and their aiders and abetters, even if some or all of these phone calls were abroad.

225.  The exchange of confidential information to trader over the NYMEX ensured that defendants collectively manipulated prices to the desired levels to maximize the profitability of their transactions around and during these critical pricing windows.

226.  Defendants' representatives on the Fixing calls were in constant communication with their physical and derivatives trading desks, the FCM defendants herein, as well as with the other Defendants' respective trading desks, to ensure that platinum and palladium prices moved in a certain direction to pre-determined, non- competitive levels.

227.  In addition, Defendants acted intentionally by sharing their customer order flows for purposes of front- running expected price moves based on execution of those customer orders.

228.  Front Running is also a clear violation of NYMEX Rule 432(G) and(H).  By learning of the Auction prices in London, the FCM defendants intentionally put on positions that constituted front running.

229.  All defendants also intentionally acted in prearranging orders in a coordinated effort in violation of the Commodities Exchange Act, Section 7 U.S.C.§ 6c()(1)B

230.  7 U.S.C.§ 6c prohibits prearranging sales in the manner that defendants used during the "Auction" Fixes in London to set prices to be used on the NYMEX.  Section 6c(a)(1)(B) specifically prohibits any conduct to: "determine the price basis of any such transaction in interstate commerce in the commodity."

231.  Clearly, an inference can and should be drawn that the conduct described as part of the Auction process in London shows scienter in conducting their affairs in violation of multiple rules and laws to predetermine the prices of Platinum and Palladium Futures prices over the NYMEX exchange.

-45-

232. Defendants also intentionally engaged in this price-fixing scheme by placing large orders around the Platinum and Palladium Fixings that they had no intention of executing, also known as "spoof" orders or "painting the screen."

233. When these large orders were placed ahead of the trade, they engaged in illegal front running; whereas when these large orders were eventually withdrawn such conduct was painting the screen also known as spoofing.

234. Spoof orders were used to bait the market to react to what other market participants believed were genuine increases or decreases in supply or demand.

235. Spoofing is a violation of the Commodities Exchange Act's anti fraud provisions. 7 U.S.C. 6c((a)(5)C specifically proscribes Spoofing. Such provision provides: in pertinent part:

**Disruptive Practices**

"It shall be unlawful for any person to engage in any trading, practice or conduct on or subject to the rules of a registered entity that–[C] is, is of the character of, or is commonly known as to the trade as, "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution.)

236. An example of a large "spoof" sell order would benefit an individual with a large short position in the futures market because short positions benefit from decreases in prevailing market prices. Defendants manufactured spoof orders and took advantage of them as part of their intentional effort to manipulate platinum and palladium prices. *See Exhibit 9* describing spoofing.

237. A reasonable inference can and should be drawn that defendants engagement in Spoof orders during the relevant time period and well as front running demonstrates intentional conduct designed to influence prices of Platinum and Palladium in an uneconomic fashion.

238. Defendants' extreme self-interest in self-dealing in the very goods that they became auctioneers was so inherently conflicted that an inference of intentional conduct favoring

-46-

their own interests over plaintiffs may be drawn.

**DEFENDANTS' PRICE FIXING CONDUCT IN THE PHYSICAL MARKET IN LONDON CAUSED PRICE ARTIFICIALITY IN THE 2008 NYMEX FUTURES CONTRACT AND IN OTHER NYMEX CONTRACTS THROUGHOUT THE RELEVANT TIME PERIOD.**

239.    The Scheme conducted by defendants in connection with the Auction Process and the setting of prices in the Physical Markets for Platinum and Palladium in London caused Price Artificility in the 2008 NYMEX Platinum contract as well as other contracts throughout the relevant time period.

240.  Causation of Artificial prices in the 2008 NYMEX Future Platinum Contract and other contracts can be inferred for three well-accepted reasons:

A.  First, during the relevant time period, the price of NYMEX and Spot Platinum were so out of line with Fundamental analysis that an inference of causation may be established.

B.  During the relevant time period, prices of Platinum were so divergent from historical norms, that at inference of causation may be establised, and

C. Based on Expert Analysis, anamolous price movements during the time of the fixing process create an inference of maniuplation and causation, since there is no other explanation for such price movements under fundamental analysis.

241.  An inference of Causation of artificial prices based on market manipulation is demonstrated where price movements in Platinum have no other reason other than price manipulation as in this case.  *See Carghill v. Hardin*, 452   F. 3d 1154, 1167 (8th Cir. 1971)(Deviations from historical norms demonstrate price manipulation and causation.)

242.  Because prices of the 2008 and 2009 NYMEX Platinum were so out of line

with legitimate market forces and the fundamentals of Supply and Demand During the Relevant time Period, a Fair Inference of Causation of Price Artificiality Can Be Drawn based on defendants' conduct at the London Fixings.

243. A fair inference of causation showing that defendants' conduct created price artificiality in the 2008 and 2009 NYMEX Platinum contracts and thereafter is demonstrated by comparing the actual prices of NYMEX Platinum in Q4 2008 through Q4 2009.

244. Because the actual manipulated prices of these contracts were so out of line with fundamental analysis, a fair inference of market manipulation creating price artificiality can be easily established.

245. First, in 2008, by Q3 and Q4, according to the legitimate forces of supply and demand that should have been setting prices in a free and fair market, prices of NYMEX and Spot Platinum should have been soaring to $2500 to $3000 per troy ounce; rather these prices started declining drastically in value and by year end, 2008 Platinum prices had severely plummeted unpredicatable lows of approximatley $904 per ounce without any reasonable explanation. See Price Chart annexed hereto as Exhibits 2,5.

246. In addition, platinum prices by Q4 2008 were supposed to rise to $2500 per troy ounce due to the strikes in South African Platinum and Palladium mines, due to the increase demand for Platinum for autocatyalists, and due then due to the Financial Meltdown in Q4 2008 which in a normal marekt should have pushed prices higher since Platinum like Gold serves as a safe haven during times of financial crises. See Articles predicting the prices of Platinum annexed hereto as Exhibit 10.

247. Indeed, Gold which is supposed to move in sync with Platinum, soared by Q4 2008 and the prices of Platinum and Gold in Q4 2008 were inversely related, a true aberration

-48-

and indicative of price manipulation.  See, In Re Crude Oil Commodities Futures Litig. 913 F. Supp. 2d 41 (S.D.N.Y. 2012)(aberrant market behavior without any fundamental reason is suggestive of price manipulation.)

248.  Rather, for no reason, platinum started to drop in value in Q3 and Q4 2008 to around $900 per ounce, a truly aberrant occurrence. See Price Charts annexed hereto as Exhibit 2; *see also, In re Crude Oil Commodities Litig.* 913 F. Supp. 2d 41, (S.D.N.Y. 2012)(aberrant market behavior without any fundamental reason is suggestive of market manipulation.)

249.  As prices of Platinum started to drop, Platinum was falling further in a worldwide deficit and by year end, 2008, Platinum was in fact in a world wide deficit, which under fundamental analysis should have sent Platinum prices soaring not dropping by Q4, 2008..

250.  However, the manipulating forces of the auctioneers and their aiders and abettors and co-conspirators were in full force and effect and overwhelmed the free market so that Platinum prices were pushed artificially downward by Q4, 2008 by the manipulators to force a l ow price instead of a high price by Q4, 2008. By forcing down the price, the manipulators could assure their own profits by closing out other short positions held by them.

251.  Thus, by forcing down Platinum in Q4, 2008, these manipulators could profit on their short positions in the NYMEX market on the backs of the investing public who were acting in good faith by relying on the legitmate forces of supply and demand to make investment decisions which indicated a rising not falling Platinum market during this time frame.

252.  In 2009, the manipulation continued to cause price artificiality, however, in the reverse order.  The manipulators decided to artificially push prices up in 2009, like a puppet on a string. By flooding the market with Platinum at the London Fixings, prices started to climb upward without any basis in fundamental analysis. As such by year end 2009, although Platinum

-49-

was now in a worldwide surplus and the strikes in South Africa had abated, prices of Platinum surged instead of fell or remaining the same as they should have since stocks of Platinum were now in surplus not deficit. See Supply and Demand Chart for 2008 and 2009 annexed hereto as Exhibits 5.

.        253. Because such price movement are aberrant and out- of- line with the market based on fundamental analysis a fair inference of causation exists. See In re Crude Oil Commodities Future Litig., 913 F. Supp. 2d 41 (S.D.N.Y. 2012)(aberrant market behavior without fundamental reaons is suggestive of market manipulation.)

**Because the rise in the demand for Platinum was due to defendants and other financial institutions making large investments in these metals just to move the market and for no commercial uses; and the use of Platinum did not increase enough to justify the large price increases during the relevant time frame, an inference of causation of artificiality can be drawn based on the large increases in historical prices.**

254. Because the prices of Platinum started to exponentially increase in 2008 and 2009 and thereafter in excess of historical norms,` an inference of manipulation and causation can be implied, since the prices of NYMEX Platinum were so out of line with fundamental analysis.   See Platinum Supply and Demand Chart, and Historical Prices of Platinum.  See Carghill v. Hardin, 452 F. 2d 1154, 1167 (8th Cir 1971)(Deviations from Historical Norms demonstrate price manipulation and causation.

255.  Historically, Platinum traded in the range of $372 to $377 per ounce from 1998 through 1999. At that time, Platinum was used to manufacture *inter alia* fine jewelry.

256.  In 2000, the average price per ounce rose to $544.03, and then fell in 2001 to $529.04.

257  From 1998 to 1999, demand appeared to be growing due to the use of Platinum and Palladium to make catalytic converters and dental products.

258. By 2003, the average price of Platinum rose to $692.31. New industrial uses for Platinum were creating stronger demand and without an increase in supply prices rose..

259. In fact, in 2003 there was a deficit of Platinum of 330,000 ounces and the rise in the price of Spot Platinum was in sync with the forces of supply and demand. See Exh. 5.

260. Growing demand in 2004, led to an average price of $845.31. The deficit was only 50,000 ounces, but with continued rising demand there was an average price increase of 22%.

261. During 2005, the price of Platinum rose another 6% to $896.87 on average with a deficit of 55,000 ounces in 2005. See Exh. 5.

262. However, by December, 2006, the average price of Spot Platinum was $1142.31, 27.4% higher than the previous year. See Exhibit 2 Spot Prices of Platinum.

263. In 2006 there was a large increase in Platinum inventories and by year end there was no longer a deficit of Physical Platinum but a surplus of 355,000 ounces. See Exh. 5.

264. This surplus was stored as inventory for future use in future years.

265. By 2008, the prices continued to rise until approximately May, 2008. Through June, 2008, the spot price of Platinum and its related futures contracts continued to rise or remain at extremely high levels.

266. Because there appeared to be a surplus of Worldwide Platinum inventories in 2008 of 35,000 troy ounces, the unprecedented rise in Platinum prices were certainly not justified by supply and demand, but rather by manipulative transactions in 2008.

267. By August, 2008 the market forces of supply appeared to have been overwhelmed and prices started to fall for no apparent reason and without any fundamental reason.

-51-

268. As such, Platinum prices as well as the NYMEX contract fell back by July 2008 to $1760.5. This sudden drop in prices was also not in line with what people believed-- that the market was in an extreme deficit as reflected by the very high market prices.

268a. The continuous downward pressure on prices was due to the auction process which determined that prices should decrease and thus LPPM/LPPFC members were asked to and did agree to coordinate efforts to artificially march prices in a downward direction, alhtough these same pries should have been going up not down under fundamental analysis.

269. Because there were no new mines coming onto production for Platinum in the summer of 2008, and no decrease in demand, under normal circumstances, there would have been no explanation for this sudden drop in price, other than market distortion due to manipulation occurring simaltaneously in the London Spot Market.

270. In fact, there appears to be absolutely nothing fundamentally different in July, 2008 from March, 2008 in terms of supply and demand. However, the price declined from its high of $2200 in March, 2008 to $1700 in July, 2008 before finally settling at $900 by year-end. See Chart for Spot Platinum annexed hereto as Exhibit 2.

271. One market factor that had changed was that defendants continuous banging the fix transactions in physical Platinum during the fixes.

272. Defendants also caused the sudden decrease and collapse of the artificially high NYMEX Platinum Market by selling off their large holdings in the Physical Market in London to create fraudulent profits. Because the market for NYMEX Platinum was illiquid, such large sell offs in the Winter, Spring and Summer of 2008 where the defendants earned profits also effectively artificially decreased the market for NYMEX Platinum thus forcing out the other market competitors such as plaintiff whom could not compete in the artificial markets due to a

-52-

sudden and unexpected Margin Call.

273.   By year end 2008, there was no difference in the fundamentals of supply and demand from March, 2008 to December, 2008, yet the market price had dropped by over 50% back to approximately $904 per ounce,–an extraordinary, unprecedented and unjustified sudden collapse by the auction process.

274.   This price of $904 is approximately what Platinum was back in 2005 prior to when the manipulative conduct began.   See Exhibit 2.

275.   Clearly an inference of causation can be drawn from the aberrant movements in a downward direction during this time period, during the relevant time period, that are so out of line with historical norms and fundamental analysis.

**Because Experts have identified Aberrant Price Movements in Platinum Prices Between 2008 and 2014 at the time of the Fixes where prices spiked arount the fixes and such movements cannot be explained by the legitimate forces of supply and demand, an inference of causation of artificial prices is established.**

276.   Another way to prove causation of price artificiality in Platinum spot and NYMEX prices is based on aberrant behavior where a prices of a particular commodity in this case Platinum and/or Palladium are aberrant.   In Re Crude Oil (Occurrence of a reversal of Backwardation and Contango supported an inference of market manipulaiton and causation of price artificiality.)

277.   Experts utilized a model that was designed to capture the dynamic features of the platinum ma rket's volatility in order to determine  whether or not price moves around the daily Platinum and Palladium Fixings are anomalous and statistically significant.

278.  With respect to the platinum market expert,  a n analysis was conducted that   examined: (1) anomalous   price moves over a seven year period (January 2008-

September 2014) both before and during the afternoon Platinum and Palladi um Fixings;( 2) intraday price moves on specific days across this period that not o nl y included platinum prices before, during, and after the afternoon fixing window, but also compared t hese price movements to movements in other markets; (3) intraday price and return moves over a seven-year period, with analyses for each year within this period; and ( 4) potential evidence of "i nformation leaking" that suggests that Defendants were moving platinum prices around the Platinum and Palladium Fixings inbfavo r of themselves and their preferred clients and to the detriment of other market participants such as Plaintiff who believed she was tradi ng in a competitve market.

279. These analyses point to unusual price moves in the markets for platinum and platinum futures. As d escribed in further detail below, these price movements can only be ex plained by Defendants' unlawful manipulation and therefore creating a strong inference of causation.

280. There was also expert preliminary analyses of palladium prices around the afternoon Platinum and Palladium Fixing. These analyses similarly reveal anomalous movements in the prices of palladium t h a t can only be explained by Defendants' unlawful manipulation.

281. Because Platinum and Palladium are interchangeable in the relevant market place for manufacturing autocatalysits, this Scheme could not have worked unless both Platinum and Palladium which moved together were both being manipulated. Otherwise end users could have just switched from one metal to the next based on aberrant pricing. See Exhibit 7.

-54-

282.    The inferences drawn from these aberrant and anomalous price movements is the existence of market manipulation.

283.    Price moves after the Platinum and Palladium Fixings were also observed in order to analyze the ex tent to which pre-fix moves reverse after the Platinum and Palladium Fixing because such a phenomenon creates an inference of causation of price artificiality.

284.    When assessing the degree to which price fluctuatio ns around the daily afternoon Platinum and Palladium Fixing are anomalous, the expert analysis considered price movements across two distinct windows: ( l) price moves occurring in t he 30-minute window before the start of the afternoon Platinum and Palladium Fixing call; and (2) price moves during the afternoon Platinum and Palladium Fixing call itself.

285.    In examining these windows, expert analysis found that there was a relatively high frequency of anomalous price moves both before and during the calls between at least 2008 and 2014. The following tables summarize both the frequency of these anomalous price moves as well as their quantum over this period.

## FREQUENCY OF ANOMALOUS

## OBSERVATIONS

|  | Before Call | During Call | Combined |
|---|---|---|---|
| 2007 | 7% - 23% | 5% - 18% | 12% - 36% |
| 2008 | 6% - 18% | 8% - 17% | 13% - 33% |
| 2009 | 8% - 25% | 8% - 25% | 16% - 45% |
| 2010 | 10% - 22% | 10% - 20% | 18% - 36% |
| 2011 | 9% - 27% | 7% - 21% | 13% - 37% |
| 2012 | 12% - 25% | 6% - 20% | 17% - 40% |
| 2013 | 12% - 24% | 9% - 20% | 20% - 41% |
| 2014 | 13% - 28% | 10% - 22% | 22% - 40% |
| 2007 - 2014 | 10% - 25% | 10% - 20% | 20% - 40% |

# QUA NTU M O F ANOMALOUS

# OBSERVATIONS

| | Before Call | During Call |
|---|---|---|
| 2007 | 0.30% - 0.45% | 0.30% - 0.50% |
| 2008 | 1.35% - 1.20% | 0.35% - 1.00% |
| 2009 | 0.60% - 0.85% | 0.55% - 0.65% |
| 2010 | 0.45% - 0.65% | 0.45% - 0.50% |
| 2011 | 0.45% - 0.60% | 0.40% - 0.60% |
| 2012 | 0.45% - 0.60% | 0.35% - 0.45% |
| 2013 | 0.50% - 0.65% | 0.40% - 0.50% |
| 2014 | 0.30% - 0.35% | 0.25% - 0.35% |
| 2007 - 2014 | 0.50% - 0.65% | 0.45% - 0.60% |

286. As the above charts demonstrate, the frequency of anomalous observations was substantial, ranging from 10%- 25% before the afternoon Platinum and Palladium Fixing call to 10% -20% during the call from at least 2008-2014. In addition, the quantum of anomalous observations was also substantial, ranging from 0.50% - 0.65% before the afternoon Platinum and Palladium Fixing call to 0.45% - 0.60% during the call during the same period.

-57-

287. Experts also tested the direction of the anomalous moves to determine whether they were largely negative (in the case of price suppression) or positive (in the case of price inflation). To assess whether price moves were negative or positive, experts independently determined the percentage of anomalous price fluctuations that were negative or positive around the daily afternoon Platinum and Palladium Fixings.

288. Experts found that for the period 2008 through 2014, between 50% and 65% of all anomalous moves were negative. By contrast, only 35% - 50% of anomalous price moves were positive, as shown in the graphic below.

AVERAGE SIGN OF ANOMALOUS OBSERVATION

|  | **% Postive** | **% Negative** |
|---|---|---|
| 2008-2014 | 35%-50% | 50-65% |

289. The above chart demonstrates that from at least 2008-2014. Defendants' manipulation resulted in a general suppression of platinum prices.

290. Experts also graphically demonstrated the dispersion of anomalous prices moves before and during the Platinum and Palladium Fixings.

**DISPERSION OF ANOMALIES BEFORE THE FIXING CALL**



291.    The above graphical analyses demonstrates a noticeable increase in the percentage of anomalous negative price moves during the afternoon Platinum and Palladium Fixing window when compared to price moves during the pre-Fixing window.

292.    Price suppression would help platinum futures traders with particularly large short positions in the futures markets because they become more valuable as prices, or future expectations of prices, drop-provided that they close out their positions before any reversal of prices. According the CFTC's *This Monnth in the Platinum Futures Market,* commercial traders of platinum futures-i.e., traders, like Defendants, who transact in the futures market for hedging purposes-have held outsized short positions at points during the Relevant Period when compared to their long positions.

293.    For example, in November 2012, the number of "commercial" short positions was *over jive times larger* than the number of "commercial" long positions (9,100 long vs. 51,400 short). A similarly large disparity was observed a year earlier, in November 2011 (5,700 long vs. 29,100 short). Thus, Defendants had ample motive to actively

participate in suppressing prices when it favored their short positions. To the extent that they held long positions at different points duting the Class Period, Defendants wo uld move the platinum prices during the Platinum and Palladi um Fixings to artiticial levels in o rder to benefit those positions.

### A. Sample Price Charts From Specific Days Demonstrate Anomalous Activity Around And During the Platinum and Palladium Fixings.

294.    Experts also analyzed platinum futures p rice behavior around and during the daily afternoon Platinum and Palladium Fixing on certain days w here the experts' statistical model identified anomalous price moves. As ex plained abo ve, platinum physical and futures prices tend to be highly correlated, so anomalous prices moves in the physical market will be tracked in the futures market and vice versa. For each of t hese days, experts produced a chart demonstrating the price moves around the fixing window.

295.    In addition, for each of the specific dates, the experts also analyzed price activity occurring simultaneously in other markets to ensure that the anomalous prices moves in platinum were not matched in other markets, and thus, not likely to have been driven by broader macroeconomic forces.

296.    Movements in other markets in sync with Platinum and Palladium movements would support legitimate not manipulated price movements. Beca use these markets were supposed to move together in response to world news and worldwide events that equally effected all markets, a deviation of Platinum and Palladium from their benchmarkets support a strong inference of manipulation. Such other markets are therefore used as a

-60-

benchmark tor purposes of comparison including physical gold, U.S. dollar index, and MSCI emerging markets index.

297.   Gold is often used as a hedge against inflation, deflation, and other indicators of macroeconomic turmoil. Generally, when these factors are present there is a flight to gold as an investment, which in turn, results in increased prices tor gold.

298.   As a result, the price of gold should reflect the presence or absence of these factors around the time of the Platinum and Palladium Fixings.

299. Thus, for example in Q4 2008 when Gold was exponentially increasing so too should have Platinum, instead of decreasing in value without explanation and out of sync with Gold.

300. The U.S. dollar index is a measure of the value of the U.S. dollar relative to six of the major currencies. This index has a significant influence on the U.S. futures and option markets. including platinum futures and options. By showing the movement of this index around and Palladium one can rule out are the change in the value ot the U.S. dollar relative to other currencies .

301. Similarly, the MSCI emerging markets index can be used to rule out anomalous observations in the platinum market that are caused by the change in the performance of investments tied to economic conditions in emerging markets

302. Charts were created by experts that demonstrate the relative movements in these markets around the afternoon Platinum and Palladium Fixings and juxtaposed them to movements in platinum prices on anomalous dates identified by their

statistical model.

303. Specifically, they found several days where activity around the afternoon Platinum and Palladium Fixing may be the result of front running behavior on the part of Defendants. In the charts that follow, they found that there was distinct price decreases shortly before the afternoon Platinum and Palladium Fixing, which continues during the Fixing, only to bounce back after the Fixing.

304. Based on these movements, an inference can be drawn showing that these Defendants have taken advantage of the information asymmetry created by the fact that, by exchanging information with other Platinum and Palladium Fixing members prior to the fixing call, they have prior knowledge of the composition of the buy and sell order books ahead of the Fixing.

305. For example, on May 11, 2009, one can see a sharp dip starting at about 1:35 p.m. GMT/8:35 a.m. EST that lasts through the entire afternoon Fixing window. It is only after the Fixing ends and the price is "fixed" at $1,114 per troy ounce that prices begin their slow creep back to the pre-Fixing levels. Moreover, as seen in the second chart for May 11, 2009, these price moves are not observed in any other market.



-62-





Relative Fluctuations of Platinum Futures Prices and Indices - 11 May 2009

306.   The price moves within the afternoon Platinum and Palladium Fixing window are even more dramatic on November 5, 2009. On this date, platinum prices begin to fall before the start ofP the Fixing window, and then accelerate their fall during the Fixing, moving from around $1368 per troy ounce to $1,359 per troy ounce, in a span of 24 minutes. Only after the price of platinum is "fixed" does one see prices reversing course and ascend back up to pre-Fixing levels. Further, the second chart for May 11, 2009, above, the second chart for this date also shows no similar price moves in the benchmark markets. This is highly anomalous and suggestive of manipulation during the fixing window by defendants.

-63-

Platinum Futures Prices November 5, 2009

(See Exhibit 12 annexed hereto)

Relative Fluctuations of Platinum Futures Prices and Indices



307.   In addition, the intraday price movements in the platinum futures

market before and after the afternoon Platinum and Palladium Fixing caused price

manipulation during the afternoon Fixing window. Price movements typical of this kind of

-64-

anomalous behavior are sharp price changes in the afternoon Platinum and Palladium Fix

ing window that are not consistent with market behavior prior to and after the fixing window.

308. Anomalous price moves before and during the afternoon Platinum and Palladium Fixing are observed on January 12, 2010. On this date, prices before the afternoon Platinum and Palladium Fixing fell from slightly over $1,600 per troy ounce to around $1,585 per troy ounce. The suppression continues shortly into the Fixing window, only to abruptly reverse course through the fixing call. Such a reverse can occur if a participant enters large buy orders or when "spoofed" sell orders have been withdrawn. Again, the pre-fix suppression and subsequent reversal of relative platinum futures prices are not matched by relative moves in any of the other indices.



309. Similarly, reversals of prices within the afternoon Platinum and Palladium Fixing window are also observed on September 20, 2010. Again, the price moves in the platinum futures market on this day were not matched by similar price moves in the other markets analyzed by experts.

-65-



Relative Fluctuations of Platinum Futures Prices and Indices Sept. 20, 2010



310. On April 28, 2009, one can see a sharp dip in futures prices in the half hour leading up to the afternoon Platinum and Palladium Fixing, from approximately $1,090 per troy ounce to just under $1,075 per troy ounce just before the afternoon Platinum and Palladium Fixing starts. Once the afternoon Platinum and Palladium Fixing starts, the price of platinum soars dramatically, but in the last seconds drop about $7.00 before the Fixing window closes.



311. This movement is highly anomalous because as seen in the following chart, activity in other markets is relatively stable around the Platinum and Palladium Fixing window. As explained above, the lack of price movement in these other markets allows one to discount the possibility of macroeconomic factors playing a role in the observed price moves during the afternoon Platinum and Palladium Fixing. Thus, the price moves observed in the chart above are consistent with manipulation.

Relative Fluctuations of Platinum Futures Prices and Indices w...



**B. Because Experts have identified Aberrant Price Movements in Platinum Prices Between 2008 and 2014 that cannot be explained by the legitimate forces of supply and demand, an inference of causation of artificial prices is established.**

312. A sharp dip and post-Platinum and Palladium Fixing reversal in platinum futures prices is also observed on September 25, 2009. On this date, platinum prices fell from nearlyS 1,300 per troy ounce to $1,275 per troy ounce in the minutes leading up to the afternoon Platinum and Palladium Fixing. Soon after, these prices rebounded close to the levels prior to the attemoon Platinum and Palladium Fixing.



313.  Moreover, like the April 28, 2009 chart above, the following chart for September

25, 2009 shows that the activity observed in around the afternoon Platinum and Palladium Fixing

window is absent in the other markets. A reasonable inference can be drawn based on this

comparison between a non-manipulated market and the present market of price artificiality and

manipulation in the Platinum and Pladium Fixing Window.



314.  As shown by the above charts. the price of platinum futures around the

afternoon Platinum and Palladium Fixing window observed the same distinct pattern of

price suppression that was then followed by a reversal, either during the Fixing or post-

Fixing. These price moves are highly anomalous and indicative of price artificiality.

315.  However, anomalous moves were not always characterized by pre-fix

price suppression.  In some instances, Defendants sought to dramatically raise the

price of platinum around the afternoon Platinum and Palladium Fixing. To illustrate this

point, on January 11, 2012, there was a sharp spike in platinum prices in the 30 minutes

leading up to the beginning of the afternoon Platinum and Palladium Fixing from around $1

,478 per troy ounce to over $1,495 per troy ounce. Shortly after the Platinum and Palladium

Fixing began, prices fell sharply.

316. As they amassed their customer orders ahead of the afternoon Platinum and Palladium Fixing, Defendants shared this information with each other and took positions in the physical and derivatives market to ensure that they would ride ahead of order flows to take advantage of rising prices. Indeed, knowing their respective customer order flows, Defendants engaged in front running of customer orders between 13:30:00 GMT and 1 3:45:00 GMT moving platinum prices up uneconomically in the market just ahead of the afternoon fixing call.

317. To perform this analysis, the experts normalized platinum prices across these years for purposes of identifying particular times of the day demonstrating there were, on average, sharp price movements.

318. Experts found that there was a sharp dip in the average normalized prices in the minutes leading up to and during both the morning and afternoon Platinum and Palladium Fixings, as shown in the chart below.



Average Normalized Futures Platinum Price: Oct 2007

319. These results suggest some anomalous market behavior taking place throughout this period. Moreover, because this behavior has been observed before the release of the fixing price, these price moves are suggestive of front-running and information leakage occurring during the Platinum and Palladium Fixing call.

320. Further, these anomalous price moves around the Platinum and Palladium Fixings were also compared to corresponding fixings for gold and silver. Indeed, when one compares the relative movements of prices around the respective fixings for gold, silver, and platinum, one can see that, each experiences similar price drops in the time period leading up to the fixings, followed by a reversal. This is not surprising given that gold and silver have come under recent regulatory scrutiny with respect to their fixing processes and the behavior of prices around and during those fixings, as explained in further detail below.

321. To illustrate the similarities in the way that physical prices in the gold, silver, and platinum fixings exhibit similarly anomalous price drops and recoveries around their respective fixings, experts analyzed the average normalized intraday prices in the gold, silver, and platinum markets around their corresponding fixing times, using a time period of one hour before and after the fixing times of each precious metals market (the afternoon gold tixing is at 3:00p.m. GMT/lO:OO a.m. EST, and the silver fixing is at 12:00 p.m. GMT/7:00a.m. EST). The chart below demonstrates that prices of gold, silver, and platinum all experience sharp drops around their respective fixings with subsequent recoveries post-fixing.

Across Different Precious Metals Markets

-71-



Physical liquid curve          ----- Physical silver

322 . To confirm their inferences with respect to price moves due to
manipulation around the Platinum and Palladium Fixings, experts conducted further analyses
to illustrate the degree to which the prices and returns of platinum futures around the daily
Platinum and Palladium Fixings are anomalous.

323. In the following chart, experts measured the extent to which platinum
prices are different from the immediately preceding prices (the "Linear Forecast Errors") and
the extent to which platinum returns are different from immediately preceding returns (the "R
eturn Forecast Errors").

324.    Specifically, for each value of the Linear Forecast Errors series, experts
plotted the squared difference between the current price and the average price in the previous
30 minutes. This process was repeated for the Return Forecast Error series, using returns
instead of pnces.

325. These Forecast Errors are a measure of outlier prices. Therefore, large
increases in the size of these forecast errors correspond to large fluctuations in average
normalized platinum prices. Normally, large price fluctuations would not occur in properly
functioning markets absent some market-shaking event.

-72-



326. The Chart above demonstrates large spikes in both the Linear and Return Forecast Errors at both the morning and afternoon Platinum and Palladium Fixings over the seven-year period they analyzed. These results highlight the fact that the price moves around the Platinum and Palladium Fixings are highly anomalous.

327. Experts also conducted similar analyses for each year during the seven-year period analyzed. These year-by-year analyses showed that in each year within the 2007-2014 period exhibits similar spikes in these Forecast Errors around the Platinum and Palladium Fixing.

328. This r e s u l t is contrary to what should occur in a free market; b u t consistent with a manipulated market. The period around the afternoon Platinum and Palladium Fixing is a time in which a very large volume of platinum futures are traded, as seen in the following chart. As a result, this should be a period where the futures market is at optimal efficiency with price fluctuations being relatively small.

329. Instead, as seen in the chart above displaying the Average Rolling Forecast Errors, the exact opposite was occurring. Again, the fact that these anomolies were happening at the time of the fix where liquidity was high supports a reasonable inference of manipulation of the Physical Platinum and Palladium Markets during the relevant time

-73-

period.



330.    In addition, experts generated a "Cumulative Platinum Return Index" to

demonstrate the long-term relative differences in average fluctuations of the price of

platinum during the different periods of the trading day. To do this, experts examined

the same eight-hour interval each day containing both the morning and afternoon

Platinum and Palladium Fixings (the "Fixing period") and compared relative

differences in average platinum price fluctuations in the Fixing period to the remaining

eight-hour intervals of each day - i.e., the pre-Platinum and Palladium Fixings period,

from 12:00 a.m. GMT to 7:59a.m. GMT, and post-Platinum and Palladium Fixing

period, from 4:00 p.m. GMT to 11:59 p.m. GMT.

331.    The following chart demonstrates the relative differences in returns

during these three, eight-hour intervals over the period October 2007 through September

2014.



332.     As can be seen in the chart above, the returns in the Fixing period

significantly underperformed during the post-Fixing period. Further, the Platinum and

Palladium Fixing period's strong negative trend confirms that there is a conscious

a n d d e l i b e r a t e  effort to suppress platinum prices during the Platinum and

Palladium Fixings.

### C.     The facts showing slamming and banging the fix transaction demonstrated Disclosure of Confidential Information Around the Platinum and Palladium F i x i n g s .

3 3 3 .  T h e  g r a p h i c  evidence showing abnormal price movements prior

to and at the fix either in an upward direction or in a downward direction absent any news

linked to fundamental analysis demonstrates that the Platinum and Palladium Fixing

members were leaking confidential information obtained from the call to traders on their

derivatives desks a nd potentially some favored clients while the call was ongoing.

334. Traders with information about the nature of the fixing calls are able to

trade ahead of the release of the published "fixing" and profit trom the impending market

movements.

335.    To demonstrate this information leakage, experts used linear forecast

errors (described above), and normalized platinum futures prices from October 2007 to

September 2014. Experts plotted the data series 15 minutes before and 15 minutes after the afternoon Platinum and Palladium Fixing.

336.   As the chart below demonstrates, on average, the platinum futures prices move before the Platinum and Palladium Fixing and in the same direction of the fixing price change.

### Normalized Plaitnum Futures Price and Rolling Forecast Errors October 2007- Septeber 2014

### [See Exhibit 13 annexed hereto]

337. To further analyze the degree to which this phenomenon is taking p l a c e, experts calculated how accurate a predictor price moves in the first few minutes of the afternoon Platinum and Palladium Fixing call are of the price moves across the entire length of the afternoon Fixing call.

338.   The timing of these Price moves in the first few minutes of the fixing window which are the same as those across the entire fixing window, reasonable infers information leakage and insider trading with respect to the information obtained by those partaking in the call because normally there would not be a similar pattern of movement throughout this time frame, rather the pattern would be random.

339.   The following chart demonstrates the percentage of days on which this is the case for each year between 2007 and 2014. It demonstrates the predictive power of three time windows: the first 3, 5, and 7 minutes of the afternoon Platinum and Palladium Fixing. It show also shows the predictive power of a dynamic window that changes window size according to the actual length of the individual afternoon Platinum and Palladium Fixing, *i.e.* when the fixing window is longer, the experts used a longer

-76-

predicting window.



Analysis of Alleged Information Leakage

340.   As can be seen from the chart above, the direction of the price moves in the first few minutes of the Platinum and Palladium Fixing call is typically a good predictor of the price moves across the entire length of the call, with the odds that prices in these intervals will match price moves over the entire length of the call usually being greater than 50% during the Relevant Period, with some years seeing the odds jump to over 70%.

341.   These results listed in #337 *supra* demonstrate information leaking from the fixing members to their proprietary trading desks and their preferred clients.

342.   Indeed. a similar analysis was undertaken by Andrew Caminschi and Richard Heaney of the University of Western Australia in their study of the London

gold fixings.[8]   In their study, they observed that gold futures price moves in the first few minutes of the gold fixing calls accurately predicted the movement of the fixing prices direction over 80% of the time. To Messrs. Caminschi and Heaney, these results, along with the relative increase in the volume of trading in gold futures around and during the gold fixings, was indicative of information leaking to the fixing members trading desks and their preferred clients. Indeed, as shown above, trading in NYMEX platinum futures also spikes around the afternoon Platinum and Palladium Fixing. The fact that both the gold fixings and Platinum and Palladium Fixings demonstrate the same anomalous tendencies is likely not a coincidence because both are similarly subject to the manipulative temptations of their respective fixing members.[9]

### C. Analyses of Palladium Prices around the Platinum and Palladium Fixings Also Reveal Similar Anomalous Movements

343.   Experts also conducted preliminary analyses of palladium prices around the Platinum and Palladium Fixings. Similar to their analyses of platinum prices, experts analyzed intraday average prices between 2007 and 2014 to determine when there were, on average, sharp price movements in palladium prices. As can be seen in the chart below, experts found that there were sharp drops in the prices of palladium around both the morning and afternoon Platinum and Palladium Fixing.

---

[8] Andrew Caminschi & Richard Heaney, *Fixing a Leaky Fixing: Short-Term Reactions to the London PM Gold Price Fixing, J. Of Futures Markets (2013).*

[9] Similar Investigations into the Gold Fix demonstrate manipulation in this Market as well.



Average Normalized Futures Palladium Price: Jan 2007 - Nov 2014

343a. Indeed, during the afternoon Platinum and Palladium Fixings, one can see a noticeable dip in palladium prices near the beginning of the Fixing call, tollowed by a quick recovery. Such a sharp movement over a short period of time *is* highly unusual and thus, is suggestive of manipulation.

343b. To show that the palladium price moves around the afternoon Platinum and Palladium Fixings are anomalous, experts examined the Linear and Return Forecast Errors tor palladium prices around the Platinum and Palladium Fixings. The experts' Forecast Errors analysis was conducted in a manner similar to the Forecast Errors analysis they performed tor platinum, using palladium price readings instead of platinum price readings. The chart below graphically demonstrates these Forecast Errors for palladium around the Platinum and Palladium

Fixings.



Average Rolling Forecast Errors: Jan 2007 - Nov 2014

343c.   As was observed in the Linear and Return Forecast Errors for platinum, large

spikes in both the Linear and Return Forecast Errors for palladium appear at both the morning

and afternoon Platinum and Palladium Fixings over the seven-year period the experts analyzed.

These results highlight the fact that the palladium price moves around the Platinum and Palladium

Fixings are highly anomalous.

344. As with the experts' observations with respect to platinum prices, the presence

of large spikes in the Forecast Errors tor palladium is contrary to what should occur in a

market free of manipulation. The period around the afternoon Platinum and Palladium

Fixing is a time in which a very large volume of palladium futures are traded, as seen in the

following chart. As a result, this should be a period where the futures market is at optimal

efficiency with price fluctuations being relatively small. Instead, as seen in the chart above

displaying the Average Rolling Forecast Errors, the exact opposite was occurring-just as it

was with platinum. These anomalous readings are suggestive of manipulation. See Average

NYMEX Futures Trading Volume Chart, Jan. 2007-Nov. 2014 annexed hereto as Exhibit

14.

345.  Taken together, these analyses suggest that palladium prices were likewise being

manipulated by Defendants to their collective benefit and to the detriment of Plaintiff and the

other members of the investing public.

346.  Further, the fact that similarly anomalous readings have occurred in both platinum

and palladium markets around the Platinum and Palladium Fixings is not a coincidence: as

described above, the same Defendants that are "fixing" the prices for platinum are also "fixing"

the prices of palladium, and are doing so on the same teleconference call using the same

procedures, one right after the other.

**Plaintiff was Injured and Caused to Sustain Actual Losses as Well As Lost Profits as a direct result of her ownership of NYMEX Platinum Futures Contracts during the relevant time period.**

347.  As a result of the aforesaid Manipulation of the NYMEX Platinum Market

during the relevant time period, Plaintiff was caused to sell her NYMEX Platinum Contracts at

artificially deflated prices.

348.  As a result of the aforesaid manipulation of the NYMEX Platinum Market

during the relevant time period, Plaintinff was caused to purchase her NYMEX Platinum

Contracts at artificially inflated prices.

349.  Beginning in by May and/or June, 2008, the prices of NYMEX Platinum

began to  collapse and as a result Plaintiff's account lost its value. Plaintiff was given a Margin

Call on or about August 15, 2008 requiring her to add cash to her account that she never

recovered.  The total losses due were substantial due to the sudden and inexplicable decrease in her NYMEX Platinum as well as consequential losses in other contracts that Ms. Levy was also forced to liquidate due to the Margin Call in Platinum.

350.  Plaintiff also had to forego lost profits in the 2008 NYMEX Contract which was supposed to go to $2500 or $3000 under fundamental  market conditions and due to the strikes in South Africa.

351. A Margin Call requires the customer to either put in more funds to bring the account up to maintenance margin or sell off positions to reduce margin requirements.  Thus, a customer will be forced to liquidate her account absent meeting a Margin Call within three business days.

352.  When the prices of Platinum began to suddenly collapse on or about August 15, 2008 and thereafter, a Margin Call was issued to Ms. Levy's account.  Ms. Levy could not sustain this sudden collapse, and she was forced to liquidate her positions in her NYMEX Platinum Futures Contracts as well as other positions in her account that she was also forced to liquidate once she was placed on a Margin Call.

353.  The sudden and sharp decrease in the Platinum market created a Margin Call on her entire account, not just the Platinum portion of it, thus, causing more loses than just in the Platinum market.

354.  Plaintiff is entitled to rely on the Fraud on the Market Presumption of Reliance since she purchased her contracts during the Relevant time Period when the Manipulation was occurring.

### FRAUDULENT CONCEALMENT

355. Throughout the Relevant Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

356. Neither Defendants nor their co-conspirators told Plaintiff or other members of the Investing Public that they were conspiring to fix, stabilize, maintain, and/or otherwise manipulate Platinum and Palladium Fixings underpinning numerous platinum- and palladium-based transactions. Furthermore, price-fixing conspiracies are inherently self-concealing.

357. Defendants and their co-conspirators conducted their conspiracy secretly concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

358. Defendants and their co-conspirators were able to affirmatively conceal their conspiracy by, among other things, engaging in secret communications to discuss customer orders and to coordinate trading strategies.

359. Because this Scheme occurred in London, England, members of the investing public in New York did not have the ability to hear about what was going on across the Atlantic and regulators could not reach on encroach on Britain..

360. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiff and claims have been tolled.

361. Plaintiff did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust, RICO and commodity laws as well as pendant state law claims until shortly before this action

was commenced. Plaintiff could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection and affirmatively conceal such violations.

362.    Further, reasonable due diligence could not have uncovered Defendants' conspiracy because Defendants' discussions and activities during the Platinum and Palladium Fixing calls were not public information. Information about Defendants' trading positions and holdings in the platinum and palladium physical and derivatives markets are also non-public information.

363.    As a result of the self-concealing nature of the conspiracy, the active steps taken by Defendants to fraudulently conceal their conspiracy, and the lack of public information concerning material aspects of the conspiracy, the statute of limitations was tolled for Plaintiff's claims.

## COUNT 1

## MARKET MANIPULATION IN VIOLATION OF THE
## COMMODITIES EXCHANGE ACT 7 U.S.C. § 1 Et. Seq., 17 C.F.R. § 33.9(d)

364.   Plaintiff repeats and realleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

365.   Defendants undertook the activities alleged herein individually and in concert, and as one another's principal or agents.

366.   Each defendant and/or their principals or agents had the economic power and/or legal authority and/or was otherwise able and had the opportunity and motive to fix and/or set prices for NYMEX Platinum and/or Palladium during the relevant time period.

367.   Each defendant or his principal or agent specifically intended their activities alleged herein to move or support the prices of NYMEX Platinum contracts to or at artificial levels during the relevant time period.

368.   Each defendant or his principal or agent had the ability to and did in fact dominate the market in NYMEX Platinum and/or Palladium in 2008 and during the relevant time period.

369.   Each defendant, his principal or agent caused the prices of NYMEX Platinum to be artificially inflated and/or deflated during the relevant time period

370.   Each defendant or his principal or agent caused the prices to drop sharply from June and/or July 2008 through December 2008 by flooding the market with Platinum and Palladium from their own inventories and to sell to each other on a pro rata basis agreed to during the fixing auctions and outside the legitiamte forces of supply and demand. Thus, each defendant by selling large quantities of physical platinum at the "auctions" on an agreed to pro rata share effectively forced down the prices in the NYMEX 2008 Platinum contracts.

371.   During the relevant period, Defendants aided and abetted the manipulation of the Platinum NYMEX futures contract prices for the 2008 contracts in violation of Sections 6©, 6(d), and 22(a) of the Commodities

Exchange Act, 7 USC §§ 9(1)(a), 13b, 13(a)(1) & (2), and 13(c)(a) and 25(a).

372. Plaintiff is entitled to damages for the violations of the CEA alleged herein which proximately caused her to sustain actual damages. 7 USC § 25(a)

373. Plaintiff is also entitled to a presumption of damages since she purchased her contracts at artificially inflated prices and/or sold her contracts at artificially deflated prices based on the Fraud on the Market presumption of reliance.

### Count II

**DEFENDANTS MADE FALSE, MISLEADING OR KNOWINGLY INACCURATE, FALSE AND/OR MISLEADING REPORTS CONCERNING THE PRICES OF 2008 NYMEX Platinum IN VIOLATION OF SECTION CEA § 6© OF THE ACT, 7 U.S.C § 9(1)(a), 7 U.S.C. § 6b(a)(2)(B), and 7 U.S.C. § 6(c)(2)(B) (Against all defendants)**

374. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

375. Defendants made false reports of the settlement prices and closing prices of NYMEX Platinum and/or Palladium during the relevant time period.

376. Such daily settlement prices and closing prices were intentionally and/or recklessly made with extreme arbitrariness and were inaccurate, false and/or misleading as these settlement prices were based on price fixing and market manipulation in the Physical Market in London.

377. Defendants reported the settlement prices falsely to their agents and principals by way of daily and/or monthly statements caused to be mailed or emailed to their customers.

378. Defendants intentionally made false, misleading and or inaccurate reports concerning the settlement prices of NYMEX Platinum and/or Palladium during the relevant time period by knowingly causing to be published these manipulated settlement prices on its website and/or to have caused to be mailed or emailed this information to clients or to be used to mark -to-market client's positions and/or issue margin calls based on these false, misleading and/or inaccurate

settlement prices.

379.   Based on this violation of 7 U.S.C. § 9(1)(A) and 7 U.S.C. § 6b(a)(2)(B), 7 U.S.C.        §

6(c)(2)(B) of the Commodities Exchange act, plaintiff is entitled to actual damages in excess of the Jurisdiction of this Court.


## Count III

## VIOLATIONS OF THE ANTI-FRAUD PROVISIONS OF THE CEA 7 USC § 6, ET.SEQ.

## Violations of 7 U.S.C. §6(b)(2)(A)- Cheating.

**380.**   Plaintiff repeats and  realleges each and every allegation in the preceding paragraphs and

incorporates by reference herein all such previous allegations.

381.   Defendants did willfully cheat by executing trades in NYMEX and/or Platinum trades between

during the relevant time period in an unlawful manner based on manipulative conduct in connection with the pricing of

Physical Platinum and Palladium in an artificial manner to fix the settlement prices of Platinum and/or Palladium thus

rendering the closing and/or settlement prices artificial and out of line with the legitmate forces of supply and demand.

382.   Defendants  aided and abetted pursuant to 7 USC. § 13(c)(a) and 25(a) the primary violators in

cheating by facilitating these false settlement prices by participating in the trade executions that gave rise to this manipulative

pricing.

383.   Because the price artificiality of Platinum was due to these manipulation occurring during the

auction process in London, England during the relevant time period, the NYMEX Prices were also artitcial.

384   Therefore ,prices also sharply declined due to defendants unloading of large quantities of NYMEX

Platinum and Palladium onto the market causing downward pressure on prices as they took profits.

385.   As a result, Plaintiff received a Margin Call on August 15, 2008 requiring her to liquidate her

Platinum positions and other NYMEX contracts in other commodities and precious metals, and she was required to sell off

these contracts as well by September, 2008, sustaining heavy losses in excess of the jurisdiction of this Court.

**Violations of 7 U.S.C. § 6B(a)2(C)-Willful Deception and/or Aiding and Abetting**

386. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

387. . Such deception confirmed by the artificial settlement prices of NYMEX Platinum caused Plaintiff to enter the Platinum market believing that demand was strong and rising.

388. As a result of defendants' deception, Platinum was caused to sustain severe losses in her NYMEX Platinum Contracts.

## COUNT IV

## VICARIOUS LIABILITY

389. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

390. Under common law, as well as 7 U.S.C.§ 2(a)(1)(A), defendants who are employers or principals are strictly liable and independently responsible for the actions of their employees or agents, and independent contractors herein.

391. Defendants are liable for the actions of their employees and agents during the relevant time period.

392. Defendant GSG, Inc. is liable for the acts of its agents, GSI, GSEC and GS & Co., since The Goldman Sachs Group, Inc. was also a principal of these wholly owned subsidiaires and agents upon information and Belief.

393. GSEC and GS & CO. as FCMs acted as agent for co-defendant GSI and GSG in maintaing positions on the NYMEX Exchange.

394. GSI also acted as agent for the other Goldman Sachs defendants as well as the other auctioneer defendants, the participating member defendant as wells as the Enterprise defendants.

395. Defendant UBS AG is vicariously liable for the conduct of its agent and wholly owned subsidiary UBS Securities LLC.

-88-

396.   Defendant HSBC Holdings Plc. is vicariously liable for the acts of its agents, HSBC Bank USA, NA, HSBC USA, HSBC Securities (USA).

397.   Each of these principals intended to grant to their agents authority to conduct the business of the Parent Companies,  by granting them power to execute trades and positions in this case in NYMEX Platinum and Palladium Physical Platinum and Palladium.  Each agent agreed to the grant of authority to buy and sell Platinum and Palladium futures and physical holdings and to manage a portfolio consisting of the same.

398.   Alternatively, these parent companies retained control over their agents who could be fired at any time; and such parent companies could have stopped the misconduct at any time during the 7 year time span.

399.   John Does #1-20 working for defendants are agents to their principals and to each one's parent company and such parent company and/or employer intended to grant authority to the John Does #1-20 to enter trades to buy and sell NYMEX Platinum and Palladium Futures Contracts over the Exchange; and to purchase physical Platinum and Palladium during the London "auctions." Each John Does #1-20 agreed to accept the authority granted to them by their parent to trade in futures contracts over the NYMEX exchange; and to purchase physical Platinum and Palladium in the London Auctions. Each principal maintained the ability to remove and/or find and discipline the their employees and/.or agent at any time if any of those  personnel violated the NYMEX Rulebook.

400.   Alternatively these agents were given authority to execute trades on their principals's behalf and accepted such authority in placing the unlawful trades over the NYMEX and purchasing Physical Platinum and Palladium during the London Auctions.

### Count V

## VIOLATIONS OF THE ANTITRUST LAWS, 15 U.S.C. § 1, § 2 AS WELL AS  N.Y GENERAL  BUSINESS LAW § 340, Et. Seq. (THE DONNELLY ACT)(Against All Defendants).

401.   The Sherman Antitrust Act's purpose is to preserve or advance our system of free, competitive enterprise, and to encourage to the fullest extent practicable, free and open competition in the market place so the pubic may

receive better goods and services at the lowest obtainable prices.

402.   Any unreasonable interference, by contract, combination, or conspiracy with the ordinary, usual and freely competitive pricing or distribution system of open and competitive markets in interstate trade and commerce constitutes an unreasonable restraint of interstate trade.

403.   Plaintiff, Ms. Levy, was a direct purchaser of NYMEX Platinum contracts during the relevant time frame and in the Relevant Market. She purchased her contracts directly over the NYMEX and through her FCM.

404.   Plaintiff was a direct purchaser of NYMEX Platinum contracts because she held these contracts in her own name and for her own account and was the beneficial owner of these contracts.

405.   Plaintiff was a direct customer/competitor of NYMEX Platinum during the relevant time period and therefore has antitrust standing to bring a claim under the Sherman Act and Donnally Acts.

406.   The relevant market consisted of the market for NYMEX Platinum contracts for delivery between in 2008 and/or during the calendar year of 2008 along with the delivery of physical Platinum consisting of 50 ounces per contract that met the specification of the NYMEX contract in the United States.

407.   This market repeated itself every year during the relevant time period as contracts were writtne for 2009, through 2014 consisting of the NYMEX contract and 50 ounces of physical Platinum.

408.   Alternatively the relevant market consisted of the market for NYMEX Platinum contracts for delivery from 2008 through 2014 in the United States.

409.   Defendants violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiff.

410.   NYMEX Platinum futures contract prices substantially affected interstate commerce because these contracts are publicly reported throughout the United States in interstate commerce.

411.   During the Relevant Period, defendants' violations substantially affected

-90-

interstate commence because defendants bought and sold NYMEX Platinum and Palladium futures contracts and/or physical Platinum and Palladium directly in interstate commerce.

412. Each of the Defendants were independent decision makers who followed their own internal manuals and procedures and were competitors for NYMEX Futures Contracts and well as Physical Platinum and Palladium during the relevant time period.

413. Defendants were independent decisions markers and competitors for NYMEX Platinum and Palldium as well as Physical Platinum and Palladium during the relevant time period.

414. Defendants intentionally conspired and contracted with each other through independent and/or through their agents by purposefully fixing the prices of NYMEX Platinum during the relevant time period to be artificially lower and/or higher than the normal market prices and from what was indicated by the fundamental factors of supply and demand.

415. These above-mentioned defendants acted in furtherance of the price fixing conspiracy to fix the prices of NYMEX Platinum and Spot Platinum artificially prices to inflate and/or deflate such prices to cause other competitors such as plaintiff herein to pay more to get less with respect to her NYMEX contracts in comparison towhat was normal and which would have been less absent the price fixing Scheme.

416. Defendants' unlawful agreement in restraint of trade and other anticompetitive conduct unreasonably restrained commerce, inflated and then deflated NYMEX Platinum and futures contract and spot prices, and caused misleading signals to be sent to market participants.

417. The above-named defendants had the ability to accomplish their price fixing Scheme by a variety of means including the slamming the fix transactions, banging the fix transactions, purchasing contracts in violation of position limits, and/or by entering into trading

huddles in New York and London where market information was readily shared among competitors so that each defendant could calculate how to act in concert to set prices to their advantage and to the advantage of their trading desks.

418. As a direct result of Defendants' anti-competitive conduct and agreement in restraint of trade, NYMEX and Spot Platinum prices rose dramatically and also fell without any reason linked to the legitimate forces of supply and demand, like a puppet on a string, and became artificial during the relevant time period.

419.   Plaintiff was caused to pay higher than normal prices for inflated contracts and was caused to suffer severe monetary losses when the prices suddenly fell and became artificially deflated also due to defendants' conspiracy and conduct in flooding the market with contracts and/or phsyical assets.

420. Whereby Plaintiff has been damaged in her property or business, and has paid supra-competitive prices.

421.  Defendants' unlawful acts alleged herein have had a substantial anticompetitive effect on interstate commerce within the United States.

422.  Plaintiff suffered antitrust injury because she was damaged by defendants sudden suppression of market prices thus causing plaintiff to receive a margin call on August 15, 2008 requiring her to satisfy a margin call by paying artificially inflated prices. Because of this price fixing Scheme , Ms. Levy suffered a sharp decline in her holding thus sustaining actual, consequential, out-of- pocket, and exemplary damages in excess of the jurisdication of this Court.

423.  The alleged price-fixing Scheme constitutes a per se violation of the Sherman Act, § 1, 15 U.S.C. § 1.

424.  The alleged price fixing Scheme also violates the rule of reason.

-92-

425.    The aforesaid price fixing contracts, combinations and conspiracy was in violation of Section § 1 of the Sherman Antitrust law, and the Donnally Act N.Y. General Business Law § 340, Et. Seq.

426.  As a result of said unlawful acts, Plaintiff is entitled to recover three fold the damages sustained by her, together with costs of suit, including reasonable attorneys fees, together with interest.  Plaintiff has been damaged in an amount as yet undetermined but believed to be in excess of the jurisdiction of this Court.  See Strobl v. NYMEX, 768 F. 2d 22 (2d Cir. 1985); **The Availability of Antitrust Treble Damages For Commodities Market Manipulation,** 54 FORDHAM LAW REVIEW, p. 853 (1986); 15 U.S.C. § 15.

## Violations of the Sherman Act, 15 USC § 2, NY GBL § 340, Et. Seq. Monopolization Against All Defendants

427.  The above-named defendants also had the economic power to push the prices of NYMEX and Spot Platinum higher or lower to accomplish their price fixing Scheme because the defendants controlled enormous assets and had the economic power to purchase and sell and did in fact purchase and sell and sustain in their inventories without any real need for these goods consisting of Platinum and/or Palladium and large quantities of NYMEX Platinum contracts and/or physical holdings that other competitors simply could not afford to compete with.

428.  As such defendants had the ability to corner the market and squeeze the shorts by simply buying up large amounts of spot and NYMEX Platinum during the relevant time frame.

429.  Defendants all multimillion dollar and/or billion dollar companies also had the economic resources to maintain these trades on behalf of themselves and their preferred clients and all defendants were independent decision makers who came together in the London auction fix to dominate the market for phsical Platinum and Palladium as well as NYMEX Platinum and

-93-

Palladium.

430.    Defendants through their agents and on their own behalf jointly and severally

monopolized or attempted to monopolize and combined or conspired among themselves and

among other persons and entities presently unknown to the Plaintiff but well known to these

defendants, to monopolize a part of the trade or commerce among several states of the United

States or the District of Columbia, to wit: the interstate trading of NYMEX Platinum Futures

Contracts for delivery in 2008 to 2014. These defendants did so by controlling the prices of

NYMEX Platinum through their price manipulation strategies due to their physical purchases in

London England.

431.    Defendants possessed and/or acquired monopoly power through restrictive

and collusive means, including by acquiring a dominant position in physical Platinum and/or

Palladium even though defendants had no commercial need for such physical Platinum or

Palladium and then uneconomically waited to sell such dominant positions during the relevant

period from January, 2008 through December, 2014.

432.    Defendants also were able to control the prices of NYMEX Platinum and

Spot Platinum in the relevant markets by setting prices twice daily in the London Physical Market

with all defendants in part by agreeing to purchase or sell Platinum or Palladium to each other on a

pro rata basis.

433.   Defendants' price control during the Relevant Time Period  reflects monopoly, power and collusion.

434.   Defendants willfully acquired and maintained this monopoly power during the relevant time period and foreclosed competitors such as plaintiff herein from effectively competing in the market place by causing sudden, large and unnatural swings in the prices of NYMEX Platinum causing plaintiff as a competitor to lose her holdings by being squeezed out of the Market.

435.   Because of defendants' conduct, plaintiff Ms. Levy was caused to suffer monetary losses starting in June, 2008 and thereafter when defendants price-fixing by artificially suppressing prices.

436.   Such price-fixing conduct in restraint of trade caused artificially suppressed prices in the 2008 NYMEX Platinum Contract thus causing Ms. Levy to receive a margin call and wiping out her investment in the amount of $364,000.

437.   This Monopolization of the market effectively caused damage to plaintiff's business and/or property as a futures investor in NYMEX Platinum.

438.   The aforesaid monopolization, combination or conspiracy was in violation of Section 2 of the Sherman Antitrust Act , the Donnally Act NY Gen Bus Law.§ 340 and Common Law.

439.   As a result of said unlawful acts, and antitrust injury, the Monopolization of the NYMEX Platinum market artificially caused suddenly decrease causing Plaintiff's loses; thus plaintiff is entitled to recover threefold damages sustained by her together with costs of suit, including reasonable attorneys fees, together with interest.

-95-

### Count VI

## VIOLATIONS OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATION ACT, 18 USC §§ 1961, ET. SEQ. AND 18 USC §§ 1962(a)(b) &©.

440.   Plaintiff repeats and realleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

441.   This RICO Cause of Action asserts claims against the Goldman Sachs International, defendant the HSBC BANK USA NA, Standard Bank, BASF, (the "auctioneer" defendants) and John Does #1-20 ("the RICO defendants) for violations of 18 U.S.C. § 1962(a)(b) and © *inter alia* for conducting the affairs of the LPPM and/or LPPFC (the "Enterprise" defendants) through a pattern of racketeering activity.

442.   During the relevant period, plaintiff Susan Levy was and is a "person" as that term is defined under 18 U.S.C. § 1961(3).

443.   During the relevant period, plaintiff was injured in her business or property as a direct investor in and owner of NYMEX Platinum Futures Contracts for future delivery in April, July and/or October, 2008 by reason of RICO Violation within the meaning of 18 U.S.C. § 1964©.

444.   During the relevant period, the RICO defendants are "persons" as defined under 18 U.S.C. §§ 1961(3) who conducted the affairs of the Enterprise described below through the pattern of racketeering activity described below. While the RICO defendants ("RICO defendants" hereinafter) participated in the Enterprise, these RICO defendants had an existence separate and distinct from the Enterprise. ("LPPM" and/or "LPPFC" are the "Enterprise" Defendants)

445.   Further, the Enterprise is separate and distinct from the "pattern of

racketeering activity" in which the RICO defendants have engaged.

446. During the Relevant period, the RICO defendants were associated with, operated or controlled, the Enterprise, (the LPPM and/or LPPFC) and the RICO defendants participated in the operation and management of the affairs of the Enterprise also referred to herein by a variety of actions described herein.

447. The RICO defendants' participation in Enterprise was necessary for the successful operation of the RICO defendants' Scheme.

## THE RICO ENTERPRISE

448. Section 1961(4) of RICO defines an "enterprise" as "any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

449. The following persons, and others presently unknown, have been members of and constitute an "enterprise" within the meaning of RICO which are referred to herein."Each entity individually and/or in combination as an association-in-fact constituted the RICO Enterprise.

    a. the LPPM

    b. Defendants the LPPFC

450. Each of the above-companies individually or in combinationt formed an enterprise or alternatively in combination formed an association-in-fact as defined within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" individually or associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described in this Complaint, namely by setting up and administering an Auction Process to buy and sell physical Platinum and Palladium during the relevant time period.

451. The Enterprise was and is still an ongoing organization with an ascertainable

structure, and a framework for making and carrying out decisions, that function as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which the RICO defendants have engaged. The Enterprise was used as a tool to effectuate the pattern of racketeering activity alleged herein.

452. The participants of the Enterprise, including the auctioneer defendants along with the FCM defendants and UBS AG are and/or were all in the business of buying and selling futures contracts sold in the United States and/or physical assets and each entity individually and as an association-in-fact was and/or is engaged in activities effecting interstate commerce both presently and/or at the times relevant to this Amended Complaint within the meaning of 18 U.S.C.§§ 1961(4) and 1962©.

453. The RICO defendants accomplished their goals by defrauding and' manipulating customers, by the various means described in this Complaint and through dishonest practices described in this Complaint causing price artificiality.

454. The RICO Defendants are members of the Enterprise participated in these RICO violations by failing to stop the conduct of their employees and agents who were blatantly violating the laws and also continuing to engage in dishonest conduct.

### RICO PERSONS

455. The auctioneer defendants, the FCM defendants, UBS AG as well as John Does, ##1-40 and the other defendants herein as co-conspirators and aiders and abettors are defined as persons within the meaning of 18 U.S.C.A.§ 1961(3). Each RICO defendant, received income derived directly and/or indirectly from a pattern of racketeering activity which was used to acquire an interest in said enterprise in violation of 18 U.S.C. A § 1962(a). To wit:

a. Defendants earned profits from the manipulative trades in physical and/or

-98-

NYMEX Platinum and/or Palladium made during the relevant time period.

        b.  Defendants all earned fees, commissions and or bonuses and/or perks directly or indirectly related to the profits generated as a result of the manipulative conduct during the relevant time period in connection with the trading of NYMEX Platinum and/or Palladium during the relevant time period in violation of 18 U.S.C. § 1962(a)

        c.  RICO defendants, and their co-conspirators and aiders and abettors knew of the criminal aspects of Manipulative Scheme and each RICO defendant intentionally acted to engage in this continued conduct 2008 through 2014 to personally gain fees, commissions bonus and other perks in connection with this unlawful activity.

        456.  Each RICO defendant, as persons within the meaning of 18 U.S.C.A. § 1961(3) through a pattern of racketeering activity maintained directly or indirectly an interest in and/or control of the affairs of said enterprise in violation of 18 U.S.C.A. 1962(b).

        457.  The RICO Defendants, within the meaning of 18 U.S.C.A. § 1961(3) and as persons employed by and/or associated with the Enterprise conducted and participated directly and indirectly in the conduct of the affairs of said Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. A. § 1962©.

**PATTERN OF RACKETEERING ACTIVITY**

        **458**.  As set forth herein, the RICO defendants have engaged in a pattern of racketeering activity with respect to the price fixing Scheme of NYMEX Platinum and /or Palladium as defined in 18 U.S.C.§ 1961(5), by committing or conspiring to commit at least two acts of racketeering activity, described below within the past 10 years.

        459.  The RICO defendants have engaged in a Scheme to defraud consumers and/or competitors, including plaintiff through fraudulent misrepresentations, knowing

concealment, suppressions and omissions of material facts such as by creating and publishing false and misleading settlement prices that were artificially inflated and/or deflated with respect to NYMEX Platinum to lure members of the investing public including Ms. Levy into the NYMEX Platinum market to provide liquidity for defendants so they could trade out of their unlawful positions at a tidy profit and then tank the market as they exited their huge positions.

460. The RICO defendants Scheme to defraud was knowingly made and reasonably calculated with intent to deceive and defraud persons of ordinary prudence and comprehension, including plaintiff.

461. The RICO defendants' Scheme to defraud was knowingly made with intent to induce and did induce reliance by plaintiff upon such misrepresentations, concealment, suppressions or omissions to wit the falsity of the settlement prices that were artificial due to the manipulative conduct inducing plaintiff to purchase her contracts and forcing her to sell them at artificially reduced prices.

462. The RICO defendants' Scheme to defraud was made with the purpose of gaining hundreds of millions or tens of millions of dollars in profits from customers including plaintiff that would not have been gained but for the RICO defendants' conduct and omissions alleged herein in this Complaint.

463. As alleged, the fraudulent Scheme consisted of manipulative acts enumerated in This Complaint.

**PREDICATE ACTS-(WIRE FRAUD, 18 U.S.C.§ 1343, MAIL FRAUD,**

**U.S.C. § 1341, MONEY LAUNDERING, 18 USC § 1956, TRANSACTIONS IN STOLEN**

**PROPERTY AND SALE OR RECEIPT OF STOLEN MONEYS, 18 USC § 1957.**

464.   Each RICO defendant engaged in two or more predicate acts in furtherance
of the Racketeering activity during the relevant time period which spanned over seven years from
at least 2008 through 2014 and would have continued indefinitely but for the LME's decision
totake over the Platinum and Palladium Auction Process that ended the aforesaid Racketeering
Conduct.

**Each Defendant Committed at least Two acts of Wire Fraud- In**
**Violation of 18 USC § 1343 In Furtherance of their Scheme to Defraud**

465.   In furtherance of the manipulative trading practices to artificially inflate and
deflate the prices of NYMEX Platinum during the relevant time frame and at various times
relevant to this  Complaint from on or about  2008 through 2014, The RICO defendants
unlawfully, willfully and knowingly, having devised and intending to devise a Scheme and
artifice to defraud, and for obtaining money and property by means of false and fraudulent
pretenses, representations, and promises would and did transmit and/or caused to be transmitted
by means of wire communications in interstate commerce, writings, signs, signals, pictures and
sounds for the purpose of executing such Scheme and artifice, to wit each Rico defendant caused
the prices of Platinum and Palladium to be determined over the phone lines and then allowed
orders to be placed over the phone lines and via mobile devices and/or the internet to purchase
and to sell NYMEX or Spot Platinum and/or Palladium; each Rico defendant caused or actually
sent daily and monthly confirmation statements to customers, year-end tax statements, moneys
due to customer redemption requests, and each defendant caused false and misleading prices to
be published over the internet to entice unwitting participants to enter the NYMEX Platinum
Future Market BTC transactions in NYMEX Palladium and 44 unlawful BTC transactions in

-101-

NYMEX Platinum during the relevant time period.

466.   During the relevant time period, defendants caused to be generated and sent by email  daily and monthly statement, year end summaries and tax statements as well as redemptions to their investors throughout the United States and Globally  who owned held accounts with such defedants to apprise them of their profits earned by artificially moving the prices of NYMEX Platinum and/or Palladium.

467.   These RICO Defendants participated in creating those settlement prices and generated or caused to be generated these daily and monthly statements, tax statements and redemptions sent by email to customers throughout the United States and outside the United States.

**The RICO Defendants used the internet, phone lines or mobile devices to report the artificially move prices that were published on a daily basis over the Internet to unwitting competitors and consumers of NYMEX Platinum including Ms. Levy.**

468.   On a daily basis during the relevant time period, some or all of the RICO defendants caused to be reported artificial prices of NYMEX Platinum over the wires to others who published these prices on a daily basis on their website so that their customers could be apprised on a minute by minute basis the market prices that were in fact artificial.

469.   On a daily basis some or all of the RICO defendants use the wires to publish these artificially inflated prices as part of the conduct of the Enterprise alleged herein.

470.   On a daily basis during the relevant time period some or all of the RICO defendants used the internet to report the closing and settlement prices of NYMEX Platinum to the others who also published these artificial prices on their websites on a daily so that the members of the public such as Ms. Levy could observe these artificial prices and make her

investment decisions based on these false and misleading and artificial prices.

**Each RICO Defendant Engaged in at Least 2 Acts of Mail Fraud- 18 U.S.C. § 1341**

471.  Some or all of the RICO Defendants also engaged in Mail Fraud and/or aided and abetted Mail Fraud to further their price fixing Scheme to artificially moving the prices of NYMEX Platinum and/or Palladium by intentionally using the Postal Service to mail or caused to be mailed: (1) customer daily and monthly Statements (2) year end tax statements to their customers, and (3) redemption checks to customers who requested such.  These defendants also caused to be mailed moneys from new customers who wanted to open accounts to invest in NYMEX Platinum and/or Palladium based on the phony data.

**Predicate Acts Laundering of Monetary Instruments In Violation of 18 USC § 1956**

472.  Some or all of the RICO Defendants,  also knowingly and with  specific intent  used the proceeds of their profits in NYMEX Platinum and/or Palladium Contracts to purchase more contracts during the relevant time period and as a result of their manipulative conduct causing price artificiality to establish even more NYMEX Platinum and/or Palladium positions in violation of 18 USC § 1956.

473.  Some or all of the RICO Defendants with specific intent used the unlawful profits and proceeds of their manipulative trades as maintenance margin to sustain further positions in NYMEX Platinum and/or Palladium to generate more profits in violation of 18 USC § 1956.

474. Some or all of the RICO Defendants used the profits of their manipulative trades on other occasions during the relevant time period.

475. Some or all of the RICO Defendants knowingly and with criminal intent aided and abetted each other in using the proceeds of their manipulative trades to initiate more

-103-

positions and profits in NYMEX Platinum during the relevant time period by helping these defendants establish the positions on the NYMEX exchange.

476. Some or All of the RICO defendants aided and abetted each other in committing Mail Fraud and/or wire fraud.

**Predicate Acts-Engaging in monetary Transactions in**

**Property derived from specified unlawful activity In Violation of 18 USC § 1957**

477. Some or all of the RICO Defendants, each knowingly and with criminal intent engaged in monetary transactions using the moneys earned by engaging in the unlawful and manipulative conduct by taking for themselves profits as earnings, fees and commissions resulting from the profits earned from the unlawful manipulative conduct in connection with their trading of NYMEX Platinum and or Palladium contracts and/or in the London Physical Market during the relevant time frame.

478. All or some of the RICO Defendants each or in combination intentionally transferred or caused to be transferred profits linked to their trading in NYMEX Platinum and/or Palladium to their own personal accounts and/or corporate accounts and or partnership accounts and/or withdrew amounts in excess of $10,000.00 to themselves as profits, fees, salaries and/or commissions derived from the manipulative trades which resulted in profits. Some or all of these transfers of profits, fees and commissions from the accounts held in the name of these defendants and/or on their behalf were made within the United States and in violation of 18 U.S.C § 1957.

479. Some or All of these RICO defendants engaged in such monetary transactions on more than two occasions during the relevant time.

480. All of the above enumerated predicate acts of racketeering occurred with ten

years of one another and constitute a pattern of racketeering with the meaning of 18 USCA § 1961(5).

481. All of the above-enumerated predicate acts occurred for two years and would have continued indefinitely except for the transferring of the London Auction Fix to the LME group.

482. Plaintiff was injured in her property and/or business as a direct and beneficial owner of NYMEX Platinum contracts during the relevant time period when these contracts were suddenly caused to lose most or all of their value due to defendants Scheme causing the prices of NYMEX Platinum to decline sharply and in contravention to the legitimate forces of supply and demand in Q3 and Q4 2008 due to the manipulative conduct of defendants.

483. Plaintiff was also injured when defendants flooded the market with large positions of NYMEX Platinum and/or physical holdings during the relevant time frame thus artificially suppressing prices.

484. As such plaintiff received a margin call on August 15, 2008 and she eventually lost her entire Platinum investment as well as non-Platinum investments that can be linked directly to the price-fixing and Rico Scheme.

485. By reason of defendants' violation of 18 USCA § 1962, Plaintiff is entitled pursuant to 18 U.S.C.A § 1964©, to threefold the damages sustained , with interest thereof at 9% New York Statutory Rate per annum, a reasonable attorneys fee in connection herewith

**Violation of 15 U.S.C. § 1962(a)**

486. The RICO Defendants violated 15 U.S.C. § 1962(a) by unlawfully receiving income derived from the Manipulative and Price Fixing Scheme based the profits generated from this Scheme.

487. Because profits were being reinvested into the Scheme, a violation of 15 U.S.C.§ 1662(a) occurred.

**Violation of 15 U.S.C. § 1962(b)**

488. The RICO defendants violated 15 U,.S.C. § 1962(b) through engaging in a pattern of racketeering described in this Complaint and by acquiring or maintaining an interest in the Enterprise.

489. The continued interest and or control maintained over the Enterprise was due to the Racketeering activity which continued to promote the economic dominance and power of the RICO Defendants.

490. Plaintiff sustained RICO injury and has RICO standing to sue based on the allegations already made supra.

## Count VII

**AIDING AND ABETTING -THE FEDERAL LAW CLAIMS 7 U.S.C. § 25(a) and 13(c)(a)**

491. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations

492. To the extent that certain defendants are not held primarily liable for breaches of substantive law, each defendant-- including John Does #1-20 herein willfully participated in the Scheme to Price Fix, defraud and manipulate the market for NYMEX Platinum and Physical Platinum during the relevant time period and violated all laws enumerated herein with respect to the NYMEX Platinum and Physical market alleged herein, and were aware of their respective roles in such fraud and manipulative conduct, knowingly rendered substantial assistance in perpetrating such fraud and manipulation and racketeering conduct. Without each defendants' assistance such fraud, manipulation and other enumerated conducted listed in this

Complaint could not have succeeded.

493.    Defendants afforded this extraordinary assistance to achieve the manipulative Scheme and based on each one's assistance defendantswere able to accomplish their  manipulate Scheme to artificially move the prices of NYMEX Platinum for delivery in the January, April, July and October 2008 Contracts and thereafter through 2014.

494. Each Defendant also knew of the Scheme and intentionally assisted  in carrying out the Scheme during the relevant time period by placing phone calls and actually place these unlawful trades on behalf of and at the instructions of the other defendants.

495.    Defendants with intent assisted each other by communicating over the phones and by email to make sure each understood what to do and how to place their unlawful orders.

496.    Some or all of these Defendant was an integral part of the Scheme and provided substantial assistance in furtherance of the Scheme.

### Count VIII

### FRAUDULENT CONCEALMENT and EQUITABLE TOLLING

497.    Because all defendants willfully hid their unlawful conduct, Plaintiff's Statute of limitations is tolled from the time of learning of the Manipulative Conduct in or about 2014.

498.    By its very nature, the unlawful manipulative conduct, as alleged herein, that Defendants engaged in was self-concealing.  Defendants, *inter alia*, engaged in secret and surreptitious communications and trading activity oversees in order to manipulate and make artificial prices for NYMEX Platinum and Palladium futures contracts on the NYMEX.

499. Defendants took affirmative steps to prevent the discovery of his

manipulative conduct by concealing the manipulative conduct from regulators and the public by

conduct these affairs in London, England

500. In addition, because the very nature of commodities futures trading is self-concealing, there was no way for plaintiff to discover the conduct prior to it becoming public knowledge in or about 2014.

501. Plaintiff's continuing ignorance of the claims was not the lack of plaintiff's due diligence. Since learning of the Class Action Complaint, Ms. Levy has consulted with at attorneys and experts and has conducted her own independent investigation into this matter and believes it to be meritorious.

## STATE LAW AND COMMON LAW PENDANT CLAIMS

## Count IX

## <u>UNJUST ENRICHMENT</u>

502, Plaintiff repeats and realleges each and every allegation in the preceding paragraphs and incorporates by reference here all such previous allegations.

503. . To the detriment of plaintiff, defendants have been unjustly enriched as a result of the unlawful conduct and/or wrongful conduct to manipulate the prices of Physical and NYMEX Platinum and/or Palladium during the relevant time period..

504. These aforesaid defendants have unjustly benefitted through the purchase and sale of NYMEX aad Physical Platinum and/or Palladium contracts at artificial prices either inflated and/or deflated prices, which created an anti-competitive monopoly price for plaintiff either by way of profits or by way of fees..

505. The defendants have been unjustly enriched at the expense of Plaintiff who relied on the market prices generated by such defendants and/or published on their websites. Although Plaintiff

was not in privity with defendants, her participation was connected to all defendants because Plaintiff **had** to lose in order for defendants to profit in this zero-sum game.[1] Since plaintiff was a direct purchaser and seller of NYMEX Platinum during the relevant time period and thereafter, Plaintiff was a necessary counter party either by her having her contracts used in market transactions or providing the necessary market the liquidity to allow defendants to successfully trade out of their unlawful positions.

506. But for Plaintiff and other counter parties similarly situated, there would have been no market liquidity for defendants to profit from.

507. That the marketplace required counter parties such as plaintiff to provide liquidity to this extremely illiquid market was well known to all defendants and they knowingly lured in members of the public by creating an artificial market.

508. Both defendants and plaintiffs were necessary direct competitors in the NYMEX Platinum market and were necessary to trade with in connection with these Platinum and/or Palladium contracts.

509.. As such, it would be unjust for defendants to retain the benefits attained by their actions including profits . Accordingly, Plaintiff seeks full restitution of defendants' enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein and seeks the imposition of a constructive trust over the ill-gotten gains.

510. Equity and good conscience require full restitution of the monies received by defendants pursuant to the price fixing Scheme including fees and commissions. This amount includes not only money itself but also proceeds of that money.

---

[1] In fact, on several days that Ms. Levy traded including but not limited to February 20, 2008 and February 23, 2008, defendants were also pushing prices downward in the London Fix on those very same days. Such action by defendants would not have been possible without the liquidity provided by plaintiff and others.

### Count X

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

511.  Plaintiff repeats and realleges each and every allegation in the preceding

paragraphs

and incorporates by reference here all such previous allegations                  8

512.  Based on the foregoing facts pled herein, defendants intentionally caused Plaintiff

great distress by purposefully setting her up to lose her savings by luring her into the Platinum market in

order to manipulate it and watch her account tank.

513.  Defendants purposefully needed to lure members of the public including Platiniff

into the Platinum market to create counter parties into this extremely illiquid market because every long

needs a short.

514.  By artificially deflating and/or inflating the  prices of Physical and therefore

NYMEX Platinum Plaintiff incorrectly believed that there was a robost and legitimate market for

Platinum during the relevant time frame..

515.  These defendants intentionally used outrageous conduct that is shocking and

engaged in these "auctions" in a callous manner designed to trick members of the public into believing th

ere was a legitimate Platinum market,  knowing that other members of the public also invested over the

NYMEX and were competing for Platinum contracts.

516.  These Defendants all knew that in order for them to eventually profit, other counter

parties such as Plaintiff would have to and would sustain severe losses since they knew the market would

eventually and purposefully crash as they conducted their Scheme.

517.  These defendants knew that plaintiff and others would experience severe shock

and loses as a result of this Scheme.

518.   These Defendants engaged in this pump and dump operation at Plaintiff's expense and intentionally caused her account to tank in the summer of 2008.

519.   Defendants knew or should have known that manipulation of the NYMEX Platinum market would have devastating effects on other market participants including plaintiff.

520.   Defendants callously inflicted monetary and emotional damages onto Ms. Levy.

521.   As a result, Ms. Levy has suffered due to this Scheme and her loses and realization that she was a victim of felonious conduct extreme emotional distress with physical manifestations including but not limited to muscle pain, weight gain, an exacerbation of uvitis requiring prednisone eye drops, insomnia, anxiety, jaw-clenching and temporal mandibular joint dysfunction, requiring physical therapy, and the need to undergo acupuncture and acupressure.

## COUNT XI

## PUNITIVE DAMAGES

522.   Plaintiff repeats and realleges each and every allegation in the preceding paragraphs and incorporates by reference here all such previous allegations

523.   By reason of the foregoing willful and unconscionable acts causing severe monetary losses and emotional distress and as a matter of public policy to punish defendants for such conduct and based on their extreme lack of contrition since at least one of the defendants knows and has known of plaintiff's claim for a long period of time and nobody has come forward to compensate her for these loses despite the overwhelming evidence in favor of compensation under the totality of the circumstances, punitive damages are sought in excess of the jurisdictional limits of this honorable Court

to be determined at time of trial by a jury.

## JURY DEMAND

524. Plaintiff requests a jury trial to resolve the outstanding issues in this case.

## DAMAGES AND OTHER RELIEF

525. Based on the foregoing, plaintiff demands judgement on her Complaint because she was caused to lose her entire Platinum investment well as other non-Platinum investments as well as future profits to be determined at trial on these NYMEX Platinum Futures investments that plaintiff otherwise would have earned; and as a result of the foregoing plaintiff has suffered monetary damages in excess of the jurisdictional limits of this the Court and in an amount to be determined and is entitled to recovery of such damages as follows:

526. On all counts actual damages

527. On the First, Second, Third, Forth, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh, Counts- treble damages and post judgment interest on the New York claims at New York's Statutory Rate of 9% as well as lost profits to be determined at time of trial and in excess of the jurisdictional limitation of this Court.

528. On the Fifth and Sixth causes of action -treble damages to be determined at time of trial, plus, attorneys fees, costs, disbursements and statutory interest.

529. On the Ninth cause of action, plaintiff requests the imposition of a constructive trust as to all defendants over the proceeds linked to the unlawful conduct and out of those proceeds, plaintiff should recover an amount within the jurisdiction of this Court and no less than her actual damages.

530. On all counts including costs, interest, attorneys fees and disbursements to be determined at the time of trial; and for all further and other relief that this Court deems just and proper.

Respectfully Submitted,

December 30, 2015

/s/ Susan J. Levy
Susan Levy, Esq.
Plaintiff Pro Se
40 East 10th Street, Suite 2K
New York, New York 10003
212-962-1782 (tel)
212-962-3711 (fax)
Susanjlevy@aol.com