**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Susan Levy, | ) |
| | ) |
| | ) |
| *Plaintiff*, | ) |
| v s . | ) |
| | ) |
| BASF Metals Limited, *et al*., | ) **Civil Action No. 15-CV-7317 (GHW)** |
| | ) |
| *Defendants*. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFF'S AMENDED COMPLAINT**

)

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT .....................................................................................1

BACKGROUND .............................................................................................................4

ARGUMENT ...................................................................................................................8

    I.   Plaintiff's Claims Are Untimely. ...................................................................9

        A.    The Statue of Limitations for Each of Plaintiff's Claims Has Lapsed. .......9

        B.    Equitable Tolling and Fraudulent Concealment Do Not Apply to Plaintiff's Claims. ..................................................................................................11

    II.  The Complaint Fails To State a Claim for Violation of the Sherman Act.............13

        A.    The Complaint Does Not State a Claim Under Section One of the Sherman Act…………………….................................................................13

        B.    The Complaint Does Not State a Claim Under Section Two of the Sherman Act…………………….................................................................22

        C.    Plaintiff Lacks Antitrust Standing. ...........................................................23

    III. The CEA Claims Must Be Dismissed................................................................28

        A.    The CEA Does Not Reach the Extraterritorial Conduct Alleged in the Complaint....................................................................................................28

        B.    The CEA Does Not Grant Plaintiff a Private Right of Action To Bring Claims for False Information and Cheating.................................................31

        C.    The Complaint Fails To State a Claim for Market Manipulation Under the CEA............................................................................................................31

    IV. The Complaint Fails To State a RICO Claim. .....................................................39

        A.    Plaintiff Lacks Standing Under RICO. ......................................................39

        B.    Plaintiff's RICO Claim Contains Multiple Additional Pleading Defects..41

    V.  The Complaint's RICO Claim Must Be Dismissed Because the Predicate Offenses on Which It Is Based Do Not Involve "Sufficient Domestic Conduct." ...............46

    VI. Plaintiff Fails To State a Claim for Unjust Enrichment........................................47

    VII. The Complaint Does Not State a Claim for Intentional Infliction of Emotional Distress. .....................................................................................................................49

    VIII. Plaintiff Is Not Entitled to Punitive Damages.....................................................50

CONCLUSION................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
   483 U.S. 143 (1987) ................................................................................................10

*In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth I*"), 587 F.
   Supp. 2d 513 (S.D.N.Y. 2008) ................................................................35, 38, 48

*In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth II*"), 612 F.
   Supp. 2d 376 (S.D.N.Y. 2009) ................................................................35, 36, 38

*In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013) .........................32

*Angermeir v. Cohen*,
   14 F. Supp. 3d 134 (S.D.N.Y. 2014) ..........................................................................43

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006) ................................................................................................40, 41

*Apex Oil Co. v. DiMauro*,
   822 F.2d 246 (2d Cir. 1987) ..........................................................................................35

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................8, 21, 23

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ................................................................................................13, 27

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) ................................................................................................25

*Banco de Chile v. Aitken Lavanchy*,
   No. 05 Civ. 4658, 2008 U.S. Dist. LEXIS 91499 (S.D.N.Y. Nov. 6, 2008) .........................43

*Bazak Int'l Corp. v. Tarrant Apparel Grp.*,
   347 F. Supp. 2d 1 (S.D.N.Y. 2004) ..........................................................................48

*Beatty v. JP Morgan Chase & Co. (In re Commodity Exch., Inc. Silver Futures &
   Options Trading Litig.)* ("*In re Silver II*"), 560 F. App'x 84 (2d Cir. 2014).........16, 36, 37, 39

*Beauford v. Helmsley,*
    740 F. Supp. 201 (S.D.N.Y. 1990) ........................................................................42

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).............................................................................. *passim*

*Braman v. CME Grp., Inc.,*
    __ F. Supp. 3d __, 2015 WL 7776871 (N.D. Ill. Dec. 3, 2015) .............................31

*Brasseur v. Speranza,*
    21 A.D.3d 297 (1st Dep't 2005) ...........................................................................11

*Bridge v. Phx. Bond & Indem. Co.,*
    553 U.S. 639 (2008).............................................................................................43

*Brothers v. Saag,*
    No. 13-466, 2014 WL 838890 (N.D. Ala. Mar. 4, 2014) ......................................18

*Butala v. Agashiwala,*
    916 F. Supp. 314 (S.D.N.Y. 1996) .......................................................................12

*Cal. Pub. Emps.' Ret. Sys. v. N.Y. Stock Exch., Inc. (In re NYSE Specialists Sec.*
    *Litig.),* 503 F.3d 89 (2d Cir. 2007).......................................................................18

*Cargill, Inc. v. Monfort of Colo., Inc.,*
    479 U.S. 104 (1986).............................................................................................27

*Carl Wagner & Sons v. Appendagez, Inc.,*
    485 F. Supp. 762 (S.D.N.Y. 1980) .......................................................................50

*CFTC v. Amaranth Advisors LLC,*
    554 F. Supp. 2d 523 (S.D.N.Y. 2008)............................................................. 35-36

*CFTC v. Parnon Energy, Inc.,*
    875 F. Supp. 2d 233 (S.D.N.Y. 2012)...................................................................36

*Charron v. Pinnacle Grp. N.Y. LLC,*
    874 F. Supp. 2d 179 (S.D.N.Y. 2012)...................................................................50

*City of New York v. Smokes-Spirits.com, Inc.,*
    541 F.3d 425 (2d Cir. 2008).................................................................................41

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,*
    No. 11004003, 2013 WL 2156358 (N.D. Cal. May 17, 2013) ...............................18

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig. ("In re*
    *Silver I"),* No. 11 Md. 2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012) ..............32, 33, 36

*Corsello v. Verizon N.Y., Inc.*,
    18 N.Y.3d 777 (2012) ............................................................................................47

*Crimpers Promotions, Inc. v. Home Box Office, Inc.*,
    554 F. Supp. 838 (S.D.N.Y. 1982) ......................................................................23

*De Atucha v. Commodity Exch., Inc.*,
    608 F. Supp. 510 (S.D.N.Y. 1985) ......................................................................26

*DNJ Logistic Grp., Inc. v. DHL Express (USA), Inc.*,
    No. 08 Civ. 2789, 2010 WL 625364 (E.D.N.Y. Feb. 18, 2010)............................44

*Dolmetta v. Uintah Nat. Corp.*,
    712 F.2d 15 (2d Cir. 1983).....................................................................................9

*European Cmty. v. RJR Nabisco, Inc.*,
    764 F.3d 129 (2d Cir. 2014), *cert. granted*, 136 S. Ct. 28 (2015) ....................46, 47

*FLM Collision Parts, Inc. v. Ford Motor Co.*,
    543 F.2d 1019 (2d Cir. 1976)................................................................................23

*Gatt Commc'ns v. PMC Assocs., L.L.C.*,
    711 F.3d 68 (2d Cir. 2013).........................................................................23, 24, 26

*Giro v. Banco Espanol de Credito, S.A.*,
    No. 99-7883, 2000 U.S. App. LEXIS 4319 (2d Cir. Mar. 17, 2000)....................40

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
    17 F. Supp. 2d 275 (S.D.N.Y. 1998).....................................................................13

*Gunderson v. ADM Investor Servs., Inc.*,
    85 F. Supp. 2d 892 (N.D. Iowa 2000)...................................................................50

*Hansen Packing Co. v. Armour & Co.*,
    16 F. Supp. 784 (S.D.N.Y. 1936) .........................................................................50

*Heart Disease Research Found. v. Gen. Motors Corp.*,
    463 F.2d 98 (2d Cir. 1972)....................................................................................23

*Higgins v. N.Y. Stock Exch., Inc.*,
    942 F.2d 829 (2d Cir. 1991)..................................................................................10

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992)...............................................................................................40

*Ill. Brick Co. v. Illinois*,
    431 U.S. 720 (1977)...............................................................................................26

*Kades v. Organic, Inc.*,
　　No. 00 Civ. 3671, 2003 WL 470331 (S.D.N.Y. Feb. 24, 2003) ............................45

*Kalnit v. Eichler*,
　　264 F.3d 131 (2d Cir. 2001)..................................................................................38

*Kiobel v. Royal Dutch Petroleum Co.*,
　　133 S. Ct. 1659 (2013) ..........................................................................................29

*Koch v. Christie's Int'l PLC*,
　　699 F.3d 141 (2d Cir. 2012)....................................................................................9

*Kolari v. N.Y.-Presbyterian Hosp.*,
　　455 F.3d 118 (2d Cir. 2006)..................................................................................47

*LaFlamme v. Societe Air France*,
　　702 F. Supp. 2d 136 (E.D.N.Y. 2010) ..................................................................28

*Landy v. Mitchell Petroleum Tech. Corp.*,
　　734 F. Supp. 608 (S.D.N.Y. 1990) ........................................................................44

*Laydon v. Mizuho Bank, Ltd.* ("*Laydon I*"),
　　No. 12 Civ. 3419, 2015 WL 151487 (S.D.N.Y. Mar. 31, 2015) ...........................46

*Laydon v. Mizuho Bank, Ltd.*,
　　No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014)...................... *passim*

*Leist v. Simplot*,
　　638 F.2d 283 (2d Cir. 1980)..................................................................................48

*Lenz v. Associated Inns & Restaurants Co. of Am.*,
　　833 F. Supp. 362 (S.D.N.Y. 1993) ........................................................................12

*Lia v. Saporito*,
　　909 F. Supp. 2d 149 (E.D.N.Y. 2012), *aff'd*, 541 F. App'x 71 (2d Cir. 2013)......................10

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR I*"),
　　935 F. Supp. 2d 666 (S.D.N.Y. 2013).............................................................. *passim*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR III*"),
　　27 F. Supp. 3d 447 (S.D.N.Y. 2014).........................................................16, 35, 37

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR IV*"),
　　No. 11 MDL 2262, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) .........................48

*Loginovskaya v. Batratchenko*,
　　764 F.3d 266 (2d Cir. 2014).............................................................................29, 31

*Lubin v. Dubin*,
   13-cv-6619, 2014 U.S. Dist. LEXIS 24734 (E.D.N.Y. Feb. 24, 2014) ..................................43

*Mahmud v. Kaufmann*,
   496 F. Supp. 2d 266 (S.D.N.Y. 2007).....................................................................................13

*Martin v. Citibank, N.A.*,
   762 F.2d 212 (2d Cir. 1985).....................................................................................................49

*Martin v. Dickson*,
   100 F. App'x 14 (2d Cir. 2004) ...............................................................................................50

*Mason v. Am. Tobacco Co.*,
   346 F.3d 36 (2d Cir. 2003)........................................................................................................8

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)............................................................................................13, 14, 15

*McGown v. City of New York*,
   No. 09 Civ. 8646 (CM), 2010 WL 3911458 (S.D.N.Y. Sept. 9, 2010) ..................................49

*Menominee Indian Tribe of Wis. v. United States*,
   136 S. Ct. 750 (2016)...............................................................................................................12

*Merrill Lynch, Pierce, Fenner & Smith v. Young*,
   91 Civ. 2923, 1994 U.S. Dist. LEXIS 2929 (S.D.N.Y. Mar. 15, 1994) .................................42

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993).....................................................................................................44

*Mooney v. AXA Advisors, LLC*,
   19 F. Supp. 3d 486, 502 (S.D.N.Y. 2014) ..............................................................................25

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010).................................................................................................................29

*N.Y. State Catholic Health Plan, Inc. v. Acad. O&P Assocs.*,
   No. 15-CV-3298, 2015 U.S. Dist. LEXIS 169526 (E.D.N.Y. Dec. 18, 2015) .......................43

*Navarra v. Marlborough Gallery, Inc.*,
   820 F. Supp. 2d 477 (S.D.N.Y. 2011)......................................................................................23

*Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*,
   No. 98-4067, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) .............................................26, 27

*Parkcentral Global Hub Ltd. v. Porsche Auto Holdings SE*,
   763 F.3d 198 (2d Cir. 2014)......................................................................................................30

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v.*
    *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) ............................................ 8-9

*In re Platinum & Palladium Commodities Litig.*,
    828 F. Supp. 2d 588 (S.D.N.Y. 2011)..................................................................................39, 42

*Rao v. Med. Soc. of State of N.Y.*,
    No. 98-cv-1675, 1998 WL 799191 (S.D.N.Y. Nov. 17, 1998)..................................................11

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
    631 F.2d 10 (2d Cir. 1980).................................................................................................26, 27

*Ross v. Am. Express Co.*,
    35 F. Supp. 3d 407 (S.D.N.Y. 2014)........................................................................................16

*Rotella v. Wood*,
    528 U.S. 549 (2000)................................................................................................................10

*Sedima v. Imrex Co.*,
    473 U.S. 479 (1985)................................................................................................................41

*Shak v. JPMorgan Chase & Co.*,
    __ F. Supp. 3d __, 2016 WL 154119 (S.D.N.Y. Jan. 12, 2016)..................................10, 11, 47

*Sheehan v. Daily Racing Form, Inc.*,
    104 F.3d 940 (7th Cir. 1997) ...................................................................................................19

*Simmtech Co. v. Barclays Bank PLC (In re Foreign Exch. Benchmark Rates*
    *Antitrust Litig.)*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015)............................................................22

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008)....................................................................................................44

*Three Crown Ltd. P'ship v. Caxton Corp.*,
    817 F. Supp. 1033 (S.D.N.Y. 1993)..........................................................................31, 39, 49

*Transcience Corp. v. Big Time Toys, LLC*,
    50 F. Supp. 3d 441 (S.D.N.Y. 2014) .......................................................................................50

*Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*,
    502 F.3d 47 (2d Cir. 2007)......................................................................................................22

*Twombly v. Bell Atl. Corp.*,
    425 F.3d 99 (2d Cir. 2005), *rev'd on other grounds*, 550 U.S. 544 ......................................15

*UFCW Local 1776 v. Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010)....................................................................................................43

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) .................................................................................22, 23

*United States v. Loe*,
   248 F.3d 449 (5th Cir. 2001) ...............................................................................9

*United States v. Maher*,
   108 F.3d 1513 (2d Cir. 1997) .............................................................................45

*United States v. Thorn*,
   659 F.3d 227 (2d Cir. 2011) ...............................................................................45

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
   257 F.3d 256 (2d Cir. 2001) ...............................................................................25

*Yong Ki Hong v. KBS Am., Inc.*,
   951 F. Supp. 2d 402 (E.D.N.Y. 2013) ...............................................................49

*Zaro Licensing, Inc. v. Cinmar, Inc.*,
   779 F. Supp. 276 (S.D.N.Y. 1991) .....................................................................43

*Zenith Radio Corp. v. Hazeltine Reseearch, Inc.*,
   401 U.S. 321 (1971) ............................................................................................10

*Zinser v. Cont'l Grain Co.*,
   660 F.2d 754 (10th Cir. 1981) ............................................................................26

*Zito v. Leasecomm Corp.*,
   No. 02 Civ. 8074, 2003 WL 22251352 (S.D.N.Y. Sept. 30, 2003) ...................42

**Statutes**

7 U.S.C. § 9 .................................................................................................................29

7 U.S.C. § 13 ...............................................................................................................29

7 U.S.C. § 25 .........................................................................................9, 29, 31, 50

15 U.S.C. § 15b ...........................................................................................................10

18 U.S.C. § 1341 ...................................................................................................43, 44

18 U.S.C. § 1343 .........................................................................................................43

18 U.S.C. § 1956 ...........................................................................................43, 45, 46, 47

18 U.S.C. § 1957 ...................................................................................................43, 47

18 U.S.C. § 1961 .........................................................................................................39

18 U.S.C. § 1962 ....................................................................................................39

18 U.S.C. § 1964 ....................................................................................................39

18 U.S.C. § 3077 ....................................................................................................47

28 U.S.C. § 1367 ....................................................................................................47

N.Y. Gen. Bus. L. § 340 ..................................................................................... *passim*

**Other Authorities**

72 Fed. Reg. 69,288 (Dec. 7, 2007) ......................................................................21

73 Fed. Reg. 44,620 (July 31, 2008) ......................................................................21

78 Fed. Reg. 62,017 (Oct. 11, 2013) ......................................................................21

London Bullion Market Association, *Pricing and Statistics*,
  http://www.lbma.org.uk/pricing-and-statistics (last visited Feb. 5, 2016) ............................15

CFTC, *This Month in Futures—November 2012* (Dec. 5, 2012),
  http://www.cftc.gov/oce/web/files/OCE_COT_Report_November_2012.pdf.......................17

BASF Metals Limited; BASF Corporation; Goldman Sachs International; The Goldman Sachs Group, Inc.; Goldman, Sachs & Co.; Goldman Sachs Execution and Clearing, L.P.; HSBC Bank U.S.A., N.A.; ICBC Standard Bank Plc; UBS AG; UBS Securities LLC; and The London Platinum and Palladium Fixing Company Ltd. (collectively, "Defendants") respectfully submit this Memorandum of Law in Support of Their Motion To Dismiss Plaintiff's Amended Complaint (the "Complaint") under Federal Rules of Civil Procedure 9(b) and 12(b)(6).

## PRELIMINARY STATEMENT

In the summer of 2008—during the height of the global financial crisis, as global platinum prices plummeted—a margin call required Plaintiff to liquidate her entire NYMEX platinum position.  More than seven years later, and well past all applicable limitations periods, Plaintiff brings this suit, alleging that her economic misfortune was the result of a long-running conspiracy among Defendants to manipulate platinum prices.  But the few "facts" contained in the Complaint tell a different story.  The Complaint itself acknowledges that the autocatalyst sector (which produces a key component in car parts) is the largest user of platinum globally.  It was therefore entirely predictable that during some of the most severe months of the global financial crisis, demand for platinum would precipitously decline, as the auto industry began to experience significant turmoil.  In the face of these economic realities, the Complaint offers only general, unsupported, and often contradictory allegations about the ways in which Defendants purportedly schemed to manipulate the price of platinum.  According to Plaintiff, Defendants possessed the power to move platinum prices up or down to suit their economic interests, "like a puppet on a string."  Compl. ¶ 252.  Yet the Complaint contains *no* factual allegations explaining how Defendants—none of whom is a producer of platinum—could have subverted the natural market forces of supply and demand to manipulate the price of platinum for a period of seven years.

The primary "facts" contained in the Complaint are undisclosed and secondhand analyses

of platinum prices generated by "experts" in other actions.  Even if the fruits of such commissioned studies were an accepted basis for pleading, they cannot be accepted here, because the Complaint does nothing more than parrot the positions advanced by *other counsel and other plaintiffs* in the Class Action[1] to ground its unsupportable claims.  From the seven-year period specified, the Complaint points to a mere seven days across only three years on which supposedly anomalous pricing behavior occurred during the afternoon platinum auctions.  Compl. ¶¶ 305-306, 308-310, 312, 315.  From that trivia, Plaintiff asks the Court to infer a long-running conspiracy among more than 20 named and unnamed defendants.

As a threshold matter, the Complaint should be dismissed in its entirety because every claim that it alleges is untimely.  Plaintiff claims that she began to experience losses on her platinum futures trading account in June 2008 and that these losses culminated in a margin call in August 2008 that "wip[ed] out her investment."  Compl. ¶¶ 31, 352, 435-436.  But she did not commence this action until more than seven years later, on September 16, 2015.  Dkt. No. 1.  Accordingly, all of the Complaint's claims accrued well beyond the applicable limitations periods and are time-barred—despite Plaintiff's flimsy allegations of fraudulent concealment.

In any event, the Complaint's antitrust claims should be dismissed for several additional reasons:  *First*, the Complaint does not allege facts sufficient to support even a plausible inference of unlawful agreement among Defendants to manipulate NYMEX platinum futures prices.  It does not refer to a single communication among Defendants, let alone a communication in which two or more Defendants discussed coordinated activity.  Nor does it offer a plausible motive from which an unlawful agreement could be inferred.  *Second*, the Complaint does not plead any facts to support the proposition that Defendants held and exercised monopoly power in the platinum

---

[1] The "Class Action" is *In re Platinum & Palladium Antitrust Litig.*, No. 1:14-cv-9391-GHW (S.D.N.Y.), which is likewise the subject of a pending motion to dismiss for numerous pleading deficiencies.

markets during the period relevant to the Complaint.  *Third*, Plaintiff lacks standing to assert her antitrust claims.  She is, at most, an indirect purchaser who cannot claim damages under the Sherman Act.  And the Complaint does not allege injury of the kind that the antitrust laws were designed to prevent; at most, it asserts that Plaintiff was injured as a result of Defendants' "sudden suppression of market prices."  Compl. ¶ 422.

Nor does the Complaint allege valid Commodity Exchange Act ("CEA") claims.  The extraterritorial conduct at the heart of the Complaint is beyond the CEA's scope.  And in any case, the Complaint does not allege with the requisite particularity any of the elements of a CEA claim: that artificial platinum prices existed, that Defendants caused any artificial prices, that Defendants had the ability to influence prices, and that Defendants acted with scienter.  The Complaint's derivative CEA claims—for principal-agent and aiding-and-abetting liability—also fail for the reasons discussed below.

The Complaint likewise fails to meet the stringent pleading standards that attach to liability under the Racketeer Influenced and Corrupt Organizations Act ("RICO").  It recites a string of predicate acts that are unmoored from any of the conduct alleged in the Complaint, and it does not come close to alleging that any injury suffered by Plaintiff was proximately caused by any of these acts.

The Complaint's state-law claims are similarly deficient.  The unjust-enrichment claim is nothing more than an impermissible recasting of Plaintiff's federal statutory claims and, even if considered on its own merits, is not adequately pleaded.  The Complaint's allegations of intentional infliction of emotional distress fail to lay out anything more than a conclusory restatement of the claim's elements.  And Plaintiff's request for punitive damages fails because those damages are unavailable for the Complaint's antitrust, RICO, CEA, and state-law claims.

**BACKGROUND**

<u>The Plaintiff</u>

Plaintiff Susan Levy is an attorney and *pro se* litigant who brings this action on an individual basis.  Compl. ¶ 47.  She alleges that she "purchased and sold NYMEX platinum futures contracts" and was a "direct purchaser of Platinum NYMEX Futures Contracts."  Compl. ¶¶ 47-48.  A futures contract is an instrument, purchased on an anonymous basis over a centralized exchange, in which one party, the "long," agrees to purchase a commodity at a stated price and time in the future, and the counterparty, the "short," agrees to sell the commodity at that stated price and time.  Compl. ¶¶ 112-114.  Holders of long positions through futures contracts benefit when the price of the underlying commodity increases; holders of short positions benefit when that price decreases.  Compl. ¶ 36.

Plaintiff does not allege that she made any investments of any kind in palladium or that she engaged in any transactions in the spot, over-the-counter ("OTC"), or physical markets for platinum.  She does not allege that she engaged in any transactions on any centralized exchange other than NYMEX.  And she does not allege that she directly entered into a futures contract with any Defendant, was a customer of any Defendant, or used any Defendant to execute any trade on NYMEX.

The Complaint alleges that Plaintiff was injured both when she "was caused to sell her NYMEX Platinum Contracts at artificially deflated prices" and when she "was caused to purchase her NYMEX Platinum Contracts at artificially inflated prices."  Compl. ¶¶ 347-348.  More specifically, it alleges that Plaintiff's losses began in June 2008 and that her futures trading account was "wiped out" when "she was forced to liquidate her positions in her NYMEX Platinum Futures Contracts as well as other positions in her account" as a result of a margin call on or around August 15, 2008.  Compl. ¶¶ 31, 349-352.  Plaintiff commenced this action more than seven years later, on

4

September 15, 2015.  Dkt. No. 1.[2]

The Defendants

Defendants are BASF Metals Limited ("BASF Metals"); BASF Corporation ("BASF Corp."); The Goldman Sachs Group, Inc. ("GSG, Inc."); Goldman Sachs International ("GSI"); Goldman, Sachs & Co. ("GS & Co."); Goldman Sachs Execution and Clearing Company, LP ("GSEC"); HSBC Bank USA, NA ("HSBC"); ICBC Standard Bank plc ("ICBC Standard"); UBS AG and UBS Securities LLC ("UBS"); and the London Platinum and Palladium Fixing Company, Ltd. ("LPPFC").

The Complaint alleges that between 2008 and 2014, "most or all of the defendants[] held themselves out as dealers in Platinum and Palladium" and that all Defendants were "[m]ajor market participants in the platinum and palladium spot markets."  Compl. ¶¶ 17, 141.  It further alleges that Defendants BASF Metals, GSI, HSBC, and ICBC Standard—the so-called "auctioneer [D]efendants"—were participating members of the LPPFC, Compl. ¶¶ 53, 61, 76, 78,[3] a London-based entity, and that from 1989 until October 16, 2014, the auctioneer Defendants participated in auctions in London to establish spot prices for platinum and palladium "twice daily at 9:45 a.m. and 2:00 p.m. London time" (the "Auctions").  Compl. ¶¶ 91, 98, 160-161.  The Complaint does not allege that Defendants BASF Corp., GS & Co., GSEC, UBS AG, or UBS Securities LLC participated in the Auctions or were members of the LPPFC.

The Auctions and Plaintiff's Core Allegations

Referring to the twice-daily Auctions, the Complaint alleges that all Defendants used a

---

[2] This is Plaintiff's second attempt to recover for her alleged platinum losses.  Previously, she asserted and settled claims that the same losses were caused by entirely different conduct on the part of a largely different set of actors.  *See* Complaint, *Levy v. Welsh*, No. 13 Civ. 1858 (S.D.N.Y. Apr. 26, 2012), ECF No. 1.  The Complaint offers no explanation for Plaintiff's serial, and inconsistent, litigations.

[3] The Complaint concedes that "London, England" is the principal place of business or headquarters for each of BASF Metals, GSI, ICBC Standard, and LPPFC.  Compl. ¶¶ 49, 60, 78, 89-90.  The Complaint also concedes that "Zurich, Switzerland" is the principal place of business for UBS AG.  Compl. ¶ 81.

variety of improper techniques to "[a]rtificially fix the prices of Physical (Spot) Platinum and Palladium in London, England, during a contrived and false auction process." Compl. ¶ 5(A). It further alleges that the auctioneer Defendants manipulated Auction prices "by keeping the fixing process closed and confidential until the prices were set," Compl. ¶ 42(A); yet at the same time, it acknowledges that "[a]t any time during the twic[e]-daily fixing calls, participating member[s] *or their customers* could increase or decrease an order, withdraw a previously declared buying or selling order, or place a new order." Compl. ¶ 186 (emphasis added).

Rather than offer a coherent theory of price fixing or manipulation, the Complaint variously alleges that, at only vaguely identified times, the auctioneer Defendants conspired to *increase* prices during the Auctions, but at other equally ill-defined times, those same Defendants conspired to *suppress* prices. Compl. ¶¶ 248, 252. The Complaint alleges further that the spot and futures markets are "highly correlated," Compl. ¶ 294, so that (supposedly) artificial prices for spot platinum determined in the auction "necessarily" resulted in "artificially fixed prices of Platinum on the NYMEX futures Exchange," Compl. ¶¶ 4-5(A). The Complaint also speculates—without a single supporting fact—that some of the auctioneer Defendants would voluntarily take small losses during the Auctions to move spot prices in the desired direction so that all of the Defendants, including non-auctioneer Defendants, could benefit their own allegedly larger NYMEX positions. Compl. ¶¶ 5, 14-15, 27, 208. Critically, the Complaint does not identify any trade in which any Defendant voluntarily took a loss during the twice-daily Auctions or any position, short or long, of any Defendant on NYMEX, much less a position that was advantaged as a result of the Auction prices.

Plaintiff's Reliance on "Expert" Analyses

The Complaint refers to various expert analyses from other lawsuits. Plaintiff, who traded

6

only in platinum futures, Compl. ¶ 47, relies on expert reports in the Class Action to allege that "80% of the time," physical platinum "fell in price during the fixing period and up to 30% of the time [it] rose in value," Compl. ¶¶ 23, 34(B), 278, 284.

And while the Complaint complains about "intraday" price movements in both directions, Compl. ¶¶ 34(B), 278, 284, it does not allege that Plaintiff ever bought or sold a platinum futures contract at a loss based on any of those intraday prices; it alleges only that she suffered her market losses as a result of a margin call on August 15, 2008, when platinum prices were in the midst of a severe, months-long downswing, Compl. ¶¶ 31, 347-352.   Finally, although the Complaint acknowledges that Plaintiff exited the market in August 2008, Compl. ¶¶ 347-352, the few specific dates that it focuses on in its "expert"-analysis section—April 28, 2009; May 11, 2009; September 25, 2009; November 5, 2009; January 12, 2010; September 20, 2010; and January 11, 2012, Compl. ¶¶ 305-306, 308, 312-313, 315—occurred long after her account was liquidated.

Overview of the Claims for Relief

The Complaint purports to assert eleven claims for relief, styled as "Counts."  Counts I-III allege market manipulation, false and misleading statements, and fraud, all under the CEA, and appear to be asserted against all Defendants.

Count IV asserts a claim for vicarious liability under the CEA and appears to be asserted against (a) GSG, Inc. for the acts of "GSI, GSEC and GS & Co." and as an alleged agent of "the other Goldman Sachs defendants as well as the other auctioneer [D]efendants," Compl. ¶¶ 392-394; (b) UBS AG for the acts of UBS Securities LLC, Compl. ¶ 395; and (c) HSBC Holdings plc—which is not named as a defendant in the case caption—for the acts of "HSBC Bank USA, NA, HSBC USA, and HSBC Securities (USA)," Compl. ¶ 396.[4]   Count V, asserted against all

---

[4] Elsewhere, the Complaint suggests that HSBC Bank USA, NA and HSBC USA are the same entity.  Compl. ¶ 75.

Defendants, is an antitrust claim for alleged violation of Sections One and Two of the Sherman Act and New York's Donnelly Act.  Compl. ¶¶ 401-439.  Count VI is brought under RICO, Compl. ¶¶ 440-490, and against the "auctioneer [D]efendants"—BASF Metals, GSI, HSBC, and ICBC Standard—along with 20 John Doe defendants, Compl. ¶ 441.

Count VII is asserted against each Defendant for allegedly aiding and abetting the purported CEA violations.  Compl. ¶¶ 491-496.  Count VIII, also asserted against each Defendant, is for fraudulent concealment and equitable tolling.  Compl. ¶¶ 497-501.  Counts IX-XI, styled as "state law and common law pendant claims," are asserted against each Defendant and are for unjust enrichment, intentional infliction of emotional distress, and punitive damages, respectively. Compl. ¶¶ 502-523.

## ARGUMENT

To survive a motion to dismiss, a complaint must set forth "sufficient factual matter" to state a facially plausible claim to relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  In evaluating whether a pleading has met this burden, a court disregards "legal conclusions, deductions or opinions couched as factual allegations," *Mason v. Am. Tobacco Co.*, 346 F.3d 36, 39 (2d Cir. 2003) (alteration omitted), "'naked assertion[s]' devoid of 'further factual enhancement,'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)), and allegations couched in "vague" or "general" terms, *Laydon v. Mizuho Bank, Ltd.* ("*Laydon I*"), No. 12-cv-3419, 2014 WL 1280464, at *3 (S.D.N.Y. Mar. 28, 2014) (internal quotation marks omitted).

A well-pleaded complaint must "raise a reasonable expectation that discovery will reveal evidence" consistent with the claims alleged.  *Twombly*, 550 U.S. at 556.  Otherwise, Defendants may be unfairly exposed to the "enormous," *id.* at 559, and "asymmetric costs" of discovery, which can lead to "settlement extortion," *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic*

*Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013).  No claim asserted in the Complaint is adequately pleaded.

## I.     Plaintiff's Claims Are Untimely.

The Complaint should be dismissed in its entirety for the simple reason that every claim it seeks to allege is untimely.  Plaintiff claims that she began to experience losses on her platinum futures trading account in June of 2008 and that these losses culminated in a margin call on or about August 15, 2008 that "wip[ed] out her investment."  Compl. ¶¶ 31, 352, 435, 436.  But she did not commence this action until more than seven years later, on September 16, 2015.  Dkt. No. 1.  While the applicable limitations periods vary among the counts alleged in the Complaint, each period had lapsed long before Plaintiff filed suit.  Cursory attempts to resurrect those claims through the doctrines of equitable tolling and fraudulent concealment are unavailing.

### A.     The Statue of Limitations for Each of Plaintiff's Claims Has Lapsed.

Counts I-III of the Complaint allege violations of the CEA and regulations promulgated under it.  Civil claims under the CEA must be brought "not later than two years after the date the cause of action arises."  7 U.S.C. § 25(c).  A CEA cause of action accrues upon a plaintiff's "*discovery of the injury*, not discovery of the other elements of a claim."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR I*"), 935 F. Supp. 2d 666, 697 (S.D.N.Y. 2013) (emphasis added) (quoting *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148-49 (2d Cir. 2012)). Counts IV and VII, which assert derivative CEA claims for vicarious liability and aiding and abetting, are subject to the same statute of limitations as the direct CEA claims.  *See Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 19 (2d Cir. 1983) ("[W]hen applying a statute of limitations, courts look at the essence of the stated claim and not the label by which a plaintiff chooses to identify it."); *United States v. Loe*, 248 F.3d 449, 458 (5th Cir. 2001) ("aiding and abetting is governed by the statute of limitations applicable to the predicate offense").

Count V of the Complaint alleges violations of federal and state antitrust laws.  Both the Sherman Act and New York's Donnelly Act are subject to four-year statutes of limitation.  *See* 15 U.S.C. § 15b; N.Y. Gen. Bus. L. § 340(5).  A claim for violation of the antitrust laws accrues as soon as the plaintiff learns of her injury.  *See Higgins v. N.Y. Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir. 1991).  As the Second Circuit noted in *Higgins*, "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future."  *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339 (1971)).

Count VI, alleging RICO violations, is likewise subject to a four-year statute of limitations. *See Rotella v. Wood*, 528 U.S. 549, 553 (2000).  And as with the CEA and antitrust claims, a RICO cause of action accrues when the plaintiff knows of her injury, regardless of when she discovers the other elements of the claim.  *See id.* at 554.[5]

Count IX, for unjust enrichment, is subject to a three-year limitations period that "begins to run upon the occurrence of the wrongful act giving rise to a duty of restitution" because Plaintiff's claim is for money damages only.  *Lia v. Saporito*, 909 F. Supp. 2d 149, 167 (E.D.N.Y. 2012) (internal quotation marks omitted), *aff'd*, 541 F. App'x 71 (2d Cir. 2013).  But if the unjust-enrichment claim is "duplicative of another claim with a shorter limitations period, the shorter period will apply."  *Shak v. JPMorgan Chase & Co.*, __ F. Supp. 3d __, 2016 WL 154119, at *9-10 (S.D.N.Y. Jan. 12, 2016) (internal quotation marks omitted) (applying shorter limitations period to dismiss unjust-enrichment claim that was duplicative of CEA claim).  Here, Plaintiff's unjust-enrichment claim duplicates her CEA claims and is time-barred on the basis already discussed for

---

[5] While claims under the CEA are subject to a shorter limitations period than claims under RICO or the Sherman Act, the triggering and measuring of the limitations period for all of these claims is controlled by a common body of case law.  *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987) (finding the statutes of limitation for RICO and Sherman Act claims to be analogous); *In re LIBOR I*, 935 F. Supp. 2d at 697 (noting that the discovery rule applies to both CEA and RICO claims).

those claims.  *Id.*  The final count, intentional infliction of emotional distress ("Emotional Distress"), has a one-year limitations period, measured from the date of the conduct that allegedly caused the plaintiff's emotional harm.  *See Brasseur v. Speranza*, 21 A.D.3d 297, 298 (1st Dep't 2005).

The foregoing demonstrates that the longest limitations period applicable to Plaintiff's claims is four years.  Her claims accrued as early as June 2008, when Plaintiff first began to suffer monetary losses, and no later than August 15, 2008, when the margin call "wiped out" her platinum investments and commodities trading account.  Compl. ¶¶ 435-436.  Yet she allowed more than seven years to pass before instituting this action, thus rendering each of her claims untimely under even the most generous limitations period.

### B.   Equitable Tolling and Fraudulent Concealment Do Not Apply to Plaintiff's Claims.

Acknowledging that her claims are beyond the statutory limitations periods, Plaintiff alleges that, under the doctrines of equitable tolling and fraudulent concealment, the "[s]tatute of limitations is tolled from the time of learning of the Manipulative Conduct in or about 2014." Compl. ¶ 497.  Neither doctrine is available here.

Plaintiff may not rely on equitable tolling to extend the applicable limitation periods.  This doctrine may be invoked only "where the plaintiff knew of the existence of his cause of action, but the defendants' misconduct caused him to delay in bringing suit, for example by lulling the plaintiff into believing it was not necessary to commence the litigation."  *Rao v. Med. Soc. of State of N.Y.*, No. 98-cv-1675, 1998 WL 799191 at *6 (S.D.N.Y. Nov. 17, 1998).  The Complaint makes no such showing:  Plaintiff has not alleged facts demonstrating that she "has been pursuing [her] rights diligently" and that "some extraordinary circumstance . . . beyond [her] control" "stood in [her] way and prevented timely filing."  *Menominee Indian Tribe of Wis. v. United States*, 136 S.

11

Ct. 750, 755-56 (2016) (internal quotation marks omitted).  The Complaint does not even claim the existence of any communication, correspondence, or dealing with any Defendant at any time from August 2008, when her commodities account was liquidated, to September 2015, when she commenced this action.

Nor can Plaintiff toll the limitations period on any of her claims based on the doctrine of fraudulent concealment.  To do so, she was required to plead "(1) wrongful concealment by the defendant, (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery of the claim."  *Butala v. Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996).  And she was required to meet the heightened pleading requirements of Rule 9(b) for each of these elements.  *Id.*  The Complaint fails to do so.

The Complaint's conclusory allegations that Defendants' "unlawful manipulative conduct" was "self-concealing" and that they concealed their conduct by "conduct[ing] their affairs in London, England," Compl. ¶¶ 355, 359, 498-499, are insufficient to plead "wrongful concealment" even under the general pleading requirements of Rule 8(a), let alone the heightened requirements of Rule 9(b).  The Complaint does not adequately allege any conduct by Defendants that prevented Plaintiff from discovering her claimed injury.  To the contrary, it concedes that she knew of her alleged injury as early as June 2008, Compl. ¶ 435, when she began to suffer account losses, and no later than August 2008, when she experienced the "total collapse of her investments," Compl. ¶¶ 31, 436.  *See Lenz v. Associated Inns & Restaurants Co. of Am.*, 833 F. Supp. 362, 375 (S.D.N.Y. 1993); *In re LIBOR I*, 935 F. Supp. 2d at 697 ("discovery of the injury, . . . not the other elements of the claim, is what starts the clock").

Finally, Plaintiff does not allege that she pursued her claims with due diligence.  As noted above, she admits that she knew of her losses no later than August 2008 yet does not explain why

she waited more than seven years to commence this action, a delay especially inexcusable in light of the fact that *she commenced litigation for the very same losses* almost four years ago.

## II.    The Complaint Fails To State a Claim for Violation of the Sherman Act.

Plaintiff has not alleged the elements of a claim under either Section One or Section Two of the Sherman Act.  Nor has she established that she suffered an injury sufficient to confer Article III standing, much less that she "is a proper party to bring a private antitrust action," as she must to recover damages for her Sherman Act claims.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983).  The antitrust claims should thus be dismissed.[6]

### A.    The Complaint Does Not State a Claim Under Section One of the Sherman Act.

To state a claim for relief under Section One of the Sherman Act, a plaintiff "must allege (1) concerted action; (2) by two or more persons; (3) that unreasonably restrains interstate or foreign trade or commerce."  *Mahmud v. Kaufmann*, 496 F. Supp. 2d 266, 275 (S.D.N.Y. 2007) (internal quotation marks omitted).  A complaint must therefore allege specific facts sufficient to demonstrate the existence of an unlawful "contract, combination, or conspiracy" to restrain trade.  *Twombly*, 550 U.S. at 553-54.  Plaintiff's Complaint does not do so.

#### 1.    The Complaint Does Not Allege Facts That Support the Existence of an Anticompetitive Conspiracy.

A "plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed."  *Mayor & City Council of Balt., Md. v. Citigroup, Inc.,* 709 F.3d 129, 136 (2d Cir. 2013).  A complaint must

---

[6] The Complaint also purports to plead a cause of action under New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, based on the same allegations as the Complaint's Section One claim.  It should be dismissed for the same reasons.  The Donnelly Act is "modeled on the Sherman Act and should be construed in light of federal precedent."  *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 298 (S.D.N.Y. 1998) (internal quotation marks omitted) (dismissing Sherman and Donnelly Act claims).

therefore offer either (i) direct evidence of an unlawful agreement among Defendants or (ii) sufficient circumstantial facts supporting the inference that a conspiracy existed. *Id.* The Complaint here does neither.

Instead of direct evidence of an unlawful agreement, the Complaint offers only generic and unsupported allegations that Defendants "were collusively agreeing on how to price fix Platinum and Palladium," Compl. ¶ 43; that "[e]ach horizontal competitor collusively communicated with each other directly to establish 'fixed' prices for platinum and palladium," Compl. ¶ 213; and that Defendants "discuss[ed] their trading strategies including confidential customer orders prior to the Fixing call in order to coordinate their strategies during the Platinum and Palladium Fixings," Compl. ¶ 217. Similarly, while the Complaint asserts that Defendants "us[ed] the phone[,] wires or other means of communications" in a supposed effort to facilitate collusive conduct, Compl. ¶ 43, it does not identify a single communication among two or more Defendants, let alone one that demonstrates an agreement to manipulate prices. *See Citigroup*, 709 F.3d at 136. Plaintiff's failure to allege facts, rather than impermissible "labels and conclusions," *Twombly*, 550 U.S. at 555, extends to her misunderstanding of the relationship among Defendants, including (among other mistakes) her failure to distinguish UBS AG and UBS Securities LLC from the "auctioneer [D]efendants," even though the "UBS Defendants" concededly never participated in the Auctions. Compl. ¶ 42(B), 161, 165-66. *But see* Compl. ¶ 141 (incorrectly listing UBS AG as the fifth of "four" panel members).

Likewise, the Complaint's meager circumstantial allegations fail to support an inference that a conspiracy existed. Although the existence of a conspiracy "may be inferred on the basis of conscious parallelism, when . . . interdependent conduct is accompanied by circumstantial evidence and plus factors," *Citigroup*, 709 F.3d at 13, such as a "common motive to conspire,"

such an inference requires evidence showing that the parallel acts "were against the apparent individual economic self-interest of the alleged conspirators," or a "high level of interfirm communications," *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 114 (2d Cir. 2005) (internal quotation marks omitted), *rev'd on other grounds*, 550 U.S. 544.

Here, the Complaint has alleged no plausible parallel behavior.  It points to *seven days* occurring scattered within only three years of the *seven-year* period specified (the "Relevant Time Period"), when supposedly anomalous pricing behavior occurred during the afternoon Platinum auctions.  Compl. ¶¶ 305-306, 308-310, 312, 315.  Those seven dates—each of which was months or years *after* Plaintiff's claimed losses occurred—account for just 0.4% of the Auction days within the Relevant Time Period.[7]  Even setting aside the fact that the "expert" findings of misconduct on those dates have been lifted, nearly verbatim, from the Class Action,[8] and even assuming that those questionable findings are accurate, a seven-*year* conspiracy cannot be inferred from seven *days* of claimed anomalous data, nor can conduct alleged on dates long after Plaintiff suffered her losses and *exited the Platinum futures business forever* somehow "relate back" to an earlier time to bootstrap her conspiracy claim.  Although the quoted expert assertions do not even attempt to distinguish the conduct of various Defendants in this action, even if they had done so, at most these "anomalous dates," Compl. ¶ 302, would point to instances of parallel conduct.  And parallel conduct by "auctioneers" and by others (such as the "UBS Defendants"), "without more," does not plead a conspiracy under Section One of the Sherman Act.  *Twombly*, 550 U.S. at 554.

Even if the Complaint sufficiently alleged that Defendants acted in parallel, it would not state an antitrust claim, because it does not identify the existence of any plus factors that even

---

[7] The afternoon platinum Auction occurred on 1,769 days in the Relevant Time Period.  *See* London Bullion Market Association, *Pricing and Statistics*, http://www.lbma.org.uk/pricing-and-statistics (last visited Feb. 5, 2016).

[8] *See* Complaint ¶¶ 92-93, 95-97, 99, 102, *In re Platinum & Palladium Antitrust Litig.*, No. 1:14-cv-9391-GHW (S.D.N.Y. Apr. 21, 2015), ECF No. 1 (the "Original Class Action Complaint").

"nudge [Plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. First, the Complaint fails to allege that Defendants shared a plausible motive to conspire. This defect is dispositive, as "[c]ourts may not infer a conspiracy where the defendants have no rational economic motive to conspire." *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 442 (S.D.N.Y. 2014) (internal quotation marks omitted). The Complaint asserts that Defendants held "outsized short positions," Compl. ¶ 292, *and* "long positions," *id.* ¶ 293, in platinum during the Relevant Time Period, and consequently benefited from both the suppression *and* the inflation of prices. That convenient assertion is implausible, unsupported by any factual allegations, and would seem to undercut the suggestion of common motive, especially because nothing in the Complaint provides the Court with the ability to determine which Defendants were long or short over what periods, a necessary inquiry to have a basis to determine the existence of a common motive. In any event, because *every* trader has some position from which she hopes to profit, it is well settled that an "inference of intent cannot be drawn from the mere fact that [a defendant] had a strong short position" or any other market position it naturally wished to advantage. *Beatty v. JP Morgan Chase & Co. (In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.)* ("*In re Silver II*"), 560 F. App'x 84, 86 (2d Cir. 2014); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR III*"), 27 F. Supp. 3d 447, 468 (S.D.N.Y. 2014).

The Complaint offers no "factual enhancement," *Twombly*, 550 U.S. at 557, for this "sometimes higher, sometimes lower" conspiracy. Instead, cribbing from the Original Class Action Complaint, *compare* Compl. ¶¶ 292-293, *with* Original Class Action Complaint ¶¶ 83-84, Plaintiff points to a dated CFTC "This Month in Futures Markets" report (the "CFTC Report") that purports to show that an unspecified number of unnamed "commercial traders" held an *aggregate* short position in NYMEX platinum futures contracts in a single week of November 2012—four

years after Plaintiff's alleged loss—and uses this finding to support the claim that each Defendant "held outsized short positions" at various times *throughout* the seven-year period of the alleged conspiracy.  Compl. ¶ 292.

The CFTC Report cannot support an inference of common motive.  First, the Report is dated four years after Plaintiff's investments were "wiped out" and is therefore factually irrelevant to her claims.  Even putting this aside, the Report does not provide any data regarding any Defendant's trading position in platinum at any time.  It simply sets out the volume of open NYMEX platinum futures positions held *market-wide* by all "commercial traders," including not just financial institutions but also industrial users, such as car manufacturers and jewelry producers.[9]  Further, even if one or more of the Defendants were among the "commercial traders" whose positions were aggregated in the CFTC Report, that would not provide a basis to infer that the Defendant in question held a net short position.  Indeed "commercial traders" are defined as those who "use futures or options contracts in a given commodity for *hedging purposes*," and who "hold positions in *both the underlying commodity* and in the futures (or options) contracts on that commodity."[10]  Thus, the statistics the report provides necessarily do not account for spot, forward, option, or ETF-share transactions offsetting the futures positions that Defendants allegedly held.

The Complaint also fails to allege that Defendants had an opportunity to engage in manipulation.  Plaintiff attempts to do so by characterizing the Auctions as a "closed and confidential" process, Compl. ¶ 42(A), involving the "exchang[e of] confidential customer orders," Compl. ¶ 39, among "horizontal competitors," Compl. ¶ 43 n.6.  But these allegations are contradicted by the Complaint's concessions that Defendants' buying and selling interests in the

---

[9]  *See* CFTC, *This Month in Futures—November 2012* (Dec. 5, 2012), http://www.cftc.gov/oce/web/files/OCE_COT_Report_November_2012.pdf.

[10]  *Id.* at 1 (emphasis added)

17

Auctions took into account "legitimate market orders" placed by their customers, who had the opportunity to follow the Auction process and were free to place, change, or withdraw their orders in real time.   Compl. ¶ 21.   More fundamentally, Plaintiff cannot establish an inference of conspiracy simply by describing longstanding, publicly known structural features of the twice-daily Auctions as nefarious signs of collusion.  *See* Compl. ¶¶ 43, 165-176.

## 2.      *"Expert"-Based Allegations Do Not Support an Inference of Conspiracy.*

In the absence of (i) any direct evidence of a conspiracy, (ii) any circumstantial evidence of opportunity or motive to conspire, and (iii) any "plus factors" showing common motive or opportunity to conspire, the Complaint relies almost exclusively on borrowed and unsubstantiated opinions of unnamed "experts" from the Class Action.  *See* Compl. ¶¶ 23, 284-346.[11]   Those "opinions couched as factual allegations" cannot be considered on a motion to dismiss.  *Cal. Pub. Emps.' Ret. Sys. v. N.Y. Stock Exch., Inc. (In re NYSE Specialists Sec. Litig.)*, 503 F.3d 89, 95 (2d Cir. 2007) (internal quotation marks omitted); *see Brothers v. Saag*, No. 4:13-cv-466, 2014 WL 838890, at *6 (N.D. Ala. Mar. 4, 2014) ("considering expert opinions at the pleading stage" is "inappropriate"); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, No. 5:11-CV-04003, 2013 WL 2156358, at *7 (N.D. Cal. May 17, 2013) (holding that "[expert] opinions cannot substitute for facts" and dismissing complaint for failure to state a claim).

The Complaint does not claim that Plaintiff has ever consulted with these "experts" or investigated their findings.   And it does not attempt to explain why the analysis used in the Original Class Action Complaint—which was premised on a general theory of episodic price

---

[11] The Complaint incorporates by reference the "findings of the Class Action Experts described in their" complaint (presumably the Second Amended Complaint) and simply extracts whole sections of the Original Class Action Complaint.  *See* Original Class Action Complaint ¶¶ 74-135.   Twenty-seven pages of the Complaint are copied directly from the Original Class Action Complaint.   Graphs and charts have been copied as well, although a number of them lack titles or labeling on their axes that would allow for proper interpretation.  *See, e.g.*, Compl. ¶¶ 290, 305, 308-313, 321, 329, 331, 339.

suppression in brief windows around the time of the Auctions—supports Plaintiff's fundamentally different allegations of harm caused by persistent, months-long suppression (*and* inflation) of the settlement price of her NYMEX futures contracts from one day to the next, Compl. ¶¶ 347-353. In any event, the secondhand analysis borrowed from the Class Action complaint is anonymous, untestable, and unexplained. Plaintiff offers vague generalities—for example, that the experts "utilized a model that was designed to capture the dynamic features of the platinum market's volatility in order to determine whether or not price movements around the daily Platinum and Palladium Fixings" were anomalous. Compl. ¶ 277. But this is just jargon; it does not describe the nature, source, or quality of the data analyzed, or the specific assumptions underlying the analysis. Perhaps these omissions are not accidental, since there are sound reasons to question the reliability of the data cited in the Complaint.

Even without the benefit of a proper *Daubert* process, Plaintiff's "expert" work product and independent analysis is riddled with obvious flaws. *First*, the Complaint assumes—without explanation—that manipulation of the spot price "necessarily also artificially fixed prices of Platinum on the NYMEX Futures Exchange." Compl. ¶¶ 5(A), 18. But the Complaint offers no reason why spot-market prices would necessarily drive prices in the futures market—a critical omission given Plaintiff's characterization of the futures market as "much" larger than the spot market in London. Compl. ¶¶ 25-26. Merely demonstrating that prices in the two markets are correlated is not sufficient to show causation, much less the *direction* of causation. *See Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) ("[E]quating a simple statistical correlation to a causal relation . . . indicates a failure to exercise the degree of care that a statistician would use in his scientific work[]").

*Second*, the Complaint's descriptions of the platinum market and of Plaintiff's expectations

19

for price movements are frequently contradictory and inconsistent with the (untested) theory and (equally untested) purported conclusions of the secondhand "expert" analysis on which it seeks to rely. In places, the Complaint alleges that by the end of 2008, NYMEX and spot platinum prices "should have been soaring" higher. Compl. ¶ 245-248. But later the Complaint backtracks, calling any rise in platinum's price in 2008 "unprecedented" because of an excess supply of the metal in that year. Compl. ¶ 266. The Complaint does not even try to explain why platinum prices should simultaneously "soar" and fall.[12] Yet it arbitrarily labels the price changes "anomalous" and the result of "manipulative transactions in 2008." *Id.* The Complaint is also inconsistent in its descriptions of market forces in 2008. *Compare* Compl. ¶ 246, *with* Compl. ¶¶ 270, 273. And although the Complaint maintains that platinum prices should have risen in late 2008, it paradoxically describes an increase in prices that occurred in early 2009 as an "artificial[]" price movement. Compl. ¶ 252.

*Third*, while the Complaint's "fundamental analysis" is intended to demonstrate how platinum prices should have trended over the Relevant Time Period, the Complaint asserts elsewhere that the platinum market is extremely volatile and subject to a variety of forces. It provides a complicated list of reasons related to supply and demand that explain this volatility for 12 years before the start of the Relevant Time Period. *See* Compl. ¶ 255 *et seq.* But it fails to account for how those same factors affected prices during the Relevant Time Period, or even acknowledge that they continued to do so.

Most fundamentally, the "experts" and the Complaint fail to address "obvious alternative explanation[s]," *Twombly*, 550 U.S. at 567, or "more likely explanations," *Iqbal*, 556 U.S. at 681,

---

[12] The Complaint further claims that platinum must have been manipulated because prices were "in excess of historical norms" in 2008, Compl. ¶ 254, although Plaintiff allegedly also expected—through "fundamental analysis"—that platinum prices would rise higher still and provide a handsome profit on the NYMEX futures that she held, *see* Compl. ¶ 245.

for the pricing patterns allegedly observed between 2008 and 2014, including:

- **The Financial Crisis.**  The Complaint asserts that Plaintiff suffered a "total collapse" of her platinum investment in August 2008, at the peak of the financial crisis.  *See* Compl. ¶ 31.  To counter the obvious alternative explanation that her investments collapsed as a result of broad market turmoil during that period, the Complaint claims that platinum prices should have behaved like gold prices, which rose during the financial crisis when gold became a safe haven for investors.  *See* Compl. ¶¶ 32, 297 *et seq.*  But platinum and gold are very different commodities, traded in very different markets.  Plaintiff identifies no reason why pricing behavior should be consistent between the two.  *See infra* Section III.C.1.

- **Industrial Supply and Demand.**  The Complaint concedes that industrial supply and demand determine prices for both platinum and palladium, which "move in sync" because they "are interchangeable in the relevant market for [a]utocatalyst[s]" and industrial segments, and both metals are "used heavily" for this purpose.  Compl. ¶¶ 31, 130, 146.  But the Complaint does not account for the decline in economic activity associated with the massive global recession in 2008, or any associated decline in industrial demand for platinum that would have led to a decline in price.

- **Hedging.**  The Complaint posits that Defendants had "absolutely no fundamental economic reasons to make . . . purchases and sales of commodities in both the physical and futures markets except to move prices in a desired direction."  *See, e.g.*, Compl. ¶¶ 6, 15 n.2, 17.  But in describing Defendants' supposedly collusive activity, the Complaint effectively describes a hedge, *see, e.g.*, Compl. ¶¶ 14-15, which is a "fundamental economic reason" for simultaneously buying and selling in the physical and futures markets.[13]

### 3.    The Investigations Mentioned In The Complaint Are Irrelevant And Should Be Struck.

Rather than providing factual support for Plaintiff's claims, the Complaint's digressions about litigations and investigations into *unrelated* misconduct emphasize its inadequacy.  *See* Compl. ¶¶ 9 n.1, 39 n.5, 43 n.6, 342 n.9.[14]  The Complaint's references to the foreign-exchange,

---

[13] Indeed, Defendants are functionally required by regulation to hedge.  *See* Regulatory Capital Rules:  Regulatory Capital, Implementation of Basel III, Capital Adequacy, 78 Fed. Reg. 62,017, 62,094-95 (Oct. 11, 2013); Supervisory Guidance: Supervisory Review Process of Capital Adequacy Related to the Implementation of the Basel II Advanced Capital Framework, 73 Fed. Reg. 44,620, 44,623-24 (July 31, 2008); Risk-Based Capital Standards:  Advanced Capital Adequacy Framework, 72 Fed. Reg. 69,288, 69,303 (Dec. 7, 2007).

[14] The allegation that Defendants "[went] to London" to avoid regulatory scrutiny, *see* Compl. ¶ 35, defies logic.  The Complaint concedes that many of the Defendants are U.K. entities, Compl. ¶¶ 49, 60, 78, 89, and that "twice-daily indication[s] of market price for spot platinum" had been centered in London for more than 30 years before the start of the Relevant Time Period, *see* Compl. ¶¶ 92, 160.

aluminum, and LIBOR cases should be struck, or simply ignored, because they have no bearing on the matters alleged in this Complaint—the purported manipulation of prices in the platinum market.  *See Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*, 502 F.3d 47, 52 (2d Cir. 2007) (rejecting argument that "if it happened there, it could have happened here").  Similarly, the Complaint's vague reference to an unspecified gold investigation includes no mention of "the scope and outcome" of the investigation and offers no reason to believe that it relates to the platinum markets.  *See Simmtech Co. v. Barclays Bank PLC (In re Foreign Exch. Benchmark Rates Antitrust Litig.)*, 74 F. Supp. 3d 581, 592 (S.D.N.Y. 2015).

## B.     The Complaint Does Not State a Claim Under Section Two of the Sherman Act.

To state a claim for relief under Section Two of the Sherman Act, a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  This Complaint does not clear that pleading bar.

### 1.     The Complaint Does Not Plead the Existence of Monopoly Power.

Monopoly power can be inferred from defendants' predominant market share, or shown by their ability to control prices or exclude competition in the relevant market.  *Grinnell Corp.*, 384 U.S. at 571.  The Complaint demonstrates neither.  It asserts, without citation, that Defendants possessed "market power," had the "power to dominate and monopolize" the physical and futures markets for platinum, and were profitable enough institutions "to make large purchases of Platinum."  Compl. ¶¶ 45, 200, 205.  But it does not support these assertions with a single fact.  It makes no attempt to allege the market share that each Defendant held, and even concedes that there were numerous other participants in the platinum market whose behavior had a marked impact on

22

prices.  *See* Compl. ¶¶ 94, 142, 246, 252, 258, 269.  At most, the Complaint seeks to allege that Defendants *collectively* sought to monopolize the platinum market, but that is a classic "claim of oligopoly, and is not cognizable under Section 2 of the Sherman Act."  *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 554 F. Supp. 838, 841 n.2 (S.D.N.Y. 1982); *see FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1030 (2d Cir. 1976) (allegations of a "shared monopoly" amount to no more than a "§ 1 claim under another name").  In any case, because the Complaint offers nothing more than bare "[l]egal conclusions masquerading as fact," it fails to plead a plausible Section Two claim.  *Navarra v. Marlborough Gallery, Inc.*, 820 F. Supp. 2d 477, 485 (S.D.N.Y. 2011).

### 2.      The Complaint Does Not Allege Willful Acquisition.

Even if the Complaint had adequately pleaded monopoly power, its Section Two claim would still fail because it does not allege the "willful acquisition or maintenance of that power" through exclusionary conduct.  *Grinnell Corp.*, 384 U.S. at 570-71.  The Complaint does not point to a single exclusionary or predatory act by any Defendant to acquire or maintain their alleged market power.  Instead, it offers up legal conclusions that "Defendants willfully acquired and maintained" their monopoly power, Compl. ¶ 434, and "had enough financial assets . . . to achieve monopoly power," Compl. ¶ 208.  These words are unsupported by allegations of fact, and Plaintiff's Section Two claim should therefore be dismissed.  *See Iqbal*, 556 U.S. at 678; *Heart Disease Research Found. v. Gen. Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972) (affirming dismissal of antitrust claim because "a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal").

### C.      Plaintiff Lacks Antitrust Standing.

A plaintiff seeking to establish antitrust standing must show that she has sustained a "special kind of antitrust injury" and is an "efficient enforcer" of the antitrust laws.  *Gatt*

*Commc'ns v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).   The Complaint does not satisfy either requirement.

### 1.    *Plaintiff Did Not Suffer Antitrust Injury.*

The Complaint offers a seemingly contradictory account of Plaintiff's injury-in-fact and does nothing to suggest that this injury was an anticompetitive one.[15]   Although in places the Complaint alleges that Plaintiff sustained damage as a result of Defendants' alleged price suppression, it simultaneously asserts that she was victimized by artificially high prices.[16]

Even putting aside the absence of consistent allegations to support the existence of injurious price manipulation, the Complaint does not assert that Plaintiff *ever* traded during the period when prices were supposedly manipulated.   The inadequate attempted substitute for this prerequisite to standing is a set of charts and graphs purporting to reflect the frequency of anomalous price movements in 30-minute "windows" before and during the afternoon platinum Auctions for each year between 2007 and 2014.  Compl. ¶¶ 285-286.   Without any information about the instruments Plaintiff actually traded in, or when Plaintiff traded on the NYMEX futures exchange, or *any fact linking the afternoon Auction price to her trades on NYMEX*, it is impossible to conclude that any of the alleged suppression did in fact affect Plaintiff's trades.   *See Laydon I*, 2014 WL 1280464, at *8.

Further, even if the Complaint's allegations could be read generously to establish that

---

[15] Courts in this Circuit apply a three-step analysis to determine whether a plaintiff has alleged antitrust injury sufficiently: (1) the plaintiff "must identify[] the practice complained of and the reasons why such a practice is or might be anticompetitive"; (2) the court must identify "the actual injury the plaintiff alleges" by examining whether, and to what extent, the plaintiff is in a less favorable position as a result of the defendants' conduct; and (3) the court must "compar[e] the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *Gatt*, 711 F.3d at 76 (alterations in original) (internal quotation marks omitted).

[16] *Compare* Compl. ¶¶ 245, 248-251, 422 ("Plaintiff suffered antitrust injury because she was damaged by [Defendants'] sudden suppression of market prices[,] thus causing her to satisfy a margin call by paying artificially inflated prices"), *with* Compl. ¶ 254 (the "prices of Platinum started to exponentially *increase* in 2008 and 2009 and thereafter in excess of historical norms" (emphasis added)) *and* Compl. ¶ 288 (for the period 2008-2014, platinum price movements were *positive* up to 50% of the time, and were negative for, at most, 65% of the time).

24

Plaintiff sustained *an* injury, they could not be read to establish the required *injury to competition*. *See id.*; *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior.").   At most, the Complaint alleges that NYMEX platinum prices were distorted during the Relevant Time Period.   *See* Compl. ¶ 3.   Price manipulation alone, however, is not anticompetitive, and it does not produce antitrust injury unless it forms part of an anticompetitive scheme.  *See Laydon I*, 2014 WL 1280464, at *8 ("[I]t is not sufficient that the plaintiffs paid higher prices because of defendants' collusion; that collusion must have been anticompetitive, involving a failure of defendants to compete where they otherwise would have.").  While the Complaint claims that Plaintiff was "deprived of transacting in a lawful, nonmanipulated, competitive market," Compl. ¶ 47, it does not allege any facts tending to show that her claimed injuries resulted from a *reduction in competition* in a relevant antitrust market. For example, nowhere does the Complaint allege that Defendants' price-fixing scheme resulted in lower platinum outputs, *see Mooney v. AXA Advisors, LLC*, 19 F. Supp. 3d 486, 502 (S.D.N.Y. 2014), or decreases in the quality of platinum, *see Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 264 (2d Cir. 2001).  It merely alleges in general terms that Defendants engaged in such manipulative conduct as front-running, spoofing, and disclosing confidential client information before the Auction.[17]  And while such actions (had they occurred) could theoretically affect price, the Complaint does not explain how those actions restrained competition in any market.  The Complaint does not allege any harm to competition, much less a connection between any such harm and the injuries that Plaintiff claims to have sustained.

### 2.     *Plaintiff Is Not an Efficient Enforcer.*

Even if the Complaint pleaded an antitrust injury, Plaintiff would still lack standing

---

[17] *See* Compl. ¶¶ 7, 225, 232, 234, 237, 303.

because she is not an efficient enforcer of the antitrust laws.[18]

*First*, Plaintiff's claimed injuries are too indirect to support antitrust standing. Under the "direct purchaser" rule articulated in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746-47 (1977), as a general rule there can be no "antitrust action by a [plaintiff] who alleges price-fixing by a defendant with whom [s]he has not dealt directly." *Zinser v. Cont'l Grain Co.*, 660 F.2d 754, 761 (10th Cir. 1981). The Complaint does not allege that Plaintiff purchased platinum from, or sold platinum to, any Defendant. And the Complaint concedes that Plaintiff's injuries were not directly caused by Defendants' conduct on the NYMEX futures exchange (where Plaintiff transacted) but instead were allegedly caused by Defendants' manipulative conduct in the Auctions (where Plaintiff did not transact). Compl. ¶¶ 5-6, 11-13, 15, 176. Courts in this Circuit have rejected such tenuous attempts to ground standing in allegations that manipulation of a price remote from the plaintiff affected the different price at which the plaintiff transacted. *See Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13 (2d Cir. 1980); *Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*, No. 98-4067, 1999 WL 1201701, at *4 (S.D.N.Y. Dec. 15, 1999); *de Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510 (S.D.N.Y. 1985). Even a "strong correlation" between the price of spot platinum in London and NYMEX platinum futures contracts, Compl. ¶¶ 36, 147-152, would not confer standing, because both prices are subject to change "due to factors wholly unrelated to [D]efendants' [alleged conduct]." *Ocean View*, 1999 WL 1201701, at *4.

*Second*, there are entities better situated to vindicate harms that Plaintiff alleges—Defendants' direct customers, whose Auction orders were transacted in a supposedly manipulated process. Indeed, to determine that a plaintiff is not just *an* efficient enforcer but *the* efficient

---

[18] To determine efficient enforcer status, courts in this Circuit consider the following four factors: (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries. *Gatt*, 711 F.3d at 78.

enforcer on whom standing should be conferred, the Court should deem a key consideration the question whether other parties may have been more directly harmed.  *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986); *Associated Gen. Contractors*, 459 U.S. at 541-42, 545-46.  Because Plaintiff is not *the* efficient enforcer of her antitrust claims, those claims must be dismissed.  *See Associated Gen. Contractors*, 459 U.S. at 541-42; *Ocean View*, 1999 WL 1201701, at *7.

> *Third*, Plaintiff is not an efficient enforcer because her theory of harm is too speculative to confer antitrust standing.  To support her theory that conspiratorial price-fixing of spot platinum in the Auctions resulted in artificial price-fixing of NYMEX platinum futures contracts, Compl. ¶¶ 5, 11-13, 15, 176, Plaintiff relies on the allegedly "strong correlation" between the two prices during a portion of the Relevant Time Period.  Compl. ¶ 147.  But that "strong correlation" is based entirely on "expert" analysis of only *27 days* of the *seven-year* Relevant Time Period.  Compl. ¶¶ 148-149.  Even if NYMEX futures contracts frequently incorporated prices from the Auctions as Plaintiff alleges, the Complaint never suggests that they did so on any of the 27 days identified.  Compl. ¶¶ 147-150.  If permitted to pursue this theory, Plaintiff would force this Court to engage in "hopeless speculation" about a complicated series of market interactions among countless market players, *Reading*, 631 F.2d at 13, an analysis further complicated by "many independent factors that could influence perceptions in the market and price decisions," *Laydon I*, 2014 WL 1280464 at *10.

> Similarly speculative is the Complaint's suggestion that Defendants' "discretion" as Auction members of the LPPM, Compl. ¶¶ 202-203, 209, combined with their (alleged but unspecified) large volume of holdings in spot and NYMEX platinum, Compl. ¶¶ 200-201, 205, gave them the "ability" to "move prices and exercise monopoly power over [platinum prices],"

Compl. ¶ 202.  Fatally, the Complaint offers no information about Defendants' platinum holdings—either collectively or individually—during the Relevant Time Period, Compl. ¶¶ 201, 204, and provides no basis to leap from what Defendants *might have done* to a conclusion about what *they actually did*.  *See LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 154-55 (E.D.N.Y. 2010) (allegations of price-fixing by air carriers did not permit the court to infer anything "more than the mere possibility of misconduct" (internal quotation marks omitted)). Standing requires the latter.

### III.    The CEA Claims Must Be Dismissed.

The Complaint asserts three primary-liability claims under the CEA:  market manipulation (Count I), "misleading reports" and false information (Count II), and "cheating" (Count III).  It also asserts a derivative vicarious-liability claim (Count IV) and an aiding-and-abetting claim (Count VII).

The crux of the CEA claims is that in the second half of 2008, Defendants used the twice-daily Auctions to effect a sustained suppression in the price of platinum and that this conduct directly caused the drop in NYMEX platinum futures prices that allegedly caused Plaintiff to liquidate her NYMEX platinum position in August 2008.  *See* Compl. ¶¶ 239-251, 349-352.

Those claims fail for at least three independent reasons.  *First*, the CEA does not extend to the alleged foreign transactions and conduct that are the central focus of the Complaint.  *Second*, Plaintiff's false information and cheating claims are not cognizable as private causes of action under the CEA.  *Third*, the Complaint does not adequately allege the elements necessary to state a claim for relief under the CEA's anti-manipulation rules.

### A.    The CEA Does Not Reach the Extraterritorial Conduct Alleged in the Complaint.

The Complaint's CEA claims rest on the assumption that the anti-manipulation provisions

of the CEA apply to bids, asks, and trades made by *foreign* employees of mostly *foreign* corporations in a *foreign* auction for a *foreign* physical commodity. Those claims are foreclosed because the CEA's anti-manipulation provisions do not reach the conduct alleged in the Complaint. *See* 7 U.S.C. §§ 9(3), 13(a)(2).

The Supreme Court has declared that federal statutes do not apply to foreign conduct unless Congress has given a "clear indication" otherwise. *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013); *accord Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). The presumption that a statute does not reach beyond the United States can be overcome only if Congress has "clearly expressed" an "affirmative intention" to give the law "extraterritorial effect." *Morrison*, 561 U.S. at 255 (internal quotation marks omitted).

The Second Circuit has held that the presumption against extraterritoriality applies to the private right of action afforded by Section 22 of the CEA, 7 U.S.C. § 25(a)(1), limiting that right of action to claims alleging commodities transactions within the United States. *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014). Congress likewise did not manifest any intent to apply the anti-manipulation provisions of the CEA to foreign transactions. As the Supreme Court recognized in *Morrison*, it is a "traditional principle that silence means no extraterritorial application." 561 U.S. at 261. Applying that "traditional principle" to the CEA's anti-manipulation provisions, which are silent on extraterritoriality, compels the conclusion that those provisions do not apply abroad. *See id.* (noting that courts "apply the presumption [against extraterritoriality] in all cases, preserving a stable background against which Congress can legislate with predictable effects").

Although the Complaint alleges that Plaintiff's losses derived from domestic transactions— 2008 NYMEX platinum futures contracts, Compl. ¶¶ 347-354—and that prices in this market were

artificially suppressed as a result of Defendants' allegedly anticompetitive conduct in connection with the twice-daily Auctions, Compl. ¶ 239, these allegations are insufficient to bring Plaintiff's claims within the scope of the CEA.

In *Parkcentral Global Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198 (2d Cir. 2014), the Second Circuit considered the application of *Morrison* to domestic transactions in derivative securities whose values were tied to the prices of foreign securities. As a threshold matter, the court determined that "while a domestic transaction or listing is *necessary* to state a claim under [Securities Exchange Act] § 10(b), a finding that these transactions were domestic would not *suffice* to compel the conclusion that the plaintiffs' invocation of § 10(b) was appropriately domestic" under *Morrison*. *Id*. at 216. Applying that understanding to the facts before it—where the "allegedly deceptive conduct occurred primarily in Germany," was undertaken by foreign defendants, and concerned foreign securities—the court held that the conduct alleged was insufficiently domestic in nature for Section 10(b) to apply. *Id.* at 207, 218.

The facts here require a similar result under the CEA. The Complaint makes clear that the Auctions at the heart of this litigation are foreign. They occurred exclusively in London; the auctioneer Defendants were "participating members" of the LPPFC, a U.K. entity, Compl. ¶ 90; the Auction participants were U.K.-based traders, Compl. ¶ 163, who worked for mostly foreign companies; and the platinum they were trading was either from London or Zurich, Compl. ¶ 178. And Defendants' conduct during the Auctions is unquestionably the primary subject of the Complaint. Plaintiff alleges that it was "Defendants' price fixing conduct in the physical market in London [that] caused price artificiality in the 2008 NYMEX Futures Contract," Compl. p. 47, and she relies entirely on Defendants' alleged conduct during the Auctions in her attempt to establish scienter, Compl. ¶ 231. Thus, Plaintiff's CEA claims must be dismissed.

**B.      The CEA Does Not Grant Plaintiff a Private Right of Action To Bring Claims for False Information and Cheating.**

Section 22 of the CEA is the exclusive source of any private right of action under the CEA, and "lays out what are in essence conditions precedent" to any such action.  *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1042 (S.D.N.Y. 1993) (internal quotation marks omitted).  A private right of action exists under Section 22 in only four specific circumstances, "each of them explicitly transactional in nature":  where (i) the plaintiff received trading advice from defendant for a fee; (ii) the plaintiff traded though or deposited money with the defendant in connection with a commodities trade; (iii) the plaintiff purchased or sold commodities to or from the defendant; or (iv) the defendant engaged in market manipulation.  *See Loginovskaya*, 764 F.3d at 270; *see* CEA § 22, 7 U.S.C. § 25(a)(1).  Thus, outside of Plaintiff's claim for market manipulation (Count I, addressed below), Section 22 requires Plaintiff to have transacted directly with Defendants in a domestic commodities exchange in order to have standing to assert a private right of action.  *See* 7 U.S.C. § 25(a)(1).  Yet here the Complaint contains no allegations that Plaintiff ever entered into any domestic transactions with any of the Defendants, and thus the claims against Defendants for false information (Count II) and cheating (Count III) are not viable under Section 22.  Accordingly, they must be dismissed.  *See Braman v. CME Grp., Inc.*, __ F. Supp. 3d __, 2015 WL 7776871, at *7 (N.D. Ill. Dec. 3, 2015) (dismissing false-information claim because no such private right of action exists).

**C.      The Complaint Fails To State a Claim for Market Manipulation Under the CEA.**

A market-manipulation claim under the CEA (Count I) requires proof that (1) the defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendants caused the artificial price; and (4) the defendants acted with scienter—that is, they specifically intended to cause the artificial price.  *See In re Amaranth Natural Gas Commodities*

*Litig.*, 730 F.3d 170, 183 (2d Cir. 2013).  And since the market-manipulation claim here "sounds in fraud"—as is evident from the allegation that Defendants intentionally created a "contrived and false auction process which necessarily also artificially fixed prices of Platinum on the NYMEX futures Exchange," Compl. ¶ 5—it is subject to the higher pleading standard imposed by Federal Rule of Civil Procedure 9(b), which dictates that each element "must be pled with particularity." *In re LIBOR I*, 935 F. Supp. 2d at 714.

### 1. The Complaint Fails Adequately To Allege the Existence of Artificial Prices.

"Artificial prices are those prices that do not reflect the forces of supply and demand in the market or do not otherwise comport with contemporaneous prices in comparable markets."  *See In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.* ("*In re Silver I*"), No. 11 Md. 2213, 2012 WL 6700236, at *12 (S.D.N.Y. Dec. 21, 2012), *aff'd*, 560 F. App'x 84.  "When determining if artificial prices exist, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue." *Id.*

The Complaint's theory that the "total collapse" of platinum prices in the second half of 2008 was artificial rather than a result of the global financial crisis rests entirely on its allegation that the price of platinum should have followed the same patterns as the price of gold.  *See* Compl. ¶ 32.  But this allegation is baseless.  Not only does the Complaint provide no support for its claim that gold "is supposed to move in sync with Platinum," Compl. ¶ 247, but both news articles it attaches as Exhibit 10 observe that the price of gold remained flat while platinum surged.  Notably, these articles are from February 2008, *before* Defendants allegedly suppressed the price of platinum.  Relatedly, the Complaint provides no basis for its claim that "Platinum like Gold serves as a safe haven during times of financial crises."  *Id.*  Indeed, the Complaint asserts that the

autocatalyst sector (a key component in car parts) is the "biggest user" of platinum, which suggests that platinum prices both should correlate at least to some extent with demand for new motor vehicles and are subject to at least one appreciable market force to which gold is not subject. *See* Lawrence Williams, *Platinum Continues To Surge—How High Can It Rise?*, Feb. 15, 2008 (attached as part of Exhibit 10 to Complaint); Compl. Ex. 5. It is thus entirely predictable, and benign, that the price of platinum plummeted in the summer of 2008, just as the global financial crisis was hitting full froth and the auto industry was in disarray.

### 2. *The Complaint Does Not Adequately Allege that Defendants Caused Artificial Prices.*

The Complaint also does not allege any facts showing that Defendants were "the proximate cause of [any] price artificiality." *In re Silver I*, 2012 WL 6700236, at *16. Although it alleges that "the manipulating forces of the auctioneers and their aiders and abettors and co-conspirators were in full force and effect and overwhelmed the free market so that Platinum prices were pushed artificially downward by Q4, 2008," Compl. ¶ 250, it does not explain the mechanism by which Defendants allegedly effected and maintained significant suppression of platinum prices throughout the latter half of 2008.[19] Indeed, the Complaint offers contradictory accounts of how Defendants supposedly manipulated prices. At one point, it alleges that Defendants manipulated prices by "buying Platinum and Palladium that would be stored as inventory without any real commercial need or use for these acquisitions, other than to move prices," Compl. ¶ 34, and at another it contends that by "forcing down the price, the manipulators could assure their own profits by closing out other short positions held by them," Compl. ¶ 250.

Whether Defendants were supposed to be cornering the market or shorting it, the

---

[19] And by simply lumping all Defendants together, the Complaint fails to account for the differences between them by, for example, ignoring the fact that UBS AG and UBS Securities LLC, among other Defendants, were not members of the panel that conducted the Auctions. *See* Compl. ¶¶ 165-166.

Complaint itself makes clear that NYMEX imposes strict position limits on "speculators" to inhibit these very forms of market manipulation.  Compl. ¶¶ 153-159.  Moreover, while the Complaint alleges that Defendants engaged in such conduct as "spoofing" and "front running," *see, e.g.*, Compl. ¶ 237, it offers *no* facts to support its allegation that any Defendant ever did so in the platinum market.  More to the point, the allegation that Defendants could have manipulated the platinum market for a sustained period is implausible in light of other allegations in the Complaint.  If the Complaint is correct that by Q4 2008 global demand for platinum was rising as global supply was falling, *see* Compl. ¶ 246, it is implausible that Defendants—none of which produces platinum—could engineer such a sustained decline in the price of platinum as occurred in 2008.

As discussed previously, the Complaint incorporates *verbatim* nearly 30 pages of observations and reports from anonymous "experts," drawn in substantial part from the Original Class Action Complaint.  Compl. ¶¶ 276-346.  Those "analyses" do not support a plausible claim and cannot be considered on a motion to dismiss.  In any event, there is no apparent connection— factual, causal, or otherwise—between the alleged temporary manipulation of the daily afternoon Auction price and the sustained price suppression that the Complaint alleges in the second half of 2008.  Compl. ¶ 299; *see* Section II.A.2, *supra*.  Even if the supposed *intraday* suppression occurred in short, 30-minute "windows" before and during the Auction, that would not establish that Defendants systematically suppressed settlement prices of NYMEX platinum futures contracts from one day to the next in August 2008, causing Plaintiff's margin call and supposed injury.

### 3. The Complaint Does Not Adequately Allege that Defendants Had the Ability To Influence Prices.

The Complaint's failure to plead the existence of a conspiracy precludes any showing that Defendants had the ability to influence prices.  Where, as here, "the complaint alleges [a price manipulation claim by] collective action," it must establish a conspiracy in order to demonstrate

Defendants' ability to influence prices. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 261 (2d Cir. 1987). As discussed above in Section II.A.1, the Complaint does not allege any facts showing the existence of a conspiracy beyond unsupported allegations that Defendants communicated with one another and thus does not show that Defendants had the requisite collective ability to influence prices.

### 4. The Complaint Does Not Adequately Allege Facts Giving Rise to a Strong Inference of Scienter.

"Scienter, in relation to commodities fraud, is the intent to deceive, manipulate, or defraud. Rule 9(b) imposes a significant burden on allegations of scienter." *In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth II*"), 612 F. Supp. 2d 376, 383 (S.D.N.Y. 2009) (internal quotation marks omitted). "[P]laintiffs must . . . allege facts that give rise to a *strong inference* of scienter," *In re LIBOR III*, 27 F. Supp. 3d at 468 (internal quotation marks omitted)[20]—one that is "at least as compelling as any opposing inference one could draw from the facts alleged," *In re Amaranth Natural Gas Commodities Litig.* ("*In re Amaranth I*"), 587 F. Supp. 2d 513, 535-36 (S.D.N.Y. 2008) (internal quotation marks omitted). To meet this burden, the Complaint must allege particularized facts either (a) showing that Defendants had a motive and opportunity to manipulate or (b) constituting strong circumstantial evidence of conscious misbehavior or recklessness. *See, e.g.*, *In re LIBOR III*, 27 F. Supp. 3d at 468.

In other, unrelated commodities litigations, plaintiffs have attempted to show manipulative intent through emails, instant messages, and other similar direct evidence. *See, e.g.*, *CFTC v. Amaranth Advisors LLC*, 554 F. Supp. 2d 523, 533 (S.D.N.Y. 2008) ("numerous instant message conversations"); *see also Laydon I*, 2014 WL 1280464, at *6 ("overwhelming factual content,"

---

[20] Though Judge Buchwald sustained the plaintiffs' CEA claims in *In re LIBOR III*, she did so on the theory that the submitting banks were motivated by reputational concerns and the desire to appear financially stable during the financial crisis and a time of perceived liquidity challenges. 27 F. Supp. 3d at 469-71. That theory is not alleged here, and finds no support even inferentially in the Complaint.

including "direct evidence [of scienter] from certain Defendants' communications"); *CFTC v. Parnon Energy, Inc.*, 875 F. Supp. 2d 233, 250 (S.D.N.Y. 2012) ("multiple communications" evidencing defendants' intentions). While the presence of such evidence alone does not satisfy a plaintiff's stringent burden under Rule 9(b), "[t]he Complaint here, by contrast, includes no reference to specific communications between the Defendants about any specific plan to cause artificial prices or an artificial price trend in the [platinum] futures market." *In re Silver I*, 2012 WL 6700236, at *11; *see In re Silver II*, 560 F. App'x at 87 ("plaintiffs allege[d no] specific facts indicative of an intent to affect prices similar to those that have been found sufficient in comparable CEA actions").

The Complaint alleges that Defendants "engag[ed] in secret communications to discuss customer orders and to coordinate trading strategies," Compl. ¶ 358, and "collusively communicated with each other directly to establish 'fixed' prices for platinum and palladium," Compl. ¶ 213. Yet, as noted above in Section II.A.1, the Complaint does not identify *a single* collusive communication.[21] Without *any* direct evidence, the Complaint must identify other *particularized* facts that demonstrate Defendants' motive and opportunity to manipulate the market or show strong circumstantial evidence of Defendants' conscious misbehavior. *See In re Amaranth II*, 612 F. Supp. 2d at 383.

    a.   <u>The Complaint Does Not Adequately Allege That Defendants Had Motive To Commit Manipulation.</u>

An "inference of intent cannot be drawn from the mere fact that [a defendant] had a strong short position" or from any other market position it wished to advantage. *In re Silver II*, 560 F. App'x at 86; *see also In re LIBOR III*, 27 F. Supp. 3d at 468 ("a large presence in the [relevant]

---

[21] Exhibit 15 to the Complaint, titled "Summary of Evidence Indicating Collusive Manipulation of Platinum and Palladium Prices Around the AM and PM Fixing," similarly fails to provide any direct evidence of collusion among Defendants.

market amounts to only a generalized motive" and "is insufficient to show intent" (alteration in original) (internal quotation marks omitted)).  The Complaint alleges two inconsistent theories of motive based on Defendants' apparent simultaneous holding of both long and short positions in platinum.  First, it alleges: "Defendants all had the opportunity and motive to manipulate [the Spot and NYMEX Futures] markets and price fix because each defendant owned investments for their accounts in Platinum . . . Futures and in Physical Assets.  Each defendant therefore had a motive to increase profits and certainly each defendant had an opportunity to do so since each was privy to information ahead of the fixings."  Compl. ¶ 218.  Second, Plaintiff claims that by "forcing down the price, the manipulators could assure their own profits by closing out other short positions held by them."  Compl. ¶ 250.

Putting aside the clear law in this District—that merely holding a position does not establish motive—these conflicting allegations undermine any inference one might otherwise attempt to draw.  If Defendants were both long *and* short, then any profits gained by manipulating the price in one direction (up or down) would be offset by losses in the other direction.  And, of course, the allegation that Defendants desired to *increase* the value of their "enormous positions in Physical Platinum," Compl. ¶ 201, is contrary to the Complaint's central allegation—that Defendants caused Plaintiff's platinum investment to be "wiped out" by engineering a sustained suppression of platinum prices in the second half of 2008, Compl. ¶ 250.

Finally, even if the Complaint had sufficiently pleaded that Defendants were net short platinum in 2008, and even if such allegations were sufficient to show scienter, its theory would still fail to satisfy *Twombly*'s plausibility requirement.  The Complaint does not explain how Defendants could have successfully and persistently suppressed prices in 2008, when, allegedly, global demand was increasing and supply was contracting (two forces that contribute to *increased*

37

prices). Compl. ¶ 246. It also does nothing to rebut the obvious alternative explanation for why platinum prices substantially declined in the second half of 2008—general market concerns over the global financial crisis, and the anticipated and observed loss of demand for platinum by the auto industry. Accordingly, because the Complaint does not plead "facts that give rise to an inference of scienter at least as strong as any competing inference," its CEA claims must be dismissed. *In re Amaranth I*, 587 F. Supp. 2d at 530.

> b. The Complaint Does Not Adequately Allege Conscious Misbehavior or Recklessness.

To adequately allege conscious misbehavior or recklessness, a plaintiff must show that the defendant's conduct is, "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Amaranth II*, 612 F. Supp. 2d at 383 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). If a plaintiff attempts to "plead scienter by identifying circumstances indicating conscious behavior by the defendant, . . . the strength of the circumstantial allegations must be correspondingly greater." *Id*. (quoting same).

The Complaint offers hardly any specific allegations of conscious misbehavior, and the few allegations that it levels are irrelevant. For instance, the Complaint alleges that Defendants were "conspiring and sharing confidential information as they formed trading huddles to exchange illegal information." Compl. ¶ 220. To support this claim, it cites a $22 million fine that FINRA imposed on Defendant GS & Co. in 2012. Compl. ¶ 221. But that fine concerned supposedly improper "equity research analyst communications" and had nothing to do with commodities markets generally (much less the platinum market specifically). *See* Compl. Ex. 8.

Similarly, to support its allegations that Defendants conspired to engage in front-running,

spoofing, and wash sales, the Complaint cites a court's finding that similar conduct had taken place in the foreign-exchange markets.  Compl. ¶ 39 & n.5.  But findings about other defendants, trading in different markets, cannot substitute for Plaintiff's burden to "prove to the court that [her] complaint is backed by specific facts supporting a strong inference of fraud."  *Three Crown*, 817 F. Supp. at 1040 n.11.[22]

### IV.     The Complaint Fails To State a RICO Claim.

The Complaint attempts to repackage Plaintiff's antitrust and CEA claims as a civil RICO claim, but its speculative allegations cannot confer standing under RICO or establish the multiple predicate acts required to state a claim under the statute.  In light of the stringent requirements that attach to RICO liability, this claim must be dismissed.

### A.     Plaintiff Lacks Standing Under RICO.

The RICO statute provides civil remedies, treble damages, costs, and attorneys' fees for "any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]."  18 U.S.C. § 1964(c).  In relevant part, Section 1962 makes it unlawful for any person to (1) acquire or maintain control of an enterprise through a pattern of racketeering activity or through the collection of an unlawful debt, § 1962(b); or (2) conduct the affairs of an enterprise through a pattern of racketeering activity or collection of an unlawful debt, § 1962(c).  Section 1961(1) provides an exhaustive list of activities—commonly referred to as "predicate acts"—that constitute "racketeering activity" under Section 1962.  A "pattern of racketeering activity" requires the commission of at least two predicate acts.  § 1961(5).

Even if a plaintiff adequately pleads the RICO elements just listed, she must also show that she has suffered an injury to her "business or property" as a *proximate result* of the defendant's

---

[22] Because Plaintiff's primary-liability claims under the CEA all fail, Plaintiff's vicarious-liability claim (Count IV) and aiding-and-abetting claim (Count VII) must be dismissed as well.  *See, e.g.*, *In re Silver II*, 560 F. App'x at 87; *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 599-600 (S.D.N.Y. 2011).

RICO violation. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267-68 (1992).   In other words, she must show that the RICO violation was the proximate cause of her injury.   The primary consideration in determining proximate cause in this setting is the directness of the relationship between the injury asserted and the injurious conduct alleged. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).   Speculative allegations of causation lacking supporting facts cannot be credited. *Giro v. Banco Espanol de Credito, S.A.*, No. 99-7883, 2000 U.S. App. LEXIS 4319, at *9-10 (2d Cir. Mar. 17, 2000) (dismissing RICO claim because alleged damages were too speculative given "the number of independent intervening actions" and "decisions by third parties").

Here, Plaintiff seeks damages for losses allegedly suffered as a result of the "total collapse of the NYMEX Platinum Market," Compl. ¶¶ 31-32, 349, which she attributes to Defendants' manipulation of the Auction process.   But as explained above in Section III.C.1, the Complaint does not come close to alleging a plausible set of facts from which the Court can infer that Defendants' conduct caused the collapse of the market, much less Plaintiff's claimed individual harm.   Not only does Plaintiff's claim that prices were *inflated* for much of the Relevant Period undermine the central allegation that she was damaged by price *suppression*, but the Complaint also acknowledges the significant volatility of the platinum market, the impact that supply and demand fundamentals have had on platinum prices historically, and the specific relevance of automobile demand in particular as affecting the price of platinum. *See* Compl. ¶ 255 *et seq*.

Even if Plaintiff's injury could be traced to Defendants' conduct, she would still lack standing under RICO because the Complaint makes no attempt to trace the injury to a violation of any RICO predicate.   While the Complaint recites the allegations that Defendants used the mail and wires to purchase and sell platinum; to deliver confirmation statements, tax information, and

redemption payments to customers; and to publish misleading prices on the internet, Compl. ¶ 465 *et seq*, it makes no effort to link these acts to the broader scheme alleged: submitting false pricing information during the Auctions, as well as front-running, spoofing, and the disclosure of confidential client information before the Auctions, Compl. ¶¶ 7, 225, 232, 234, 237, 303. That scheme is not characterized by the use of the mails and wires in the manner that Plaintiff describes, much less by money laundering or transacting in property derived from unlawful activity.

These facts foreclose standing because they remove sufficient factual support for the inference that the alleged RICO injury flowed from "the commission of the predicate acts." *Sedima v. Imrex Co.*, 473 U.S. 479, 497 (1985); *accord City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 440 (2d Cir. 2008), *rev'd on other grounds sub nom. Hemi Grp. LLC v. City of New York*, 559 U.S. 1 (2010); *see also Anza*, 547 U.S. at 461 ("[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries"). Nothing in the Complaint suggests that the damage Plaintiff sustained resulted from Defendants' use of the mails and wires to deliver account statements, tax information, or redemption checks to clients, let alone money laundering or transacting in property derived from unlawful activity. Indeed, Plaintiff does not even claim to have been a customer of *any* Defendant, so there is no basis even to infer that any Defendant sent an allegedly fraudulent communication *to her*. Because Plaintiff cannot attribute her alleged injuries to a violation of any RICO predicate, she lacks standing under the RICO statute.

**B.      Plaintiff's RICO Claim Contains Multiple Additional Pleading Defects.**

Even putting aside Plaintiff's lack of standing, the Complaint's RICO claim is riddled with pleading deficiencies.

*1.      The Complaint's Group Pleading Warrants Dismissal.*

41

The Court must dismiss a RICO claim that "impermissibl[y] fail[s] to distinguish between [certain] Defendants" and "never specifically alleges the nature of each defendant's participation in the allegedly fraudulent scheme." *In re Platinum*, 828 F. Supp. 2d at 602 (third alteration in original) (internal quotation marks omitted); *see also Merrill Lynch, Pierce, Fenner & Smith v. Young*, 91 Civ. 2923, 1994 WL 88129, at *15 (S.D.N.Y. Mar. 15, 1994) ("Even Rule 8(a) pleading requires plaintiffs to identify the specific defendant charged with committing a particular predicate act, rather than collectivizing a group of defendants as plaintiffs have done here."). The Complaint repeatedly refers to the "RICO Defendants" (a group that includes not only the named defendants but also 20 John Doe defendants), the "Enterprise Defendants," and UBS AG (which is neither an "auctioneer Defendant" nor an "Enterprise Defendant") without making any attempt to distinguish among them. *See, e.g.*, Compl. ¶ 440 *et seq*. A pleading does not properly distinguish among individual actors if it "merely sets forth a number of so-called 'Racketeering Acts' committed by [those] Defendants, . . . and adds a catalog of communications by mail or interstate wires alleged to have been made or caused to be made by them." *In re Platinum*, 828 F. Supp. 2d at 602 (omission and alterations in original) (quoting *Young*, 1994 WL 88129, at *20). On the contrary, a plaintiff "must charge *each* named defendant with engaging in specific racketeering acts, constituting a pattern within the meaning of the statute, committed by *that* defendant in the course of conducting the affairs of the enterprise." *Zito v. Leasecomm Corp.,* No. 02 Civ. 8074, 2003 WL 22251352, at *10 (S.D.N.Y. Sept. 30, 2003) (emphases added); *see Beauford v. Helmsley*, 740 F. Supp. 201, 213 (S.D.N.Y. 1990) (RICO claim dismissed where fraudulent actions attributed to defendants only collectively). Nowhere does the Complaint identify which two predicate acts each of the individual Defendants committed. This deficiency requires dismissal.

### 2. *The Underlying Predicate Acts Are Not Pleaded Adequately.*

The Complaint does not properly allege any predicate acts. "Courts require that each

predicate act . . . be articulated clearly in a civil RICO complaint . . . [t]o try to minimize the temptation for would-be RICO plaintiffs to recast ordinary commercial disputes as racketeering activity." *Banco de Chile v. Aitken Lavanchy*, No. 05 Civ. 4658, 2008 U.S. Dist. LEXIS 91499, at *31 (S.D.N.Y. Nov. 6, 2008) (alteration in original) (internal quotation marks omitted).   The Complaint alleges that Defendants engaged in wire fraud, 18 U.S.C. § 1343, mail fraud, § 1341, money laundering, § 1956, and transactions in unlawfully obtained property, § 1957.  Mail and wire fraud are both subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *N.Y. State Catholic Health Plan, Inc. v. Acad. O&P Assocs.*, No. 15-CV-3298, 2015 U.S. Dist. LEXIS 169526, at *52-53 (E.D.N.Y. Dec. 18, 2015) ("Where the predicate acts alleged involve mail or wire fraud, allegations must satisfy the particularity requirement of Rule 9(b)"); *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 145 (S.D.N.Y. 2014).

### a.    Wire Fraud

The heightened pleading requirements of Rule 9(b) apply "with even greater urgency in civil RICO actions."  *See Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 281 (S.D.N.Y. 1991).  In addition, a plaintiff must also plead reliance on the alleged material misrepresentation and causation (which are usually linked to each other).  *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132-33 (2d Cir. 2010) ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation." (citing *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 658 (2008))).  The Complaint does not provide any of the information required by Rule 9(b).  It identifies neither the timing of any instance of wire fraud nor the specific participants who engaged in any such conduct.  *See Lubin v. Dubin*, 13-cv-6619, 2014 U.S. Dist. LEXIS 24734, *21 (E.D.N.Y. Feb. 24, 2014).  Nor does it allege that Plaintiff relied on any purported misrepresentation made by any Defendant.  Although it claims that Defendants misrepresented platinum and palladium prices, it does not identify any communication Plaintiff

43

received or any prices of which she was aware during the Relevant Period or on which she relied when she transacted in platinum.  Indeed, as noted in Section II.C.1, *supra*, it provides no information about her own platinum transactions, much less the specific prices that she may have relied on in entering into those transactions.

### b.     Mail Fraud

The Complaint does not allege that Defendants used the mail in furtherance of their alleged scheme, *supra* Section IV.A—a prerequisite to any "mail fraud" claim.  *See* 18 U.S.C. § 1341; *Landy v. Mitchell Petroleum Tech. Corp.*, 734 F. Supp. 608, 623 (S.D.N.Y. 1990); *DNJ Logistic Grp., Inc. v. DHL Express (USA), Inc.,* No. 08 Civ. 2789, 2010 WL 625364, at *6 (E.D.N.Y. Feb. 18, 2010).  Although the Complaint makes cursory references to "Defendants'" use of the mail to buy and sell platinum and palladium, and to deliver confirmation statements, tax information, and redemption payments to customers, it does not make any effort to explain how these acts furthered the core elements of Defendants' alleged scheme, which allegedly included the submission of false pricing information during the Auctions in London, front-running, spoofing, and disclosure of confidential client information before the Auction, *supra* Section II.C.1.  Nor does it specify with particularity which Defendants engaged in which alleged acts of mail fraud, or when they did so.  All of these are fatal pleading deficiencies.  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) ("Allegations of predicate mail and wire fraud acts 'should state the contents of the communications, who was involved, . . . where and when they took place, and . . . explain why they were fraudulent.'" (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993))); *Landy*, 734 F. Supp. at 623.  And, as noted above, Plaintiff does not allege that she was ever a trading counterparty or customer of any Defendant.

### c.     Transacting in Stolen Property

The Complaint's allegations regarding transactions in stolen property likewise fall short of

Rule 9(b)'s pleading requirements.  *See Kades v. Organic, Inc.*, No. 00 Civ. 3671, 2003 WL 470331, at \*9 (S.D.N.Y. Feb. 24, 2003).  Although the Complaint alleges that "some of the RICO Defendants each or in combination" transferred "profits linked to their trading in NYMEX Platinum and/or Palladium to their own personal, corporate, and/or partnership accounts," Compl. ¶ 478, it does not explain when or how such transfers occurred, which Defendants effected them, or *how* Defendants' conduct—which included legitimate commodities trades with willing counterparties—involved unlawfully obtained property.

### d.    Money Laundering

The Complaint offers no facts to substantiate the elements of this predicate act.  *See* Compl. ¶¶ 472-476.   Proof of money laundering requires a plaintiff to show that (1) the defendant conducted a financial transaction; (2) the transaction in fact involved the proceeds of "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7); (3) the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) the defendant knew that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, or control of those proceeds.  *United States v. Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997); *see* 18 U.S.C. § 1956(a)(1)(A)(i); *United States v. Thorn*, 659 F.3d 227, 231-32 (2d Cir. 2011).

As noted above, the Complaint does not identify any specific "financial transaction" that any Defendant engaged in, much less a transaction involving the proceeds of unlawful activity. Nor does it identify which of the "specified unlawful activities" Defendants engaged in.  And no facts are offered to support the conclusion that Defendants sought to conceal or disguise the ownership of any proceeds of such unlawful activity.

45

**V.    The Complaint's RICO Claim Must Be Dismissed Because the Predicate Offenses on Which It Is Based Do Not Involve "Sufficient Domestic Conduct."**

The conduct underlying Plaintiff's RICO claim occurred overseas and was performed by foreign actors. *Supra* Section III.A. But as the Second Circuit has recently held, RICO has limited extraterritorial application, "appl[ying] extraterritorially if, and only if, liability or guilt could attach to extraterritorial conduct under the relevant RICO predicate." *European Cmty. v. RJR Nabisco, Inc.*, 764 F.3d 129, 136 (2d Cir. 2014), *cert. granted*, 136 S. Ct. 28 (2015). Because the Complaint does not allege facts giving rise to extraterritorial application of any of the predicates alleged, its RICO claim must be dismissed.

To begin, wire fraud and mail fraud, two of the predicate acts alleged, Compl. ¶¶ 465-476, do not apply extraterritorially in any circumstances. *RJR Nabisco*, 764 F.3d at 140-41. Here, however, Plaintiff claims that Defendants' "scheme" involved manipulation of prices on the Auctions in London.[23] The Complaint thus lacks allegations of "sufficient domestic conduct . . . to sustain the application of RICO" based on mail- and wire-fraud predicates. *RJR Nabisco*, 764 F.3d at 139, 141 (wire- and mail-fraud predicates were sufficiently domestic only because "all elements" of those violations "were completed *in the United States* or while crossing U.S. borders" (emphasis added)); *see Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419, 2015 WL 151487, at *7-9 (S.D.N.Y. Mar. 31, 2015) (RICO claim based on manipulation of foreign benchmarks was impermissibly extraterritorial).

The remaining predicate acts alleged—money laundering and transacting in property derived from specified unlawful activity—apply extraterritorially only if committed by "a United

---

[23] While the Complaint alleges that Defendants used the U.S. mail and wires to deliver account statements, tax information, and redemption checks, Compl. ¶¶ 470-471, it does not attempt to link this domestic conduct to the fraudulent scheme alleged. *See supra* Section IV.A.

States citizen" or "a United States person," 18 U.S.C. §§ 1956(f)(1), 1957(d)(2),[24] or if the conduct occurs in the United States, §§ 1956 (f)(1), 1957(d)(1).[25] Yet three-quarters of the known "RICO Defendants" are not United States citizens, one-half are not United States persons, *see* Compl. ¶¶ 49, 60, 78, 441, and the Complaint does not specify which of those Defendants purportedly violated Sections 1956 and 1957, *see* Compl. ¶¶ 472-479 ("[s]ome or all RICO Defendants" engaged in misconduct). Further, the Complaint's unsupported allegation that "[s]ome or all of" the Section 1957 violations occurred in the United States, Compl. ¶ 478, provides no information about what actually occurred. The Complaint thus fails to plead domestic violations of Sections 1956 and 1957.

## VI. Plaintiff Fails To State a Claim for Unjust Enrichment.[26]

Plaintiff's unjust-enrichment claim must also be dismissed. *First*, it is impermissibly "derivative and duplicative of" Plaintiff's federal statutory claims. *Shak*, 2016 WL 154119, at *9-10 & n.12 (dismissing unjust-enrichment claim alleging manipulation of COMEX silver futures prices, as "little more than a recasting of [plaintiffs'] CEA and antitrust claims" (internal quotation marks omitted)). "[U]njust enrichment is not a catchall cause of action to be used when others fail," and it is "not available where it simply duplicates, or replaces, a conventional [legal] claim." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012). Here, the Complaint alleges that Defendants "unjustly benefited" by manipulating the market for NYMEX Platinum futures contracts. Compl. ¶¶ 503-504. Because the Complaint identifies "no theory of unjust conduct independent of the alleged acts of market manipulation underlying" its federal claims, its unjust-

---

[24] As relevant here, a "United States person" is "a corporation organized under the laws of the United States, any State, the District of Columbia, or any territory or possession of the United States, and a foreign subsidiary of such corporation." 18 U.S.C. § 3077(2)(F).

[25] *See RJR Nabisco*, 764 F.3d at 139.

[26] If this Court dismisses the claims over which it has original federal jurisdiction—the Sherman Act, CEA, and RICO claims—it should decline to exercise supplemental subject-matter jurisdiction over any of Plaintiff's state-law claims. 28 U.S.C. § 1367(c); *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006).

enrichment claim fails as a matter of law.  *Shak*, 2016 WL 154119, at \*9-10 & n.12.

 *Second*, the Complaint does not adequately allege the requisite "direct dealing or actual, substantive relationship with" any Defendant.  *See Laydon I*, 2014 WL 1280464, at \*13. Conceding that Plaintiff's platinum futures transactions on NYMEX—an anonymous, centralized exchange—could not place her "in privity with" Defendants,[27] the Complaint claims that Plaintiff was "connected to" all Defendants because they allegedly influenced the prices of NYMEX platinum futures market-wide, including in her transactions with non-Defendants.  Compl. ¶ 505. Numerous courts have rejected identical allegations by futures-market participants as failing to "establish a relationship, of *any* sort," let alone the "substantive relationship" necessary to establish a claim for unjust enrichment.  *See In re LIBOR I*, 935 F. Supp. 2d at 737 (emphasis added); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR IV*"), No. 11 MDL 2262, 2015 WL 6243526, at \*75, \*84 (S.D.N.Y. Oct. 20, 2015); *In re Amaranth I*, 587 F. Supp. 2d at 547.

 *Third*, the Complaint cannot show that any Defendant was "unjustly enriched" at *Plaintiff's* expense.  *See Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004) ("A complaint does not state a cause of action in unjust enrichment if it fails to allege that defendant received something of value *which belongs to the plaintiff*." (emphasis added)).  Because exchange-traded futures are not "contracted directly" between counterparties, Defendants' "unjust gains, if any, cannot be identified as corresponding to" Plaintiff's alleged losses on NYMEX Platinum futures.  *In re LIBOR IV*, 2015 WL 6243526, at \*75 (dismissing claim by futures-contract purchasers).  The Complaint's conclusory allegation that Defendants "unjustly benefited" at Plaintiff's expense, Compl. ¶ 504, cannot overcome this fact.  *See Laydon I*, 2014 WL 1280464, at

---

[27] Parties to exchange-traded futures contracts, such as NYMEX platinum futures, do not transact directly with one another, but through a clearinghouse, which acts as "the seller to all buyers and the buyer from all sellers."  *Leist v. Simplot*, 638 F.2d 283, 287 (2d Cir. 1980), *aff'd*, 456 U.S. 353 (1982).

*13 (assertion that defendants "financially benefitted" from manipulating futures market did not give rise to unjust-enrichment claim).  Thus, the unjust-enrichment claim must be dismissed.

**VII.    The Complaint Does Not State a Claim for Intentional Infliction of Emotional Distress.**

Emotional Distress is a "highly disfavored cause of action" and "is almost never successful."  *McGown v. City of New York*, No. 09 Civ. 8646 (CM), 2010 WL 3911458, at *5 (S.D.N.Y. Sept. 9, 2010).  Courts in this Circuit have recognized that Emotional Distress claims are particularly "far out of place in a commercial setting."  *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 425 (E.D.N.Y. 2013).

An Emotional Distress claim requires that plaintiff suffer emotional distress as a consequence of conduct by a defendant that is so "extreme" and "outrageous" as to be "utterly intolerable in a civilized society."  *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985).  In addition, the conduct must have been "intentionally directed at the plaintiff."  *Id.*  Here, the Complaint asserts that Defendants "intentionally caused Plaintiff great distress" by manipulating the price of NYMEX platinum futures contracts.  *See* Compl. ¶¶ 512-521.  These conclusory allegations cannot establish the required showing.

First, "manipulation of a market," including in connection with "the purchase and sale of securities and commodities," is not sufficiently "extreme and outrageous" to give rise to a claim for Emotional Distress.  *Three Crown*, 817 F. Supp. at 1048 (dismissing Emotional Distress claim by futures contract purchasers alleging manipulation of market for U.S. Treasury securities); *see also Yong Ki Hong*, 951 F. Supp. 2d at 425-26 (same for antitrust claim).  Likewise, manipulation of an entire market, "by its very nature," is "not aimed at any particular individual" but is instead "calculated to cause profits for the manipulators."  *Three Crown*, 817 F. Supp. at 1048-49. Plaintiff's Emotional Distress claim cannot overcome these fundamental defects and must

49

therefore be dismissed.

### VIII.   Plaintiff Is Not Entitled to Punitive Damages.

If any of Plaintiff's claims survives dismissal, the Court should reject her request for punitive damages.[28]  Punitive damages are unavailable for RICO, Sherman Act, Donnelly Act, and unjust-enrichment claims.  *See Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 195 (S.D.N.Y. 2012) (RICO), *aff'd*, 731 F.3d 241 (2d Cir. 2013); *Hansen Packing Co. v. Armour & Co.*, 16 F. Supp. 784, 788 (S.D.N.Y. 1936) (Sherman Act); *Carl Wagner & Sons v. Appendagez, Inc.*, 485 F. Supp. 762, 776 (S.D.N.Y. 1980) (Donnelly Act); *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 445 n.13 (S.D.N.Y. 2014) (unjust enrichment).  And while a plaintiff may seek punitive damages under the CEA in limited circumstances, Plaintiff here cannot, because the Complaint does not assert that Plaintiff's CEA claim "aris[es] from a violation in the execution of an order on the floor of a registered entity."  7 U.S.C. § 25(a)(3)(B); *Gunderson v. ADM Investor Servs., Inc.*, 85 F. Supp. 2d 892, 913 (N.D. Iowa 2000).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Complaint be dismissed with prejudice.

---

[28] Plaintiff's request for punitive damages is labeled "Count XI," Compl. ¶¶ 522-523,  ignoring the fact that "there is no separate cause of action in New York for punitive damages."  *Martin v. Dickson*, 100 F. App'x. 14, 16 (2d Cir. 2004).

Dated: March 14, 2016
New York, New York

Respectfully submitted,

 /s/ Michael Lacovara
Michael Lacovara
Leah Friedman
Scott A. Eisman
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 277-4000
Fax: (212) 277-4001
michael.lacovara@freshfields.com
leah.friedman@freshfields.com
scott.eisman@freshfields.com

*Attorneys for Defendant*
*HSBC Bank USA, N.A.*


/s/ Joseph Serino, Jr.
Joseph Serino, Jr., P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4913
Fax: (212) 446-6460
jserino@kirkland.com

*Attorneys for Defendants*
*BASF Corporation and BASF Metals Limited*


/s/ Stephen Ehrenberg
Stephen Ehrenberg
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10005
Tel: (212) 558-4000
Fax: (212) 558-3588
ehrenbergs@sullcrom.com

*Attorneys for Defendants*
*Goldman Sachs International; Goldman Sachs Group, Inc.; Goldman, Sachs & Co.; and*
*Goldman Sachs Execution & Clearing, LP*


/s/ Robert G. Houck
Robert G. Houck
John D. Friel
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019
Tel: (212)-878-8000
Fax: (212)-878-8375
robert.houck@cliffordchance.com
john.friel@cliffordchance.com


*Attorneys for Defendant*
*ICBC Standard Bank Plc*

/s/ Ethan Edward Litwin
Ethan Edward Litwin
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
Tel: (212) 837-6540
Fax: (212) 299-6540
litwin@hugheshubbard.com


*Attorneys for The London Platinum and Palladium Fixing Company Ltd.*

/s/ Joel S. Sanders
Joel S. Sanders
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105
Tel: (415) 393-8200
jsanders@gibsondunn.com


D. Jarrett Arp
Melanie L. Katsur
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 955-8500
jarp@gibsondunn.com
mkatsur@gibsondunn.com

Peter Sullivan
Indraneel Sur
200 Park Avenue
New York, NY 10166
Tel: (212) 351-4000
psullivan@gibsondunn.com
isur@gibsondunn.com

*Attorneys for UBS AG and UBS Securities LLC*