UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SUSAN LEVY,

                Plaintiff,

              -against-

BASF METALS LIMITED, BASF CORPORATION,
GOLDMAN SACHS INTERNATIONAL,
GOLDMAN SACHS GROUP, INC. GOLDMAN
SACHS & CO., GOLDMAN SACHS EXECUTION
& CLEARING, LP  HSBC BANK USA, NA, ICBC
STANDARD BANK PLC, UBS AG, UBS
SECURITIES LLC,  LONDON PLATINUM AND
PALLADIUM FIXING COMPANY LTD.; John
Does #1-20.

                Defendants.
-----------------------------------------------------------------x

**SECOND
AMENDED
COMPLAINT**

JURY TRIAL DEMANDED

15-cv-7317 (GHW)

Related to

15-CV-9319

Susan Levy, Esq. & Pro Se
40 East 10th Street
Suite 2K
New York, New York 10003
(212) 962-1782 (Tel)
(212) 962-3711 (Fax)
susanjlevy@aol.com

# **TABLE OF CONTENTS**

**Page**

EXHIBIT LIST............................................................................................................vi

SUMMARY OF ALLEGATIONS...............................................................................1

PARTIES......................................................................................................................7

Plaintiff........................................................................................................................7

Defendants...................................................................................................................8

JURISDICTION AND VENUE.................................................................................21

FACTUAL ALLEGATIONS.....................................................................................23

The Platinum and Palladium Physical and Futures Market......................................23

Basic Principals of Commodities Investing in Platinum and Palladium...................23

NYMEX Platinum and Palladium-Based Financial Products....................................28

The Relevant Market For NYMEX Palladium Futures Contracts.............................30

The Physical Platinum and Palladium Markets.........................................................32

Interrelationship between the Spot and Futures Markets For Platinum and Palladium................34

The NYMEX Restricts the Number of Contracts a Market Participant Can Own To Avoid
Market Manipulation.................................................................................................35

THE PLATINUM FIXING PROCESS/
THE PLATINUM AND PALLADIUM AUCTION PROCESS...................................36

The Auction Process Demonstrates a Plausible Prior Fixing Scheme in Restraint of
Trade because 60% to 80% of the time during the relevant time frame from January 1,
2008 through December 1, 2014, the prices fell during the fixing Periods which is
also statistically aberrant and a deviation from the Norm.  The Statistical Evidence also
shows Intentional Conduct...........................................................................................44

In order for the price of Platinum to fall during the fixing period as
demonstrated in the above-charts, all of the fixing defendants and the other market
making dealers including defendant UBS AG had to agree to go short and not to put in
any market moving long buy orders during the fixing period which would have ruined
their scheme to suppress prices during the Fix..............................................................58

Defendants' Conduct was Intentional..............................................................................61

Disruptive Practices.........................................................................................................65

The Auctioneer defendants, UBS and the FCM defendants were Horizontal
Competitors for Spot and NYMEX Platinum and Palladium and Together
Had the Ability to Combine and Conspire to Set Prices During the Relevant
Time Period.......................................................................................................................65

CIRCUMSTANTIAL EVIDENCE OF A PRICE-FIXING CONSPIRACY AS
WELL AS MOTIVE AND INTENT (Plus factors).........................................................66

On-Going Government Investigations...............................................................................66

Other Manipulative and Price Fixing
Conduct to Support the Instant Complaint.......................................................................73

Other Plus Factor besides Government Investigations....................................................73

All Defendants Had the Ability to Fix the Prices of NYMEX Platinum And
Move The Market For NYMEX Platinum in the Direction each defendant Desired....................75

DEFENDANTS' PRICE FIXING CONDUCT IN THE PHYSICAL MARKET IN
LONDON CAUSED PRICE ARTIFICIALITY IN THE 2008 NYMEX FUTURES
CONTRACT AND IN OTHER NYMEX CONTRACTS THROUGHOUT THE
RELEVANT TIME PERIOD...........................................................................................79

The Aberrant Price Movements in Platinum Prices Between 2008 and 2014
at the time of the Fixes where prices spiked lower around cannot be explained by the
legitimate forces of supply and demand, thus, an inference of causation of artificial
price is established...........................................................................................................85

A.     Sample Price Charts from Specific Days Demonstrate Anomalous
       Activity Around And During the Platinum and Palladium Fixings..................................89

       The facts showing slamming and banging the fix transaction demonstrated Disclo-
       sure of Confidential Information Around the Platinum and Palladium Fixings...............91

-ii-

PROXIMATE CAUSATION............................................. ............................................97

The Collapse of the Platinum NYMEX Futures Markets as Well as Other Related
Markets in August, 2008 and particularly on August 15, 2008 proximately
caused Ms. Levy's Financial Injury.................................................................................98

FRAUDULENT CONCEALMENT.................................................................................99

Claim I

     MARKET MANIPULATION IN VIOLATION OF THE COMMODITIES
     EXCHANGE ACT 7 U.S.C. § 1 Et. Seq., 17 C.F.R.§ 339(d)..........................................103

Claim II

     DEFENDANTS MADE FALSE, MISLEADING OR KNOWINGLY
     INACCURATE, FALSE AND/OR MISLEADING REPORTS CON-
     CERNING THE PRICES OF 2008 NYMEX Platinum IN VIOLATION
     OF SECTION CEA §6© OF THE ACT, 7 U.S.C.§9(1)(a), 7 U.S.C.§6
     §6b(a)(2)(B) and 7 U.S.C.§6(c)(2)(B)(Against all defendants)..........................................104

Claim III

     VIOLATION OF THE ANTI-FRAUD PROVISIONS OF THE CEA
     7 U.S.C. §6, ET. SEQ. VIOLATIONS OF 7 U.S.C.§6(b)(2)(a)-Cheating.......................105

Claim IV

     VIOLATIONS OF  7 U.S.C.§ 6B(a)2© Willful Deception and/or Aiding
     and Abetting...................................................................................................................106

Claim V

     VIOLATIONS OF 7 U.S.C.§1, Et. Seq. EMPLOYMENT OF MANIPULATIVE
     OR DECEPTIVE DEVICE OR CONTRIVANCE IN VIOLATION OF THE
     COMMODITY................................................................................................ 107

Claim VI

     VICARIOUS LIABILITY...............................................................................................108

Claim VII

     VIOLATIONS OF THE ANTITRUST LAWS, 15 U.S.C.§1,§2 AS WELL
     AS N.Y. GENERAL BUSINESS LAW §340, Et. Seq. (THE DONNELLY
     ACT) (Against All Defendants).....................................................................................110

Claim VIII

     VIOLATIONS OF THE SHERMAN ACT, 15 U.S.C.§2, NY GBL § 340, Et. Seq.
     Monopolization Against Defendant LPPFC...........................................................114

Claim IX

     VIOLATIONS OF THE RACKETEERING INFLUENCED AND CORRUPT
     ORGANIZATION ACT, 18 USC §§1961, ET. SEQ. AND 18 USC §§ 1962(A)
     (B) & © ........................................................................................................................116

THE ENTERPRISE.................................................................................................................116

THE RACKETEERING VIOLATION...................................................................................118

PATTERN OF RACKETEERING ACTIVITY........................................................................118

RACKETEERING ACTIVITY...............................................................................................120

Racketeering Acts Involving Wire Fraud...............................................................................120

Racketeering Acts Involving Mail Fraud................................................................................123

Racketeering Acts Involving Money Laundering Section 1956 Violations..................................124

Section 1957 Violations.........................................................................................................125

Claim X

     RICO § 1962(d) Conspiracy..............................................................................................126.

     RICO RELIEF....................................................................................................................126

Claim  XI

    AIDING AND ABETTING-THE FEDERAL LAW CLAIMS 7 U.S.C. § 25(a)
    and 13 (c)(a)...............................................................................................................126

Claim XII

    FRAUDULENT CONCEALMENT and EQUITABLE TOLLING...............................128

STATE LAW AND COMMON LAW PENDANT CLAIMS.....................................................129

Claim XIII

    UNJUST ENRICHMENT................................................................................................129

Claim XIV

    TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE........................130

Claim  XV

    PUNITIVE DAMAGES..................................................................................................132

JURY DEMAND...............................................................................................................132

DAMAGES AND OTHER RELIEF............................................................................................132

**EXHIBIT LIST**

**EXHIBIT**

1.  Charts of Platinum and Palladium Spot behavior Following AM and PM Fixing Calls 2008-2014

2.  Gold Charts for 2009 showing price drops during the PM Gold Fixing Window

3.  Preliminary list of Days on which defendants' conduct resulted in artificial downward movement of the PM Platinum and Palladium Fixings.

4.  BASF Metals Limited Precious Metals Services offices around the Globe and a description of its services.

5.  Platinum Worldwide Demand and Supply Charts 2004-2013.

6.  United States Car Sales Data 1931-2011.

7.  Charts showing strong correlation between prices of physical platinum and palladium and NYMEX Future contracts for platinum and palladium.

8.  Data showing Bank Positions in NYMEX Futures Contracts during the relevant time period.

9.  Article Entitled UBS Precious Metal Misconduct Found by Finma in FX Probe November 12, 2014.

10. FINMA Report entitled Foreign exchange trading at UBS AG: Investigation conducted by FINMA, dated November 12, 2014.

11. Emails of Metals Trader Andrew Maguire to U.S. Regulator. January through March 2010.

12. Financial Conduct Authority Final Notice regarding the Action taken against Trader Daniel James Plunkett.

13. Articles regarding rise of Platinum prices to at least $2500 in 2008.

14. Gold vs. Platinum charts 2005-2015 showing strong correlation other than the Fall of 2008.

15. Prices of Physical Platinum from 1960-2015.

16. Dispersion of Anomalies before and during the fixing call, 2008-2014 for platinum.

17.    Graph Showing Normalized platinum futures prices and rolling Forecast Errors October 2007 to September, 2014

18.    Average NYMEX Futures Trading Volume Jan. 2007- November 2014.

19.    Summary of Evidence Indicating Collusive Manipulation of Platinum and Palladium Prices Around the AM and PM Fixing.

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

SUSAN LEVY,


               Plaintiff,

                                                          **SECOND AMENDED**
          -against-                                       **COMPLAINT**

BASF METALS LIMITED, BASF CORPORATION,                    JURY TRIAL
GOLDMAN SACHS INTERNATIONAL, GOLDMAN                      DEMANDED
SACHS GROUP, INC. GOLDMAN SACHS & CO.,
GOLDMAN SACHS EXECUTION & CLEARING, LP                    1:15-cv-7317
HSBC BANK USA, NA, ICBC STANDARD BANK PLC,                related to
UBS AG, UBS SECURITIES LLC,  LONDON PLATINUM              1:14-cv-9391
AND PALLADIUM FIXING COMPANY LTD.; John Does
#1-20.
               Defendants.

----------------------------------------------------------x


          Plaintiff, Susan Levy, Esq. proceeding pro se complains upon knowledge with

respect to allegations regarding herself and her losses in the NYMEX Platinum market and

upon information and belief as to all other allegations and parties as follows:

## SUMMARY OF ALLEGATIONS

**Manipulation, Price Fixing and Racketeering Scheme ("The Scheme") to
Artificially inflate and/or deflate the price  NYMEX Platinum Futures Contracts
from at least January, 2008 through December, 2014. ("The Relevant Time
Period")**

          1.  Between at least January 1, 2008 and December 1, 2014, ("The Relevant Time

Period" herein after) defendants conspired to and did engage in a Scheme to manipulate and

thereby fix the prices the NYMEX Platinum Futures contract ("NYMEX Platinum"

hereinafter) during the relevant time period.

          2.  Defendants accomplished their Scheme by means of a variety of facts and practices

that were intended to and did manipulate the settlement prices and closing prices of the NYMEX Platinum Futures contracts for the 2008 contracts expiring in January 2008, April, 2008, July 2008, and October, 2008. (NYMEX Platinum), and other contracts through 2014.

3. As a result, this Scheme caused the prices of NYMEX Platinum to rise generally over the 6 year period with pronounced dips in the market occurring eerily at the same time each day corresponding to the AM and PM fixing periods.

4. The statistical data clearly show that during the six year period from 2008 through 2014 the prices of platinum, were lower 60% to 80% of the time following the AM and PM Fixings. Prices also were consistently lower just prior to fixings as well. Prices for Palladium moved lower too. Both platinum, and palladium were generally rising in value during the relevant period except for one time period from the spring/summer of 2008 through year end 2008. See Charts annexed hereto as Exhibit 5.

5. Defendants caused platinum to increase in value at the am and pm fixing period up to 30% of the time during the relevant time period.

6. These price movements were not linked to any macroeconomic events that would have moved the prices during the platinum and palladium fixings, rather each defendant conspired to price fix and manipulate these metals especially at the time of the fixings. Thus, the prices were not the result a free market system, but a result of collusion.

7. These aberrant price movements just at the time of the fixing and before the fixing as well occurred where the auctioneer defendants secretly got together on a conference call to determine the price of these commodities, platinum and palladium.

8. Each defendant was also trading for profit in each one's own proprietary account in

2

both the physical plaitinum and palladium and the NYMEX futures contract.

9. The second way the defendants manipulated the market for platinum and palladium, during the relevant time period, in both the physical market and the NYMEX contract, was by purchasing extremely large stockpiles of these metals to hold in their vaults so that they would have enough ammo during the Fixings to actually move the market either up or down, usually down 60 to 80% down, during the relevant time from 2008 through 2014.

10. The 60% to 80% statistic is abnormal and contrary to the law of averages which would mandate that the prices should go up 50% of the time, stay, and go down 50% on average.

11. Thus, the prices of NYMEX platinum and physical platinum were distorted and out-of-line with the legitimate forces of supply and demand during the relevant time period causing Ms. Levy to loose her entire investment on or about August 15, 2008 when these traders decided to crash the market by covering their short positions, purchasing more positions at deflated prices and generally failing to properly coordinate their scheme with other precious metals traders who were also manipulating the market in the same fashion as the platinum and palladium traders including gold, palladium and silver, upon information and belief. See Gold Chart for 2009 showing the same pattern of dropping prices at the PM Gold London Fixings during the relevant time period, annexed hereto as Exhibit 2.

12. During the relevant time period, each defendant purchased and sold Physical platinum and palladium in the London Market, although none of the defendants had any commercial use for these metal, and their only purpose in buying these metals was to monopolize the market and price-fix.

3

13.  Thus defendants violated of *inter alia* Sections 6©, 6(d) and 9(a)(2) of the Commodity Exchange Act ("the Act".) 7 U.S.C. §§ 9, 15, 13(b) an d 13(a)(2) (1994), as amended by the Commodity Futures Modernization Act of 2000 as well as Sections 1 and 2 of the Sherman Act, 15 U.S.C.§§ 1, 2, and Sections 1961 and 1962 of RICO Act 18 U.S.C.§§ 1961 Et. Seq., as well as Pendant State Law Claims.

14.  Since 2011, the NYMEX market for platinum was approximately 100 billion dollars per year; whereas the physical Market in London represented approximately 13 billion dollars per year of platinum, upon information and belief.

15.  All defendants, their co-conspirators and aiders and abettors acted with intent, knowledge, bad faith and/or constructive bad faith based on extreme arbitrariness.

16.  Defendants Scheme consisted of Four parts:

A.  **Manipulative Step One**: The Auctioneer defendants who are horizontal competitors in the market for physical platinum and palladium and NYMEX platinum and palladium conspired with their New York trade desks in order to gain an advantage with respect to their NYMEX futures contracts that were being traded at the NYMEX exchange in New York.

B.  **Manipulative Step Two:** To ensure that their NYMEX contracts could be traded at a profit, each defendant agreed to fix the price of physical platinum and palladium, since the physical prices are an essential price-component of the NYMEX contract prices. Thereby, if defendants could artificially set the physical prices of platinum and palladium, the NYMEX contracts would follow suit since the prices of all NYMEX contracts are inextricably linked to the spot prices of each contracts underlying commodity in this case

4

platinum an palladium.

      C. **Manipulative Step Three:**   The auctioneer defendants in unison with the non-auctioneer dealers would agree twice a day to halt trading for 10 to 30  minutes in the morning and 10 to 30 minutes in the afternoon in order to engage in an "auction" process to reset these prices of physical platinum and palladium.  Private conference calls were set up where confidential information was exchanged by the auctioneer defendants who could determine prices and take positions prior to the public even knowing what those prices were.

      D. **Manipulative Step Four:** As a result, defendants were able to position their NYMEX futures contract trades in conformity with the pricing information that to which they were privy ahead of the public on the conference call. The auctioneer defendants were required to enter into real market transactions to set the prices of these metals that were pre-determined at the "auction" whether these defendants even needed or wanted to purchase or sell platinum or palladium at all.

      17. **Causation of Artificial Prices-** As a result of these four maniupulative steps, defendants were able to position their investments at large profis to themselves and their New York trading desks, trading NYMEX contracts down at One North End Avenue, New York, New York by taking the risk out of these risky investments, since they were conspiring to move the market and did move the market in an advantageous direction for each other.

      18. Because the New York traders got instantaneous pricing information ahead of the public, they could also profit from price rigging the market during the fixing auctions.

      19. This conduct occurred form 2008 to 2014 on at least 1761 occasions. <u>See</u>

5

Preliminary list of days on which defendants' conduct resulted in artificial downward movement of th PM platinum and palladium Fixings annexed hereto as Exhibit 3.

20. These Manipulative Steps were accomplished by continuously conspiring with co-defendants and other market participants John Does # 1-20 who are presently unknown to Plaintiff, but well-known to defendants, to determine where the prices were going and how they would be set to ensure profitability for themselves and their co-conspirators.

21. This manipulative Scheme was also accomplished by a variety of illegal conduct including *inter alia:* (1) slamming the fix[1] and banging the fix transactions which are per se manipulative; (2) disclosure of non-public information among defendants who were in fact horizontal competitors constituting collusion, (2) front running orders, (3) painting the screen (spoofing), and (4) wash sales.

22. As a result of this Scheme defendants did not have to bear any of the risk of investing in the NYMEX Platinum Market, since they knowingly set the prices and knew where the prices would be headed.

23. Because it is well-known that the trading of NYMEX futures contracts as well as physical platinum and palladium is a zero-sum game, for every market participant who profits, another necessarily losses his or her entire investment.

24. Thus, on Ausgust 15, 2008 and for several days prior thereto, each

_____

[1]Slamming the Fix means in this Second Amended Complaint that during the fixing window, the auctioneer defendants would sell large quantities of Platinum and or Palladium without any other reason to do so other than to purposefully push down the price of these metals. This conduct is extremely similar to slamming the closing which was found to be maniuplative conduct. See *In Re Amaranth,* 587 F. Supp. 2d 513 (S.D.N.Y 2008). Banging the Fix is the converse where large purchases would be made without any economic reason other than to move prices higher.

6

defendant decided to take profits from the scheme and caused price of NYMEX futures contracts to plummet, by commencing a sell-off of positions as well as initialing new short positions and closing out expiring contracts. As such, because the scheme was relativly a new endeavor, the traders failed to coordinate properly and caused a seismic gyration crashing the market on August 15, 2008 for no fundamental reason at all. Defendants' conduct purposefully stopped out customers like Ms. Levy who were direct competitors in the marketplace, who simply could not compete due to the monoply conduct that caused a total corner and squeeze of the NYMEX Platinum futures Market.

25.  As a result of this manipulative scheme, there was no more competitive market in NYMEX Platinum and Palladium. Defendants controlled the market with their sheer economic might. The entire market became a farce during the relevant time frame, and the legitimate forces of supply and demand were reduced to a nullity and overwhelmed by market manipulation allowing defendants to take positions to their advantage, since they set the prices themselves and knowing where the prices were headed on a twice daily basis as a result of the LPPFC's fixing process.

**PARTIES**

**Plaintiff**

26.  Susan Levy is an individual residing in New York State.. During the Relevant Period, Ms. Levy purchased and sold NYMEX platinum futures contracts at artificial prices proximately caused by defendants' unlawful manipulation as alleged herein. Ms. Levy was deprived of transacting in a lawful, non-manipulated, competitive market for

7

platinum investments, including in the segment for platinum futures contracts, and otherwise suffered injury to her business or property as a direct and proximate result of defendants' unlawful conduct.

27.  During the relevant period, plaintiff was a direct purchaser of Platinum NYMEX Futures Contracts.  Her contracts were heavily influenced by the prices set at the London Fixings during the relevant time period.  Therefore the settlement of her contracts and mark-to-market value of her NYMEX contracts were dictated in by the platinum and palladium  Fixings occurring in London during the relevant time period. As a  result of Defendants' manipulative and collusive conduct, Plaintiff was injured in her business or property.

**Defendants**

28.  Whenever in this Second Amended Complaint reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agent, employees, or representatives while they were engaged in the management, direction, control, or transaction of the entity's business or affairs.

**BASF Defendants**

29.  BASF Societas Europea ("BASF SE"), a german company, is the largest chemical producer in the world.  In 2006, BASF SE completed its acquisition of Englehard Corporation, which was one of the largest manufacturers of catalytic converters in the world. Englehard Corporation (via a subsidiary) was a fixing  member of the LPPFC up until 2006. BASF SE is organized by divisions

8

30. Defendant BASF Metals Limited ("**BASF Metals Ltd.**"), is a subsidiary of BASF SE.

31. Defendants BASF Metals Limited is a division of BASF Catalysts. BASF Catalysts is a Division of BASF Corporation ("BASF Corp" hereinafter") which is headquartered in Iselin, New Jersey.

32. BASF Corporation maintains an office in New Jersey at 25 Middlesex Turnpike in Iselin, New Jersey and conducts business out of that office.

33. BASF Metals Limited has an office located at110 Bishopsgate, London England.

34, BASF Catalyst Division of BASF Corporation maintains a 60,000,00 square foot office at 33 Wood Avenue, Iselin, New Jersey.   This location is considered the BASF Catalyst Division global headquarters.

35. BASF Catalyst Division has voluminous operations in the United States in Alabama, California, Georgia, Louisiana, Michigan, Mississippi, New Jersey, Ohio, Oregaon, Pennsyvania, South Carolina and Texas.

36. BASF Catalyst Division maintains a storage Vault in Union, New Jersey that has precious metals inventories including Platinum and Palladium in excess of $200 million dollars. (200 Million Dollars), upon informatoin and belief.

37. BASF Corporation maintains a storage Vault in Union, New Jersey that has preicous metal inventories including Platinum an Palladium in excess of $200 million. (Two hundred Million Dollars), upon information and belief.

38. BASF Metals Limited's only operations is to provided Precious Metals Services

9

on behalf of itself, its affiliates, and its customers.

39. Precious Metals Services are provided by BASF Catalysts which is a division of BASF Corporation.

40. BASF Catalyst Division is also its own entity, BASF Catalysts, LLC. which is a Delaware limited liability Company.

41. BASF Catalyst Division provides "Precious Metals Services" throughout the world including through BASF Metals Ltd. in London, England.

42. BASF Catalysts Division's Precious Metals Services are "globally and vertically integrated, and are available around the clock to provide precious metal services strategic solutions.

43. BASF Metals Limited on behalf of BASF Catalysts Division provided Precious Metal Services including acting as an auctioneer in the London Platinum and Palladium Fixing process from its inception in 2006 until this Auction Process was terminated on December 1, 2014.

44. Other Precious Metals Services provided by BASF Corp and/or BASF Catalysts and/or BASF Metals Limited include:

> "Trading and hedging of precious metal products such as platinum, palladium, rodium and other platinum group metals (PGM) as well as gold and silver. Where knowledge is power, our customers can leverage our integrated commercial trading platform enabling them to utilize powerful analytics providing insights on supply and demand fundamentals."

See BASF Metals Product and Services Information Sheet annexed hereto as Exhibit 4.

45. BASF Metals Limited was formerly known as Engelhard Metals Limited, when the latter was acquired by BASF SE in May 2006. After the acquisition, BASF Metals

10

Limited assumed Engelhard Metals Limited's role as a participating member in the London Fixing.

46.     BASF Metals Limited conducts proprietary trading in the platinum and palladium markets. During the Relevant Period, BASF Metals entered directly into platinum and palladium spot, forward, option and platinum and palladium ETF share transactions with members of the investing public.

47.  BASF Catalysist and/or BASF Corporation also have their own benchmark for pricing platinum and palladium called the EIB or (Englehard Industrial Bullion), upon information and belief.

48.  BASF Catalysts and/or BASF Corporation claim that this EIB benchmark is recognized as a leading benchmark in pricing platinum and palladium metals.

49.  Defendant BASF Metals Ltd. is also a market-making member of The London Platinum and Palladium Market (the "LPPM").

50.  Defendant BASF Metals Ltd. is also a participating member of the London Platinum and Palladium Fixing Company, Ltd. ("LPPFC.").

51.  Defendant BASF Metals, Ltd. was one of the four auctioneers who conducted the twice Daily Fixing Auctions during the relevant period.

52.  BASF Corp. serves as an approved carrier, assayer, and refiner of platinum and palladium for the CME Group in the United States.  BASF Corp., also provides CME Group-approved platinum and palladium brands. This branded physical platinum and palladium is deliverable against NYMEX platinum and palladium futures contracts.

53.  Because BASF Corp, BASF Catalysts Division and BASF Metals Litimited all

11

provide Precious Metals Services on a worldwide basis, these distinct corporate forms require veil piercing since BASF Corp. BASF Metals, and BASF Catalyst have all been engaging in the same business and sharing the same profits and to avoid the inequitable result of recognizing these distinct corporate formalities.

54.  BASF Corp, Basf  Catalysts Division, and BASF Metal Limited are all agents of each other to provide Precious Metals Services globally.

### Goldman Sachs Defendants

55.  Defendant Goldman  Sachs  International  ("GSI" hereinafter)  is a  financial services unlimited company incorporated under the Laws of Great Britain  and is a subsidiary of The Goldman Sachs Group, Inc., with its principal place of business in London, England.

56.  GSI is a participating member in the London Platinum and Palladium Fixings ("LPPFC"), and a full member of the LPPM.

57.  GSI served  as one of the four auctioneers who conducted the platinum and palladium Fixing Auctions twice daily during the Relevant Time Period.

58.  Defendant Goldman Sachs Group, Inc. ("GSG, Inc." hereinafter) is Delaware Corporation headquartered at 200 West Street, New York, New York 10282.  GSG, Inc. is a bank holding company and a financial holding company. It is the parent of the wholly owned subsidiary Goldman Sachs International. Inc.

59.  GSI at all times hereinafter was acting as agent for its parent, GSG, Inc. during the relevant time period.

60.  Goldman Sachs Execution & Clearing, L.P ("GSEC" hereinafter). was and is a Limited Partnership registered as a United States Futures Commission Merchant and Clearing

12

House member of the New York Mercantile Exchange.

61.  GSEC is registered to do business and conducts business in New York.

62.  GSEC on behalf of itself, GSG, Inc. GSI  and clients initiated, held and closed-out trading positions in platinum and palladium and their derivative financial products as an agent and independently in platinum and palladium futures and or options contracts on behalf of GSG, Inc., GSI, and for  itself, and firm clients during the relevant time period.

63.  Goldman Sachs & Co. (GS & Co.)  is a company conducting business in New York and is a wholly owned subsidiary of GSG, Inc.

64.  GS & Co. is a registered Futures Commission Merchant and a Clearing House member of the New York Mercantile Exchange.  (Collectively the Goldman Sachs defendants)

65.  During the relevant time period, GS & Co. independently and as an agent for GSI and GSG, Inc. initiated and closed out positions in NYMEX Futures and/or Options Platinum and Palladium contracts over the NYMEX Exchange on behalf of GSI, GSG, Inc. and its customers and/or for it own account

66.  The Goldman Sachs defendants (collectively referred to as "Goldman Sachs") executed client trades in the physical platinum and palladium markets, on the NYMEX Exchange, in platinum and palladium derivatives, and in shares of platinum and palladium ETFs.  Goldman Sachs clients could make orders at the Fixing price.  Goldman Sachs operates electronic platforms for trading platinum and palladium products.  Goldman Sachs also conducted proprietary trading in the platinum and palladium markets, during the Relevant Period.

13

**HSBC Defendants**

67.  Defendant HSBC Bank USA, N.A. ("HSBC USA" hereinafter) is a subsidiary of HSBC Holdings Plc, which is a banking and financial services holding company. HSBC USA maintains its nominal principal place of business in McLean, Virginia.

68.  HSBC USA maintains its operation principal place of business at 452 Fifth Avenue, New York, New York.

69.  HSBC USA is a commercial bank that is registered with the FDIC. HSBC USA as a commercial bank is regulated by the Office of Comptroller of the Currency which is part of the United States Department of Treasury.

70.  HSBC USA maintains commercial branches throughout the United States.

71.  HSBC USA is a participating member in the Platinum and Palladium Fixings ("LPPFC)" and a full member of the LPPM.

72.  Defendant HSBC USA was one of the four auctioneers running the twice daily Fixings on behalf of LMMP and/or LPPFC during the relevant time period

73.  During the relevant time period, defendant HSBC USA executed trades in the physical platinum and palladium markets and on the NYMEX Exchange, in platinum and palladium Futures contracts, and in shares of platinum and palladium ETFs. HSBC USA can execute orders at the fixing price. HSBC USA operates electronic platforms for trading platinum and palladium products. HSBC USA also conducts proprietary trading in the platinum and palladium markets. HSBC USA also serves as an approved platinum and palladium depository and weight master for CME group in the United States.

74.  During the relevant period, HSBC USA entered directly into platinum and palladium spot, forward, option and platinum and palladium ETF share transactions with

14

members of the public.

**ICBC Standard Bank Defendant**

75. Defendant ICBC Standard Bank Plc (" ICBC Standard Bank" hereinafter), is a company incorporated under the Laws of Great Britain and is a subsidiary of Standard Bank Group Limited, a South African banking and financial services company. ICBC Standard Bank maintains its principal place of business in London, England.

76. ICBC Standard Bank was a participating member in the Platinum and Palladium Fixings (LPPFC) and a full member of the LPPM.

77. ICBC Standard Bank and its parent Standard Bank Group Limited also maintain and conduct business out of an office at 520 Madison Avenue, 28th Floor, New York, New York 10022.

78. ICBC Standard Bank lists on its Website that it has "operations in Dubai, Hong Kong, Shanghai, Singapore, New York, and Tokyo."[2]

79. Because a corporate entity cannot operate without an office, its representation on its website that it operates in New York clearly shows that it does have an office in New York.

80. ICBC Standard also had listed on its website until recently that it maintained an office at 520 Madison Avenue, New York, New York. However this office location has recently been deleted from its website.

81. Notwithstanding this deletion, at least one managing director of ICBC Standard Bank, Mr. Tom Wilcock, works permanently out of ICBC Standard Bank Plc.'s New York

---

[2] See www.icbcstnadardbank.com/Corporatesite/aboutus/Overview

15

office at 520 Madison Avenue, New York, New York, upon information and belief.

82.  During the relevant time period, ICBC Standard Bank was one of the four auctioneers who conducted the Platinum and Palladium twice daily Fixing Auctions.

83.  ICBC Standard Bank shares these offices at 520 Madison Avenue, New York, New York with its corporate affiliates ICBC Standard Resources (America) Inc. which is a Delaware Corporation with its principal place of business at 520 Madison Avenue, 28th Floor, New York, New York 10022.

84.  ICBC Standard Bank also shares its offices at 520 Madison Avenue, New York, New York with ICBC Standard Securities Inc., a Delaware Corporation with its principal place of business in New York City.

85.  ICBC Standard Bank executes trades in physical platinum and palladium markets, on

NYMEX, in platinum and palladium derivatives, and in shares of platinum and palladium

ETFs.  86.  ICBC Standard Bank clients can make orders at the Fixing price.

87.  ICBC Standard Bank also conducts proprietary trading in the platinum and palladium markets. During the relevant Period, ICBC Standard Bank entered directly into platinum and palladium spot, forward, option and platinum and palladium ETF share transactions.

88.  ICBC Standard Securities, and ICBC Standard Resources (America) Inc. trade NYMEX contracts on the NYMEX exchange and did so during the relevant time frame. ICBC Standard Bank and its affiliates recently have been disciplined by the CME group for trading violations including executing block orders improperly.

**USB Defendants**

16

89.  Defendant UBS AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland.

90.  Defendants UBS AG maintains an office in New York City at 1285 Avenue of the Americas, New York, New York known as the UBS Tower.

91.  Prior to moving its headquarters to 1285 Avenue of the Americas, UBS AG owned a 49% interest in 299 Park Avenue, New York, New York which in 2010 sold for $180 million dollars.

92.  Today, most of UBS AG's New York operations are located in 1285 Avenue of the Americas which has 1.2 million square feet, and is informally known as the UBS tower.

93.  UBS AG has approximately 37% of its worldwide employees working in the Americas, 37% working in Switzerland, 16% working in the rest of Europe and 10% in Asia Pacific.

94.  This Building at 52nd and Avenue of the Americas, is the United States Headquarters for UBS AG's operations.

95.  UBS AG also has US operations and offices in Connecticut, New Jersey and Illinois.

96.  Defendant UBS Securities LLC, is a wholly owned subsidiary of UBS AG, and is a Delaware Limited Liability Company with its principal place of business in Stamford, Connecticut.

97.  Defendant UBS Securities LLC is also a futures commission merchant registered with the CFTC and is a Clearing House Member of the NYMEX exchange.

98.  As such UBS Securities LLC was allowed to and did hold accounts for its principal UBS AG as well as other clients.

17

99. During the relevant time period UBS Securities LLC on behalf of itself, UBS AG and its customers bought and sold NYMEX future contracts and other derivatives based on Platinum and Palladium over the New York Mercantile Exchange.

100. Defendant UBS AG and UBS Securities LLC hold themself out as leader providing physical and derivative precious metal products to a broad range of customers around the globe. During the relevant time frame, UBS AG bought and sold Physical Platinum through the Fixing defendants at the London Auctions and fully participated in agreements to buy and sell Platinum and Palladium according to the benchmarks which were set twice daily.

101. Defendant UBS AG on behalf of itself and its clients traded in NYMEX Platinum and Palladium during the relevant time period through its agent UBS Securities LLC, a clearing house firm at the NYMEX.

102. UBS AG and UBS securities, LLC ("UBS" collectively hereinafter) execute client trades in the physical platinum and palladium markets, on NYMEX, in platinum and palladium derivatives and in shares of platinum and palladium ETFs. UBS operates electronic platforms for trading platinum and palladium products. UBS also conducts prorprietary trading in platinum and palladium markets. At least some of UBS's proprietary platinum and palladium trading is managed in Stamford, Connecticut at the offices of UBS Securities, LLC. During the relevant period, UBS cleared platinum and palladium transactions, and entered directly into platinum and palladium spot, forward, option, and platinum and palladium ETF transactoins with members of the investing public.[3]

103. During the relevant time period, UBS AG was a market making member of non-

[3] Goldman Sachs & Co., Goldman Sachs Execution & Clearing, LP, and UBS Securities LLC are collectively referred to at the "FCM" defendants or "New York trade desk" defendants herein after.

18

defendant, the London Platinum and Palladium Market. ("LPPM")

**Defendant the London Platinum and Palladium Fixing Company Limited ("LPPFC" hereinafter) and Non-Defendant, the London Platinum and Palladium Market ("LPPM".)**

104. Defendant The London Platinum and Palladium Fixing Company, Limited ("LPPFC") is a private company organized and existing under the laws of the United Kingdom with its principal place of business in London, England.

105. LPPFC is 100% owned and controlled by four companies: (1) BASF Metals Ltd., (2) Goldman Sachs International,(3) HSBC USA Bank NA, and (4) ICBC Standard Bank. These four individual defendants are referred to as the "Auctioneer Defendants,,ixing Defendants" and/or "RICO Defendants"), hereinafter.

106. Because the LPPFC is entirely owned and controlled by the auctioneer defendants, the LPPFC is indistinguishable from the Fixing defendants for jurisdictional purposes.

107. LPPFC was founded in 2004 by the four entities that then conducted the London Fix. From 2008 to 2014, the LPPFC was owned and controlled by the Fixing Defendants; the Fixing Defendants were the only members of the LPPFC.

108. The day-to-day business of LPPFC was conducted by a group of directors who were selected by the Fixing Defendants, (who were typically employees of the Fixing Defendanst), and nearly all of the LPPFC's revenue was derived from the Fixing Defendants' membership fees such that the LPPFC was financially dependent on the Fixing Defendants.

109. Currently, all LPPFC directors are employees (mostly, if not all, senior commodities traders) of the Fixing Defendants including: Amir Ravan of Goldman Sachs International, David Benjamin Rose of HSBC Bank USA NA; John Patrick Metcalf of BASF Metals Ltd;

19

Peter Dennis Drabwell of HSBC Bank USA, NA; Oeter Gurst if Gikdnab Sachs International; Rupert Prest of ICBC Standard Bank, and Katrina Cvijovic of ICBC Standard Bank.

110.    During the Relevant Period, LPPFC administered the Platinum and Palladium Fixings.

111.  The LPPFC's only function is "to take on and continue the promotion, administration and conduct of the London Platinum and Palladium Fixing Market.[4]  As such, at all times, LPPFC was an instrumentality in Defendant's conspiracy alleged in this Complaint. LPPFC merely served as a shell for the operation of the Fixing, as a vehicle for defendants' conspiracy, and as an agent for the fixing defendants.  Defendants' conspiracy–via LPPFC-was targeted at and had substantial depressive effects on the platinum and palladium derivatives traded on the NYMEX in this District.

112.  During the relevant time period, defendants LPPFC conducted the Platinum and Palladium Fixings Auctions twice daily at 9:45 am and 2:00 p.m. London time.

113.  At all times hereinafter, LPPFC and its members and directors knew that the Fixing and the Fix prices reached thereby, had a substantial effect on the prices of Platinum and Palladium NYMEX Future Contracts traded in the United States.

114.  On October 16, 2014, the LPPFC removed itself from its responsibilities of administering the Platinum and Palladium Fixings and appointed the LME as the new administrator of the supposedly revamped global price-setting process for platinum and palladium.

---

[4]LPPFC Memorandum of Association (filed December 1, 2004).  Alhtough the LPPFCs incorporation documents describes a varity of activities that LPPFC engages in, all of these activities relate to the administration of the platinum and palladium Fixing.

20

115. Non-Defendant, the London Platinum and Palladium Market ("LPPM' hereinafter) is a trade association and Limited Company organized under the Law of Great Britain during the relevant time period. The London Platinum and Palladium Market ("LPPM") was established in 1987. The LPPM acts as the coordinator for activities conducted on behalf of its members and other participants in the market for London Platinum and Palladium. The LPPM also sets standards for "London Good Delivery"- a set of rules prescribing the physical characteristics of platinum and palladium bars used in settlement in London Platinum and Palladium Market Transactions.

116. The LPPM is overseen by a Chairman and Management Committee, which are elected annually by LPPM members.

117. The LPPM currently has 12 market-making full members, 6 ordinary full members, 34 associated members, and 45 affiliate members.

118. The LPPM had various members who conducted business in the Platinum and Palladium Physical and NYMEX futures markets including but not limited to defendants herein as well as Barclays Bank PLC, Credit Suisse, Deutsch Bank AG, JP Morgan Chase Bank, The Bank of Nova Scotia, and Scotia Mocatta.

119. Defendants John Does #1-20 were persons, not known by name to the Plaintiff, but did aid and abet the defendants in placing trades in Platinum and Palladium during the relevant time period.

## JURISDICTION AND VENUE

120. Platinum and palladium are "commodities" and are the "commodities underlying platinum and palladium futures and options contracts traded on NYMEX, as those terms are defined and used in the Commodity Exchange Act, 7 U .S.C. §§

Ia(9) & 25(a) respectively

121.    This Court has subject matter jurisdiction pursuant to Section 22 of the Commodities exchange Act, 7 U.S.C. §§ 25(a)(D), 25©, 28 U.S.C. § 1331 and §1337 (a) and (b), the Sherman and Clayton Acts, 15 U.S.C. §1, et. Seq. and the RICO act pursuant to 18 U.S.C. § 1961, Et. Seq.

122.  This Court, has personal jurisdiction over the Sherman Act claims pursuant to 15 U.S.C. §§§ 4, 15(a), 22 and  26; over the RICO claims pursuant to 18 U.S.C.§ 1964 and §1965 in that this action arises under the laws of the United States, more particularly,

123.  With respect to the Commodities Exchange Act, 7 USC § 1, et. Seq., this Court has personal jurisdiction over defendants pursuant to New York's Long Arm Statute, C.P.L.R. §§§ 302(a)(1)(2)(3) as well as to the Federal Rules of Civil Procedure Rule 4K.

   124.  This Court may also exercise pendent  jurisdiction over the common law claims and State law claims asserted by Plaintiff pursuant to this Court's supplemental jurisdiction pursuant to 28 U.S.C.§ 1367(a) and the Federal Rules of Civil Procedure, 18(a).

125. Each defendant maintained either its own office in New York in the Southern District of New York or purposefully availed itself to New York by transacting and conducting business in the Southern District of New York by purchasing and selling NYMEX Futures Platinum and Palladium Contracts; and therefore the claims arose in the Southern District of New York where the NYMEX exchange is located and where all Platinum and Palladium Futures Contracts were traded in the United States. A substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

126.  By virtue of the effects that each defendant created in New York by their price

22

setting activity each defendant is liable in New York for damages suffered by New York State domiciliaries.

127. Venue is also proper in this District pursuant to 1 5 U.S.C. § l5(a) &22 and 28 U.S.C. §139l(b), © and (d), because during the Relevant Period all defendants transacted business or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

128. Venue is also proper in the Southern District of New York pursuant to Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25, because defendants' unlawful acts manipulated the prices of platinum and palladium futures and/or option contracts traded on the NYMEX, a designated contract market located in New York.

## FACTUAL ALLEGATIONS

### The Platinum and Palladium Physical and Futures Markets

129. Platinum and Palladium are two metals described as Platinum Group Metals that are used and sold world wide both in a Spot or Cash (also referred to as the "Physical" market or in the NYMEX Futures Market. ("NYMEX Platinum" hereinafter)

130. In the United States, the Commodities Futures Markets including the NYMEX provide a market for the purchase and sale of Platinum and Palladium futures contracts ('NYMEX Platinum and NYMEX Palladium".)

131. One of the most important features of the NYMEX Commodities market is to allow for price discovery of the price of a particular commodity. By allowing parties to take a futures position, the prices become standardized and stabilized absent manipulation.

### Basic Principals of Commodities Investing in Platinum and Palladium

132. The pricing of both cash (physical) Platinum and NYMEX Platinum are supposed

23

to be based on the fundamentals of supply and demand.

133. The fundamentals of supply and demand include the legitimate forces that move the prices up as well as the legitimate forces that move the prices down.

134. These legitimate market forces of supply and demand are used in price discovery so that the proper equilibrium price is reached usually based on the best execution rule that requires the lowest offer to match the highest bid to form a valid market transaction.

135. Thus, any conduct that violates the best execution rule such as the London Platinum Fixings which allowed the auctioneers to set prices notwithstanding the offers and bids in the overall market place violates the best execution rule.

136. For example, during the London Auction, if there was disequilibrium in the market of less than 4000 ounces of Platinum, then the Chair could unilaterally actually lower demand and raise supply by simply asking the other participants to adjust their demand and supply levels in order to "match" supply and demand to fix a price. Thus, the rules of the LPPFC created a market totally divorced from the legitimate forces of supply and demand, and instead, it was as if platinum and palladium were being traded in the world of Alice in Wonderland.

137. With respect to platinum, some of the legitimate forces of demand included the manufacturing of Auto catalysts, chemicals Glass, Electrical products, Jewelry, Medical and Dental supplies, Petroleum, and investments. See Platinum Supply and Demand Charts annexed hereto as Exhibit 5.

138. The Investments category included those who wanted to hold Platinum bars as a hedge against inflation or for a flight to safety during times of economic uncertainty.

139. The greater the demand, the greater the prices would rise

140. The act of purchasing a commodity will raise prices and the act of selling the commodities will lower prices.

24

141. Supply was more finite and based on production of platinum in mines mostly in South Africa in 2008.

142. Because of the rise of China and Brazil, there was a voracious appetite for platinum and palladium in 2008. Because production was finite and there were no new mines coming into production until 2009, the year 2008 appeared to be an excellent time to invest in Long Platinum Contracts.

143. The market predicted platinum to rise to $2500 per troy ounce or higher by year end 2008. Ms. Levy believed the prices could even reach $3000 per troy ounce based on the information she had at the time. She observed trend lines, and compared the rise to historical prices showing a tripling of prices from approximately 2002 to 2008.

144. However, this Fundamental analysis stated above, could be changed and was changed by manipulative conduct where large companies, including defendants herein, with vast economic resources started to privately buy large amounts of Platinum in a secretive and closed "auction" without any commercial use for the metal other than to hold it in inventory to take out when need during the auction process to move the prices in an uneconomic fashion.

145. Because investors use the legitimate forces of supply and demand to calculate the price of a particular commodity, in this case platinum, these investors including Ms. Levy took positions on whether they believed the prices of platinum and palladium would rise or fall by a particular date in this case the beginning of 2009.

146. They then make investments based on their research, and they bear the risk of whether they are correct. If they believe the price of Platinum will rise, they will take a long position; whereas if they believe the prices will fall, they will take a short position.

147. The market risk is therefore dependant on calculations based on legitimate forces of supply and demand. If an investor loses his or her investment because of manipulators, they are entitled to a full refund under 7 USC § 25(a) as actual damages.

25

148. The purchase and sale of commodities with the intent to move prices and for no other reason is considered per se manipulative absent any fundamental reason linked to supply and demand.

149. Thus, because these purchases by defendants herein were done in secret without public disclosure of the amounts, the members of the public had no way of knowing in real time how much platinum was being purchased and sold at the private auctions and among interbank dealers which did not disclose such data upon information and belief.

150. Thus, as it turned out, the seismic upward trend in platinum prices was due to the manipulation, rather than due to the legitimate forces of supply and demand.

151. The fact that car manufacturing slowed down in 2008 made no differnce or a very small difference in the price of platinum, because as it turns out this fundamental factor was totally overwhelmed by the manipulators' conduct. In fact, according to a report by Johnson Matthey the demand for platinum in automobiles dropped only by 12% in 2008 from 4.15 million ounces to 3.65 million ounces. Thus, the decrease in the price of platinum during this time frame dropped from $2,250 per ounce on March 5, 2008 to $770 per ounce on November 20, 2008, a 65% drop.

152. Furthermore, although car sales were declining in 2006, 2007 and the first half of 2008, platinum prices were soaring. Thus, this inverse relationship during much of the relevant period demonstrates increased and decreased demand for platinum due to car manufacturing in fact did not correlate to the price of platinum. Rather, the forces of manipulation and monopolization had overwhelmed fundamentals by summer, 2008, as is demonstrated by the inverse relationship between car sales and the rise of Platinum prices. See U.S. Vehicle sales chart annexed hereto as Exhibit 6; Platinum price chart, Exhibit 15.

153. It was easy for the members of the investing public to misunderstand the rising market as legitimate, since all legitimate forces pointed to a rising market in 2008.

154. However, defendants' reason to purchase Platinum and Palladium was illegitimate,

26

because none of these defendants had any legitimate use for hoarding so much metal. Rather, each purchased Platinum and Palladium so that each could sell it off during the auction process to move prices mostly down. The same illegitimate large purchases which initially moved prices up, were artificial, as were the twice daily suppressions during the fixes.

155. Therefore, when Ms. Levy started purchasing her contacts in 2008, she was buying at artificially high prices, because this scheme had been in full swing in 2008.

156. Thus, as of 2008 Ms. Levy had to pay more to get less Platinum or the same amount than she would have had to pay, had each auctioneer defendant not purchased such large amounts of Platinum to move prices during the auction process and at other times.

157. Where illegitimate forces of supply and demand invade the free market, the manipulators and monopolizers can move the market in the direction they so desire because these manipulators are able to purchase or sell enough of the commodity to move the price in their desired direction at will.

158. In this case, not only were the auctioneer defendants moving prices artificially and out-of-sync with supply and demand, but they were doing it secretly over private conference calls, so that the members of the investing public, such as Ms. Levy, had no clue that such price-fixing conduct was occurring, and she believed that these dealers were just filling orders on behalf of their customers like Chinese automobile manufacturers who had a voracious appetite for these metals in 2008, upon information and belief.

159. Had the members the investing public known and had they been allowed to hear those conference calls, Ms. Levy, could have easily protected herself, by immediately exiting the market place, knowing that the prices were not based on lawful analysis, but based on manipulative conduct.

160. However, defendants had to keep their conduct secretive, because had the members of the public pulled out of their investments, the Futures market would have dried up and collapsed.

27

161.  Absent the involvement in the NYMEX futures market by members of the public, such as Ms. Levy, there would have been no profits for each defendant since their scheme to buy up platinum in the spot market required "loss leaders" at the London Fix when each auctioneer defendant on occasion had to sell platintum or palladium at a loss to move the prices down.  In order for defendants to reap profits required the participation of the public who provided liquidity so that defendants could trade in and out of the NYMEX Market which was much more liquid than the Spot market in London..

162.   Thus, this scheme was aimed to effect the New York NYMEX Platinum and Palladium Market which it certainly did by causing the Platinum market to crash on August 15, 2008 and thereafter through year-end 2008.

**NYMEX Platinum-and Palladium-Based Financial Products**

163.  A Commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity.  See *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir 1980) (Friendly, J.) ("*Leist*") *aff'd, Merrill Lynch Fenner & Smith v. Curran*, 456 U.S. 353, 384-85 (1982).  In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.

164.  Apart from physical platinum and palladium OTC transactions, some of the most heavily traded platinum- and palladium-based financial products are platinum and palladium NYMEX futures contracts.

165.  The aggregate annual value of platinum futures has surpassed $100 billion each year since 2011.

166.  Trades of platinum and palladium futures contracts have two sides.  The "long" side represents the buyer of the contract who is obligated to pay for platinum or palladium and take delivery.  The "short" side represents the seller of the contract who is obligated to receive payment for the platinum or palladium and make delivery.

28

167. Futures contracts expire unlike other contracts. On the date of expiry, each market participant must perform under the terms of the futures contract.

168. If a market participant holds its position to the end of the settlement period for a platinum or palladium futures contract, the market participant is obligated to take delivery upon settlement date, and the futures contract for a particular month becomes a present contractual obligation for the purchase or sale of the platinum or palladium.

169. Long Platinum futures contracts require delivery of 50 troy ounces of good platinum *(i.e.,* platinum with a minimum of 99.95% purity), physically settled at a NYMEX-approved warehouse.

170. Trading is conducted for delivery during (I) the current calendar month; (2) the next two calendar months; and (3) each January, April, July, and October falling within a I2-month period beginning with the current calendar month.

171. Long Palladium contract holders must take delivery, and shorts must make delivery of 100 troy ounces by the date of delivery specified in the Futures Contract. The prices for the platinum or palladium that go to delivery are the "settlement prices" of the platinum and palladium

172. NYMEX futures contracts may be closed out prior to delivery by executing an offsetting transaction prior to the date of expiry of each contract.

173. The "bilateral" aspect of the futures contract is that there is a seller and buyer, Leist 638 F.2d at 322.

174. The sellers are one-half of the bilateral futures contract and one-half of the commodity futures market. *Id.* They are referred to as "shorts." Id.

175. The buyers are the other one-half, and are referred to as "longs." *Id.*

176. One of the many differences between stock and commodity futures trading is

29

that the commodity exchange (here, the NYMEX) publishes the amount of the open interest of "longs" and "shorts" at the end of each trading day.

177. Open interest is defined as the total number of futures contracts in a delivery month or market that has been entered into and not yet offset or cancelled. Each open transaction has a buyer (a long) and a seller (a short).

178. Buying pressure in a commodity futures contract and physical market will increase prices and selling pressure will decrease prices.

179. Because the prices of NYMEX futures contracts are publicly reported by the CME group, the increased or decreased prices resulting from buying pressure or selling pressure acts as a signal to the investing public to act accordingly.

180. Increased prices are often buy indicators and decreasing prices are often sell indicators.

181. Indeed, chartist create charts based on technical analysis of closing and settlement prices. Once points are plotted on a graph, the public reads these charts as indicating a buy or sell of the particular commodity and may enter or exit the market based on these charts.

182. A rising trend line due to falling prices is often a sell signal to members of the public.

183. Thus when defendants artificially suppressed prices en mass in August of 2008, it caused members of the public to also sell their positions, since under technical analysis a falling market is a sell signal; thus, defendants caused a total collapse of the market due to the manipulative selling pressure on the market.

**The Relevant Market For NYMEX Palladium Futures Contracts**

184. Another futures contract created by the NYMEX who has been approved by the CFTC to create standardized contracts is the NYMEX Palladium futures contract.

185. Palladium is a silver-white metallic element in the so-called Platinum

30

group metals ("PGM").

186.   During the relevant time period, Palladium   futures   contracts   were
transacted electronically   on   the   Chicago   Mercantile Exchange ("CME") Globex and CME
ClearPort trading platforms and also through open outcry on the floor market at the NYMEX in
New York.  Globex is an electronic trading platform owned by the NYMEX's parent company,
the CME Group.  Open outcry is a method of public auction for making bids and offers in the
trading pits (on the floor) of futures exchanges.

187.  The size of a NYMEX Palladium futures contract is 100 troy ounces.

188.  NYMEX  Palladium futures contracts call for settlement by physical delivery.

189.  Palladium delivered under this contract must be a minimum of 99.95% pure.

190.      During each calendar month (the "current calendar month"), the Exchange will
make available for trading contracts that provide for delivery of Palladium in the following
months: 1) the current calendar month; 2) the first calendar month following the current calendar
month; 3) the second calendar month following the current calendar month; and 4) each March,
June, September and December during the period beginning with the first calendar month
following the current calendar month through the 15th calendar month following the current
calendar month.

191.  Trading in Palladium futures contracts terminates on the third to last business
day of the delivery month.

192.  The settlement prices for both Platinum and Palladium futures contracts are
calculated based on the volume-weighted average price of all transactions conducted both on the
trading floor of the NYMEX and on Globex during the two-minute closing period.

193.  Trading  in  NYMEX  Palladium  futures  contracts  is  subject  to  the  rules  and

31

regulations of the NYMEX, and prices are quoted per troy ounce. Typically—as was the case with Palladium futures during the Relevant Period—the prices for different expirations of futures contracts in the same commodity are chained together by arbitrage and so-called spread trading. Thus, if one contract increases significantly in price it will cause other contracts to also increase in price (though not always by the exact same amount). This was true of Palladium futures contract prices during the Relevant Time Period.

194. Regular trading hours for NYMEX Platinum and Palladium futures

contracts are Monday – Friday 8:30 a.m. – 1:00 p.m. eastern time. The two minute closing period ends at 1:00 p.m. for Platinum and Palladium. During regular trading hours NYMEX futures Platinum and Palladium contracts trade on the trading floor as well as on the CME Globex and Clear port electronic trading platforms. The volume of trading was much larger in the electronic market than on the floor market. NYMEX Platinum and Palladium futures contracts also trade continuously from Sunday – Friday 6:00 p.m. – 5:15 p.m. eastern time on the CME's Globex and ClearPort electronic trading platforms.

195. The volumes of trading and liquidity of trading in the electronic trading platforms were much greater than the floor volume.

**The Physical Platinum and Palladium Markets**

196. The spot platinum and palladium markets are Over-The-Counter markets major market participants in the platinum and palladium spot markets include members and affiliates of the LPPM, including the four participants in the Platinum and Palladium Fixings-Defendants ICBC Standard Bank, BASF, HSBC Bank USA, NA, and GSI. These entities and others compete for customers in the physical platinum and palladium markets.

197. There are other interbank dealers who make markets for Physical Platinum and

32

Palladium, who are members of the LPPM including but not limited to co-defendant UBS, AG, and non-defendants including but not limited to JP Morgan Chase, Credit Suisse, Barclays Bank, and the Bank of Nova Scotia, and Johnson Matthey.

198. These dealers in Platinum and Palladium have both proprietary interests in trading in Platinum and Palladium as well as buying or selling Platinum and Palladium on behalf of their customers.

199. Non-dealer members of the LPPM who are not market-makers in Platinum and Palladium include other participants that enter the platinum and palladium markets from time to time, including platinum and palladium producers (such as miners and refiners), consumers (such as jewelers and industrials) and investors (such as pension funds, hedge funds, and individuals).

200. One major use for platinum and palladium is in the production of catalytic converters, which curb harmful emissions from automobiles. According to Johnson Matthey's *Platinum 2013 Interim Review,* both platinum and palladium are used heavily in catalytic equipment for automobiles.

201. As of 2013, gross demand for platinum was over eight million ounces. The *Platinum 2013 Interim Review* indicates that demand for platinum from these various sources between 2009 and 2013 rose from less than seven million ounces to more than eight million ounces in five years. See World Wide Supply and Demand Charts annexed hereto as Exhibit 5.

202. The *Platinum 2013 Interim Review* also indicates that gross demand for palladium is similarly large at over 9.6 million ounces for palladium.

203. Palladium is interchangeable with Platinum in the relevant market for autocatalyst and industrial segments.

33

**Interrelationship between the Spot and**
**Futures Markets for Platinum and Palladium**

204.   The prices for platinum futures contracts and physical platinum are inextricably linked because the prices for both the futures contract and the physical commodity tend to converge on the date of delivery specified in the platinum futures contracts.

205.   Indeed, platinum futures contracts prices represent what the market believes will be the spot prices of physical platinum on the delivery dates specified in the platinum futures contracts.

206.   The Chart annexed hereto as Exhibit 7 shows the strong correlation between the price of platinum futures contracts and physical (spot) platinum between October 2007 and September 2014 around afternoon London-time Platinum and Palladium fixing call.

207.   The difference in contract price and spot price is extremely small. There is a 99.4% correlation between the prices of NYMEX platinum futures contracts and the prices of physical platinum.

208.   Thus, any movement in price of physical platinum should be tracked in the prices of NYMEX platinum futures contracts, and vice versa.

209.   There is a similar correlation that can be observed with respect to the prices of physical palladium and palladium futures contracts.

210.   Thus, any movement in the price of physical palladium is generally tracked in price of palladium futures.

211.   Conversely, the NYMEX future contract prices of Platinum and Palladium heavily influence the Physical prices as well.

212.   Both the NYMEX contract prices and the Physical prices are nearly identical and

34

only differ by the costs of storage, insurance and financing.

**The NYMEX Restricts the Number of Contracts a Market
Participant Can Own To Avoid Market Manipulation**

213.  To avoid Manipulation, the NYMEX imposes position limits on all

purchasers of NYMEX platinum and palladium contracts whereby one entity including the

principal and all subsidiaries may not own in aggregate at any one  more than 25 Platinum

contracts and 25 Palladium. (50 contracts in total.)

214.  This position-limit ensures that no one market participant owns so much

Platinum that his or her purchase or sale can move the market up or down uneconomically.

215.  This 25 position limit imposed on all platinum or palladium contracts is

embodied in a NYMEX rule based on a Congressional mandate as set forth in 7 U.S.C.§

7(d)(5) to prevent manipulation requiring a market participant to stop accumulating contracts

once the limit of 25 contracts has been reached so as to avoid an anti-competitive impact on

the futures contract prices that resulted from large purchases of over only 25 contracts per

market participant.

216.  This position limit of 25 contracts does not apply to hedgers but only to

speculators.  A hedger is a person or entity who has an actual need for the commodity such as

a autocatalyst  manufacturer; whereas a speculator or investor is one who has no actual use for

the commodity other than investment and thus is bound by the 25 position limit. Defendants

herein the Goldman Sachs defendants, HSBC Bank USA NA, ICBC Standard Bank ( other

than BASF) were all speculators and had absolutely no commercial use for owning physical

Platinum and Palladium.

35

217.  Because each NYMEX Contract represents 50 troy ounces of Platinum, the NYMEX regulators have in effected determined that as little as 1250 physical ounces of Platinum (50x 25) can move a market uneconomically.

218.  The NYMEX rules also impose position accountability requirements that require a large trader who holds more that 1500 Platinum and/or Palladium contracts to report their ownership interest so that the NYMEX can regulate the market and avoid market manipulation.

219.  Any market participant who has accumulated such a large position of 1500 platinum or palladium contracts has to immediately report such conduct to the NYMEX governors.

220.  Both position limits and position accountability rules are intended to control market manipulation whereby a large trade can move a market in an uneconomic fashion where large volumes are hoarded and then unloaded onto the market.

221.  Based on the significant amount of platinum and palladium futures contracts defendants maintained during the relevant time frame, including contracts listed in the CFTC Bank Participation reports filed during the relevant time period, it appears that each defendant was also in violation of position limits, and were also moving the NYMEX futures market as well in a price fixing manner.  See Bank Platinum and Palladium Futures Position, during the relevant time frame. Exhibit 8.

**THE PLATINUM  FIXING PROCESS/ THE**
**PLATINUM AND PALLADIUM AUCTION PROCESS**

222. The Platinum and Palladium Fixings are a relatively recent creation.  The London

36

Platinum Quotation, the predecessor to the Platinum and Palladium Fixings, was established in 1973, and was a twice-daily indication of the market price for spot platinum, reported by some of the principal companies dealing in this precious metal. However, this was an informal trading system, and in 1987 it was formalized via the establishment of the LPPM. Two years later, the Platinum and Palladium Fixings were formally established for platinum and palladium.

223. The Platinum and Palladium Fixings occur twice daily by teleconference: 9:45 a.m. GMT/4:45a.m. EST (the "morning Platinum and Palladium Fixing") and 2:00p.m. GMT/9:00a.m. EST (the "afternoon Platinum and Palladium Fixing"), the latter to accommodate the U.S. trading day. During each fixing call, the fixing members first set the price of platinum and then set the price of palladium.

224. During the relevant time period, the platinum and palladium Fixings were administered by the LPPM. Defendants are full members, along with Barclays Bank PLC, Credit Suisse, Deutsche Bank AG, Johnson Matthey PLC, JP Morgan Chase Bank, Mitsui & Co. Precious Metals Inc., (London Branch), Standard Chartered Bank, The Bank of Nova Scotia,

225. Full membership," according to the LPPM, is "open to those companies in the UK engaged in trading and dealing in platinum and palladium and are recognized by the [LPPM] Management Committee as offering additional services in the UK to the market, including marrket-making, clearing services, refining or manufacturing."3

226. In addition to full membership, there is "associate membership,"

37

in the LPPM which is open to companies in the UK currently engaged in trading and dealing in platinum and palladium and have an appropriate level of net assets and experience. Lastly, LPPM permits certain companies to act as "affiliates," which are defined as companies that failed to meet the normal requirements of full or associate membership, but "are recognized by the LPPM as being involved with or offering support to the global platinum and palladium markets.[4]

227. The Platinum and Palladium Fixings involve the fixing members of the LPPM, BASF METALS ltd, HSBC USA, GSI and ICBC STANDARD BANK who are all horizontal competitors and who compete for both physical Platinum and Palladium in the Spot Market as well as NYMEX contracts in Platinum and Palladium in the futures market to come together and agree with each other on a twice daily in the AM and PM fixing to determine the price of Physical Platinum and its sister metal Palladium.

228. Based on the agreement among the fixing defendants, the price of Physical Platinum and Palladium cannot be fixed without the unanimous agreement of all four fixing defendants, BASF METALS ltd., HSBC USA, GSI and ICBC STANDARD BANK.

229. The Fixing Defendants collect orders on a twice daily basis from their trade desks in New York and London as well as their clients and other market participants in deciding how to fix the price.

230. During the fixing calls, these orders can be changed or rescinded. The orders are made known to each participating fixing defendants who presumably are able to tally what the entire market for platinum and palladium will be on the day before a price is determined.

38

231. However, the Fixing defendants do not just match bids and asks based on customer orders to determine and equilibrium price. Rather, they can march prices up or down at their total discretion and based on uneconomic factors outside the fundamentals of supply and demand, such as adding to their customer order's their own orders to influence prices..

232. The Fixing defendants did engage in this uneconomic conduct to fix prices using artificial injections of supply and demand.

233. The Fixing defendants also had the discretion to and did, based on a concerted agreement among themselves, buy and sell physical platinum and palladium to each other in the London Physical market to move the prices in an agreed direction.

234. Such sales and purchases among financial institutions had absolutely no economic value and were uneconomic and were engaged in just to tweak the prices to move in the direction that these defendants agreed it should move.

235. Legitimate market participants, such as car manufactures, would also send their orders to the fixing Defendants who used these legitimate orders in a manipulative fashion by placing and timing these orders with an intent to manipulate by bunching these orders to move prices artificially.

236. Unlike in a competitive market not subject to defendants' manipulative conduct, defendants would instead consolidate their respective customer orders, as well as any proprietary orders from their own trading desks. The fixing process would then begin.

237. The price fixing process referred to as the auctions, were not real auctions since

39

auctioneers were extremely conflicted and were also buyers and sellers of the very items being auctioned under their direction and control.

238.  The auction process used was blatantly ridden with examples of self-dealing as well as unilateral and arbitrary conduct by the fixing defendants to move prices as they pleased and outside the principles of supply and demand.

239.  In addition, such fixing defendants and co-conspirator defendants UBS AG and others would agree to help move prices by volunteering and/or agreeing in restraint of trade to honor the fixing price after it was established and to go along with this hoax rather proceeding to fill customer orders based on the best execution rule.

240.  Had UBS AG for example refused to respect this auction fix, it could have been greatly ostracized by the cartel and eventually squeezed out.  So, non-auctioneer defendants were extremely incentivized to go along to get along.

241.  The Chair would announce  a starting price (also known as the "Opening  Price") for  loco (short tor location)  London or Zurich platinum or palladium. stated in U.S. dollars, which is usually at or near the current spot price. Each of the remaining three participating fixing members would eventually declare themselves as either a net buyer or a net seller, or as having no interest at the starting price.

242,  That the Chair could arbitrarily set a starting price or Opening prices ab initio shows price fixing because there was not necessarily any rational economic justification for the opening price other than the Chairs desire to fix prices to the advantage of himself and the other LPPM members to their advantage.

243. If there was no buying and no selling interest at the starting price from any participating member, the Chair could arbitrarily announce the Opening Price as the "fixed" price.

244. If at the staring price there is only a selling or a buying interest, the Chair will ask for figures and then may either:

> a. Declare the price as "Fixed" if the quantity offered or sought is matched exactly or is within 4,000 troy ounces; or
>
> b. Move the Opening Price lower or higher until there is two-way interest-i. e. , a match between a net buyer and a net seller.

245. If the Chair must move the price to obtain two-way interest, the increments in which Chair moves the price are determined by:

> a. The prevailing bid/offer price in the platinum or palladium futures market as quoted on the CME adjusted to the physical London spot market using a prevailing Exchange for Physical *(i.e.,* an exchange of a position in the underlying physical instrument or *a* corresponding futures position);
>
> b. The prevailing bid/offer price on electronic trading platforms representing the spot market price; and
>
> c. The level of buying and selling interests declared in the Fixing Call.

246. The Chair will choose the level of price increments as he/she considers necessary in order to match supply and demand.

247. The Chair's unilateral ability to change the prices was also arbitrary and uneconomic,

41

and there was no legitimate reason for the Chair to set the prices where he/she did other than collusion with the other members to gain a trading advantage on the NYMEX exchange.

248. The fact that the chair could move prices of less than 4000 ounces of platinum or apportion buy and sell orders among market participants clearly demonstrates that there were no more legitimate forces of supply and demand moving the market; but rather, the market was manipulated and totally or partially divorced from legitimate prices dictated by actual supply and demand.

249. At any time during the twice-daily fixing calls, participating members or their customers could increase or decrease an order, withdraw a previously declared buying or selling order, or place a new order.

250. In the event of such an occurrence, a participating member could call a "flag" to suspend the fixing call so that it may recalculate its overall interest.

251. When the flag was called, the Chair was not permitted to call the platinum or palladium prices "Fixed."

252. When buy and sell orders are matched, the Chair will declare that the prices for platinum and palladium are fixed and state the time at which they have been fixed and the final price in U.S. dollars.

253. Once the Fixing Prices for platinum and palladium have been declared by the Chair, buy and sell orders declared in relation to those Fixing Prices may not be altered or withdrawn by the firms participating in the Platinum and Palladium Fixings. The Chair will also provide the equivalent trading prices in pounds sterling and euros using the then-prevailing exchange rates published on Bloomberg or Reuters and read out these rates at the end of the call.

42

254. The Chair would then match up the participating firms' orders and would specify the trades that must then be executed between the participating firms. The Chair will fill the largest seller's order first by matching that order with the largest buyer's order, with the participating firms' orders then being matched in descending order size.

255. Where the Chair has been unable exactly to match supply and demand and has instead declared the price as fixed when the difference between quantities of platinum and palladium bid and offered was 4,000 troy ounces or less, the Chair will pro rate the difference between supply and demand between the participating firms

256. Cash-settled, platinum- and palladium-based financial products, such as futures and options, are directly impacted by the physical prices assessed through the Platinum and Palladium Fixings.

257. In an open and transparent system for the discovery for platinum and palladium, all market participants should have the opportunity to see in real-time bids and offers for platinum and palladium to gauge their prices.

258. However, the Platinum and Palladium Fixings were exclusively controlled by the self-dealing, four large and heavily self-interested fixing defendants who participated in the platinum and palladium markets.

259. This conduct at the auction gave each fixing defendant the opportunity and motive to manipulate the platinum and palladium Fixings to their advantage, particularly with respect to their own holdings in both platinum and palladium and platinum- and palladium-based financial products, like futures and options. Each Fixing defendants took full

43

advantage of this opportunity to the detriment of a truly competitive market.

**The Auction Process Demonstrates a Plausible Price Fixing Scheme in Restraint of Trade because 60% to 80% of the time during the relevant time frame from January 1, 2008 through December 1, 2014, the prices fell during the Fixing Periods which is statistically aberrant and a deviation from the Norm. The statistical Evidence also shows Intentional Conduct**.

260. The data from the twice-daily fixing auctions compiled by experts in the Class Action Complaint and subsequent amendments which are fully incorporated by reference in this Second Amended Complaint and made a part hereof demonstrate that there was a highly usual occurences when the prices of platinum and palladium would fall during the Fixing Period and immediately prior thereto.

261. On 997 occasions with respect to platinum and on 764 occasions with respect to palladium, from 2008 to 20014 did prices fall during the fixes. See Chart annexed as Exh 3.

262. Based on the law of averages, absent a valid explanation which does not appear to exist in this case, prices should have moved up or down in the same proportion (50% of the time) during the fixing period which lasted 10 to 30 minutes, upon information and belief.

263. Instead, on 1761 occasions during the Six year relevant time period from 2008 through 2014, the evidence suggests prices of platinum and palladium falling during the fixing period even where the overall market was rising.

264. Thus, the falling of prices on the fix is a statistical anomaly, because one would expect prices to be rising not falling during the fixing period.

265. This pattern is very simalar to the conduct occurring in the Gold Fixing Market which also showed a statistical skewing of downward prices during PM gold fix. See Gold

44

Fix charts annexed hereto, as Exhibit 2.

266. In addition, the largest spikes occurred around the PM fixing as opposed to other times of day which is very important since there is no rational explanation for it other than manipulation. Certainly a fair and neutral market would not show this aberrant behavior absent a valid explanation.

267. No explanations exist for this aberrant statistic such as evidence of macroeconomic events that happened to coincide with the Fixing auctions that would impact prices. Nor, is hedging a valid explanation, since the none of these defendants were hedging as hedgers, rather they, as financial institutions, were speculating not hedging.

268. Because the market was liquid during the entire day, the physical platinum and palladium markets should not have experienced greater volume during the auction period, except when the auctioneer defendants purposefully bunched their customer orders together and waited to place them in the market during the auction or just prior thereto. However, if there was more volume during the fixing period, there would have been more buyers not just sellers during this small fixing window.

269. The fact that 60% to 80% of the time the prices fell during that Fixing period creates a valid inference that there was a concerted effort to push prices down 60% to 80% percent of the time.

270. As an example of the fall in prices during the fixing process during the entire relevant period is, on May 11, 2009. One can see a sharp dip starting at about 1:35 p.m. GMT/8:35 a.m. EST that lasts through the entire afternoon Fixing window. It is only after

45

the Fixing ends and the price is "fixed" at $1,114 per troy ounce that prices begin their slow

creep back to the pre-Fixing levels. Moreover, as seen in the second chart for May 11, 2009,

these price moves are not observed in any other market.

### Platinum Moving prices May 11, 2009 around PM Fixing Window



### Relative Fluctuation of Platinum Futures Prices and Indices, May 11, 2009



271.    The price moves within the afternoon Platinum and Palladium Fixing window

are even more dramatic on November 5, 2009. On this date, platinum prices begin to fall before

the start of the PM Fixing window, and then accelerate their fall during the Fixing, moving from around $1368 per troy ounce to $1,359 per troy ounce, in a span of 24 minutes. Only after the price of platinum is "fixed" does one see prices reversing course and ascend back up to pre-Fixing level.

272. Further, the second chart for May ll , 2009, on page 46, shows no similar price moves in the other benchmark markets. This is highly anomalous and suggestive of manipulation during the fixing window by defendants.

273. The same conduct was observed as well on November 5, 2009, when prices fell before and during the fixing call in a similar way to May 11, 200

274. In addition, the intra day price movements in the platinum futures market before and after the afternoon platinum and palladium Fixing caused price manipulation during the afternoon Fixing window. Price movements typical of this kind of anomalous behavior are sharp price changes in the afternoon platinum and palladium Fixing window that are not consistent with market behavior prior to and after the fixing window.

275. Anomalous price moves before and during the afternoon Platinum and Palladium Fixing are observed on January 12, 2010. On this date, prices before the afternoon platinum and palladium Fixing fell from slightly over $l ,600 per troy ounce to around $ 1,585 per troy ounce. The suppression continues shortly into the Fixing window, only to abruptly reverse course through the fixing call. Such a reversal can occur if a participant enters large buy orders or when "spoofed" sell orders have been withdrawn. Again, the pre-fix suppression and subsequent reversal of relative platinum futures prices are not matched by relative moves in any

47

of the other indices.

**Platinum Futures Prices beore, at and after PM Fixing  Jan 12, 2010**



276.  Similarly, reversals of prices within the afternoon Platinum and Palladium Fixing window are also observed on September 20,2010. Again, the price moves in the platinum futures market on this day were not matched by similar price moves in the other markets analyzed by experts

**Platinum Futures Prices before, after and at PM Fixing on Sept. 20, 2010**



Relative Fluctuations of Platinum Futures Prices and Indices Sept. 20, 2010



277.   On April 28, 2009, one can see a sharp dip in futures prices in the half hour leading up to the afternoon Platinum and Palladium Fixing, from approximately $1,090 per troy ounce to just under $1,075 per troy ounce just before the afternoon Platinum and Palladium Fixing starts. Once the afternoon Platinum and Palladium Fixing starts, the price of platinum soars dramatically, but in the last seconds drop about $7.00 before the Fixing window closes.

Platinum Futures Prices on April 28, 2009 just before, at and after the PM Fixing Window.



49

278.  This movement is highly anomalous because as seen in the following chart, activity in other markets is relatively stable around the Platinum and Palladium Fixing window. As explained above, the lack of price movement in these other markets allows one to discount the possibility of macroeconomic factors playing a role in the observed price moves during the afternoon Platinum and Palladium Fixing. Thus, the price moves observed in the chart above are consistent with manipulation.



PM Fluctuations of Platinum Futures Prices and Indices



**Because Experts have identified Aberrant Price Movements in Platinum Prices Between 2008 and 2014 that cannot be explained by the legitimate forces of supply and demand, an inference of causation of artificial prices is established.**

279.  A sharp dip in prices at the platinum and palladium Fixing with an sharp correction in platinum futures prices is also observed throughout the Relevant period; and one example is found on September 25, 2009. On this date, platinum prices fell from nearly

50

$1,300 per troy ounce to $1,275 per troy ounce in the minutes leading up to the afternoon platinum and palladium Fixing. Soon after, these prices rebounded close to the levels prior to the afternoon platinum and palladium Fixing.

PM Fixing September 25, 2009



280. Moreover, like the April 28, 2009 chart above, the following chart for September 25, 2009 shows that the activity observed in around the afternoon platinum and palladium Fixing window is absent in the other markets. A reasonable inference can be drawn based on this comparison between a non-manipulated market and the present market of price artificiality and manipulation in the platinum and palladium Fixing Window.

Sep 2009

51

Relative Fluctuations of Platinum Futures Prices & Indices, Sept. 2009



281. As shown by the above charts. the price of platinum futures around the afternoon platinum and palladium Fixing window observed the same distinct pattern of price suppression that was then followed by a reversal, either during the Fixing or post-Fixing. These price moves demonstrate highly anomalous moves and are indicative of price artificiality.

282. However, anomalous moves were not always characterized by pre-fix price suppression, and up to 30% of the time defendants acted to artificially raise prices at the Fixings. In some instances, defendants sought to dramatically raise the price of platinum around the afternoon Platinum and Palladium Fixing. To illustrate this point, on January 11, 2012, there was a sharp spike in platinum prices in the 30 minutes leading up to the beginning of the afternoon Platinum and Palladium Fixing from around $1,478 per troy ounce to over $1,495 per troy ounce. Shortly after the Platinum and Palladium Fixing began, prices fell sharply.

283. As they amassed their customer orders ahead of the afternoon Platinum and Palladium Fixing, Defendants shared this information with each other and took positions in the physical and derivatives market to ensure that they would ride ahead of order flows to take advantage of rising prices. Indeed, knowing their respective customer order flows, Defendants

52

engaged in front running of customer orders between 13:30:00 GMT and 1 3:45:00 GMT moving platinum  prices up uneconomically in the market just ahead of the

afternoon fixing call.

284.   To perform this analysis, the experts normalized platinum prices across these years for purposes of identifying particular times of the day demonstrating there were, on average, sharp price movements.

285.   Experts found that there was a sharp dip in the average normalized prices in the minutes leading up to and during both the morning and afternoon Platinum and Palladium Fixings, as shown in the chart below.

**Average Normalized Future Platinum Prices: Oct. 2007**



286. These results suggest some anomalous market behavior taking place
53

throughout this period. Moreover, because this behavior has been observed before the release of the fixing price, these price moves are suggestive of front-running and information leakage occurring during the Platinum and Palladium Fixing call.

287. Further, these anomalous price moves around the Platinum and Palladium Fixings were also compared to corresponding fixings for gold and silver. Indeed, when one compares the relative movements of prices around the respective fixings for gold, silver, and platinum, one can see that, each experiences similar price drops in the time period leading up to the fixings, followed by a reversal. This is not surprising given that gold and silver have come under recent regulatory scrutiny with respect to their fixing processes and the behavior of prices around and during those fixings, as explained in further detail below.

288. To illustrate the similarities in the way that physical prices in the gold, silver, and platinum fixings exhibit similarly anomalous price drops and recoveries around their respective fixings, experts analyzed the average normalized intraday prices in the gold, silver, and platinum markets around their corresponding fixing times, using a time period of one hour before and after the fixing times of each precious metals market (the afternoon gold fixing is at 3:00 p.m. GMT/lO:OO a.m. EST, and the silver fixing is at 12:00 p.m. GMT/7:00a.m. EST). The chart below demonstrates that prices of gold, silver, and platinum all experience sharp drops around their respective fixings with subsequent recoveries post-fixing.

54



Gold, Silver and Platinum-Average Normalized Intra-day
Prices at Each One's Fixing Window

289    To confirm their inferences with respect to price moves due to manipulation around the Platinum and Palladium Fixings, experts conducted further analyses to illustrate the degree to which the prices and returns of platinum futures around the daily Platinum and Palladium Fixings are anomalous.

290.  In the following chart, experts measured the extent to which platinum prices are different from the immediately preceding prices (t he "Linear Forecast Errors") and the extent to which platinum returns are different from immediately preceding returns (the "Return Forecast Errors").

291.    Specifically, for each value of the Linear Forecast Errors series, experts plotted the squared difference between the current price and the average price in the previous 30 minutes. This process was repeated for the Return Forecast Error series, using returns instead of prices.

55

292.   These Forecast Errors are a measure of outlier prices. Therefore, large
increases in the size of these forecast errors correspond to large fluctuations in average
normalized platinum prices. Normally, large price fluctuations would not occur in properly
functioning markets absent some market-shaking event.

Average Rolling Forecast Errors October 2007- September 2014



293.   The Chart above demonstrates large spikes in both the Linear and Return
Forecast Errors at both the morning and afternoon platinum and palladium Fixings over the
seven-year period they analyzed. These results highlight the fact that the price moves around the
platinum and palladium Fixings are highly anomalous.

294.   Experts also conducted similar analyses for each year during the seven-year
period analyzed. These year-by-year analyses showed that in each year within the 2007-2014
period exhibits similar spikes in these Forecast Errors around the platinum and palladium Fixing.

295.   This is contrary to what should occur in a free market; but consistent with a
manipulated market. The period around the afternoon platinum and palladium Fixing is a time

56

in which a very large volume of platinum futures are traded, as seen in the following chart. As a result, this should be a period where the futures market is at optimal efficiency with price fluctuations being relatively small.

296.  Instead, as seen in the chart above displaying the Average Rolling Forecast Errors, the exact opposite was occurring.  Again, the fact that these anomalies were happening at the time of the fix where liquidity was high supports a reasonable inference of manipulation of the Physical Platinum and Palladium Markets during the relevant time period.

NYMEX Futures Trading Volume-October 2007-2014



297.  In addition, experts generated a "Cumulative Platinum Return Index" to demonstrate the long-term relative differences in average fluctuations of the price of platinum during the different periods of the trading day. To do this, experts examined the same eight-hour interval each day containing both the morning and afternoon Platinum and Palladium Fixings (the "Fixing period") and compared relative differences in average platinum price fluctuations in the Fixing period to the remaining eight-hour intervals of each day-i.e. , the pre-Platinum and Palladium Fixings period, from 12:00 a.m. GMT to

57

7:59a.m. GMT, and post-Platinum and Palladium Fixing period, from 4:00 p.m. GMT to

11 :59 p.m. GMT

298.    The following chart demonstrates the relative differences in returns

during these three, eight-hour intervals over the period October 2007 through September

2014.

Cumulative Returns Index
Platinum Futures Oct. 2007 to Sept. 2014



299.    As can be seen in the chart above, the returns in the Fixing period

significantly underperformed during the post-Fixing period. Further, the Platinum and

Palladium Fixing period's strong negative trend confirms that there is a conscious and

deliberate effort to suppress platinum prices during the Platinum and Palladium Fixings.

**In order for the price of Platinum to fall during the fixing period as
demonstrated in the above-charts, <u>all</u> of the fixing defendants and the other market
making dealers including defendant UBS AG had to agree to go short and not to put in
any market moving long buy orders durng the fixing period which would have ruined
their scheme to suppress prices during the Fix.**

300.    Because the physical platinum market during the relevant time frame

was a 24 hour a day, over- the-counter market that effected traders all over the globe, at any

time any of the dealers who were not fixing defendants could have disregarded the fixing

58

auction and proceeded to trade with their customers who wanted to purchase Platinum for example during the Fix.

301. There was no law or rule mandating that each market maker including defendant UBS AG wait to consummate a large buy order before or during the auction. Rather, for this scheme to work out, there would have had to have been an agreement between these otherwise horizontal competitors.

302. For example, absent a coordinated effort to restrain trade, if UBS AG had executed a large buy order while the other fixing defendants were selling, there would have been a wash, especially if the fixing defendants did not have enough platinum in their inventories to sell off to overcome the buy order of the UBS AG customer. Thus, had another market-maker continued to trade during the auction process in the opposite direction of the cartel, but in the same amount, the equilibrium price would have remained the same.

303. Rather, **the only way** to ensure that the prices fell as they did 80% of the time during the fixing auction was to make sure all of the defendants and other market making platinum dealers agreed to cease trading during that fixing period or to only trade in the direction that the cartel intended the prices to move.

304. So for example, UBS, AG against its own interest, but to appease the horizontal conspirators would have had to refuse to sell platinum to its customer until after the fixing call. UBS AG might have had to forego some profits, because by the time it filled it customer's buy order, the cartel had moved prices down. However, UBS AG could have more than made up for its losses by being in on the strategy ahead of the curve, so, for example, UBS AG could have initiated short NYMEX Platinum contracts simaltaneoulsy knowing prices would fall in value and gaining on its short NYMEX position. If that is what

59

defendants refer to as a hedging strategy, is dove-tails perfectly with these claims of price fixing during the relevant time period..

305. Or UBS AG could time the market and sell to customer A after the prices rebounded at a nice profit, since these patterns show reversals shortly after the fixing windows. These rebounds were probably due to the fact that the dealers themselves were buying up inventory at cheap prices after their artificial suppression, then by holding aside customer buy orders until the rebound, they could sell platinum to their customers at a tidy profit to themselves. Quite a profitable, albeit unlawful strategy in restraint of trade.

306. However, because the market for platinum was over-the-counter, unless all of the dealers agreed to obey the direction of the fixing defendants, this scheme would have failed, since there would not have been enough fire power to move the market in a particular direction.

307. Likewise, because there were legitimate orders in the market for buying and selling physical platinum or NYMEX contracts, such as by jewelry manufactures or investors such as myself, the dealers could use these legitimate orders in an illegitimate fashion to also move prices during the fixing window unbeknownst to the customers who were being used as pawns.

308. Thus, because the free market would have prevented the auctioneers from setting prices had the market continued to trade, the only way for these prices to drop, would have been by the consent of all of the other dealers who were buying and selling Platinum worldwide.

309. Indeed, because there was no reason to set prices twice a day, because there was already a robust market and prices were constantly being set by the market, the intrusion into

the free market not once but twice a day by these auctioneer defendants clearly changed the
direction of the free market by exerting artificial leverage into the market and allowing the
fixing defendants to just buy or sell inventory.

## DEFENDANTS CONDUCT WAS INTENTIONAL

310.  Defendants intentionally manipulated and fixed prices with respect to
their platinum and palladium positions in the Spot and NYMEX Futures markets and their
intentional conduct is clearly demonstrated by their disregard for well-accepted norms as well
as specific violations of the Commodities Exchange Act and NYMEX Rules by (1) discussing
their trading strategies including confidential customer orders prior to the Fixing call in order
to coordinate their strategies during the platinum and palladium
Fixings, (2)  By pre-arranging NYMEX futures prices by collusively fixing physical platinum
prices during the London Fixes, and (3) by Engaging in unlawful Spoof Orders.

### Motive and Intent

311.  Each defendant had the opportunity and motive to manipulate the Physical and
NYMEX market in platinum and palladium because each defendant had an extraordinary
financial incentive and motive to manipulate and price fix the NYMEX and physical markets
and/or to take positions knowing when the fix was in to their advantage.

a.  First, each defendant was one of the largest participants in the NYMEX Platinum
and Physical Platinum markets during the relevant time frame.

b.  Not only did each defendant, either individually or through its New York trading
desks conduct substantial trading in NYMEX Platinum and Palladium, but also each held
large trading positions in the Over the Counter physical markets

c.  Four of the defendants, the auctioneer defendants, ran the price fixing auctions

61

twice daily and thus had the opportunity to set prices and learn what the other defendants were planning on doing in terms of buying and/or selling physical platinum and palladium, during the fixing call and prior to the members of the public who did not know in which direction the prices would be heading.

d. Each defendant profited handsomely from their manipulative and price fixing conduct in connection with their trading of NYMEX and Physical Platinum and Palladium.

312. Each defendant therefore had the ability, as well as a motive, to manipulate NYMEX and Physical Platinum and Palladium during the relevant time period.

313. Each defendant therefore had a motive to increase profits and certainly each defendant had an opportunity to do so since each was privy to information ahead of the fixings.

314. Each defendant also had the opportunity to profit based on this unlawful manipulation and price fixing, because each defendant knew based on the fixing calls where the price of platinum and palladium was heading ahead of the calls.

315. During the relevant period, some or all of the FCM defendants were also conspiring and sharing confidential information as they formed trading huddles to exchange illegal information.

316. In addition, because confidential customer orders had to be tallied to figure out the direction of prices on the conference call, a reasonable inference can be made that defendants intentionally or with extreme recklessness rising to the level of bad faith acted in furtherance of their scheme, when they gave or received confidential customer orders which are supposed to be kept strictly confidential.[5]

---

5

NYMEX Rule 532 requires that all customer orders be kept strictly confidential and states:

317.  However, in order to manipulate and price fix the Platinum market, defendants discussed and evaluated confidential customer orders over the phone during the fixing calls among themselves and their trades desks. Although this conduct may have appeared in London to be superficially valid as part of the "Auction" process, the moment that NYMEX futures were purchased based on these conversations where confidential information was knowingly exchanged, the laws of the United States were egregiously and knowingly violated in the United States by United States companies and their aiders and abetters, even if some or all of these phone calls were abroad.

318.  The exchange of confidential information to traders over the NYMEX ensured that defendants collectively manipulated prices to the desired levels to maximize the profitability of their transactions around and during these critical pricing windows.

319.  Defendants' representatives on the Fixing calls were in constant communication with their physical and derivatives trading desks, the FCM defendants herein, as well as with the other Defendants' respective trading desks, to ensure that platinum and palladium prices moved in a certain direction to pre-determined, non- competitive levels.

320.  In addition, Defendants acted intentionally by sharing their customer order flows for purposes of front- running expected price moves based on execution of those customer orders.

321.  Front Running is also a clear violation of NYMEX Rule 432(G) and(H). By

"No person shall disclose another person's order to buy or sell except to a designated Exchange official or the CFTC and no person shall solicit or induce another person to disclose other information. An order for pit execution is not considered public until it has been bid or offered by open outcry. No person shall take action or direct another to take action based on non-public information, however acquired. The mere statement of opinions or indications of the price at which a market may open or resume trading does not constitute a violation of this rule.

63

learning of the Auction prices in London, the FCM defendants intentionally put on positions that constituted front running.

322. All defendants also intentionally acted in prearranging orders in a coordinated effort in violation of the Commodities Exchange Act, Section 7 U.S.C.§ 6c(a)(1)B.

323. 7 U.S.C.§ 6c prohibits prearranging sales in the manner that defendants used during the "Auction" Fixes in London to set prices to be used on the NYMEX. Section 6c(a)(1)(B) specifically prohibits any conduct to: "determine the price basis of any such transaction in interstate commerce in the commodity."

324. Clearly, an inference can and should be drawn that the conduct described as part of the Auction process in London shows scienter in conducting their affairs in violation of multiple rules and laws to predetermine the prices of Platinum and Palladium Futures prices over the NYMEX exchange

325. Defendants also intentionally engaged in this price-fixing scheme by placing large orders around the platinum and palladium Fixings that they had no intention of executing, also known as "spoof" orders or "painting the screen."

326. When these large orders were placed ahead of the trade, they engaged in illegal front running; whereas when these large orders were eventually withdrawn such conduct was painting the screen also known as spoofing.

327. Spoof orders were used to bait the market to react to what other market participants believed were genuine increases or decreases in supply or demand.

328. Spoofing is a violation of the Commodities Exchange Act's anti fraud provisions. 7 U.S.C. 6c(a)(5)(C) specifically proscribes Spoofing. Such provision provides: in pertinent part:

64

### Disruptive Practices

> "It shall be unlawful for any person to engage in any trading, practice or
> conduct on or subject to the rules of a registered entity that–[C] is of the
> character of, or is commonly known as to the trade as, "spoofing" (bidding or
> offering with the intent to cancel the bid or offer before execution.)

329. An example of a large "spoof' sell order would benefit an individual  with a
large short position in the futures market because short positions  benefit from decreases in
prevailing  market prices. Defendants manufactured spoof orders and took advantage  of them
as part of their intentional effort to manipulate platinum and palladium  prices.

330. A reasonable inference can and should be drawn that defendants engagement in
Spoof orders during the relevant time period, as well as front running demonstrates
intentional conduct designed to influence prices of platinum and palladium in an uneconomic
fashion.

331. Defendants' extreme self-interest in self-dealing in the very goods that they
became auctioneers was so inherently conflicted that an inference of intentional conduct
favoring their own interests over plaintiffs may be drawn.

### The Auctioneer defendants, UBS and the FCM defendants were Horizontal Competitors for Spot and NYMEX Platinum and Palladium and Together Had the Ability to Combine and Conspire to Set Prices During the Relevant Time Period.

332. At base, the platinum and palladium  Fixings are price-setting mechanisms
among horizontal competitors  in the platinum and palladium markets.  HSBC. Goldman
Sachs, UBS and ICBC Standard  Bank have large commodities desks in which they
supposedly  compete for customers in connection  with their commodities trading services,
including  those tor precious metals like platinum and palladium.

333. In addition, each auctioneer defendant as well as UBS AG had its own
proprietary trading interests in platinum. and palladium in the United States including
NYMEX contracts which each auctioneer defendant and UBS AG held in accounts set up

with each one's affiliate FCM or in the case of BASF Metal, Ltd. in affiliation with its

prcious metals services department at BASF Corpration and/or BASF Catalyst Division

334.   Although the auctioneer defendants in combination with the FCM defendants are horizontal competitors, each defendants acted in an extremely collusive fashion through the guise of the London Auction. Each horizontal competitor collusively communicated with each other directly to establish "fixed" prices for platinum and palladium that are then relayed to the New York trade desks via the wires and used by all market participants in valuing their positions in both the platinum and palladium physical and derivatives markets.

335.   Thus, the platinum and palladium Auction Process provided nothing more than a subterfuge for these defendants to collusively create illegitimate and non-competitive price moves while the rest of the market was relying on the legitimate forces of supply and demand to set prices.

336.   Each defendants was able to abuse the London Auction Process to its advantage and at the expense of a competitive market.

337.   Defendants' exclusive control of the platinum and palladium Fixings gave them unparalleled power to manipulate the ultimate price of platinum, palladium, and platinum- and palladium-based financial products in the global platinum and palladium markets. Price manipulation was accomplished through their exceptional access to confidential information from other participants in the platinum and palladium markets, which allowed them the ability to use that information to manipulate platinum and palladium prices to their benefit and to the detriment of Plaintiff, Ms. Levy.

### CIRCUMSTANTIAL EVIDENCE OF A PRICE-FIXING CONSPIRACY AS WELL AS MOTIVE AND INTENT (Plus factors)

#### On-Going Government Investigations

338.   Prior to and during the institution of plaintiff's Complaint, several global market

66

regulators including the United States Department of Justice launched probes into the conduct complained of herein regarding precious metals manipulation and price fixing. These investigations are ongoing and underway.[6]

339. A recent U.S. Senate investigation, although unrelated to platinum and palladium, noted that Defendant Goldman Sachs engaged in activities that manipulated commodities prices, engaged in risky commodities activities, engaged in physical commodity activities that mixed banking and commerce, had access to non-public and commercially valuable information relating to commodities, and that regulators and the public lack key information about physical commodities to form an accurate understanding of the nature and extent of those activities and to protect the markets.[7]

340. In the wake of the Investigation into manipulation of the Foreign Exchange Market during much of the same time frame as alleged herein in this Second Amended Complaint, FINMA, the Swiss Financial Market Supervisory Authority inadvertently discovered Manipulation of the Precious Metals Market as well as the Foreign Exchange Market, during their investigation of UBS AG's role in the Foreign Exchange Market manipulation. See Exhibit 10.

---

[6] *See* Jean Eaglesham and Christopher M. Matthews, *Big Banks Face Scrutiny Over Price of Metals: U.S. Justice Department investigates price-setting process for gold, silver, platinum and palladium,* The Wall Street Journal (February 23, 2015), www.wsj.com/articles/big-banks-face-scrutiny-over-pricing-of-metals-1424744801;*see also* Jan Harvey, *CFTC subpoenaed HSBC BANK USA for documents on metals trading,* Reuters (Feb.23 2015),http://www.reuters.com/article/2015/02/23/us-precious-hsbc-cftc-idUSKBN0LR1C520150223.

[7] *See* U.S. Senate Permanent Subcommittee on Investigations, WALL STREET BANK INVOLVEMENT WITH PHYSICAL COMMODITIES (Dec. 5, 2014)(Senate Report"), at 9-10, http:www.hasgac.senate.gov/subcommittees/investigations/hearing/wall-street-bank-involvement-with-physical-commodities-day-one. Although the Senate investigation did not specifically examine platinum and palladium, it examined multiple commodities markets.

341. The Precious Metals Market ("PM") hereinafter includes: Gold, Platinum, Palladium, Rhodium and Silver.

342. UBS AG was fined $342 million by the Federal Reserve with respect to its Foreign Exchange Manipulation. UBS AG also produced documents to FINMA for their investigation including emails showing that the FOREX market had been manipulated by *inter alia* front running and other manipulative techniques alleged herein as well.

343. Indeed, the Chief Executive Office of FINMA, Mark Branson, stated on a conference call to reporters from Bloomberg News that: "We have also seen clear attempts to manipulate fixes in the precious metals market." See Bloomberg Article dated November 12, 2014 entitled UBS Precoius Metals Miconduct Found by Finma in FX Probe, *Nicholas Larkin and Elena Logutenkova* annexed hereto as Exhibit 9.

344. Because UBS AG traded Forex and Precious Metals at the same trading desk, (as did HSBC), a fair inference can be drawn for pleading purposes that the same UBS AG traders manipulating FOREX, which is now an established fact beyond question, had an equal motive and opportunity to also manipulate and price fix the Precious Metals market, since these markets were being traded at the same desk.

345. Furthermore, because FOREX has many similar features to Precious Metals such as the fact that both markets use real market transactions to set prices (Unlike Libor) and both instruments were traded by the same banks in an undisclosed over-the-counter fashion on a daily basis, it is reasonable to infer the opportunity to manipulate precious metals was too hard to resist by traders who learned how to seemlessly convey customer orders and proprietary positions via chat rooms all over the globe in nano-seconds so that these horizontal competitors could net off their positions ahead of their fixing trades.

68

346. Then when investigations of the manipulation of the precious metals market was discovered by FINMA, they made findings of fact regarding precious metals manipulation in their official report dated November 12, 2014 and annexed hereto as Exhibit 10 annexed hereto.

347. In Section 3.3.3 of the FINMA report, the Swiss regulators found in connection with precious metals manipulation:

> "The PM [precious metals] desk responsible for the bank's precious metals trading has been an organizational unit of the bank's Foreign Exchange Spot Desk since the end of 2008 and was therefore subject to similar control and monitoring processes. PM spot desks are located in Singapore, Stamford, Zurich (Opfikon). Just as in foreign exchange trading, PM spot trading ia an OTC business with transactions from principal-to-principal.
>
> The conduct and techniques inadmissible from a regulatory perspective were also applied in part to PM spot trading-for instanc, the following conduct against the interests of own client: (i) sharing information on order books with third parties (e.g. stop loss order), (ii) sharing so called "flow information" with third parties on large current or imminent orders, (iii) sharing client names with third parties, (iv) front running and (triggering stop loss orders.

*See* FINMA Report dated November 12, 2014 report annexed hereto as Exh 10.

348. The official findings of fact in connection with precious metals in the FINMA report is strong evidence to infer conspiracy in this case as well.

349. Indeed, one email in particular annexed to the FINMA report of November 12, 2014 in the appendix is quite relevant, although this email most likely relates to the FOREX market, the spirit of the email could apply just as well to Price fixing in the London Platinum auction which is also part of the FINMA report. The trader brags:

> "UBS trader 'I done the fix today [...] We lost small money on the fix but that more

69

due to me really trying to ramp it and go for home run. Last time we had a fix like this it worked out nicesly."

350. Based on this admission against interest, it is clear that in the FOREX fix as well as in the Platinum Fix, one could lose money at the Fix, as part of a profitable trading stategy as is alleged herein.

351. The FINMA report continues to identify front running in the Silver Market which is a clear violation of law.

352. Evidence of Silver Market manipulation was shown to Authorities when a Whistle blower, a metals trader named Andrew Maguire who worked for J.P. Morgan Chase & Co. (which also happens to be a arket making member of the London Platinum and Palladium Market), decided to clear his conscience and tell the authorities about his impressions of the London Silver Fix during the relevant time frame. Trader Maguire told U.S. regulators in pertinent part in an email regarding the Silver Fix on January 26, 2010:

> "I thought you might be interested in looking into the silver trading today. It is a good example of how a single seller, when they hold such a concentrated position in the very small silver market, can instigate a sell off at will."

See Email from Trader Andrew Macguire to the CFTC annexed hereto as Exhibit 11.

353. Mr. Maguire continues to explain the manipulation in the the Silver Market. Annexed hereto as Exhibit 11, are the relevant emails showing trader Maguire's insights into the manipulation of the Silver Market.

354. Again, because Spot Silver is also traded as part of the Precious Metals Desk, a reasonable inference can and should be made that the precious metals traders had the same motive and opportunity to intentionally conspire to unlawfully fix the platinum

70

and palladium markets as alleged in this Second Amended Complaint herein.

355.  Another precious metal that has great significance with respect to the platinum and palladium market is the spot gold market which is also currently being investigated by the United States Department of Justice-Antitrust Division for similar conduct as alleged herein.  The British Financial Conduct Authority already investigated the same Gold Fixing Market and fined Barclays Bank $44 million dollars, and separately fined gold trader Daniel Plunkett for obvious price fixing and manipulation of gold prices at the daily fixes.  See Financial Conduct Authority Final Notice of Daniel James Plunkett, dated May 23, 2014, annexed hereto as Exhibit 12.

356.  Because the gold Fix is so similar to the instant platinum and palladium Fix, the facts of Mr. Plunkett's violation are particularly probative and shed light on the platinum and palladium Fixings which demonstrate similar graphs showing suppression of the PM gold fixes during the relevant time frame also in a statistically unsual pattern.  See Gold Fix Chart annexed hereto as Exhibit 2.

357. The British Financial Conduct Authority found that Mr. Plunkett had engaged in manipulative practices to purposefully push the price of gold down below the price of $1558.96, a price achieved during the relevant time frame.  This price, $1558.96, was known as the barrier price in a digital contract which meant that if the price fell below the Barrier, Barclays would be liable to customer A who would be "in the money" for a payout of $3.9 million dollars.  If trader Plunkett could keep the price below the Barrier, then the digital contract would expire worthless.

358.  Mr. Plunkett by manipulating the Gold Auction Fix, was able to get the price

71

to close at $1558.50, below the Fix, even though Gold like Platinum was on the rise.

359. To make sure the price of gold was suppressed, trader Plunkett decided to sell 60,000 ounces of gold at the fix and submitted a bid to the auctioneers where Barclays was one of the five auctioneers. Because Barclays was a gold fixing member, Plunkett conveyed that sell order to his trade desk. His only reason to make that sale was to ensure that the price of gold did not exceed $1558.96.

360    The offer to sell 60,000 ounces of gold cost Barclays $93,510,000.00 (at a price of $1558.50). This trade shows the economic ability to move the market with a single trade. It shows that the only intent was to push the price down as well. It shows that Barclays hoarded gold in its vault and could spend enormous resources to suppress the price of commodities in this case, gold.

361. Sometime later that day after the price closed at $1558.50, trader Plunkett repurchased his 60,000 ounces of gold at a loss of approximately $114,000.00 to put the gold bars back in his piggy bank for the next fixing opportunity. Interestingly, when Mr. Plunkett reduced his bid to 60,000 ounces of gold, another trader reduced his order to 10,000 ounces, and the auctioneer at 50,000 ounces could conveniently set the prices himself, under the rules. Thus, a tacit agreement to coordinate trading strategies to at least get the sell amount down to 50,000 ounces thus allowing for the Chair to set prices appears to have been achieved and can be inferred from the facts set forth herein.

362. Because the Platinum Fixing was very similar to the Gold Fixing, a fair inference of conspiracy and intent can also be drawn based on conduct described in this Second Amended Complaint and based on the handsome penalty imposed and findings of fact by the British Financial Conduct Authority.

72

## Other Manipulative and Price Fixing
## Conduct to Support the Instant Complaint

363. In addition, to the alleged manipulation of the Gold fixings, the Silver fixings, the Forex Fixing which have already been determined, there have been findings of other Benchmark riggings including the LIBOR rigging scandal, the ISDA fix scandal (benchmark for interest rate swaps) and others.[8]

364. The LIBOR scandal in particular is probative on the issue of motive and opportunity because the fact that these defendants or some of them were able to even pull off such an elaborate scheme in the one trillion dollar LIBOR market is mind-boggling. In LIBOR, there were also chat rooms available for conspiring in restraint of trade and such a massive manipulation was easily achieved for many years. By the same token, a market like Platinum and Palladium which would require the same type of coordination is feasible based on the fact that there was an entire infrastructure set up for this manipulative conduct and a fair inference that these trades were motivated to commit these felonies can also be made based on these very similar and closely related other scandals.

### Other Plus Factor besides Government Investigations

365. Because the conduct and aberrant dips during a particular time of day, immediately stopped on December 1, 2014 when the LPPFX was disbandoned, a plus factor inferring a conspiracy does exist

366. The LPPFC Fixing's of Platinum and Palladium was transferred to the London Metals Exchange which set up an electronic platform to fix the prices anonymously among traders, Because of the sudden cessation of the daily fixings pattern showing fixings

---

[8]See *LIBOR, 1:13-CV-00346 In RE FOREX,* 1:13-cv-07789-LGS.

73

being suppressed 80% of the time at the PM fixings, even in a rising market is strong circumstantial evidence of conspiracy.

367. In fact, the cessation of these statistical anomalies coincided quite nicely with the Department of Justice's criminal investigation of these Platinum and Palladium fixings and of these defendants herein.

368. Another Plus Factor is demonstrated because defendants were horizontal competitors who communicated directed and privately before and during the Fixing to set the Price of platinum and palladium. Because of these ample communications, each defendant had the opportunity to signal desired pricing to each other to agree to a particular price.

369. Because the Fixings were limited to four members, the exchange of information relating to pricing was confined to a small group of competitors although the market was enormous. By vesting control over the price fixing process in four persons, it was much easier for them to price fix than had there been an open outcry system where more traders could weigh in on the fixing of prices.

370. Thus, this structure of the closed auction process made collusion a rationale strategy for increasing profits at the expense of the vast majority of the market that does not have the opportunity to set prices.

371. Because the defendants' communications among each other were private and confidential and undisclosed to the public, the public had no access to this information and was deprived of making good investment decisions in a timely fashion. Rather, the access to non-public information not only presented the defendants with unique informational

74

advantages in the markets for platinum and palladium investments, as detailed below, but it also meant that markets could not monitor the defendants' conduct in setting the prices of platinum and palladium.

372.  Because the auction process was riddled with conflicts of interest, and the auctioneer defendants who were running the auction and setting the prices were also investors in platinum and palladium, and each had a vested interest in the outcome of the auction for their own proprietary accounts; an inference can and should be drawn of a conspiracy because each trader had a strong incentive to influence prices of the fixing to ensure their own profitability.

373.  Because each auctioneer defendant would have had to take positions on occasion to its detriment to carry out the scheme, a fair inference of conspiracy can also be inferred. Each defendant on occasion would be asked to sell platinum and/or palladium at the auction to move prices down to favor their other NYMEX short positions.  Thus, because the strategy of the cartel was detrimental to individual companies a fair inference of conspiracy can be appropriately inferred herein.

374.  Lastly, because there was no reason to fix the price of metal twice a day, where the over-the-counter market set the price and at most a fixing could be achieved once a day, the twice daily fixing doubled the profits for defendants, since they had two not one times per day to ensure the profits for themselves.

**All Defendants Had the Ability to Fix the Prices of NYMEX Platinum And Move The Market For NYMEX Platinum in the Direction Each Defendant Desired**

375.  Each defendant had the ability to fix prices in the relevant markets for NYMEX and Spot Platinum and Palladium and did price fix in these relevant markets for

75

NYMEX and Spot Platinum and Palladium and/or aided and abetted the FCM/NYMEX defendants.

376. Defendant LPPFC had the ability to monopolize the relevant market for NYMEX and Spot Platinum and Palladium, and did monopolize the relevant markets for NYMEX and Spot Platinum and Palladium and/or aided and abetted the FCM/NYMEX defendants.

377. The NYMEX Palladium and Platinum markets, are relatively "illiquid," and are relatively "thin depth" markets. That is, both the amount of actual trading is low and the amount of potential trading is low in these markets than other NYMEX markets.

378. In fact, the enormous impact of buying large quantifies of platinum and palladium is evidenced by the fact that just making one large purchase or sale on a standardized exchange such as the NYMEX of 0.16 of the total amount of the subject item, may cause a permanent chance of 4.7 percent in the price of the item. *In Re Initial Public Offerings Sec. Litigation, 227 F.R.D.65, 113* (S.D.N.Y. 2004.)

379. In addition, a single large buy order can have a long term upward impact on prices. *E.g.* Robert E. Holthausen, Richard Leftwich and David Mayers, *The Effects of Large Block Transactions on Security Prices: A Cross-Sectional Analysis*, 19 J. OF FIN. ECON. 237, 240 (1987) ("Block transactions have permanent price effects if trades convey information, even if there are sufficient close substitutes to produce perfectly elastic excess demand curves."); Myron Scholes, *The Market for Securities: Substitution Versus Price Pressure and the Effects of Information on Share Prices*, 2 J. OF BUSINESS 179, 193-94 (1972); Andrei Shleifer, *Do Demand Curves Slope Down?*, J. OF FINANCE 579, 580-

582 (1986).

380.   During the relevant time period, and relative to many other futures contracts, the NYMEX Platinum and Palladium futures contracts were extremely susceptible to a trade manipulation because of the illiquidity of these market. Defendants were able to and did dominate and monopolize and/or price fix the NYMEX Platinum, Palladium and Spot Markets during the relevant time frame by a variety of methods calculated to exert market power over these markets and move the prices of NYMEX and Spot Platinum and Palladium in the direction they desired to gain profits at the expense of the other members of the investing public who were bound to lose by the sudden gyrations in the market that were only known to defendants and  intentionally caused by the  defendants and their co-conspirators and aiders and abettor and by the other defendants including John Does #1-20 herein

381.   Defendants  GSI, HSBC USA, ICBC Standard Bank and BASF Metals Ltd, as the four auctioneers of the LPPFC Fixings Auctions, individually and/or in combination had the financial ability and power to dominate and monopolize and did dominate the Platinum and Palladium futures and spot markets during the relevant period.

382.  Each Defendant including UBS AG held enormous positions in physical platinum and palladium and held enough physical platinum and or palladium to move the prices of platinum or palladium based on the sheer volume of each defendants' holdings in either physical platinum or palladium or NYMEX futures contracts in platinum and or palladium.

383.  In addition, the Fixing defendants had the ability to move prices and exercise

77

monopoly power over the prices of NYMEX Platinum and Palladium and Spot Platinum and Palladium due to their self-appointed ability to set prices during the fixing windows that occurred twice daily. These auctioneer defendants were able to move the platinum and palladium spot and future markets by purchasing and/or selling large quantities to actually move the prices to each defendants' desired price level.

384. The UBS defendants and the FCM defendants restrained trading during the fixing window to allow the fixing defendants to set the price without the free market intervening to correct the manipulation.

385. Each of the defendants were multimillion and/or multibillion dollar organizations that could afford to make large purchases of Platinum and Palladium during the relevant time frame. For example, in 2012, Goldman Sachs Group, Inc. had reported income of over 7 Billion dollars in net profits at its disposal to use to purchases Platinum and Palladium and sustain positions that most people could not afford to sustain.

386. GSG, Inc. and the other defendants used these assets in part to exert monopoly power over the Platinum and Palladium markets by purchasing and/or selling large quantities of these metals to effect a squeeze and corner on these spot and future markets.

387. Each defendant also had enough financial assets to sustain margin calls of temporary losses that they incurred in furtherance of this Scheme to achieve monopoly power over the platinum and palladium spot and NYMEX futures market.

388. The auctioneer defendants also had the ability to price fix by means of controlling the auction process during the relevant time period so as to determine market prices for spot platinum and palladium which then determined future NYMEX prices of Platinum and

78

Palladium during the relevant time period.

389. Thus, because of each defendants ability to purchase expensive and large quantities of spot plaintum and palladium, each had the ability to move the market based on their economc strength; additionally because the auction process was set up to give 4 actors total control over the prices on a twice daily basis, the LPPFC and all other defendants who agreed to the benchmark prices established at the auctions, also had the ability to set prices in this fashion as well.

## DEFENDANTS' PRICE FIXING CONDUCT IN THE PHYSICAL MARKET IN LONDON CAUSED PRICE ARTIFICIALITY IN THE 2008 NYMEX FUTURES CONTRACT AND IN OTHER NYMEX CONTRACTS THROUGHOUT THE RELEVANT TIME PERIOD.

390. The Scheme conducted by defendants in connection with the Auction Process and the setting of prices in the Physical Markets for platinum and palladium in London caused Price Artificiality in the 2008 NYMEX Platinum contracts as well as other contracts throughout the relevant time period.

391. Causation of Artificial prices in the 2008 NYMEX Future Platinum Contract and other contracts can be inferred for three well-accepted reasons:

A. First, during the relevant time period, the prices of NYMEX and Spot Platinum were so out of line with Fundamental analysis that an inference of causation may be established.

B. During the relevant time period, prices of platinum were so divergent from historical norms, that at inference of causation may be establised, and

C. Based on Expert Analysis, anamolous price movements during the time of the fixing process create an inference of manipulation and causation, since there is no other explanation for such price movements under fundamental analysis.

392. An inference of Causation of Artificial Prices based on market manipulation is demonstrated where price movements in Platinum have no other reason other than price manipulation as in this case.

393. Because prices of the 2008 and 2009 NYMEX Platinum were so out of line with legitimate market forces and the fundamentals of Supply and Demand during the relevant time period, a fair inference of causation of price artificiality can be inferred based on defendants' conduct at the London Fixings

394. A fair inference of causation showing that defendants' conduct created price artificiality in the 2008 and 2009 NYMEX Platinum contracts and thereafter is demonstrated by comparing the actual prices of NYMEX Platinum in Q4 2008 through Q4 2009.

395. Because the actual manipulated prices of these contracts were so out of line with fundamental analysis, a fair inference of market manipulation creating price artificiality can be easily established.

396. First, in 2008, by Q3 and Q4, according to the legitimate forces of supply and demand that should have been setting prices in a free and fair market, prices of NYMEX and Spot platinum should have been soaring; rather they started declining drastically in value and by year end, 2008 platinum prices had severely plummeted to unpredictable lows.

397. According to forecasts based on the legitimate forces of supply and demand, platinum prices by Q4 2008 were supposed to rise to at leasat $2500 per troy ounce due to the strikes in South African platinum and palladium mines, due to the increase demand for platinum, and due to the Financial turmoil in Q4 2008 which in a normal market should have pushed platinum prices higher, since platinum like gold serves as a safe haven during times of

80

financial crises. See Articles predicting the prices of Platinum annexed hereto as Exhibit 13.

398  Indeed, gold which is supposed to move in sync with platinum soared by Q4 2008, and the prices of platinum and pold in Q4 2008 were inversely related, a true aberration. See Gold v. Platinum price movement chart annexed hereto as Exhibit 14. Rather, for no reason, platinum started to drop in value in Q3 and Q4 2008 to around $900 per ounce, a truly aberrant occurrence. See Gold and Platinum Chart annexed hereto as Exhibit 14.

399. Although car sales were declining in 2008, this fundamental factor was of no import because Platinum was soaring while auto cars were declining; and when auto sales started to rebound,  platinum was falling in price. See Car Sales, Exhibit 6, and Prices of Platinum 1998 to 2016.  Thus fundamental analysis was no longer the norm, because the market was being manipulated and monopolized.

400.  Althoug prices of platinum started to drop in Q3 2008, platinum should have been rising, since Platinum inventories were falling further into a worldwide deficit and demand was still vigorous. See Platinum Supply and Demand Charts, Exhibit 5.  By year end, 2008, platinum was in fact in a world wide deficit, which under fundamental analysis should have sent platinum prices soaring, like gold, not dropping.

401.  Because the fundamentals of supply and demand were no longer in play in the Summer of 2008; rather the manipulating forces of the auctioneers and their aiders and abettors and co-conspirators were in full force and effect; platinum was pushed artificially downward in August, 2015 especially on August 15, 2008 by the manipulators.  Such artificially low prices were great for the manipulators who could intentionally profit on their short positions in the NYMEX market on the backs of the investing public who were acting in good faith and were

relying on the legitimate forces of supply and demand to make investment decisions.

402.  In 2009, the manipulation continued to cause price artificiality, however, in the reverse order.  The manipulators decided to artificially push prices up in 2009, like a puppet on a string. By defendants' continuing to purchase platinum, prices started to climb upward without any basis in fundamental analysis.  As such by year end 2009, although platinum was now in a worldwide surplus and the strikes in South Africa had abated, and car sales had decreased; prices of platinum surged.  See Supply and Demand Chart for 2008 and 2009 annexed hereto as Exhibit 5.  Because such price movements are aberrant and out of line with the market based on fundamental analysis a fair inference of causation exists.

403. Because the rise in the demand for platinum was due to defendants and other financial institutions making large investments in these metals just to move the market and for no commercial uses; and the use of platinum did not increase enough to justify the large price increases during the relevant time frame, an inference of causation of artificiality can be drawn based on these large increases in historical prices.

404.  Because the prices of Platinum started to exponentially increase in 2008 and 2009 and thereafter in excess of historical norms,` an inference of manipulation and causation can be implied, since the prices of NYMEX Platinum were so out of line with fundamental analysis. See Platinum Supply and Demand Chart, and Historical Prices of Platinum.  See Carghill v. Hardin, 452 F. 2d 1154, 1167 (8th Cir 1971)(Deviations from Historical Norms demonstrate price manipulation and causation.

405.  Historically, Platinum traded in the range of $372 to $377 per ounce from 1998 through 1999.  At that time, Platinum was used to manufacture *inter alia* fine jewelry.

406.  In 2000, the average price per ounce rose to $544.03, and then  fell in 2001 to

82

$529.04.

407  From 1998 to 1999, demand appeared to be growing due to the use of Platinum and Palladium to make catalytic converters and dental products.

408.  By 2003, the average price of platinum rose to $692.31.  New industrial uses for Platinum were creating stronger demand and without an increase in supply prices rose.

409.  In fact, in 2003 there was a deficit of platinum of 330,000 ounces and the rise in the price of Spot Platinum was in sync with the forces of supply and demand. See Exh. 5.

410. Growing demand in 2004, led to an average price of  $845.31. The deficit was only 50,000 ounces, but with continued rising demand there was an average price increase of 22%.

411.  During 2005, the price of Platinum rose another 6% to $896.87 on average with a deficit of 55,000  ounces in 2005.  See Exh. 15.

412.  However, by December, 2006,  the average price of Spot Platinum was $1142.31, 27.4% higher than the previous year. See Exhibit 15, Spot Prices of Platinum.

413.  In 2006  there was  a large increase in platinum inventories and by year end there was no longer a deficit of physical platinum but a surplus of 355,000 ounces. See Exh. 5.

414.  This surplus was stored as inventory for future use in future years.

415.  By 2008, the prices continued to rise until approximately June, 2008.  Through June, 2008, the spot price of platinum and its related futures contracts continued to rise or remain at extremely high levels.

416.  The unprecedented rise in platinum prices was certainly not justified by supply and demand, but rather by manipulative transactions in 2008.

417.  By August, 2008 the market forces of supply appeared to have been overwhelmed, and prices started to fall for no apparent reason and without any fundamental

reason.

418.  As such, platinum prices as well as the NYMEX contract fell back by July 2008 to $1760.5.  This sudden drop in prices was also not in line with what people believed-- that the market was in an extreme deficit as reflected by the very high market prices.

419.  Because there were no new mines coming onto production for platinum in the summer of 2008, and no apparent or substantial decrease in demand from earlier in the year, under normal circumstances, there would have been no explanation for this sudden drop in price, other than market distortion due to manipulation occurring simultaneously in the London Spot Market.

420.  In fact, there appears to be absolutely nothing fundamentally different in July, 2008  from  March, 2008 in terms of supply and demand. However, the price declined from its high of $2200 in March, 2008  to $1700 in July, 2008 before finally settling at $900 by year-end.

421. One market factor that had changed was that defendants' continuous banging  the fix transactions in physical Platinum during the fixes.

422.  Defendants also caused the sudden decrease and collapse of the artificially high NYMEX Platinum Market by selling off their large holdings in the Physical Market in London to create fraudulent profits. Because the market for NYMEX Platinum was illiquid, such large sell offs in the Winter, Spring and Summer of 2008 where the defendants earned profits also effectively artificially decreased the market for NYMEX Platinum thus forcing out the other market competitors such as plaintiff who could not compete in the artificial markets due to a sudden and unexpected Margin Call.

84

423.  By year end 2008, there was no difference in the fundamentals of supply and

demand from March, 2008 to December, 2008, yet the market price had dropped by over 50%

back to approximately $934.5 per ounce, an extraordinary, unprecedented and unjustified

sudden collapse caused by the cessation of the manipulative conduct and/or the flooding of the

market by defendants of sell orders in the NYMEX contract.

424.  This price of $934.50 is approximately what platinum was back in 2005 prior to

when the manipulative conduct began.  See Exhibit 15.

425.  Clearly an inference of causation can be drawn from the aberrant movements in a

downward direction during the relevant time period, that are so out of line with historical norms

and fundamental analysis.

**The Aberrant Price Movements in Platinum Prices Between 2008 and 2014 at the
time of the Fixes Canaot be Explained by the Legitimate Forces of Supply and Demand;
Thus, An Inference of Causation of Artificial Prices Is Established.**

426. Another way to prove causation of price artificiality in the platinum spot and

NYMEX prices is based on aberrant behavior.  In Re Crude Oil (Occurrence of a reversal of

Backwardation and Contango supported an inference of market manipulaiton and causation of

price artificiality.)

427.  Experts utilized a model that was designed to capture the dynamic features of the

platinum market's volatility in order to determine whether or not price moves around the daily

Platinum and Palladium Fixings are anomalous and statistically significant.

428.  With respect to the platinum market expert, an analysis was conducted that

examined: (1) anomalous price moves over a seven year period (January 2008- September

2014) both before and during the afternoon Platinum and Palladium Fixings; (2) intraday price

moves on specific days across this period that not only included platinum prices before, during,

85

and after the afternoon fixing window, but also compared these price movements to movements in other markets; (3) intraday price and return moves over a seven- year period, with analyses for each year within this period; and (4) potential evidence of "information leaking"that suggests that defendants were moving platinum prices around the platinum and palladium Fixings in favor of themselves and their preferred clients and to the detriment of other market participants such as plaintiff who believed she was trading in a competitive market.

429. These analyses point to unusual price moves in the markets for platinum and platinum futures. As described in further detail below, these price movements can only be explained by Defendants' unlawful manipulation and therefore creating a strong inference of causation.

430.    There was also expert preliminary analyses of palladium prices around the afternoon platinum and palladium Fixing. These analyses similarly reveal anomalous movements in the prices of palladium that can only be explained by Defendants' unlawful manipulation.

431. Because platinum and palladium are interchangeable in the relevant market place for manufacturing autocatalyst, this Scheme could not have worked unless both platinum and palladium which moved together were both being manipulated. Otherwise end users could have just switched from one metal to the next based on aberrant pricing.

432. The inferences drawn from these aberrant and anomalous price movements is the existence of market manipulation.

433. Price moves after the platinum and palladium Fixings were also observed in order to analyze the extent to which pre-fix moves reverse after the platinum and

86

palladium Fixing because such a phenomenon creates an inference of causation of price artificiality.

434. When assessing the degree to which price fluctuations around the daily afternoon platinum and palladium Fixing are anomalous, the expert analysis considered price movements across two distinct windows: (l) price moves occurring in the 30-minute window before the start of the afternoon platinum and palladium Fixing call; and (2) price moves during the afternoon platinum and palladium Fixing call itself.

435. In examining these windows, expert analysis found that there was a relatively high frequency of anomalous price moves both before and during the calls between at least 2008 and 2014. The tables annexed hereto as Exhibit 16 show both the frequency of these anomalous price moves as well as their quantum over this period.

436. The frequency of anomalous observations were substantial, ranging from 10%-25% before the afternoon platinum and palladium Fixing call to 10% -20% during the call from at least 2008-2014. In addition, the quantum of anomalous observations was also substantial, ranging from 0.50% - 0.65% before the afternoon platinum and palladium Fixing call to 0.45% - 0.60% during the call during the same period.

437. Experts also tested the direction of the anomalous moves to determine whether they were largely negative (in the case of price suppression) or positive (in the case of price inflation). To assess whether price moves were negative or positive, experts independently determined the percentage of anomalous price fluctuations that were negative or positive around the daily afternoon platinum and palladium Fixing.

87

438.  From at least 2008 to 2014, defendants' manipulation resulted in a general

suppression of platinum prices.



439.  Expert also graphically demonstrated the dispersions of anomalous price moves

before and during the platinum and palladium fixings.

440.    The above graphical analyses demonstrates a noticeable increase in the

percentage of anomalous negative price moves during the afternoon Platinum and Palladium Fixing

window when compared to price moves during the pre-Fixing window.

441.  Price suppression would help platinum futures traders with particularly

large short positions in the futures markets because they become more valuable as prices, or

future expectations of prices, drop-provided that they close out their positions before any

88

reversal of prices. According the CFTC's *This Monnth in the Platinum Futures Market,* commercial trader of platinum futures-i.e., traders, like defendants, who transact in the futures market for hedging purposes-have held outsized short positions at points during the Relevant Period when compared to their long positions.

442.    For example, in November 2012, the number of "commercial" short positions was *over five times larger* than the number of "commercial" long positions (9,100 long vs. 51,400 short). A similarly large disparity was observed a year earlier, in November 2011 (5,700 long vs. 29,100 short). Thus, defendants had ample motive to actively participate in suppressing prices when it favored their short positions. To the extent that they held long positions at different points during the Relevant Period, defendants would move the platinum prices during the platinum and Palladium Fixings to artificial levels in order to benefit those positions.

**Sample Price Charts From Specific Days Demonstrate Anomalous Activity Around And during the Platinum and  Palladium Fixings**.

443.    Experts also analyzed platinum futures price behavior around and during the daily afternoon platinum and palladium Fixing on certain days where the experts' statistical model identified anomalous  price moves. As explained above, platinum physical and futures prices tend to be highly correlated, so anomalous price moves in the physical market will be tracked in the futures market and vice versa.  For each of these days, experts produced a chart demonstrating the price moves around the fixing window.

444.    In addition, for each of the specific dates, the experts also analyzed  price activity occurring simultaneously in other markets to ensure that the anomalous  prices moves in platinum were not matched in other markets, and thus, not likely to have been driven by

89

broader macroeconomic forces.

445.  Movements in other markets in sync with Platinum and Palladium movements would support legitimate not manipulated price movements. Because these markets were supposed to move together in response to world news and worldwide events that equally effected all markets, a deviation of platinum and palladium from their benchmark support a strong inference of manipulation.  Such other markets are therefore used as a benchmark tor purposes of comparison including physical gold, U.S. dollar index, and MSCI emerging markets index.

446.  Gold is often used as a hedge against inflation, deflation, and other indicators  of macroeconomic turmoil. Generally, when these factors are present there is a flight to gold as an investment, which in turn, results in increased prices tor gold. As a result, the price of gold should reflect the presence or absence of these factors around the time of the Platinum and Palladium Fixings.

447. Thus, for example in Q4 2008 when Gold was exponentially increasing so too should have Platinum, instead of decreasing in value without explanation and out of sync with Gold.

448. The U.S. dollar index is a measure of the value of the U.S. dollar relative to six of the major currencies. This index has a significant influence on the U.S. futures and option markets. including platinum futures and options. By showing the movement of this index around the platinum and palladium fix, one can rule out anomalous observatione that are caused by the change in value in the U.S. Dollar Dollar index relative to other currencies.

449.  Similarly, the MSCI emerging markets index can be used to rule out

90

anomalous observations in the platinum market that are caused  by the change in the
performance of investments tied to economic conditions in emerging markets

450.  Charts were created by experts that demonstrate the relative movements in these
markets around the afternoon platinum and palladium fixings and juxtaposed them to
movements in platinum prices on anomalous dates identified by their statistical model.

451.  Specifically, they found several days where activity  around the afternoon
platinum and palladium Fixings may be the result of front running behavior on the part of
defendants.  In the charts that follow, the experts found that there was distinct  price decreases
shortly before the afternoon platinum and palladium fixing, which continues  during the fixing,
only to bounce back after the fixing.

452.  Based on these movements, an inference can be drawn showing that these
defendants have taken advantage of the information asymmetry created by the fact that, by
exchanging information with other platinum and palladium fixing members prior to the fixing
call, they have prior knowledge  of the composition of the buy and sell order books ahead of
the fix.

### The Facts Showing Slamming and Banging of the Fix Transaction Demonstrated Disclosure of Confidential Information Around  the Platinum and Palladium Fixings.

453. The graphic evidence showing abnormal price movements prior to and at the
fix either in an upward direction or in a downward direction absent any news linked to
fundamental analysis demonstrates that the Platinum and Palladium  Fixing members were
leaking confidential information obtained from the call to traders on their derivatives desks
and potentially some favored clients while the call was ongoing.

91

454. Traders with information about the nature of the fixing calls are able to trade ahead of the release of the published "fixing" and profit trom the impending market movements.

455. To demonstrate this information leakage, experts used linear forecast errors (described above), and normalized platinum futures prices from October 2007 to September 2014. Experts plotted the data series 15 minutes before and 15 minutes after the afternoon Platinum and Palladium Fixing.

456 . On average, the platinum futures prices move before the platinum and palladium Fixing and in the same direction of the fixing price change. See Chart annexed hereto as Exhibit 17 showing Normalized platinum futures price and rolling Forecast Errors October 2007- September 2014.

457. To further analyze the degree to which this phenomenon is taking place, experts calculated how accurate a predictor price moves in the first few minutes of the afternoon platinum and palladium Fixing call are of the price moves across the entire length of the afternoon Fixing call.

458. The timing of these price moves in the first few minutes of the fixing window which are the same as those across the entire fixing window, reasonably infers information l leakage and insider trading with respect to the information obtained by those partaking in the call, because normally there would not be a similar pattern of movement throughout this time frame, rather the pattern would be random.

459. The following chart demonstrates the percentage of days on which this is the case for each year between 2007 and 2014. It demonstrates the predictive power of three time

92

windows: the first 3, 5, and 7 minutes of the afternoon platinum and palladium Fixing. It also

shows the predictive power of a dynamic window that changes window size according to the

actual length of the individual afternoon  Platinum and Palladium Fixing, *i.e.*. when the fixing

window is longer, and the experts used a longer predicting window.

### Anaylysis of Alleged Information Leakage



Analysis of Alleged Information Leakage

460.    As can be seen from the chart above, the direction of the price moves in

the first few minutes of the platinum and palladium Fixing call is typically a good predictor

of the price moves across the entire length of the call, with the odds that prices in these

intervals will match price moves over the entire length of the call usually being greater than

50% during the Relevant Period, with some years seeing the odds jump to over 70%.

461.  These results listed in #460 *supra* demonstrate information leaking from

the fixing members to their proprietary trading desks and their preferred clients.

462     Indeed. a similar analysis was undertaken  by Andrew Caminschi and

93

Richard Heaney of the University of Western Australia in their study of the London gold
fixings.8 Analyses of palladium prices around the platinum and palladium fixings also reveal
similar anomalous movements.

463.     Experts also conducted  preliminary analyses of palladium prices around
the platinum and palladium Fixings. Similar to their analyses of platinum prices, experts analyzed
intraday average prices between 2007 and 2014 to determine when there were, on average, sharp
price movements in palladium  prices. As can be seen in the chart below, experts found that there
were sharp drops in the prices of palladium around both the morning and afternoon platinum and
palladium Fixing.


Average Normalized Futures Palladium Prices Jan. 2007 to Nov. 2014



---

8   In their study, they observed that gold future price moves in the first minutes of the gold
fixing calls accurately  predicted the movement of the fixing prices direction over 80% of the
time. To Messrs. Caminschi and Heaney, these results, along with t he relative i ncrease in the
volume of trading in gold futures around and during the gold fixings, was indicative of
information leaking to t he fixing members t rading desks and their preferred clients. Indeed, as
shown above, trading in NYMEX platinum futures also spikes around the afternoon  Platinum
and Palladium Fixing. The fact that both the gold fixings and Platinum and Palladium  Fixings
demonstrate  the same anomalous  tendencies is likely not a coincidence because both are
similarly subject to the manipulative temptations  of their respective fixing members.

464. Indeed, during the afternoon platinum and palladium fixings, one can see a noticeable dip in palladium prices near the beginning of the fixing call, followed by a quick recovery. Such a sharp movement over a short period of time *is* highly unusual and thus, is suggestive of manipulation.

465. To show that the palladium price moves around the afternoon platinum and palladium Fixings are anomalous, experts examined the Linear and Return Forecast Errors tor palladium prices around the platinum and palladium Fixings. The experts' Forecast Errors analysis was conducted in a manner similar to the Forecast Errors analysis they performed for platinum, using palladium price readings instead of platinum price readings. The chart below graphically demonstrates these Forecast Errors for palladium around the Platinum and Palladium Fixings.



**Average Rolling Forecast Errors January, 2007 to November, 2014.**

95

466     As was observed in the Linear and Return Forecast Errors for platinum, large

spikes in both the Linear and Return Forecast Errors for palladium appear at both the

morning and afternoon platinum and palladium Fixings over the seven-year period the

experts analyzed. These results highlight the fact that the palladium price moves around the

platinum and palladium fixings and are highly anomalous.

467.   As with the experts' observations with respect to platinum prices, the presence

of large spikes in the Forecast Errors for palladium is contrary to what should occur in a

market free of manipulation. The period around the afternoon Platinum and Palladium Fixing

is a time in which a very large volume of platinum and palladium futures are traded, as seen in

the chart annexed hereto as Exhibit 18. As a result, this should be a period where the futures

market is at optimal efficiency with price fluctuations being relatively small. Instead, as seen

in the chart above displaying the Average Rolling Forecast Errors, the exact opposite was

occurring-just as it was with platinum. These anomalous readings are suggestive of

manipulation.

468.   Taken together, these analyses suggest that palladium prices were likewise being

manipulated by Defendants to their collective benefit and to the detriment of Plaintiff and the

other members of the investing public.

469.   Further, the fact that similarly anomalous readings have occurred in both

platinum and palladium markets around the platinum and palladium Fixings is not a

coincidence: as described above, the same Defendants that are "fixing" the prices for platinum

are also "fixing" the prices of palladium, and are doing so on the same teleconference call using

96

the same procedures, one right after the other.

**PROXIMATE CAUSATION**

470.   Plaintiff was injured and caused to sustain actual losses as well as lost profits as a direct result of this Scheme, since she was a direct owner of NYMEX Platinum Futures Contracts during the relevant time period.  See Summary of Scheme annexed hereto as Exhibit 19.

471.   As a result of the aforesaid Manipulation and Price Fixing of the NYMEX platinum market  during the relevant time period, plaintiff was caused to sell her NYMEX platinum contracts at artificially deflated prices.

472.   As a result of the aforesaid manipulation of the NYMEX platinum market during the relevant time period, plaintiff was caused to purchase her NYMEX platinum contracts at artificially inflated prices when each auctioneer defendant and the LPPFC purposely purchased platinum at the auctions without a commericial need for the metal, but just to move prices up..

473.   Notwithstanding the inflated and deflated prices caused by the manipulation and price fixing scheme, plaintiff's positions in plaintiff would have gone up approximately $500 to $1000 per ounce or more during the time she held them according to fundamental and technical research available to her at the time.

474.   Beginning in the summer of 2008, the prices of NYMEX Platinum began to collapse and as a result plaintiff's account lost its value. Plaintiff was issued a Margin Call on or about August 15, 2008 requiring her to add cash to her account from she never recovered.

475.   Under the rules of the NYMEX exchange once a Margin Call has been issued, your entire account can be legally liquidated.

97

476.  If the defendants had not crashed the market by their manipulative trading

strategies, the margin call would not have been issued.

477.  Clearly, the manipulators were trying to and did succeed in squeezing the market

and eliminating direct competitors such as Ms. Levy.

478.  The total losses due were substantial due to the sudden and inexplicable decrease

in her NYMEX platinum as well as consequential losses in other contracts that Ms. Levy was

also forced to liquidate due to the Margin Call in Platinum.

**The Collapse of the Platinum NYMEX Futures Market and Other Precious Metals Markets in August 2008 and Particularly on August 15, 2008, was Proximately Caused by Defendant's Scheme and Proximately Caused Ms. Levy's Financial Injury.**

479.  Because August 15, 2008 presented a calamitous day for the Futures Market with

respect to platinum and other precious metals, and these markets crashed without any rational

explanation, a fair inference of manipulation can be inferred.  Therefore, this sudden,

unexpected sharp decline in NYMEX Futures including platinum, and many metals proximately

caused the injuries sustained herein.

480.  For example, on August 15, 2008 in addition to platinum declining precipitously

in value, spot Silver dropped 8.26% in value, and their futures contracts fell by 9.94%, 9.94%,

9.96% and 9.96% for the August, September, October and December 2008 maturity contracts,

respectively.  The decline of 8.26% of Spot Silver on August 15, 2008 represented the 6th

lowest return (out of 1004 days) between January 3, 2005 and December 31, 2008.

481.  In addition, the Spot price for Gold declined by 3.85% on August 15, 2008.

482.  The price of platinum fell by 7.41% on August 15, 2008

483.  The Price of palladium fell by 6.29% on August 15, 2008.

98

484.  These price drops occurred all on the same day without explanation and for no fundamental reason.

485.  Rather, the manipulators who were trading <u>all</u> of these metals from the same trade desk, had failed to refine their manipulative skills, and either intentionally or unintentionally caused a run on the market causing the precious metals market to crash across the board.

486.  Therefore, the rise or fall of car sales on August 15, 20087 had nothing to do with the sudden collapse of the entire precious metal market across the board. <u>See</u> Car Sales Chart Annexed hereto as Exhibit <u>6</u>.

487.  As a result, Ms. Levy NYMEX positions failed.

488.  Plaintiff also had to forego lost profits in the 2008 NYMEX Contract which was supposed to go  $2500 to $3000 under normal market conditions and due to the strikes in South Africa and the rising demand for Platinum especially during the Recession where platinum was a safe investment as was gold.

489.  Plaintiff is entitled to rely on the Fraud on the Market Presumption of Reliance since she purchased her contracts during the Relevant time Period when the Manipulation was occurring.

**FRAUDULENT CONCEALMENT**

490.  Throughout the Relevant Period, each defendant and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

491.  Neither defendants nor their co-conspirators told plaintiff or other members of the investing public that they were conspiring to fix, stabilize, maintain, and/or  otherwise manipulate platinum and palladium fixings underpinning numerous platinum- and palladium-

based transactions.

492. This price- fixing conspiracy and conduct are inherently self-concealing.

493. Defendants and their co-conspirators conducted their conspiracy secretly by engaging in private conference calls to fix the price twice daily; and each defendant concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

494. For example, the twice daily conference calls by the Fixing defendants were conducted confidentially and privately among the co-conspirators so that the members of the public and plaintiff in particular had no way to figure out that defendants' trades were moving the market uneconomically, as is alleged herein. Had these conference calls been open to the members of the public, Ms. Levy would have figured out this scheme much earlier.

495. The conduct underlying the claims in this complaint were also concealed by defendants in such a way to prevent Ms. Levy from discovering the existence of this RICO conspiracy and other conspiracies alleged herein by failing to state in any public records the amounts of platinum and palladium being traded during the London Fixes. Because these amounts and monetary dollars spent during the fix were never disclosed in any annual or quarterly reports, upon information and belief, there was no way for Ms. Levy to realize that these amounts exceeded lawful levels.

496. Defendants and their co-conspirators were able to affirmatively conceal their conspiracy by, among other things, engaging in secret communications to discuss customer orders and to coordinate trading strategies.

497. Because part of this Scheme occurred in London, England, members of the

100

investing public in New York did not have the ability to hear about what was going on across the Atlantic, and U.S. regulators could not reach out and encroach on Great Britain.

498. As a result of defendants' fraudulent concealment, all applicable statutes of limitations affecting plaintiff and her claims have been tolled.

499. Plaintiff did not discover, nor could have discovered through reasonable diligence, that defendants and their co-conspirators were violating the antitrust, RICO and commodity laws as well as pendant state law claims until shortly before this action was commenced.

500. Plaintiff could not have discovered the existence of the combinations and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence, because of the deceptive practices and techniques of secrecy employed by defendants and their co-conspirators to avoid detection and by affirmatively concealing such violations.

501. Further, reasonable due diligence could not have uncovered defendants' conspiracy because each defendants' discussions and activities during the Platinum and Palladium Fixing calls were not public information. Information about Defendants ' trading positions and holdings in the platinum and palladium physical and derivatives markets are also non-public information.

502. As a result of the self-concealing nature of the conspiracy, the active steps taken by defendants to fraudulently conceal their conspiracy, and the lack of public information concerning material aspects of the conspiracy, the statute of limitations was tolled for Plaintiff's claims.

503. Ms. Levy acted with extreme due diligence once she learned of the conduct of defendants which is the basis for this complaint.

101

504. Ms. Levy first learned of the alleged conduct giving rise to her injury and some of the parties involved who are named as defendants in this case in the late Fall of 2014 when an attorney she knew told her about this Complaint in the Fall of 2014.

505. Ms. Levy obtained a copy of the Class Action Complaint in the Fall of 2014 and immediately began to investigate this case. Not only did she read the complaint several times, but she started to do legal research and also started to research the LIBOR and FOREX cases also pending in the Southern District of New York.

506. In the Winter and Spring of 2015, Ms. Levy spoke to an economic expert to understand the case better. She also reviewed the case law especially with respect to the RICO cause of action. Because the Class had not brought a RICO case, she needed to take more time to evaluate that claim.

507. She decided the claim had facial validity, and she decided to draft her own complaint. She knew that the class action was underway and spent many weekends and evenings during the summer of 2015 drafting her complaint. She believed she had until the Fall of 2016 to file her complaint, and thus timely filed it in September of 2015 so as to catch up with the Class Action and file it as a related case.

508. Thus, she acted with speed and diligence and filed her case within two years of when she discovered the injury. She worked many nights and weekends to timely conduct due diligence as soon as she discovered the causes of action.

509. Ms. Levy never saw any articles in the papers concerning her claim, other than the articles she searched for herself using internet search engines, after she already knew about the complaint in the Fall of 2014.

**Claim I**

## MARKET MANIPULATION IN VIOLATION OF THE
## COMMODITIES EXCHANGE ACT 7 U.S.C. § 1 Et. Seq. 17 C.F.R. §33.9(d)

510. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

511. Defendants undertook the activities alleged herein individually and in concert, and as one another's principal or agents.

512. Each defendant and/or their principals or agents had the economic power and/or legal authority and/or was otherwise able and had the opportunity and motive to fix and/or set prices for NYMEX Platinum and/or Palladium during the relevant time period. Each defendant or his principal or agent specifically intended their activities alleged herein to move or support the prices of NYMEX Platinum contracts to or at artificial levels during the relevant time period.

513. Each defendant or his principal or agent had the ability to and did in fact dominate the market in NYMEX Platinum and/or Palladium in 2008 and during the relevant time period.

514. Each defendant, his principal or agent caused the prices of NYMEX Platinum to be artificially inflated and/or deflated during the relevant time period

515. Each defendant or his principal or agent caused the prices to drop sharply from June and/or July 2008 through December 2008 by flooding the market with platinum and palladium from their own inventories and to sell to each other on a pro rata basis agreed to during the fixing auctions and outside the legitimate forces of supply and demand. Thus, each defendant by selling large quantities of physical platinum at the "auctions" on an agreed to pro

103

rata share effectively forced down the prices in the NYMEX 2008 Platinum contracts.

516.  Once the members of the public observed these falling prices in August, 2008, they too sold out further pushing prices down, since members of the public follow trend lines set by the market, in this case the manipulated market.

517.  During the relevant period, the auctioneer defendants and UBS AG aided and abetted the manipulation of the Platinum NYMEX futures contract prices for the 2008 contracts in violation of Sections 6©, 6(d), and 22(a) of the Commodities Exchange Act, 7 USC §§ 9(1)(a), 13b, 13(a)(1) & (2), and 13(c)(a) and 25(a), by contacting their New York trade desks including but not limited to the FCM defendants to advise them of their market positions ahead of the public.

518.  Plaintiff is entitled to damages for the violations of the CEA alleged herein which proximately caused her to sustain actual damages. 7 USC § 25(a)

519.  Plaintiff is also entitled to a presumption of damages since she purchased her contracts at artificially inflated prices and/or sold her contracts at artificially deflated prices based on the Fraud on the Market presumption of reliance.

### Claim II

**DEFENDANTS MADE FALSE, MISLEADING OR KNOWINGLY INACCURATE, FALSE AND/OR MISLEADING REPORTS CONCERNING THE PRICES OF 2008 NYMEX Platinum IN VIOLATION OF SECTION CEA § 6© OF THE ACT, 7 U.S.C § 9(1)(a), 7 U.S.C. § 6b(a)(2)(B), and 7 U.S.C. § 6(c)(2)(B) (Against all defendants)**

520.  Plaintiff repeats and realleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

521.  Defendants made false reports of the settlement prices and closing prices of NYMEX platinum and/or palladium during the relevant time period.

104

522. Such daily settlement prices and closing prices were intentionally and/or recklessly made with extreme arbitrariness and were inaccurate, false and/or misleading as these settlement prices were based on price fixing and market manipulation in the Physical Market in London.

523. Defendants reported the settlement prices falsely to their agents and principals by way of daily and/or monthly statements caused to be mailed or emailed to their customers.

524. Defendants intentionally made false, misleading and or inaccurate reports concerning the settlement prices of NYMEX Platinum and/or Palladium during the relevant time period by knowingly causing to be published these manipulated settlement prices on its website and/or to have caused to be mailed or emailed this information to clients or to be used to mark-to-market client's positions and/or issue margin calls based on these false, misleading and/or inaccurate settlement prices.

525. Based on this violation of 7 U.S.C. § 9(1)(A) and 7 U.S.C. § 6b(a)(2)(B), 7 U.S.C. § 6(c)(2)(B) of the Commodities Exchange act, plaintiff is entitled to actual damages in excess of the Jurisdiction of this Court.

### Claim III

## VIOLATIONS OF THE ANTI-FRAUD PROVISIONS OF THE CEA 7 USC § 6, ET. SEQ. Violations of 7 U.S.C. §6(b)(2)(A),- Cheating

526. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

527. Defendants did willfully cheat by executing trades in NYMEX and/or Platinum trades during the relevant time period in an unlawful manner based on manipulative conduct in connection with the pricing of Physical Platinum and Palladium in an artificial manner to fix the

settlement prices of Platinum and/or Palladium thus rendering the closing and/or settlement prices artificial and out of line with the legitimate forces of supply and demand.

528.  The auctioneer defendants and aided and abetted pursuant to 7 USC. § 13(c)(a) and 25(a) the primary violators, the FCM defendants and UBS AG in cheating by facilitating these false settlement prices by participating in the trade executions that gave rise to this manipulative pricing.

529.  Because the price artificiality of platinum was due to these manipulations occurring during the auction process in London, England during the relevant time period, the NYMEX Prices were also artificial.

530  Therefore, prices also sharply declined due to defendants unloading of large quantities of NYMEX platinum and palladium onto the market causing downward pressure on prices as they took profits.

531.  As a result, plaintiff received a Margin Call on August 15, 2008 requiring her to liquidate her platinum positions and other NYMEX contracts in other commodities and precious metals, and she was required to sell off these contracts as well by approximately September, 2008, sustaining heavy losses in excess of the limits of jurisdiction of this Court.

## Claim IV

## VIOLATIONS OF f 7 U.S.C. § 6B(a)2(C)-WILFUL  DECEPTION AND/OR AIDING AND ABETTING

532.  Plaintiff repeats and  realleges each and every allegation in the preceding paragraphs and  incorporates by reference herein all such previous allegations.

533.  Such deception confirmed by the artificial settlement prices of NYMEX Platinum caused Plaintiff to enter the Platinum market believing that demand was strong and rising.

534. As a result of defendants' deception, platinum was caused to sustain severe losses in her NYMEX Platinum Contracts.

**Claim V**

## VIOLATIONS OF 7 U.S.C.§ 1, Et. Seq. EMPLOYMENT OF MANIPULATIVE OR DECEPTIVE DEVICE OR CONTRIVANCE IN VIOLATION OF THE COMMODITY EXCHANGE ACT, INCLUDING 17 C.F.R. RULE 180.1

535. Plaintiff incorporates by reference and alleges the preceding allegations as though fully se forth herein.

536. By their intentional misconduct each defendant and their co-conspirators violated Section 6(C)(1) and 9(a)(2) of the CEA, 7 U.S.C.§§ 9(1), 13(a)(2), and CFTC Rule 180.1, and caused prices of NYMEX Platinum Futures contracts to be artificial during the Relevant period including the year 2008.

537. In violation of CEA Sections 6(c)(1) and 9(a)(2) and CFTC Rule 180.1, defendants and co-conspirators caused to be delivered for transmission false, misleading, or inaccurate reports of the prices of Physical Platinum and Palladium which influenced the prices of the NYMEX contracts i.e. false reports concerning market information or conditions that affected or tended to affect both prices of platinum and palladium and prices of platinum and palladium futures contracts in interstate commerce. Defendants and co-conspirators did so either knowingly, intentionally or with reckless disregard of the fact that such reports were false, misleading or inaccurate.

538. Plaintiff transacted in NYMEX platinum contracts during the relevant time period at artificial and unlawful prices resulting from defendants and co-conspirators' manipulations in violation of CEA 7 U.S.C. § 1, Et. Seq. and Rule 180.1, and as a direct result thereof was injured

107

and suffered damages.

539.  Plaintiff sustained and is entitled to actual damages pursuant to. 7 U.S.C. §25(a)

### Claim VI

### VICARIOUS LIABILITY

540.  Plaintiff repeats and realleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

.    541.  Under common law, as well as 7 U.S.C.§ 2(a)(1)(A), defendants who are employers or principals are strictly liable and independently responsible for the actions of their employees or agents, and independent contractors herein.

542.  Defendants are liable for the actions of their employees and agents during the relevant time period.

543.  Defendant GSG, Inc. is liable for the acts of its agents, GSI, GSEC and GS & Co., since The Goldman Sachs Group, Inc. was also a principal of these wholly owned subsidiaries and agents upon information and belief.

544.  GSEC and GS & CO. as FCMs acted as agent for co-defendant GSI and GSG in maintaining positions on the NYMEX Exchange.

545.  GSI also acted as agent for the other Goldman Sachs defendants as well as the other auctioneer defendants, the participating member defendant as wells as the Enterprise defendants.

546.  Defendant UBS AG is vicariously liable for the conduct of its agent and wholly owned subsidiary UBS Securities LLC.

547.  Each Auctioneer defendant is vicariously liable for the acts of the LPPFC, its alter ego.

548.  BASF Corporation is vicariously liable for the conduct of BASF Metals Ltd,, BASF Catalyst Division and BASF Catalysts LLC.

549.  Each of these defendants as principals intended to grant to their agents authority to conduct the business of the Parent Companies and/or affiliate, by granting them power to execute trades and positions in this case in NYMEX Platinum and Palladium Physical Platinum and Palladium.  Each agent agreed to the grant of authority to buy and sell Platinum and Palladium futures and physical holdings and to manage a portfolio consisting of the same.

550.  Alternatively, these parent/affiliate companies retained control over their agents who could be fired at any time; and such parent or affiliate companies could have stopped the misconduct at any time during the 6 year time span.

551.  John Does #1-40 working for defendants are agents to their principals and to each one's parent company and such parent company and/or employer intended to grant authority to the John Does #1-40 to enter trades to buy and sell NYMEX Platinum and Palladium Futures Contracts over the Exchange; and to purchase physical Platinum and Palladium during the London "auctions." Each John Does #1-40 agreed to accept the authority granted to them by their parent to trade in futures contracts over the NYMEX exchange; and to purchase physical platinum and palladium in the London Auctions. Each principal maintained the ability to remove and/or find and discipline the their employees and/or agent at any time if any of those  personnel violated the NYMEX Rulebook.

552.  Alternatively these agents were given authority to execute trades on their principals's behalf and accepted such authority in placing the unlawful trades over the NYMEX and purchasing Physical Platinum and Palladium during the London Auctions.

## Claim VII

## VIOLATIONS OF THE ANTITRUST LAWS, 15 U.S.C. § 1, § 2 AS WELL AS N.Y GENERAL BUSINESS LAW § 340, Et. Seq. (THE DONNALLY ACT)(Against All Defendants).

553. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

554. The Sherman Antitrust Act's purpose is to preserve or advance our system of free, competitive enterprise, and to encourage to the fullest extent practicable, free and open competition in the market place so the public may receive better goods and services at the lowest obtainable prices.

555. Any unreasonable interference, by contract, combination, or conspiracy with the ordinary, usual and freely competitive pricing or distribution system of open and competitive markets in interstate trade and commerce constitutes an unreasonable restraint of interstate trade.

556. Plaintiff, Ms. Levy, was a direct purchaser of NYMEX Platinum contracts during the relevant time frame and in the Relevant Market. She purchased her contracts directly over the NYMEX and through her FCM.

557. Plaintiff was a direct purchaser of NYMEX Platinum contracts because she held these contracts in her own name and for her own account and was the beneficial owner of these contracts.

558. Plaintiff was a direct customer/competitor of NYMEX Platinum during the relevant time period and therefore has antitrust standing to bring a claim under the Sherman Act and Donnally Acts.

559. The relevant market consisted of the market for NYMEX Platinum contracts for

110

delivery between in 2008 and/or during the calendar year of 2008 along with the delivery of physical Platinum consisting of 50 ounces per contract that met the specification of the NYMEX contract in the United States.

560.    This market repeated itself every year during the relevant time period as contracts were written for 2009, through 2014 consisting of the NYMEX contract and 50 ounces of physical Platinum.

561.    Alternatively the relevant market consisted of the market for NYMEX Platinum contracts from  2008 through 2014 in the United States.

562.    Defendants' violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiff.

563.    NYMEX Platinum futures contract prices substantially affected interstate commerce because these contracts are publicly reported throughout the United States in interstate commerce.

564.    During the Relevant Period, defendants' violations substantially affected interstate commence because defendants bought and sold NYMEX Platinum and Palladium futures contracts and/or physical Platinum and Palladium directly in interstate commerce.

565.    Each defendant was an independent decision maker who followed their own internal manuals and procedures and were competitors for NYMEX Futures Contracts as well as physical platinum and palladium during the relevant time period.

566.    Defendants were independent decisions markers and competitors for NYMEX Platinum and Palladium as well as Physical Platinum and Palladium during the relevant time period.

567.    Defendants intentionally conspired and contracted with each other through

111

independent and/or through their agents by purposefully fixing the prices of NYMEX Platinum during the relevant time period to be artificially lower and/or higher than the normal market prices and from what was indicated by the fundamental factors of supply and demand.

568. These above-mentioned defendants acted in furtherance of the price fixing conspiracy to fix the prices of NYMEX Platinum and Spot Platinum artificially priced to inflate and/or deflate such prices to cause other competitors such as plaintiff herein to pay more to get less with respect to her NYMEX contracts in comparison to what was normal and which would have been less absent the price fixing Scheme.

569. Defendants' unlawful agreement in restraint of trade and other anti competitive conduct unreasonably restrained commerce, inflated and then deflated NYMEX Platinum and futures contract and spot prices, and caused misleading signals to be sent to market participants.

570. The above-named defendants had the ability to accomplish their price fixing Scheme by a variety of means including the slamming the fix transactions, banging the fix transactions, purchasing contracts in violation of position limits, and/or by entering into trading huddles in New York and London where market information was readily shared among competitors so that each defendant could calculate how to act in concert to set prices to their advantage and to the advantage of their trading desks.

571. As a direct result of defendants' anti-competitive conduct and agreement in restraint of trade, NYMEX and Spot Platinum prices rose dramatically and also fell without any reason linked to the legitimate forces of supply and demand, like a puppet on a string, and became artificial during the relevant time period.

572. Plaintiff was caused to pay higher than normal prices for inflated contracts and was caused to suffer severe monetary losses when the prices suddenly fell and became artificially

112

deflated due to defendants' conspiracy and conduct in flooding the market with contracts and/or physical assets.

573  Whereby plaintiff has been damaged in her property or business, and has paid supra-competitive prices.

574.  Defendants' unlawful acts alleged herein have had a substantial anti competitive effect on interstate commerce within the United States.

575.  Plaintiff suffered antitrust injury because she was damaged by defendants sudden suppression of market prices thus causing plaintiff to receive a margin call on August 15, 2008 requiring her to satisfy a margin call by paying artificially inflated prices. Because of this  price fixing Scheme, Ms. Levy suffered a sharp decline in her holdings thus sustaining actual, consequential, out-of- pocket, and exemplary damages including lost profits in excess of the jurisdiction of this Court.

576.  The alleged price-fixing Scheme constitutes a per se violation of the Sherman Act, § 1, 15 U.S.C. § 1.

577.  The alleged price fixing Scheme also violates the rule of reason.

578.     The aforesaid price fixing contracts, combinations and conspiracy was in violation of Section § 1 of the Sherman Antitrust law, and the Donnally Act N.Y. General Business Law § 340, Et. Seq.

579.  As a result of said unlawful acts, plaintiff is entitled to recover three fold the damages sustained by her, together with costs of suit, including reasonable attorneys fees, together with interest. Plaintiff  has been damaged in an amount as yet undetermined but believed to be in excess of the jurisdiction of this Court. See Strobl v. NYMEX, 768 F. 2d 22 (2d Cir. 1985); **The Availability of Antitrust Treble Damages For Commodities Market**

113

**Manipulation,** 54 FORDHAM LAW REVIEW, p. 853 (1986); 15 U.S.C. § 15.

### Claim VIII

## VIOLATIONS OF THE SHERMAN ACT, 15 U.S.C § 2, NY GBL § 340, Et. Seq. MONOPOLIZATION AGAINST DEFENDANT LPPFC.

580. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

581. Defendant LPPFC had the economic power to push the prices of NYMEX and Spot Platinum higher or lower to accomplish their price fixing Scheme because defendant LPPFC controlled enormous assets through its four members,

582. At least twice daily from 2008 through 2014, defendant LPPFC controlled 100% of the prices for spot platinum and palladium, since it with it four members set these prices exclusively themselves via private conference calls.

583. No other market participants were allowed to even bid at these auctions which by agreement set the price 100% of the time.

584. As such, during these fixing calls, LPPFC had the ability to corner the market by allowing its four members to purchase or sell large amounts of spot and NYMEX Platinum during the relevant time frame.

585 The LPPFC through its four members, had multimillion dollar and/or billion dollar in economic resources at its disposal to set and monopolize the price of Spot Platinum and Palladium at prices favorable to itself.

586. Defendant LPPFC through its agents and on its own behalf jointly and severally monopolized or attempted to monopolize and combined or conspired among themselves and among each of the other defendants named herein in this complaint as well as with other persons

114

and entities presently unknown to Plaintiff but well known to these defendants, to monopolize a part of the trade or commerce among several states of the United States or the District of Columbia, to wit: the interstate trading of Physical and NYMEX Platinum Futures Contracts for delivery in 2008 to 2014. These defendants did so by controlling the prices of NYMEX Platinum through their price manipulation strategies due to their physical purchases in London England and by exclusively running the auction process 100% of the time..

587. Defendant LPPFC possessed and/or acquired monopoly power through restrictive and collusive means, including by acquiring a dominant position in physical Platinum and/or Palladium even though defendant LPPFC had no commercial need for such physical Platinum or Palladium and then uneconomically waited to sell such dominant positions during the relevant period from January, 2008 through December, 2014.

588. Defendant LPPFC also was able to control the prices of NYMEX Platinum and Spot Platinum in the relevant markets by setting prices twice daily in the London Physical Market in part by agreeing to purchase or sell Platinum or Palladium to each of the other defendants on a pro rata basis.

589. Defendant LPPFC's price control during the Relevant Time Period reflects monopoly, power and collusion.

590. Defendant LPPFC willfully acquired and maintained this monopoly power during the relevant time period and foreclosed competitors such as plaintiff herein from effectively competing in the market place by causing sudden, large and unnatural swings in the prices of NYMEX Platinum causing plaintiff as a competitor to lose her holdings by being squeezed out of the Market.

591. Because of defendants LPPFC's conduct, plaintiff Ms. Levy was caused to suffer

115

monetary losses starting in the summer or 2008 and thereafter when defendants were price-fixing by artificially suppressing prices.

592. Such price-fixing conduct in restraint of trade caused artificially suppressed prices in the 2008 NYMEX Platinum Contract, thus causing Ms. Levy to receive a margin call and wiping out her investment in the amount of $364,000 as well as lost profits.

593. This Monopolization of the market effectively caused damage to plaintiff's business and/or property as a futures investor in NYMEX Platinum.

594. The aforesaid monopolization, combination or conspiracy was in violation of Section 2 of the Sherman Antitrust Act , the Donnally Act NY Gen Bus Law §340 and Common Law.

595. As a result of said unlawful acts, and antitrust injury, the Monopolization of the NYMEX Platinum market artificially caused a sudden decrease in prices causing plaintiff's loses; thus plaintiff is entitled to recover threefold damages sustained by her together with costs of suit, including reasonable attorneys fees, together with interest.

### Claim IX

### VIOLATIONS OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATION ACT, 18 USC §§ 1961, ET. SEQ. AND 18 USC §§ 1962(a)(b) &©.

596. Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

597. Defendants listed below are all "persons" capable of holding a legal or beneficial interest in property with the meaning of 18 U.S.C. § 1961(3). Defendants listed below have violated 18 U.S.C. § 1962© by committing multiple acts described below.

### THE ENTERPRISE

116

598.  At all relevant times, defendants BASF Metals, Ltd, ICBC Standard Bank, HSBC Bank USA NA, and GSI (referred to herein as the "RICO Defendants"), associated in fact with each other, and with others known and unknown, including RICO conspiracy defendants FCM and UBS AG, so as to constitute an "Enterprise" within the meaning of 18 U.S.C. Sections 1961(4).  At all times relevant to this Second Amended Complaint, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce. The "association in fact" Enterprise had a structure and organization and existed apart from its predicate acts.  The Enterprise had relationships among those associated with the enterprise and longevity sufficient to permit these associates to pursue the Enterprise's purpose. Each RICO Defendant is distinct and separate from the association-in-fact Enterprise of which they are a component part. The RICO Defendants associated with the Enterprise through its involvement in the underlying racketeering offenses as well as through the continuous concealment and promotion of the activities of the Enterprise.

599. The RICO Defendants, and others known and unknown, associated with each other for the common purpose of defrauding the Plaintiff and others.  In furtherance of the activities of the Enterprise, the RICO Defendants committed numerous acts, as described below, which constituted violations of wire fraud, mail fraud, and the money laundering statutes.

600.  The participants of the Enterprise, including the RICO Defendants, along with FCM  and UBS AG, are and/or were all in the business of buying and selling futures contracts sold in the United States and globally, and were engaged in and whose activities affected interstate commerce both presently and/or at the times relevant to this Second Amended Complaint within the meaning of 18 U.S.C.§§ 1961(4) and 1962©.

117

601.    The RICO Defendants accomplished their goals by defrauding and manipulating customers, by the various means described in this Second Amended Complaint and through illegal practices described in this Second Amended Complaint causing price artificiality.

602.    The RICO Defendants participated in the conduct of the affairs of the Enterprise by directing the activities of the Enterprise, including failing to stop the conduct of their employees and agents who were blatantly violating the laws.

## THE RACKETEERING VIOLATION

603. From in or about January 1, 2008 and continuing up through at least year 2014, Goldman Sachs International, HSBC Bank USA NA, the ICBC Standard Bank, and BASF Metals Ltd, the aforementioned RICO Defendants, each of whom are persons associated with, or employed by the Enterprise, did knowingly and unlawfully conduct or participate, directly or indirectly, in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and § 1961(5), all in violation of 18 U.S.C. § 1962©.

604.    Plaintiff alleges that RICO Defendants engaged in the alleged criminal activities with the intent to defraud Plaintiff of her business and property. The RICO Defendants also worked with others to defraud Plaintiff of money or property by concealing material facts from Plaintff resulting in loss of Plaintiff's property and monies.

## PATTERN OF RACKETEERING ACTIVITY

605.    Plaintiff alleges that the RICO Defendants, in collusion and in combination with their trade desks in New York, collusively agreed to fix the price of palladium and platinum twice daily on the London exchange so that RICO Defendants and others could make profits on the

118

NYMEX exchange.

606. The RICO Defendants' scheme to defraud was knowingly made and reasonably calculated with the intent to deceive and defraud persons of ordinary prudence and comprehension, including plaintiff.

607. The RICO Defendants' scheme to defraud was knowingly made with intent to induce and did induce plaintiff to invest in NYMEX Platinum Contracts based upon such misrepresentations, concealment, suppressions or omissions, to wit, the falsity of the settlement prices that were artificial due to the manipulative conduct inducing Plaintiff to purchase her contracts and forcing her to sell them at artificially reduced prices.

608. The RICO Defendants' scheme to defraud was made with the purpose of gaining hundreds of millions or tens of millions of dollars in profits from customers including Plaintiff that would not have been gained but for the RICO Defendants' conduct and omissions alleged herein in this Second Amended Complaint.

609. Plaintiff alleges that the course of conduct engaged in by the RICO Defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5). Plaintiff can show the relatedness prong because the predicate acts have the "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."   Plaintiff alleges that the continuity of the pattern of racketeering activity is closed-ended inasmuch as a series of related predicate offenses extended over at least six years (a substantial period of time). .

610. In furtherance of the manipulative trading practices to artificially inflate and deflate

119

the prices of NYMEX Platinum during the relevant time frame and at various times relevant to this Second Amended Complaint from on or about January 1, 2008 through December 1, 2014, the RICO Defendants unlawfully, willfully and knowingly devised and intended to devise a scheme and artifice to defraud. This Scheme to defraud was in order to obtain money and property by means of false and fraudulent pretenses, representations, and promises by transmitting and/or causing to be transmitted by means of wire communications in interstate commerce, writings, signs, signals, pictures and sounds for the purpose of executing such Scheme and artifice, to wit, each RICO Defendant caused the prices of Platinum and Palladium to be determined over the phone lines and then allowed orders to be placed over the phone lines and via mobile devices and/or the internet to purchase and to sell NYMEX or Spot Platinum and/or Palladium; each RICO Defendant caused or actually sent daily and monthly confirmation statements to customers, year-end tax statements, moneys due to customer redemption requests, and each RICO Defendant caused false and misleading prices to be published over the internet to entice unwitting participants to enter the NYMEX Platinum Future Market during the relevant time period.

## **RACKETEERING ACTIVITY**

611. Within the Southern District of New York, and elsewhere, the RICO Defendants committed the following racketeering activity:

### Racketeering Acts Involving Wire Fraud

612. From on or about January 1, 2008 through December 1, 2014, the RICO Defendants committed multiple racketeering acts of wire fraud, resulting from the RICO Defendants having devised, and intending to devise a scheme and artifice to defraud, for obtaining money and property by means of false and fraudulent pretenses, representations, and

promises, to wit, causing to be generated and sent by email daily price levels of physical platinum and palladium as well as monthly statements, year end summaries and tax statements as well as redemptions to their investors throughout the United States and globally who held accounts with such Defendants to apprise them of their profits earned by artificially moving the prices of NYMEX Platinum and/or Palladium.

613.    These RICO Defendants participated in creating those settlement prices by establishing the spot price in London during the twice daily fixes and generated or caused to be generated electronic evidence of those fixing prices to be disseminated throughout the globe, including within the United States. The RICO Defendants also caused to be sent daily and monthly statements, tax statements and redemptions sent by email to customers throughout the United States and outside the United States.

614.  On a daily basis and/or on at least on 1761 occasions during the relevant time period, some or all of the RICO Defendants caused to be reported artificial prices of Spot and NYMEX Platinum over the wires to others who published these prices on a daily basis on their website so that their customers could be apprised on a minute by minute updates as to the market prices that were in fact artificial.

615. On a daily basis and/or on at least 1761 occasions some or all of the RICO Defendants used the wires to publish these artificially inflated prices as part of the conduct of the Enterprise alleged herein.

616. On a daily basis and/or on at least 1761 occasions during the relevant time period some or all of the RICO Defendants used the internet to report the closing and settlement prices of NYMEX Platinum to the others who also published these artificial prices on their website on a daily basis so that the members of the public such as Ms. Levy could observe these artificial

prices and make her investment decisions based on these false and misleading and artificial prices.

617. When Ms. Levy observed these published prices on a daily basis she made investment decisions based on these prices and the trend lines that these prices were producing. She therefore purchased NYMEX Platinum Contracts in the winter and spring of 2008, based on inflated prices and ended-up getting stopped out on a margin call on August 15, 2008 where the entire market bottomed out. Because the data used to make her investment decisions was wired to United States companies such as the CME group and others who posted these prices on their public website, the RICO Defendants committed wire fraud by causing false prices to be transmitted to the United States for the members of the public to observe. Thereby, the wire fraud in transmitting false and artificial prices to the members of the investing public proximately and directly caused injury to Plaintiff Ms. Levy who was at all times residing in New York.

618. Plaintiff believes that based on the functioning of the scheme and use of conference calls to fix prices that there is a plausible basis to believe, pending confirmation by further discovery, that the scheme was managed both in London, and elsewhere, including the United States, where the trading desks of the RICO Defendants were located.

619. Because the New York trade desks were also making investment decisions on the price fixing activities by the RICO Defendants, the New York trade desks were also moving the market based on the scheme that they were privity to, and also created artificial prices in the market by both pushing prices higher buying cheaply after the fix as well as by covering the short positions that they had taken just prior to the fix. Thus, when the New York trade desks decided on August 15, 2008 to start to liquidate their long positions, and/or when they continued

122

to go short, knowing the market was going to have a major sell off ahead of the public, the RICO Defendants crashed the market on August 15, 2008, and directly and proximately caused Ms. Levy's losses.

## Racketeering Acts Involving Mail Fraud

620.   From on or about January 1, 2008 through December 1, 2014, the RICO Defendants committed multiple racketeering acts of mail fraud, on at least 1761 occasions resulting from the RICO Defendants having devised, and intending to devise a scheme and artifice to defraud, for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, each RICO Defendant, to further their price fixing scheme to artificially move the prices of NYMEX Platinum and/or Palladium,  intentionally used the Postal Service to mail or caused to be mailed: (1) customer daily and monthly statements (2) year-end tax statements to their customers, and (3) redemption checks to customers who requested such redemptions.  These RICO Defendants also caused to be mailed moneys from new customers who wanted to open accounts to invest in NYMEX Platinum and/or Palladium or Physical Platinum and/or Palladium based on the phony data.

621.   Each time the RICO Defendants purchased more positions out of the proceeds of their unlawful activity, *e.g.* price fixing in the spot market, a confirmation statement was generated and mailed by each RICO Defendant, and/or cash was transferred in or out of their margin accounts to reflect these monetary transactions, also generating a mailed statement upon information and belief.

622.   Each RICO Defendant did cause, and did agree to cause Plaintiff herein to sustain severe financial losses on August 15, 2008 when their predatory trading based on knowing in which direction the market was moving, in this case downward, and the RICO Defendants

123

desiring to move the market even lower so as to liquidate their positions, caused Ms. Levy to sustain a severe margin call on August 15, 2008 which she was not expecting and where no fundamental events had occurred to create this complete bottoming out of the market other than manipulative conduct.

623. Thus, Plaintiff was injured when the RICO Defendants flooded the market with large positions of NYMEX Platinum and/or physical holdings during the relevant time frame and on August 15, 2008, thus artificially suppressing prices.

624. As such Plaintiff received a margin call on August 15, 2008 and she eventually lost her entire Platinum investment as well as non-Platinum investments that can be linked directly to the price-fixing and RICO scheme.

Racketeering Acts Involving Money Laundering Section 1956 Violations

625. From on or about January 1, 2008 through 2014, the RICO Defendants committed multiple acts of money laundering within the meaning of 18 U.S.C. Sections 1956 in that:

(A) the RICO Defendants, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, conducted and attempted to conduct such financial transactions which in fact involved proceeds of a specified unlawful activity, namely mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), knowing that the transactions were designed in whole or in part to promote the carrying on of the foregoing specified unlawful activity, in violation of 18 U.S.C. §1956(a)(1)(A)(I).

626. Each RICO Defendant, with specific intent used the unlawful profits and proceeds of their manipulative trades to promote further investments in the financial markets including the NYMEX Platinum and/or Palladium markets to generate more profits in violation of 18 USC § 1956.

627. Each of the RICO Defendants used the profits of their manipulative trades on other

occasions during the relevant time period.

628. Each of the RICO Defendants knowingly and with criminal intent aided and abetted each other in using the proceeds of their manipulative trades to initiate more positions and profits in NYMEX Platinum during the relevant time period by helping each other establish the positions on the NYMEX exchange.

## Section 1957 Violations

629 From on or about January 1, 2008 through December 1, 2014, the RICO Defendants committed multiple acts of money laundering within the meaning of 18 U.S.C. Sections 1957 Because the RICO Defendants participated in an offense that took place in the United States, and knowingly engaged or attempted to engage in monetary transactions in criminally derived property of a value greater than $10,000, that was derived from specified unlawful activity, namely wire fraud (18 U.S.C. § 1343) in violation of 18 U.S.C. §1957.

630. Each RICO Defendant individually or in combination intentionally transferred or caused to be transferred profits linked to their trading in NYMEX Platinum and/or Palladium to their own personal accounts and/or corporate accounts and or partnership accounts and/or withdrew amounts in excess of $10,000.00 to themselves as profits, fees, salaries and/or commissions derived from the manipulative trades which resulted in profits. Some or all of these transfers of profits, fees and commissions from the accounts held in the name of each RICO Defendant and/or on their behalf were made within the United States and in violation of 18 U.S.C § 1957.

631. Each RICO Defendant engaged in such monetary transactions on more than two

125

occasions during the relevant time.

## Claim X

## RICO § 1962(d) Conspiracy

632. Plaintiff repeats and re-alleges each and every allegation in the preceding

paragraphs and incorporates by reference herein all such previous allegations.

633. Plaintiff alleges that commencing in January 1, 2008, and during and continuing at

all times through at least year 2014, the RICO Defendants, along with UBS AG and the FCM

defendants, conspired to violate section 1962©, i.e., each Defendant agreed that a conspirator

would conduct or participate in the affairs of the Enterprise through a pattern of racketeering,

including acts indictable under 18 U.S.C. §§ 1341; 1343,  1956; and 1957, as more fully

described above. Plaintiff alleges that the conspiratorial objective of that mutual agreement was

intended to obtain Plaintiff's interests in business and/or property, and that such conspiratorial

conduct violates RICO § 1962(d).

## RICO RELIEF

634. By reason of RICO Defendants' violation of 18 USCA § 1962© and (d), Plaintiff is

entitled pursuant to 18 U.S.C.A § 1964©, to threefold the damages sustained in connection

herewith, and reasonable attorneys' fees, and other relief deemed appropriate by this Court.

## Claim XI

126

**AIDING AND ABETTING -THE FEDERAL LAW CLAIMS 7 U.S.C. § 25(a) and 13(c)(a)**

635.    Plaintiff repeats and    realleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations

636.  To the extent that certain defendants are not held primarily liable for breaches of substantive law, each defendant-- including John Does #1-40 herein willfully participated in the Scheme to Price Fix, defraud and manipulate the market for NYMEX Platinum and Physical Platinum during the relevant time period and violated all laws enumerated herein with respect to the NYMEX Platinum and Physical market alleged herein, and were aware of their respective roles in such fraud and manipulative conduct, knowingly rendered substantial assistance in perpetrating such fraud and manipulation and racketeering conduct.  Without each defendants' assistance such fraud, manipulation and other enumerated conducted listed in this Complaint could not have succeeded.

637. Each defendants afforded this extraordinary assistance to achieve the manipulative Scheme and based on each one's assistance defendants were able to accomplish their manipulate Scheme to artificially move the prices of NYMEX Platinum for delivery in the January, April, July and October 2008 Contracts and thereafter through 2014.

638. Each Defendant also knew of the Scheme and intentionally assisted  in carrying out the Scheme during the relevant time period by placing phone calls and actually place these unlawful trades on behalf of and at the instructions of the other defendants.

639.  Defendants with intent assisted each other by communicating over the phones and by email to make sure each understood what to do and how to place their unlawful orders.

127

640.    Some or all of these Defendant were an integral part of the Scheme and provided substantial assistance in furtherance of the Scheme.

**Claim XII**

**FRAUDULENT CONCEALMENT and EQUITABLE TOLLING**.

641.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

642.    Because all defendants willfully hid their unlawful conduct, Plaintiff's Statute of limitations is tolled from the time of learning of the Manipulative Conduct in or about 2014.

643.    By its very nature, the unlawful manipulative conduct, as alleged herein, that Defendants engaged in was self-concealing.  Defendants, *inter alia*, engaged in secret and surreptitious communications and trading activity oversees in order to manipulate and make artificial prices for NYMEX Platinum and Palladium futures contracts on the NYMEX.

644.    Defendants took affirmative steps to prevent the discovery of his manipulative conduct by concealing the manipulative conduct from regulators and the public by conducting these affairs in London, England

645.    In addition, because the very nature of commodities futures trading is self-concealing, there was no way for plaintiff to discover the conduct prior to it becoming public knowledge in or about 2014.

646.    Plaintiff's continuing ignorance of the claims was not the lack of plaintiff's due diligence.  Since learning of the Class Action Complaint, Ms. Levy has consulted with

128

attorneys and experts and has conducted her own independent investigation into this matter and believes the claims to be meritorious.

## STATE LAW AND COMMON LAW PENDANT CLAIMS

### Claim XIII

### UNJUST ENRICHMENT

647.   Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs and incorporates by reference herein all such previous allegations.

648.   To the detriment of plaintiff, each defendant has been unjustly enriched as a result of the unlawful conduct and/or wrongful conduct to manipulate the prices of NYMEX Platinum and/or Palladium during the relevant time period.

649.   Each aforesaid defendant has unjustly benefited through the purchase and sale of NYMEX Platinum and/or Palladium contracts at inflated prices, which created an anti-competitive monopoly price for plaintiff either by way of profits or by way of fees and dues.

650.   Each defendant has been unjustly enriched at the expense of plaintiff who relied on the actual prices generated by such defendants and/or published on their website.  Although Plaintiff was not in privity with all defendants, her participation was connected to all defendants because Plaintiff **had** to lose in order for defendants to profit in this zero-sum game.   Since plaintiff was a direct purchaser and seller of NYMEX Platinum during the relevant time period and thereafter, Plaintiff was a necessary counter party necessary for market liquidity and to allow defendants to successfully trade out of their unlawful positions.

129

651. But for Plaintiff and other counter parties similarly situated, there would have been no market liquidity for defendants to profit from.

652. That the marketplace required counter parties such as plaintiff to provide liquidity to this extremely illiquid market was well known to all defendants and they knowingly lured in members of the public by publishing false settlement prices to get other investors into the market so defendants could easily take advantage of them and profit from this Scheme.

653. Both defendants and plaintiffs were necessary direct competitors in the NYMEX Platinum market and were necessary to trade with in connection with these Platinum and/or Palladium contracts.

654. As such, it would be unjust for defendants to retain the benefits attained by their actions including profits and Exchange fees and other income. Accordingly, Plaintiff seeks full restitution of defendants' enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein and seeks the imposition of a constructive trust over the ill-gotten gains.

655. Equity and good conscience require full restitution of the monies received by defendants pursuant to the price fixing Scheme including in excess of $54 million dollars, and Exchange profit and fees, Welsh's Commissions and the Floor Personnel's commissions. This amount includes not only money itself but also proceeds of that money.

## Claim XIV

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE

656. Plaintiff repeats and re-alleges each and every allegation in the preceding

130

paragraphs and incorporates by reference herein all such previous allegations.

657.   A business relationship existed between Plaintiff and The New York Mercantile Exchange whereby in consideration for fees paid by Ms. Levy she was able through her broker to purchase and sell NYMEX Platinum Futures Contracts over the NYMEX Exchange for Ms. Levy's account.

658.   Each defendant was well-aware that these business relationships existed between members of the investing public and the NYMEX Exchange, such as Ms. Levy, and each defendant knew these account holders with the NYMEX either individually or through a broker constituted a direct competitor to each defendant with respect to the purchase and sale of NYMEX Platinum and/or Palladium Futures Contracts.

659.   Each defendant knew that Ms. Levy and other NYMEX customers had business relationships with the NYMEX whereby they could profit by putting on Futures positions.

660.   These above-named defendants intentionally interfered with the business relationship between the NYMEX and Plaintiff, and acted with malicious intent and/or employed illegal means in so doing.

661.   By manipulating the NYMEX futures market, each defendant guaranteed that plaintiff and other NYMEX contract holder's contracts would either expire worthless or get stopped out on a margin call due to their ability to control the market and move the market at their will and not based on fundamental analysis.

662.   Because each defendant used unfair tactics to set prices for NYMEX contracts,

131

each interfered with her contracts causing her harm.

663.  Because the NYMEX exchange is the exclusive clearing house in which to trade Futures Contracts in Platinum, defendants tortious interference was exclusively aimed at the NYMEX Exchange.

664. By virtue of the foregoing, Plaintiff has been damaged in an amount to be established at trial, but believed to be substantially in excess of the jurisdictional limits of this court.

## CLAIM XV

## PUNITIVE DAMAGES

665.   By reason of the foregoing willful and unconscionable acts causing severe monetary losses and emotional distress and as a matter of public policy to punish defendants for such conduct and based on their extreme lack of contrition since at least one of the defendants knows and has known of plaintiff's claim for a long period of time and nobody has come forward to compensate her for these loses despite the overwhelming evidence in favor of compensation under the totality of the circumstances, punitive damages are sought with respect to the Tortious Interference with Prospective Business Advantage claim in excess of the jurisdictional limits of this Honorable Court to be determined at time of trial by a jury.

## JURY DEMAND

666.  Plaintiff requests a jury trial to resolve the outstanding issues in this case.

## DAMAGES AND OTHER RELIEF

132

667.  Based on the foregoing, plaintiff demands judgement on her Second Amended Complaint because she was caused to lose her entire Platinum investment in the amount of $280,000.00 as well as other non-Platinum investments in the sum of $84,000.00 as well as future lost profits, consequential damages, attorneys fees, treble damages, punitive damages, interests and costs to be determined at trial on these NYMEX Platinum Futures  investments that plaintiff otherwise would have earned; and as a result of the foregoing plaintiff has suffered monetary damages in excess of the jurisdictional limits of this the Court and in an amount to be determined and is entitled to recovery of such damages as follows:

668.  On all causes of action- $364,000.00 plus pre and post judgment interest as well as lost profits to be determined at time of trial and in excess of the jurisdictional limits of this Court.

669.  On the Seventh, Eight, Ninth, Tenth, Eleventh, Fourteenth, and Fifteenth causes of action -treble damages to be determined at time of trial, plus,  attorneys fees, costs, disbursements and statutory interest.

670.  On the Twelfth cause of action, plaintiff requests the  imposition of a constructive trust as to all defendants over the proceeds linked to the unlawful conduct and out of those proceeds, plaintiff should recover an amount within the jurisdictional limits of this Court and no less than her actual damages.

671.  On all counts including costs, interest, attorneys fees and disbursements to be determined at the time of trial; and for all further and other relief that this Court deems just and proper.

133

April 3, 2016

Respectfully Submitted,
/s/ Susan J. Levy
Susan Levy, Esq.
Plaintiff Pro Se
40 East 10th Street, Suite 2K
New York, New York 10003
212-962-1782 (tel)
212-962-3711 (fax)
Susanjlevy@aol.com