EXHIBIT 3

## EXHIBIT 1

## FACTUAL BASIS FOR BREACH

This Factual Basis for Breach of the Non-Prosecution Agreement ("NPA") dated December 18, 2012, entered into between the United States Department of Justice, Criminal Division ("Criminal Division"), Fraud Section ("Fraud Section"), and UBS AG ("UBS"), is incorporated by reference as part of the plea agreement, dated May 20, 2015, between the Criminal Division and UBS.

1.        On December 18, 2012, in exchange for UBS agreeing, among other things, to "commit no United States crime whatsoever" for a period of two years from that date, and representing to the Criminal Division that, among other things, the bank: (a) "ha[d] made important and positive changes in its compliance, training, and overall approach to ensuring its adherence to the law;" (b) had "sought to effectively remediate any problems it discovered," and (c) had "strengthened its compliance and internal controls standards and procedures," the Criminal Division agreed not to prosecute UBS for any crimes related to UBS's submissions of benchmark interest rates, including the London InterBank Offered Rate ("LIBOR"), the Euro InterBank Offered Rate ("EURIBOR"), and the Tokyo InterBank Offered Rate ("TIBOR") (collectively "IBOR"). UBS also agreed, among other things, to pay a penalty of $500 million.

2.        The Criminal Division, in an exercise of the discretion conferred upon it by the agreed upon terms of the NPA, has determined that UBS violated the terms of the NPA and declared a breach of the NPA. Relevant considerations in arriving at that determination and making that declaration include the following:

a.   Certain employees of UBS engaged in conduct after December 18, 2012, that

constitutes a breach of the NPA, namely, (i) fraudulent and deceptive currency trading and sales practices in conducting certain foreign exchange ("FX") market transactions with customers via telephone, email, and/or electronic chat, to the detriment of UBS's customers, and (ii) collusion with other participants in certain FX markets.

b.  UBS has on multiple occasions received civil and regulatory settlements, as well as three criminal resolutions, to wit:

i.  In February 2009, UBS entered into a Deferred Prosecution Agreement with the Department's Tax Division for conspiring to defraud the United States of tax revenue through secret Swiss bank accounts for United States taxpayers (which conduct occurred prior to 2008), and agreed to pay $780 million;

ii.  In May 2011, UBS entered into a Non-Prosecution Agreement with the Department's Antitrust Division to resolve allegations of bid-rigging in the municipal bond derivatives market (which conduct occurred prior to 2007), and agreed to pay $160 million; and

iii.  In December 2012, UBS and the Criminal Division, Fraud Section entered into the NPA in connection with its manipulation of IBOR benchmarks (which conduct occurred prior to 2011).

c.  UBS's instant conduct in connection with FX markets constitutes its fourth matter involving the Department over the course of approximately six years.  UBS's compliance program and its remedial efforts following the discovery and investigation of its IBOR conduct did not detect collusive and deceptive sales-related conduct in FX markets until an article was published pointing to potential misconduct in the FX markets.

d.  UBS was required under the terms of the NPA to disclose potential criminal conduct, and did so.

2

### *UBS'S FX BUSINESS*

3.     FX markets operate on a global scale. Participants include a wide variety of entities, including banks, hedge funds, investment management firms, corporations, as well as individuals. Participants buy and sell currencies on a 24-hour basis, and do so primarily for purposes of conducting international financial transactions and speculating on fluctuating currency prices for profit.

4.     FX markets are over-the-counter markets and, as such, are decentralized and require financial institutions to act as dealers willing to buy or sell a currency. Dealers, also known throughout FX markets as "market makers," therefore play a critical role in ensuring the continued functioning of the markets.

5.     UBS is a financial services corporation with its headquarters in Zurich, Switzerland. UBS conducts its FX business through its Investment Bank, which is a division of the corporation. At relevant times herein, UBS was an FX dealer/market maker, with FX trading desks in the following main locations: Stamford, Connecticut; Singapore; and Zurich, Switzerland, and FX Distribution (sales) desks in Stamford; Zurich; Singapore, and London, United Kingdom.

6.     UBS employed FX traders who were responsible for engaging in currency trading with UBS's FX customers, who include major corporations, hedge funds, asset managers, and investors, among others—and for conducting proprietary trading on behalf of the bank. UBS also employed FX salespeople whose primary responsibility was to take FX orders from customers and communicate those orders to traders, as well as to facilitate FX transactions, such as spot trades, described more fully in Paragraph 9 below, between UBS customers and FX traders.

7.      FX trading and valuation is rooted in the use of currency pairs, with the value or

exchange rate of a particular currency (also known as the "base currency") quoted as the "base"

or first currency relative to the "counter" or second currency.  For example, a quote for the Euro

versus the U.S. dollar ("EUR/USD currency pair") of 1.5000 sets forth the value of the Euro (the

base currency) in terms of U.S. dollars (the counter currency); in this example, one Euro is worth

1.50 U.S. dollars.  Currencies generally are quoted out to ten-thousandths, with the final digit (or

fourth decimal place) known as a "percentage in point," or, colloquially, a "pip."  The EUR/USD

currency pair is the most traded currency pair by volume, with a trading volume that can exceed

$500 billion per day.

8.      There are several types of products traded in FX markets, to include spot trades,

forwards, options and swaps.  In a spot trade, two parties exchange an agreed-upon volume of

one currency for another currency at an agreed-upon exchange rate.  For example, to enter into a

trade in FX spot markets, one party makes a bid to buy, or an offer (also referred to as an "ask")

to sell, fifty million (50,000,000) Euro in exchange for U.S. dollars at a specified rate, which bid

or offer the counter-party can accept or reject.  An FX customer seeking to trade currency at the

prevailing FX spot market price can transact either by obtaining a quote through an electronic

trading platform or by contacting the dealer's salesperson to obtain a quote.  A dealer like UBS

may provide price quotes to potential customers in the form of a "bid/ask spread," which

represents the difference between the price at which the dealer is willing to buy the currency

from the customer (the "bid") and the price at which the dealer is willing to sell the currency to

the customer (the "ask").  Alternatively, a dealer may provide either just the bid or just the ask to

a potential customer seeking to either sell or buy currency.  Spot transactions are conducted in

cash and typically are settled within two business days.

4

9. There also are several types of FX orders that a customer can place, including limit, fix, take-profit, and stop-loss orders. A limit order is an order to buy or sell a currency pair when certain conditions are fulfilled. A fix order is an order to trade at a subsequently determined "fix rate." When a dealer accepts a fix order from a customer, the dealer agrees to fill the order at a rate to be determined at a subsequent fix time based on trading in interdealer markets. Two such "fixes" used to determine a fix rate are the European Central Bank ("ECB") fix, which occurs each day at 2:15 PM (CET) and the World Markets/Reuters ("WMR") fix, which occurs each day at 4:00 PM (GMT).

### *UBS's CONDUCT*

10. Certain employees of UBS engaged in the following deceptive conduct.

#### *Misrepresentations about Sales Markups*

11. Prior to, and continuing after the NPA, certain UBS FX salespeople misrepresented to UBS customers that no sales markup was being added by UBS in connection with the execution of certain FX transactions when, in fact, UBS added undisclosed markups to these customers' transactions. One illustrative example follows:[1]

    a. On May 3, 2013, a UBS FX salesperson based in London, in an electronic chat with a customer, stated, "ALL of your business today we have filled completely flat and on 1 clips of gbp we took pip loss – we have not made any money out of each individual clip whatsoever …. I can assure you no hard markup is taken on yr business."

#### *Arrangements to Add Sales Markups to "Open Line" Customers*

12. On occasion, UBS customers requested that a UBS FX salesperson provide them with an "open line" while the salesperson consulted with a UBS FX trading desk to obtain a

---

[1] All typographical and grammatical errors in the excerpted communications appear in the originals. Within quotations, any use of ellipses and emphasis is that of the original author.

price. Certain customers requesting an "open line" had an expectation that the price they heard was indeed the "trader price" and therefore did not include any sales markup. Certain customers on such an "open line" sought to be privy to discussions regarding price between the UBS salesperson and the trader working on the desk relevant to the customers' specified transaction currency. Such customers sought an "open line," in part, to ensure that they could hear the price quoted directly by the trader—the "trader price"—rather than receiving a price quote that included a sales markup.

13.    Prior to, and continuing after the NPA, certain UBS FX salespeople and traders used hand signals during certain customers' "open line" calls in order to conceal from customers that they were being marked up. For example, unbeknownst to the customer, a salesperson would hold up two fingers to signal that the trader should add mark up of "two pips" to the quoted price. Further, with advance knowledge or expectation of an imminent "open line" request by a particular customer, certain UBS FX salespeople and traders entered into prior arrangements to add undisclosed markup to the price quoted by traders over the open line. These practices occurred on UBS's FX sales and trading desks in Zurich, London (sales only), and Stamford. One illustrative example follows:

a.    On July 19, 2013, a UBS FX salesperson based in Stamford, in an electronic chat with a UBS FX trader in Stamford, stated: "so the game plan is: i will ask for the price over the hoot,[2] and i will leave the phone line open for the customer to hear the hoot. so we (you and i and [a UBS colleague]) need to coordinate on pricing." The salesperson went on to say, "so because you and i will have an open hoot, the price you give me will have the spread included[.]"

---

[2] The "hoot" refers to an internal communication system that enabled salespeople and traders to communicate with one another over a speaker. A conversation over this system could be heard by a person on the other end of a phone line if there was a phone placed close enough to the "hoot."

**EXHIBIT 2**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

A copy of the executed Certificate of Corporate Resolutions is annexed hereto as "Exhibit 2."